```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------X
     BRIAN HARRIS,
 3
                     Plaintiff,
 4
                  -against-        No. 20-CV-10864(LGS)
 5
     CITY OF NEW YORK; Lieutenant ANGEL
 6   LEON; Detective KRISTEN SWINKUNAS (Shield #2190);
     Police Officer ANTONELLA JIMENEZ (Shield #5209);
 7   Police Officer MAXWELL BALTZER (Shield No. 15451);
     and Lieutenant JOHN LANE,
 8
                     Defendants.
 9   ------------------------------X

10

11

12        DEPOSITION OF POLICE OFFICER MAXWELL BALTZER

13                    New York, New York

14                    November 3, 2021

15                      10:06 a.m.

16

17

18

19

20

21

22              ELLEN SANDLES REPORTING
23             145 East 16th Street, #9H
                New York, New York 10003
24                   212-677-8739

25
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2   Mr. Arko from your body-worn camera on the day of
 3   the incident?
 4         A.    No.
 5         Q.    Have you spoken with any other members
 6   of the NYPD in preparation for today's testimony?
 7         A.    No.
 8         Q.    So other than that meeting with
 9   Mr. Arko, the TRI Report, the memo book and the
10   two body-worn camera videos, are there any other
11   materials that you reviewed or people who you
12   spoke with to prepare for your testimony today?
13         A.    I don't believe so, no.
14         Q.    How old are you?
15         A.    I am 30.
16         Q.    How tall are you?
17         A.    Five-foot eight.
18         Q.    Approximately how much do you weigh?
19         A.    Approximately 170 pounds.
20         Q.    Do you work out regularly?
21         A.    Define "regularly."
22         Q.    Do you work out at a frequency of once
23   a week or more?
24         A.    Yes.
25         Q.    Do you lift weights?
```

```
 1             POLICE OFFICER MAXWELL BALTZER
 2      A.    Yes.
 3      Q.    Do you bench press?
 4      A.    Have I bench pressed?
 5      Q.    As part of your typical workout, do you
 6  bench press?
 7      A.    Sometimes.
 8      Q.    What's your -- the maximum weight you
 9  can do in a rep on the bench press, if you know?
10            MR. ARKO:  Objection.
11      A.    That's a good question.  I haven't done
12  it in a while.
13      Q.    The last time you worked out, what did
14  you do?
15            MR. ARKO:  Objection, you can answer.
16      A.    I ran.
17      Q.    The last time you lifted weights, what
18  did you do?
19            MR. ARKO:  Objection, you can answer.
20      A.    I did bicep curls.
21      Q.    What weight did you use for those
22  curls?
23      A.    20-pound dumb bells.
24      Q.    What is the highest level of education
25  that you've completed?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2       A.     I have my bachelor's.
 3       Q.     From where?
 4       A.     Coker College.
 5       Q.     Are you right-handed or left-handed?
 6       A.     Right-handed.
 7       Q.     When were you appointed to the NYPD?
 8       A.     In 2014.
 9       Q.     What's your current rank?
10       A.     Police officer.
11       Q.     Have you ever taken the sergeant's
12  exam?
13       A.     No.
14       Q.     Have you ever applied for promotion
15  within the NYPD?
16       A.     No.
17       Q.     What's your current command?
18       A.     Emergency Service Unit, Truck Two.
19       Q.     Is that Floyd Bennet Field?
20       A.     No, no, that's in Harlem.
21       Q.     In Harlem, okay.  What was your command
22  prior to ESU?
23       A.     It was training at Floyd Bennet Field.
24       Q.     Before ESU training what was your
25  command?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2        A.    I was in the 26th Precinct.
 3        Q.    When did you move from the 26th
 4    Precinct to ESU training?
 5        A.    September 21, 2020.
 6        Q.    Was ESU a command that you applied for
 7    or sought out in some way?
 8        A.    I applied for it.
 9        Q.    Why did you apply for it?
10        A.    Because I wanted to be in the unit.
11        Q.    Why did you want to be in the unit?
12        A.    Because I wanted to help people.
13        Q.    What is it specifically about what ESU
14    does that made you think it was a good fit for
15    your desire to help people?
16        A.    We do a lot of rescue work.
17        Q.    When were you first assigned to the
18    26th Precinct?
19        A.    December of 2014 approximately.
20        Q.    Was that your first command after the
21    academy?
22        A.    Yes.
23        Q.    Today you are at the offices of the New
24    York City Law Department, yes?
25        A.    Yes.
```

```
1              POLICE OFFICER MAXWELL BALTZER
2         Q.    Do you have any documents or other
3    paperwork in front of you at the moment?
4         A.    No.
5              MR. LIEB:  I am going to paste into the
6    chat and then share on the screen what I have
7    marked as Plaintiff's Exhibit 1.
8              (Plaintiff's Exhibit No. 1 was
9         marked for identification.)
10        Q.    Officer Baltzer, can you see a document
11   with the yellow label in the upper right hand
12   corner that says Plaintiff's Exhibit 1 on your
13   screen?
14        A.    Yes.
15        Q.    This document has your name and tax ID
16   number on the top, correct?
17        A.    Correct.
18        Q.    I should have said this is a one-page
19   document Bates numbered DEF089 produced by
20   defendants in this case.
21              Do you recognize this document to be a
22   copy of your electronic activity log, also known
23   as a memo book for your tour of duty on the night
24   of September 1st and the morning of September 2,
25   2020?
```

```
1              POLICE OFFICER MAXWELL BALTZER
2         A.    Yes.
3         Q.    Directing your attention to the middle
4    portion of the document where the entries for
5    September 2nd begin, there is an entry for
6    01:30 hours.
7              Do you see that?
8         A.    Yes.
9         Q.    It says "GLA operation with Lieutenant
10   Lane."
11             Do you see that?
12        A.    Yes.
13        Q.    What does "GLA operation with
14   Lieutenant Lane" mean?
15        A.    GLA stands for "grand larceny auto," so
16   a GLA operation would be that myself and
17   Lieutenant Lane were doing the operation in
18   searching for grand larceny autos, which are
19   possible stolen cars.
20        Q.    When you say you and Lieutenant Lane
21   were doing that operation, were you in a patrol
22   car together?
23        A.    Yes.
24        Q.    At the time of this incident on the
25   morning of September 2nd of 2020, were you
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2    assigned to a particular unit or division or
 3    sector within the 26th Precinct?
 4         A.    I was designated as Lieutenant Lane's
 5    operator.
 6         Q.    When you say "operator" you mean
 7    operator of the patrol car, i.e., driver, right?
 8         A.    Correct.
 9         Q.    Had you been assigned to perform that
10    role for Lieutenant Lane on previous occasions?
11         A.    Before this incident?
12         Q.    Yes.
13         A.    I believe so.
14         Q.    Was Lieutenant Lane the special
15    operations lieutenant at the time, to your
16    knowledge?
17         A.    At the time, yes.
18         Q.    What is the special operations
19    lieutenant?
20         A.    He is the lieutenant in charge of a
21    specific number of special divisions within the
22    26th Precinct.
23         Q.    What divisions are those?
24         A.    For instance, it would be NCOs or YCOs
25    or different units within the 26th.
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2       Q.    For the benefit of the record, can you
 3   tell us the full name, as opposed to the acronym
 4   if you can?
 5       A.    Neighborhood coordination officer and
 6   youth coordination officer.
 7       Q.    Any other divisions within the 26th
 8   Precinct that the special operations lieutenant
 9   was in charge of to your knowledge?
10       A.    To my knowledge, I'm not sure.
11       Q.    Were you an NCO or a YCO at the time?
12       A.    No.
13       Q.    Understanding on the particular day in
14   question you were assigned to be Lieutenant Lane's
15   operator; more generally were you within a
16   particular division, unit or sector of the 26th
17   Precinct around September of 2020?
18       A.    I was designated as Lieutenant Lane's
19   operator.
20       Q.    Was serving as Lieutenant Lane's
21   operator something you did on a regular basis when
22   you reported for your tour every day of the week?
23       A.    Normally, but not every day.
24       Q.    Around when did you first come to be
25   assigned to be Lieutenant Lane's operator?
```

```
 1               POLICE OFFICER MAXWELL BALTZER
 2       A.    Somewhere in the vicinity of June to
 3   July of that year.
 4       Q.    Was that an assignment that you
 5   requested, applied for or sought out in any way?
 6       A.    It just mutually came to.
 7       Q.    So before becoming Lieutenant Lane's
 8   operator you and he had a working relationship?
 9       A.    No, Lieutenant Lane was new to the 26th
10   Precinct.
11       Q.    So how did you and he come to this
12   arrangement?
13       A.    He was new to the precinct and I knew
14   the area because I had worked there six years, so
15   he sought me out to show him around the precinct
16   so he could get to the know the area.
17       Q.    So before the GLA operation that was
18   reflected at 1:30 hours on the morning of
19   September 2nd, were you and Lieutenant Lane on
20   patrol throughout the precinct or at the precinct
21   itself?
22       A.    Before the start of that tour?
23       Q.    Withdrawn -- let's go back to the
24   activity log.
25               Do you see the activity log on your
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2    screen?
 3         A.    Yes.
 4         Q.    This indicates you were present for
 5    duty at the start of your tour at 10:30 hours.
 6               Right?
 7         A.    8:30.
 8         Q.    Oh, sorry, thank you.
 9               Then at 1:30 a.m. there was this grand
10    larceny auto operation, right?
11         A.    Correct.
12         Q.    Between reporting for the beginning of
13    your tour at 8:30 p.m. and the operation at
14    1:30 a.m. were you on patrol or in the precinct or
15    some combination of both?
16         A.    I was in some combination of both.
17         Q.    You were in uniform on that day?
18         A.    Yes.
19         Q.    And you had a TASER?
20         A.    Yes.
21         Q.    Did you have a body-worn camera on your
22    person on that day?
23         A.    On this day in question?
24         Q.    Yes.
25         A.    I'm not sure at this moment.
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2        Q.    Do you have any reason to believe you
 3   would not have had a body-worn camera on the day
 4   in question?
 5        A.    Yes, because the previous day on
 6   September 1st I also worked a tour, and it was a
 7   double going into this day in question that
 8   started at 20:30, and from my professional
 9   experience with the body camera that I was using
10   it only lasts eight to the nine hours, so if it
11   was on for that whole tour on the 1st then it
12   would have been charging the tour that started on
13   20:30.
14        Q.    In your experience, about how long does
15   it take the body-worn camera to charge up?
16        A.    I'm not too sure.
17        Q.    Do you charge them at the precinct?
18        A.    Correct.
19        Q.    You mentioned you had worked a tour
20   earlier in the day on September 1st, right?
21        A.    Right.
22        Q.    When did that tour end?
23        A.    I believe it went right into the tour
24   that started at 20:30, if not ending five minutes
25   before that tour.
```

```
1                  POLICE OFFICER MAXWELL BALTZER

2        Q.    So the tour that is reflected in the

3   activity log marked as Plaintiff's Exhibit 1 was

4   the second of two consecutive tours, right?

5        A.    Correct.

6        Q.    At that point -- a regularly scheduled

7   tour is what, eight and a half hours?

8        A.    I believe so, yes.

9        Q.    At the point when you reported for the

10  tour reflected on Plaintiff's Exhibit 1 at

11  8:30 p.m. you had already been on duty since

12  approximately noon on September 1st, right?

13       A.    Correct.

14       Q.    How did it come to be that you were

15  assigned a second tour on September 1st of 2020?

16       A.    Can you say that again?  I'm sorry.

17       Q.    Why, to your knowledge, did you end up

18  with a second tour on September 2020?

19       A.    As of now, I don't remember.

20       Q.    Would you expect there would be any

21  document or record generated by you or your

22  colleagues that would reflect the reason why you

23  had a double tour on that day?

24       A.    I don't remember --

25             MR. ARKO:  Objection.
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2        Q.    Just going back to Plaintiff's
 3   Exhibit 1 "steady Sunday, Monday" here indicates
 4   that Sunday, Monday were your regular days off.
 5              Correct?
 6        A.    Correct.
 7        Q.    What were the times of your regularly
 8   scheduled tour as of September 2020?
 9        A.    Can you ask that again?
10        Q.    Sure.  What time was your regular tour
11   as of September 2020?
12        A.    I don't remember.
13        Q.    So, before this particular tour in
14   which the incident with Mr. Harris occurred on the
15   morning of September 2nd of 2020, how frequently
16   did you typically carry a TASER on your tours of
17   duty?
18        A.    Just about every day.
19        Q.    Why was that?
20        A.    On patrol when we went out we were
21   pretty much required to.
22        Q.    To your knowledge, did most officers
23   within the 26th Precinct usually have TASERs with
24   them when they were out on patrol?
25              MR. ARKO:  Objection.
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2       A.    To my knowledge at this moment,
 3  usually.
 4       Q.    What does a TASER look like?
 5       A.    It's yellow in color.
 6       Q.    It's made of plastic?
 7       A.    Usually made of plastic.
 8       Q.    What does it feel like in your hand?
 9             MR. ARKO:  Objection.
10       A.    It feels like you are holding a piece
11  of plastic.
12       Q.    It is significantly lighter than your
13  service weapon, right?
14             MR. ARKO:  Objection.
15       A.    You can say that.
16       Q.    It's designed so you can tell the
17  difference between your gun and your TASER by
18  feel, right?
19             MR. ARKO:  Objection.
20       A.    I don't know if that's true, "by feel."
21       Q.    Can you tell the difference between
22  your gun and your TASER by feel?
23             MR. ARKO:  Objection.
24       A.    Personally, from my personal experience
25  of being a police officer I believe I can.
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2       Q.    So, how was it your practice to carry
 3  your TASER when you were on patrol?
 4       A.    Can you ask that again?
 5       Q.    How did you typically carry your TASER
 6  when you were on patrol?
 7       A.    It was on my duty belt.
 8       Q.    Which side?
 9       A.    On my left side.
10       Q.    You would have your gun on your right
11  side, right?
12       A.    Correct.
13       Q.    So were you trained to keep your gun on
14  the side where your dominant hand is?
15       A.    Yes.
16       Q.    Why is that to your knowledge?
17       A.    Because usually if you are right-hand
18  dominant you would have a better shot with your
19  right hand using your firearm.
20       Q.    Would you typically keep the TASER in a
21  holster on your belt?
22       A.    Yes.
23       Q.    Describe the holster.
24       A.    The holster is black, also plastic and
25  it has a locking mechanism.
```

```
 1            POLICE OFFICER MAXWELL BALTZER
 2      Q.    The holster for your gun also has a
 3  locking mechanism, right?
 4      A.    Correct, it has two locking mechanisms.
 5      Q.    And the TASER holster has one locking
 6  mechanism?
 7      A.    Correct.
 8      Q.    The purpose of the locking mechanism is
 9  to make it harder for a suspect to grab your
10  weapon in the course of an encounter, right?
11      A.    One of the reasons.
12      Q.    What's the locking mechanism on the
13  TASER holster?
14      A.    It is a button on the side of the
15  holster.
16      Q.    You know exactly where that button is
17  by feel, right?
18      A.    By feel, I believe I do yes.
19      Q.    How does that compare to the locking
20  mechanisms on your firearm holster?
21      A.    They are in different places.
22      Q.    On the firearm holster are there two
23  buttons?
24      A.    Correct.
25      Q.    So, the TASER itself has a safety
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2   switch on it, is that right?
 3        A.    On the TASER itself, yes.
 4        Q.    Describe how you toggle that safety
 5   switch between on-and-off.
 6        A.    It's a flap on either side of the
 7   TASER, and you push it up or down depending on
 8   whether you want safety on or off.
 9        Q.    You can push it on either side of the
10   TASER, right?
11        A.    Correct.
12        Q.    You just click it up or down, right?
13        A.    Correct.
14        Q.    Then once you turn the safety off the
15   TASER is automatically activated and ready for
16   use, right?
17        A.    Say that again, I'm sorry.
18        Q.    Once you turn the safety off the TASER
19   is automatically activated and ready for use,
20   right?
21        A.    When you disengage the safety, is that
22   what you're talking about?
23        Q.    Yes.
24        A.    To an extent, yes.
25        Q.    When you say "to an extent" what do you
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    mean by that?
3         A.    It depends if you want to put the
4    cartridge in the TASER or not, if the cartridge is
5    not in the TASER then no prongs will shoot out.
6         Q.    When you carry the TASER in your
7    holster on patrol, was it typically your practice
8    to keep a cartridge in it?
9         A.    What do you mean by "a cartridge in
10   it"?
11        Q.    Let's back up.  There are two different
12   ways of using a TASER, one with a cartridge with
13   probes and the other in drive stun mode, right?
14        A.    Correct.
15        Q.    So in order to shoot out the probes the
16   TASER has to have a cartridge loaded into it,
17   right?
18        A.    Correct.
19        Q.    So when you had the TASER on your belt
20   during a normal tour of duty, was it your practice
21   to have a cartridge in the TASER?
22        A.    In the front of the TASER or by the
23   handle?
24        Q.    Well, I don't know, so where was it
25   your practice to keep the cartridge for the TASER
```

1          POLICE OFFICER MAXWELL BALTZER

2    when the TASER was on your belt in a regular tour?

3        A.    My practice was to keep a cartridge

4    inside the port in the front of the TASER, inside

5    the holster.

6        Q.    When you say "inside the port in the

7    front of the TASER" that's where it would go when

8    you wanted to actually shoot the probes out,

9    right?

10       A.    Correct.

11       Q.    So it was your practice to keep the

12   TASER in your holster in a position that it was

13   already loaded with the cartridge, right?

14       A.    Correct.

15       Q.    So assuming we are in a scenario where

16   the TASER is loaded in that manner on your belt,

17   you take it out of the holster, you click off the

18   safety; at that point it is active and ready for

19   use, right?

20       A.    Correct.

21       Q.    So in a typical situation where you are

22   out on patrol with a TASER on your belt, the

23   things you would have to do to be able to use it

24   are:  push the button on the holster, draw from

25   the holster and click off the safety, right?

```
1              POLICE OFFICER MAXWELL BALTZER
2              MR. ARKO:   Objection.
3         A.      In order to use the TASER?
4         Q.      Yes.
5         A.      Essentially, yes.
6         Q.      Then in order to actually discharge the
7    TASER you pull a trigger, right?
8         A.      With the safety deactivated, yes.
9         Q.      Once the safety has been deactivated if
10   you want to discharge the TASER the way to do that
11   is by pulling a trigger, right?
12        A.      Correct.
13        Q.      Is the trigger pull on the TASER
14   similar to the trigger pull on a firearm?
15        A.      What do you mean by "similar"?
16        Q.      Do you have to do something special to
17   pull the trigger on the TASER?
18              MR. ARKO:   Objection.
19        A.      Besides taking off the safety, no.
20        Q.      So once the safety is off you pull the
21   trigger normally and it fires, right or
22   discharges?
23        A.      Again, I don't know what you mean by
24   "normally."
25        Q.      Do you have to push any other button
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    while you are pulling the trigger?
3         A.    No.
4         Q.    Does the trigger on the TASER have
5    significantly more resistance than the trigger on
6    the firearm?
7         A.    No.
8         Q.    Do you have to pull the trigger on the
9    TASER especially hard?
10             MR. ARKO:  Objection.
11        A.    To my experience, no.
12        Q.    So, obviously when you're on patrol you
13   carry a firearm to protect yourself and others,
14   correct?
15             MR. ARKO:  Objection.
16        A.    True.
17        Q.    If you encounter a situation in which
18   you feel it is necessary to use your firearm to
19   prevent imminent loss of life to yourself, another
20   officer or a civilian you have the authority to do
21   that, right?
22             MR. ARKO:  Objection.
23        A.    I believe so.
24        Q.    That is one of the things that we
25   entrust police officers with is making decisions
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    about the use-of-force, including deadly force,
3    while in the field?
4              MR. ARKO:  Objection.
5        A.    Yes.
6        Q.    You don't need authorization from a
7    supervisor to fire your gun in the field, do you?
8        A.    No.
9        Q.    You don't need authorization from a
10   supervisor to discharge your TASER in the field,
11   do you?
12             MR. ARKO:  Objection.
13       A.    No.
14       Q.    If you encounter a situation in which
15   you conclude it is necessary to discharge your
16   firearm you're not going to hesitate, are you?
17             MR. ARKO:  Objection.
18       A.    It depends on the situation.
19       Q.    Well, once you've made the decision
20   that it's necessary to use deadly force every
21   split second counts, right?
22             MR. ARKO:  Objection.
23       A.    Correct.
24       Q.    You're trained to be able to draw your
25   firearm very quickly for that reason, right?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2              MR. ARKO:  Objection.
 3       A.    That's one of the reasons.
 4       Q.    You may as a police officer find
 5  yourself in a situation where you need to get your
 6  weapon out very quickly, right?
 7       A.    Yes.
 8       Q.    That's something you can do, right?
 9              MR. ARKO:  Objection.
10       A.    I believe so.
11       Q.    You were taught in the academy how to
12  remove your firearm from the holster quickly,
13  right?
14       A.    Yes.
15       Q.    In a split second, right?
16       A.    I mean I don't know about -- as fast as
17  possible, as fast as reasonably possible.
18       Q.    You practice that in the academy?
19       A.    Practice what in the academy?
20       Q.    Drawing your weapon quickly.
21       A.    Yes.
22       Q.    Do you practice that in refresher
23  training?
24       A.    We practice drawing it as fast as
25  reasonably possible.
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2      Q.    Under ordinary circumstances you keep
 3   the safety on your firearm when you're out on
 4   patrol, right?
 5      A.    Can you say that again?  "The safety on
 6   my firearm"?
 7      Q.    You keep the safety on -- the safety
 8   mechanism of your firearm is on safety when you're
 9   out in the field, right?
10      A.    Our firearms don't have safeties.
11      Q.    "Firearms don't have safeties"?
12      A.    No.
13      Q.    When you're out in the field and you
14   have a TASER on your belt you have the authority
15   to use that TASER if you determine that it is
16   reasonably necessary under the circumstances,
17   right?
18            MR. ARKO:  Objection.
19      A.    Yes.
20      Q.    If you think you need to TASE an
21   arrestee to gain control of him or overcome his
22   resistance you can do that, right?
23            MR. ARKO:  Objection.
24      A.    Yes.
25      Q.    That's a choice that you can make on
```

```
 1              POLICE OFFICER MAXWELL BALTZER

 2   your own, right?

 3              MR. ARKO:  Objection.

 4        A.    Yes.

 5        Q.    If you've determined that a TASER is

 6   necessary, reasonably necessary to gain control of

 7   an arrestee, you're not going to hesitate are you?

 8              MR. ARKO:  Objection.

 9        A.    If I deem that I need to use a TASER

10   imminently then usually not.

11        Q.    So the process of unlocking the single

12   button on the TASER holster, pulling out the TASER

13   and clicking off the safety takes maybe a second,

14   right?

15              MR. ARKO:  Objection.

16        A.    I don't know how long it takes to be

17   honest.

18        Q.    But you can do it very quickly, right?

19        A.    As quick as reasonably possible.

20        Q.    You were trained, as part of your TASER

21   certification, in drawing the TASER, right?

22        A.    Yes.

23        Q.    That's an action that you have

24   practiced many times, right?

25        A.    Yes.
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2       Q.    You're satisfied that you can do it
 3  quickly enough to use it without hesitation when
 4  you deem it necessary, right?
 5              MR. ARKO:  Objection.
 6       A.    In my personal experience I believe
 7  that I can.
 8       Q.    Okay.  Obviously you have an obligation
 9  to follow the lawful orders of your superiors in
10  the chain of command, right?
11       A.    Yes.
12       Q.    But if you are ordered to use force in
13  a way that you determine is unnecessary and
14  excessive, you have an obligation not to follow
15  that order, right?
16       A.    Would that -- in your eyes would that
17  be considered to be an unlawful order?
18       Q.    Fair point.  You have an obligation not
19  to follow unlawful orders, right?
20       A.    Correct.
21       Q.    You know as a police officer that you
22  can only use reasonable force, right?
23       A.    Correct.
24       Q.    So if you are ordered to use
25  unreasonable force by a superior officer you have
```

```
 1            POLICE OFFICER MAXWELL BALTZER
 2     an obligation not to do that, right?
 3          A.    Correct.
 4               MR. LIEB:  I am going to paste in the
 5     chat and put on the screen what I have marked as
 6     Plaintiff's Exhibit 2, which is a ten page
 7     document Bates number defendants 245 to 254.
 8               (Plaintiff's Exhibit No. 2 was
 9          marked for identification.)
10          Q.    Can you see Plaintiff's Exhibit 2 on
11     your screen Officer Baltzer?
12          A.    Yes.
13          Q.    I will represent to you that this is
14     the portion of the patrol guide that was governing
15     TASERs that was in effect as of the time of this
16     incident in September 2020 as produced by your
17     attorney, Mr. Arko.  I am going to go to page 246,
18     the first definition on the page where it says
19     "warning arc."
20               Do you where I am on the page?
21          A.    Yes.
22          Q.    Are you familiar with something called
23     a "warning arc"?
24          A.    Honestly, I am aware of it; yes.
25          Q.    When you say "honestly" you're "aware
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2    of it," you're aware of its existence but it is
 3    not something that is typically used in your
 4    experience?
 5              MR. ARKO:  Objection.
 6         A.    It is not something I am familiar with.
 7         Q.    Okay.  Were you trained in your TASER
 8    certification on a procedure of displaying an arc
 9    of electricity as a way of warning a subject?
10         A.    I don't remember.
11         Q.    I am going to page Defendants 250,
12    paragraph 23.
13              Do you see where I am?
14         A.    Yes.
15         Q.    So paragraph 23 on page Defendants 250
16    reads "When feasible, issue an appropriate verbal
17    warning, consistent with personal safety, to the
18    intended subject and other members of the service
19    present prior to discharging CEW."
20              Do you see that?
21         A.    Yes.
22         Q.    "CEW" is a TASER, right?
23         A.    Yes.
24         Q.    It goes on to say "The verbal warning
25    may be used in conjunction with laser/arc warnings
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    in order to gain voluntary compliance and prevent
3    the need to use force."
4              Do you see that language?
5         A.    Yes.
6         Q.    Are you familiar with the procedure of
7    giving verbal warnings prior to deploying a TASER?
8         A.    I am not familiar -- quite familiar
9    with this document, I haven't seen this in a
10   while; but yes.
11        Q.    Were you trained to give verbal
12   warnings when feasible prior to deploying your
13   TASER?
14        A.    Yes.
15        Q.    Can you give me an example of the kind
16   of verbal warning that you were trained to give
17   before deploying your TASER?
18             MR. ARKO:  Objection.
19        A.    In the academy they taught to us say
20   "TASER, TASER, TASER."
21        Q.    Is saying "TASER, TASER, TASER"
22   supposed to give the subject an opportunity to
23   comply or is it supposed to alert other members of
24   the service you are about to deploy the TASER so
25   they should get out of the way?
```

```
 1            POLICE OFFICER MAXWELL BALTZER
 2            MR. ARKO:  Objection.
 3       A.    It is meant for other members that when
 4   they hear that they are to get out of the way, but
 5   also the verbal warning to the subject that a
 6   TASER had been brought into the scene.
 7       Q.    Were you ever trained to give a verbal
 8   warning in the nature of "if you don't comply, I
 9   am going to TASE you" or "if you don't stop
10   resisting, I am going to TASE you"?
11            MR. ARKO:  Objection.
12       A.    I don't remember.
13       Q.    Have you ever given a warning like that
14   as opposed to saying "TASER, TASER, TASER"?
15            MR. ARKO:  Objection.
16       A.    In this instance?  In this situation?
17       Q.    No, in any situation.
18       A.    I don't remember.
19       Q.    Going back to Plaintiff's Exhibit 2 at
20   the bottom of page 250 going onto the top of 251,
21   do you see the paragraph that begins with the word
22   "fleeing"?
23       A.    Yes.
24            MR. ARKO:  Can you orient that?
25            (Discussion regarding the page
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2   orientation.)
 3        Q.    Do you see this language that says
 4   "Fleeing should not be the sole justification for
 5   using a CEW against a subject.  Members should
 6   consider the severity of the offense, the
 7   subject's threat level to others, and the risk of
 8   serious injury to the subject before deciding to
 9   use a CEW on a fleeing subject."
10              Do you see that language?
11        A.    Yes.
12        Q.    Were you trained that fleeing should
13   not be the sole justification for using the TASER
14   against a subject?
15        A.    Yes.
16        Q.    Were you told why fleeing should not be
17   the sole justification for using a TASER on a
18   subject?
19        A.    I don't remember.
20        Q.    Do you know why fleeing should not be
21   the sole justification for using a TASER on a
22   subject?
23              MR. ARKO:  Objection.
24        A.    I don't remember.
25        Q.    Still on the top of Defendant 251 do
```

```
1              POLICE OFFICER MAXWELL BALTZER
2     you see the paragraph "The CEW should generally
3     not be used on children, the elderly, obviously
4     pregnant females, the frail, against subjects
5     operating or riding on any moving device or
6     vehicle" -- parenthetical -- "where the subject
7     may fall while it is in motion or in situations
8     where the subject may fall from an elevated
9     surface."
10              Do you see that language?
11         A.    Yes.
12         Q.    You were trained that you should not
13    use a TASER in a situation where someone might
14    fall from an elevated surface, right?
15         A.    Correct.
16         Q.    When people are TASED they often fall
17    down, right?
18              MR. ARKO:  Objection.
19         A.    At times, sometimes; not all the time.
20         Q.    But you know that when people are TASED
21    sometimes they fall down, right?
22              MR. ARKO:  Objection.
23         A.    Sometimes.
24         Q.    The reason you are not supposed to TASE
25    someone on an elevated surface where they could
```

```
 1            POLICE OFFICER MAXWELL BALTZER
 2    fall a significant distance is because it is a
 3    known consequence of TASING someone that they may
 4    fall, right?
 5            MR. ARKO:  Objection.
 6        A.    They may fall, yes.
 7        Q.    And that's why you are not supposed to
 8    TASE someone on an elevated surface because if
 9    they do fall they could sustain very serious
10    injuries, right?
11            MR. ARKO:  Objection.
12        A.    One of the reasons, yes.
13        Q.    It is foreseeable that someone may fall
14    if you TASE them, right?
15            MR. ARKO:  Objection.
16        A.    They may sometimes fall.
17        Q.    Going back to something we had
18    discussed previously, you had mentioned that your
19    body-worn camera was on your person during the
20    earlier tour on September 1st that you believe
21    preceded this tour.
22            Right?
23        A.    I believe so, yes.
24        Q.    When you said "it was on" do you mean
25    it was activated for the entirety of your tour or
```

```
1                POLICE OFFICER MAXWELL BALTZER
2    just that it was on your body?
3         A.    It was on my body but it was also on
4    standby mode, which is not actively recording but
5    taking a buffer so if it were to turn on it would
6    be a 30 second buffer from the point I turned it
7    on, prior.
8         Q.    When you have a body-worn camera on
9    your person it's your regular practice to keep it
10   on standby mode?
11        A.    Correct.
12        Q.    That's what you are required to do
13   under the patrol guide?
14             MR. ARKO:   Objection.
15        A.    I'm not so sure about the patrol guide,
16   but that is what we are supposed to do.
17        Q.    Irrespective of what document it is in,
18   that's what you're supposed to do, right?
19             MR. ARKO:   Objection.
20        A.    Yes.
21             MR. LIEB:   Let's take a five-minute
22   break.
23             MR. ARKO:   Okay, see you back at 11:11.
24             (Recess.)
25        Q.    So, Officer Baltzer there came a time
```

1              POLICE OFFICER MAXWELL BALTZER

2     on the morning of September 2nd of 2020 at which

3     you responded to Mount Sinai Morningside Hospital

4     on West 113th Street, correct?

5          A.    Correct.

6          Q.    That's within the 26th Precinct?

7          A.    Correct.

8          Q.    How did you come to respond to that

9     location on that particular day?

10         A.    I believe I drove there.

11         Q.    What led you to drive there?

12         A.    From what I remember at this moment,

13    there was a radio run for a shooting.

14         Q.    Was there a request for additional

15    units to respond to the hospital?

16         A.    I don't remember.

17         Q.    Why were you responding to the hospital

18    in connection with the shooting as opposed to some

19    other location?

20         A.    At this moment, I don't remember.

21         Q.    When you got to the hospital, were any

22    other members of the service present?

23         A.    When I arrived at the hospital?

24         Q.    Yes.

25         A.    I don't remember if they were or

```
 1              POLICE OFFICER MAXWELL BALTZER
 2    weren't.
 3         Q.    When you arrived at the hospital, did
 4    you observe anything unusual outside the hospital?
 5         A.    Yes.
 6         Q.    What did you observe?
 7         A.    I observed a vehicle parked in front of
 8    the ER entrance to the hospital in an unusual
 9    parking formation as you would say.
10         Q.    It was basically stopped in the street
11    across a lane of traffic, right?
12         A.    Correct, it was in the middle of the
13    street.
14         Q.    What else, if anything, did you observe
15    about that vehicle?
16         A.    I observed one of the doors were open
17    on the vehicle.
18         Q.    Anything else?
19         A.    No, not that I remember.
20         Q.    Do you remember that the vehicle was an
21    SUV?
22         A.    That I remember, yes.
23         Q.    If I represent to you that it was a
24    Chevy Tahoe, do you have any information
25    inconsistent with that?
```

```
1              POLICE OFFICER MAXWELL BALTZER
2              MR. ARKO:   Objection.
3         A.    I don't remember what make and model it
4    was at this point.
5         Q.    So, once you observed that the vehicle
6    was parked in this unusual manner and had an
7    opened door what did you do?
8         A.    As of right now, I believe that I
9    approached the vehicle and in connection with the
10   shooting and everything going on at the scene we
11   conducted a primary investigation and determined
12   that this vehicle could have possibly been
13   involved.
14        Q.    What was it that led you to make that
15   determination?
16        A.    The unusual manner of where the vehicle
17   was parked, how someone would park in the middle a
18   street and leave a door open.
19        Q.    Anything else?
20        A.    It was later determined that one of the
21   victims of the shooting was inside the hospital.
22        Q.    I think you had said "we" did a
23   preliminary investigation and determined that the
24   vehicle may have some potential connection to the
25   shooting.
```

```
1              POLICE OFFICER MAXWELL BALTZER
2              Who was the "we" you were referring to
3    there?
4         A.    Again, I'm not sure who was on scene or
5    not.
6         Q.    Approximately what time did you arrive
7    at the hospital?
8         A.    I'm not sure of that either.
9         Q.    So after you and some other colleagues
10   conducted this preliminary investigation
11   assessment, what did you do next?
12        A.    I don't remember specifically what
13   happened at that moment.
14        Q.    Did you go inside the hospital?
15        A.    At some point, yes.  I don't remember
16   if it was before or after the interaction with
17   Mr. Harris.
18        Q.    You were driving Lieutenant Lane on the
19   night in question, right?
20        A.    Yes.
21        Q.    So Lieutenant Lane arrived at the
22   hospital when you did because you were in the same
23   vehicle, right?
24        A.    Correct.
25        Q.    Lieutenant Lane was also present when
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2    you were conducting this initial search inspection
 3    of the vehicle, right?
 4        A.    He arrived with me, I don't remember
 5    where he went after we got on scene.
 6        Q.    About how long were you on the scene at
 7    the hospital before you encountered the person who
 8    you eventually came to know was Mr. Harris, Sr.?
 9        A.    I don't remember.
10        Q.    Was it more than three hours?
11              MR. ARKO:   Objection.
12        A.    Again, I can't put a time limit on it;
13    I don't remember.
14        Q.    Did you speak with any civilians at the
15    scene before you first encountered Mr. Harris?
16        A.    Not that I remember.
17        Q.    Did you speak with Mr. Harris' wife,
18    before you encountered Mr. Harris?
19        A.    I don't remember.
20        Q.    So tell me everything you knew about
21    the shooting, prior to the moment when you
22    encountered Mr. Harris.
23        A.    From what I remember at this moment, I
24    remember it was a shooting over the radio, I
25    remember responding to the hospital and figuring
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    out that one of the victims of the shooting was,
3    in fact, inside that hospital.
4         Q.    Did you have any other information
5    concerning the shooting at the time you first
6    encountered Mr. Harris?
7         A.    Can you repeat that?
8         Q.    Other than what you just described, did
9    you have any other information concerning the
10   shooting at the time you first encountered
11   Mr. Harris?
12        A.    Not that I remember, no.
13        Q.    What steps, if any, did you and your
14   colleagues take to secure the vehicle before
15   Mr. Harris arrived on the scene?
16        A.    I don't remember.
17        Q.    Did you put any tape around it or
18   barriers of any kind?
19        A.    I personally did not put any tape or
20   barriers.
21        Q.    Did you observe any other members of
22   the service do that?
23        A.    Not that I remember.
24        Q.    Do you know why that wasn't done?
25              MR. ARKO:  Objection.
```

```
1                POLICE OFFICER MAXWELL BALTZER
2          A.    No, not that I remember.
3          Q.    How did Mr. Harris first come to your
4    attention outside the hospital on the morning of
5    September 2, 2020?
6          A.    Mr. Harris walked up to us and
7    approached myself, Lieutenant Lane and the vehicle
8    in question.
9          Q.    So at the time you first encountered
10   Mr. Harris you were standing outside in the
11   street, right?
12         A.    Correct.
13         Q.    At the time you first encountered
14   Mr. Harris, where were you standing in relation to
15   the vehicle?
16         A.    Within a few feet of the vehicle.
17         Q.    What were you doing at that time?
18         A.    I don't remember.
19         Q.    What other members of the service were
20   present at the time that you first encountered
21   Mr. Harris, at the time you were standing a few
22   feet from the vehicle?
23         A.    I remember Lieutenant Lane and
24   Lieutenant Leon.
25         Q.    Were you familiar with Lieutenant Leon
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2   before September 2, 2020?
 3        A.    Familiar as what?
 4        Q.    Did you know his name when -- by sight?
 5        A.    Yes.
 6        Q.    Had you ever been his operator?
 7        A.    Not that I remember.
 8        Q.    Was he, to your knowledge, assigned to
 9   the 26th Precinct at the time?
10        A.    To my knowledge, yes.
11        Q.    Did you ever have chit chat in the
12   precinct when you encountered him on the job?
13        A.    I don't remember, maybe "hello" or
14   "goodbye."
15        Q.    Sure.  Are you familiar with a member
16   of the service by the name of Kristen Swinkunas?
17        A.    I'm not familiar.
18        Q.    Are you familiar with a member of the
19   service by the name of Antonella Jimenez?
20        A.    Yes.
21        Q.    Was Officer Jimenez present at the time
22   that you first encountered Mr. Harris, when you
23   were standing a few feet from the vehicle on the
24   street?
25        A.    I don't remember.
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2       Q.    Were there any women officers present
 3    when you first encountered Mr. Harris standing a
 4    few feet from the vehicle on the street?
 5       A.    I don't remember.
 6       Q.    So you indicated Mr. Harris approached
 7    you, Lieutenant Lane and the vehicle.
 8             Correct?
 9       A.    He approached the scene, yes.
10       Q.    He identified himself in sum and
11    substance as the father of the victim of the
12    shooting, correct?
13       A.    In substance, yes.
14       Q.    And he indicated in substance that the
15    vehicle was his, correct?
16       A.    In substance, yes.
17       Q.    Where was Lieutenant Lane standing in
18    relation to you as Mr. Harris approached the
19    vehicle and you?
20       A.    I don't remember.
21       Q.    Where was Lieutenant Leon standing as
22    Mr. Harris approached?
23       A.    I don't remember.
24       Q.    You had indicated that one of the doors
25    to the vehicle was open.
```

```
1                 POLICE OFFICER MAXWELL BALTZER
2               Correct?
3       A.      Correct.
4       Q.      That was the front passenger side door,
5   correct?
6       A.      Correct.
7       Q.      Was there any member of the service
8   standing in front of that door?
9               MR. ARKO:  Objection.
10      A.      I don't remember.
11      Q.      Was there anything blocking it --
12  blocking that open door in any way?
13      A.      I don't remember.
14      Q.      Was there anything indicating to a
15  member of the public who happened to walk down the
16  block that the police considered this a crime
17  scene?
18              MR. ARKO:  Objection.
19      A.      I don't remember.
20      Q.      But there was no caution tape or
21  anything like that, right?
22      A.      Again, I didn't put up any caution
23  tape.  I don't know what anyone else did.
24      Q.      You didn't see any when this incident
25  happened, did you?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2              MR. ARKO:  Objection.
 3        A.    What do you mean "when it happened"?
 4        Q.    At the time of the incident with
 5    Mr. Harris, was there any caution tape, signage,
 6    barriers or anything else outside of the vehicle
 7    indicating this was a crime scene?
 8              MR. ARKO:  Objection.
 9        A.    At the time of the incident, I don't
10    remember seeing anything like that.
11              MR. LIEB:  Plaintiff's Exhibit 3 is
12    going to be the body-worn camera footage produced
13    as Defendants 54.
14              (Plaintiff's Exhibit No. 3 was
15         marked for identification.)
16              MR. LIEB:  I can't paste that, but
17    Chris you obviously have it so I am going to share
18    that on my screen.
19              MR. ARKO:  After the deposition, if you
20    don't mind e-mailing me the documents you marked
21    I'd appreciate that.
22              MR. LIEB:  That's fine.
23        Q.    Officer Baltzer can you see on your
24    screen a still image -- can you see an image on
25    your screen?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2              MR. ARKO:  Just a second.  Before we do
 3     that, I have to minimize the pane that shows the
 4     participants so we can see the entire video.
 5         Q.    Can you see the still frame of the
 6     video on your screen Officer Baltzer?
 7         A.    Yes.
 8         Q.    Do you recognize the person in the
 9     white shirt depicted on the left side of the
10     frame?
11         A.    It is a little blurry, but it could
12     possibly be Lieutenant Lane.
13         Q.    I am going to play a few seconds of the
14     video to confirm it is working technologically.
15              (Video played.)
16         Q.    I have paused the video at 5 seconds.
17              Did you see the video play just
18     technically speaking Officer Baltzer?
19         A.    Yes.
20         Q.    I am now going to play about the first
21     minute and 5 seconds of the video.
22              (Video played.)
23         Q.    I am going to pause the video at
24     54 seconds.
25              That's Lieutenant Lane, right?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2        A.      Correct.
 3        Q.      Have you seen yourself depicted at any
 4   point in the first 54 seconds of this video?
 5        A.      Not that I believe, no.
 6        Q.      Where were you standing during the
 7   interaction depicted on this 54 seconds of video?
 8        A.      I believe that I am standing behind
 9   Lieutenant Lane.
10        Q.      Essentially out of the field of the
11   camera, further to the left from the perspective
12   of the camera?
13        A.      Correct.
14        Q.      Were you present for the entirety of
15   the interaction between Mr. Harris and the other
16   members of the service we have seen depicted so
17   far?
18        A.      So far in this video, yes.
19        Q.      Did you have your hand on your TASER
20   throughout the portion of the interaction we have
21   been watching?
22        A.      I don't remember.
23        Q.      Did you have your hand on your gun?
24        A.      I don't remember.
25                (Video played.)
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2      Q.    So I have stopped the video at 1:08.
 3            Did you hear just before I stopped the
 4   video a voice say "get your TASER"?
 5      A.    No, I did not.
 6      Q.    Okay, I will just play those few
 7   seconds one more time and see if you are able to
 8   hear it.
 9      A.    Okay.
10            (Video played.)
11      Q.    I just stopped the video again at 1:08.
12            Did you hear a voice say "get your
13   TASER"?
14      A.    Yes.
15      Q.    Based on your recollection of these
16   events you understand that to be Lieutenant Leon
17   who said that, right?
18      A.    To my knowledge, yes.
19      Q.    He was talking to you, right?
20      A.    To my knowledge, yes.
21      Q.    I am going to go back to 1:05.
22            (Video played.)
23      Q.    I have now stopped the video at 1
24   minute and 10 seconds.
25            Did you hear Lieutenant Leon say "get
```

```
1              POLICE OFFICER MAXWELL BALTZER
2     your TASER" four times?
3          A.    I don't know about four, I wasn't
4     counting.
5          Q.    I will play it again.
6                (Video played.)
7          Q.    I stopped the video at 1:10.
8                Did you hear Lieutenant Leon say "get
9     your TASER" four times?
10         A.    Yes.
11         Q.    Did you hear him say that in an
12    escalating tone of voice?
13               MR. ARKO:   Objection.
14         A.    I don't know what you consider
15    "escalating" or what Lieutenant Leon would
16    consider escalating.
17         Q.    Did you hear him say that in what you
18    would consider to be an escalating tone of voice?
19         A.    Again, I don't know what state he was
20    in at the moment, I don't know if it would be
21    escalating.  I don't know what state he was in.
22         Q.    I'm not asking you to speculate about
23    what was in Lieutenant Leon's mind or anything
24    like that, I am asking you, purely based upon you
25    hearing the voice, whether you would consider that
```

```
1            POLICE OFFICER MAXWELL BALTZER
2  to be an escalating tone of voice?
3       A.    The pitch of his voice got higher if
4  that's what you're asking.
5       Q.    He started speaking louder also, right?
6       A.    I don't know if he was speaking louder,
7  but his tone of voice got higher.
8       Q.    It took you a few seconds to get your
9  TASER, right?
10      A.    I'm not so sure we could put a few
11 seconds on that or a time on it.
12      Q.    You would agree with me that between a
13 minute seven of the video and a minute ten of the
14 video Lieutenant Leon orders you to get your TASER
15 four times, correct?
16      A.    I don't know who Lieutenant Leon was
17 ordering or who he thought he was ordering.  Only
18 he can speak to that.
19      Q.    Well, at the time you understood him to
20 be ordering you, right?
21      A.    Personally, knowing that I have a TASER
22 I heard him and I thought so, but again, I don't
23 know for sure who he was talking to.
24      Q.    But regardless of what his intent was,
25 you understood standing on the street on September
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    2nd, 2020 when he said "get your TASER" he was
3    ordering you, correct?
4              MR. ARKO:  Objection.
5         A.    Again, I don't know who he was
6    ordering, I can only say from my own knowledge and
7    my own knowledge knowing I have a TASER, I thought
8    he was talking to me.
9         Q.    You thought he was talking to you
10   right?
11        A.    At the time, yes.
12        Q.    So, over the course of a minute seven
13   to a minute ten of the video Lieutenant Leon gives
14   the order "get your TASER" four times, correct?
15        A.    Correct.
16        Q.    It took you that amount of time to get
17   your TASER, correct?
18             MR. ARKO:  Objection.
19        A.    What do you mean by "get your TASER"?
20        Q.    Had you drawn your TASER before
21   Lieutenant Leon completed those four commands?
22        A.    I can't tell from the video.
23        Q.    Do you have any recollection of having
24   drawn your TASER before he finished those
25   commands?
```

```
1              POLICE OFFICER MAXWELL BALTZER
2        A.    I don't remember.
3        Q.    There's an inference if he's still
4   saying "get your TASER, get your TASER" it's
5   because you haven't gotten it yet, right?
6              MR. ARKO:  Objection.
7        A.    I don't know what Lieutenant Leon sees,
8   I don't know if he sees me take it out or he
9   doesn't; only he can answer to that.
10       Q.    I'm not asking you what he sees, I am
11  asking you whether it is fair to conclude from the
12  fact that he's telling you to "get your TASER,"
13  that he hasn't seen you get it yet?
14             MR. ARKO:  Objection.
15       A.    I don't know what he saw.
16       Q.    Do you think that makes sense?
17             MR. ARKO:  Objection.
18       A.    I can only speak for myself, I can't
19  speak for Lieutenant Leon.
20       Q.    I know, but you have to answer my
21  question.  I am not asking you to predict what is
22  going on in Lieutenant Leon's mind.  I am asking
23  do you, Officer Baltzer, think it is a fair
24  assumption that he would not have continued to say
25  "get your TASER" if he had seen you get your
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2   TASER?
 3              MR. ARKO:  Objection.
 4       A.    That's my answer, I don't know what he
 5   would do in that situation.  I can't speak for
 6   him.
 7       Q.    If you had ordered someone to get
 8   something and you were aware that they had done
 9   it, would you continue to order them to get it?
10              MR. ARKO:  Objection.
11       A.    If I saw them get it then I would stop.
12   If I didn't see them, then I would continue.  But
13   again, I don't know who he was ordering or what he
14   saw.
15       Q.    Did you have your hand on your TASER
16   when Lieutenant Leon first ordered you to get it?
17       A.    I don't remember.
18       Q.    Were you surprised when he ordered you
19   to get it out?
20       A.    From my knowledge of the scene, I don't
21   remember hearing him the first few times because I
22   was more focused on the situation at hand than
23   Lieutenant Leon.
24       Q.    At the time Lieutenant Leon gave the
25   order, was your TASER already drawn?
```

```
 1            POLICE OFFICER MAXWELL BALTZER
 2       A.    I don't believe so.
 3       Q.    If you thought it was necessary to draw
 4  your TASER to gain compliance you had the
 5  authority to do that, right?
 6            MR. ARKO:  Objection.
 7       A.    Can you ask that again?
 8       Q.    Sure.  If you had thought just as you
 9  were standing there that it was necessary to get
10  your TASER out in order to gain Mr. Harris'
11  compliance you had the authority to draw your
12  TASER on your own, right?
13            MR. ARKO:  Objection.
14       A.    I would have the authority to drawn on
15  my own, right.
16       Q.    Why didn't you?
17       A.    I did.
18       Q.    You did it after Lieutenant Leon
19  ordered you to do it four times, right?
20       A.    No, I did it because I wanted to, not
21  because Lieutenant Leon ordered me to.
22       Q.    So the fact you ultimately drew your
23  TASER had nothing to do with the fact that
24  Lieutenant Leon ordered you to do so four times?
25       A.    No.
```

```
 1                POLICE OFFICER MAXWELL BALTZER
 2        Q.    So it was a completely independent
 3   decision on your part?
 4        A.    I drew my TASER and used my TASER
 5   because I felt like it was necessary.
 6        Q.    That was a decision that was completely
 7   independently made on your own, right?
 8        A.    Yes.
 9        Q.    So the fact that it happened after
10   Lieutenant Leon ordered you to do it four times is
11   just coincidence?
12             MR. ARKO:   Objection.
13        A.    Again, I used the TASER and being that
14   it was necessary on my own, Lieutenant Leon saying
15   "draw your TASER" had nothing to do with my
16   decision to use it.
17        Q.    What specific action or actions
18   undertaken by Mr. Harris led you to determine on
19   your own that it was necessary to draw your TASER?
20        A.    When Mr. Harris first approached the
21   vehicle he approached it in a very aggressive and
22   irate manner, from that point when he first
23   approached it the situation progressively got
24   escalated to the point where I felt it was
25   necessary to draw my TASER.
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2      Q.    You said the situation "progressively
 3   escalated," right?
 4      A.    Correct.
 5      Q.    There came a point in time in that
 6   escalation when you made your own decision to draw
 7   your TASER, right?
 8      A.    Yes.
 9      Q.    What was the action that Mr. Harris
10   took immediately prior to your deciding to draw
11   your TASER?
12              MR. ARKO:   Objection.
13      A.    There were multiple actions that were
14   taken leading up to the point where I deemed it
15   was necessary to draw my TASER, starting from --
16      Q.    That's not my question.  I am not
17   asking you about all the actions, I'm asking about
18   the actions immediately prior.  What was the
19   action Mr. Harris took immediately prior to your
20   determining that it was the necessary to draw your
21   TASER?
22              MR. ARKO:   Objection.
23      A.    Mr. Harris actively began to resist
24   arrest, and he was actively exhibiting extreme
25   aggression.
```

```
1                POLICE OFFICER MAXWELL BALTZER

2        Q.    What specific action did Mr. Harris

3    take immediately prior to you determining that it

4    was necessary to draw your taser?

5               MR. ARKO:   Objection.

6        A.    When Mr. Harris was being attempted

7    (sic)to be placed under arrest he pulled his arms

8    away and started flailing them, he waived them in

9    a very aggressive manner and was in a physical

10   struggle with my lieutenant from what I could see.

11       Q.    When you say "he waived his arms in a

12   very aggressive manner" what do you mean by that?

13       A.    He pulled away from Lieutenant Lane

14   when he attempted to place Mr. Harris under arrest

15   and he was waving them, in my opinion, as

16   resisting for us, to avoid us grabbing him.  And

17   then he went into a physical struggle when

18   Lieutenant Lane attempted to grab him again, and

19   they were struggling in front of the car.

20       Q.    Focusing specifically on what you

21   described as the use of Mr. Harris' arms in an

22   aggressive arms what specifically did he do with

23   his arms to lead you to conclude he was using them

24   in an aggressive manner?

25               MR. ARKO:   Objection.
```

                    POLICE OFFICER MAXWELL BALTZER

1

2          A.    He pulled back aggressively when

3    attempting to being placed under arrest, and he

4    moved his arms aggressively through the air

5    avoiding grasps from Lieutenant Lane from what I

6    could see.

7          Q.    Can you describe what was ostensibly

8    aggressive about his arm movements without using

9    the word "aggressive" in your answer please?

10               MR. ARKO:   Objection.

11         A.    A very fast motion of his arms away

12   from the grasp of Lieutenant Lane.

13         Q.    I am going to go back to the video.

14               Can you see a still frame of the video

15   on your screen Officer Baltzer?

16         A.    Yes.

17         Q.    I am going to go back to 1:03.

18               (Video played.)

19         Q.    I stopped it at 1:07.  Did you see just

20   before I stopped the video Mr. Harris place his

21   hands up in the air?

22         A.    I saw his palms come up, yes.

23         Q.    Is that the action you characterized as

24   him pulling his arms back aggressively when

25   Lieutenant Lane attempted to place him under

```
 1              POLICE OFFICER MAXWELL BALTZER

 2    arrest?

 3              MR. ARKO:  Objection.

 4        A.    That was the start of many actions that

 5    followed.

 6        Q.    Would you characterize the action that

 7    we just saw before stopping the video at 1:07 as

 8    "waiving his arms in an aggressive manner"?

 9        A.    Again, that was the start of what

10    progressed into waiving his arms into aggression,

11    he clearly pulled away when my Lieutenant went to

12    grab his arm and place him under arrest.

13        Q.    Try to focus on my question.  I'm not

14    asking you about what he might have done

15    subsequently, I am just asking whether that

16    particular action that we saw just before stopping

17    the video at 1:07 is what you would consider to be

18    waiving his arms in an aggressive manner?

19              MR. ARKO:  Objection.

20        A.    That specific motion at that time in

21    the video, no.

22        Q.    So it was sometime after that that

23    according to you he waived his arms in an

24    aggressive manner.

25              Is that correct?
```

1                POLICE OFFICER MAXWELL BALTZER

2          A.    Correct.

3          Q.    It was the waiving of the arms in an

4    aggressive manner that led you to conclude that

5    the TASER was appropriate, right?

6          A.    Not necessarily, that was not the main

7    reason.  The main reason was, he was actively

8    resisting arrest after multiple opportunities and

9    multiple warnings and he also was exhibiting

10   aggression in the way that him and Lieutenant Lane

11   were having a confrontation physically.

12         Q.    As of the moment where we paused the

13   video at 1:07, had you determined at that point

14   that it was appropriate to use your TASER?

15         A.    I don't remember.

16               (Recess.)

17         Q.    You testified that Mr. Harris' verbal

18   interaction with Lieutenant Lane was quote

19   "irate," and quote "aggressive."

20               Correct?

21         A.    I testified that when he approached the

22   scene, I believe that he was aggressive and irate.

23         Q.    What was he doing with his hands when

24   he approached you-all?

25         A.    I don't remember at this time.

```
 1              POLICE OFFICER MAXWELL BALTZER
 2        Q.    What was it about Mr. Harris when he
 3   approached you-all and had verbal interaction that
 4   led you to say it was aggressive?
 5        A.    You can tell by the tone of his voice,
 6   by his hands were moving, I don't remember what
 7   they were doing specifically, but you can tell by
 8   the tone of his voice and our instructions towards
 9   him, he was being very negative towards our
10   instructions to him.
11        Q.    Do you consider someone putting their
12   hands in the air to be aggressive?
13              MR. ARKO:  Objection.
14        A.    Can you say that again?
15        Q.    Do you consider someone putting their
16   hands in the air to be aggressive (indicating)?
17              MR. ARKO:  Objection.
18        A.    It depends how they put their hands in
19   the air.
20        Q.    Putting your hands up is a sign of
21   non-aggression, right?
22              MR. ARKO:  Objection.
23        A.    At times, yes.
24        Q.    That's the meaning of when someone is
25   putting their hands up, they are showing you they
```

1              POLICE OFFICER MAXWELL BALTZER

2     are not a threat, right, that's what that means?

3              MR. ARKO:  Objection.

4       A.    Again, not necessarily.  You don't know

5     if somebody was trying to grab your wrist and you

6     picked them up, that would be resisting.

7       Q.    Is all resistance aggression in your

8     view?

9              MR. ARKO:  Objection.

10      A.    In my view, no, not all resistance is

11    aggressive.

12      Q.    Before you deployed the TASER, what

13    specifically did Lieutenant Lane do to attempt to

14    place Mr. Harris under arrest?

15      A.    From my point of view, he went to grab

16    ahold of him to place him under arrest and

17    Mr. Harris pulled his hands back, and they got

18    into a physical altercation.

19      Q.    What specifically did Lieutenant Lane

20    do during this alleged physical altercation?

21      A.    I can't speak for what he did.

22      Q.    But you were watching, right?

23      A.    I was behind him.

24      Q.    You could see some of what he was

25    doing, right?

| | |
|---|---|
| 1 | POLICE OFFICER MAXWELL BALTZER |
| 2 | A.    I could see some of what he was doing. |
| 3 | Q.    Tell me everything that you saw |
| 4 | Lieutenant Lane do during the alleged physical |
| 5 | altercation with Mr. Harris. |
| 6 | MR. ARKO:  Objection. |
| 7 | A.    From my point of view, I saw Lieutenant |
| 8 | Lane attempt to place Mr. Harris under arrest by |
| 9 | grabbing him, I saw Mr. Harris pull away in |
| 10 | resistance, and I saw Lieutenant Lane attempt to |
| 11 | grab ahold of him again and place him under |
| 12 | arrest, and Mr. Harris constantly pulling away and |
| 13 | tussling to try to get away from Lieutenant Lane. |
| 14 | Q.    So your answer said Mr. Harris first |
| 15 | pulled away, and Lieutenant Lane tried again |
| 16 | leading to what you described as "tussling." |
| 17 | Right? |
| 18 | MR. ARKO:  Objection. |
| 19 | A.    From my point of view, yes. |
| 20 | Q.    Just to clarify, the first incidence of |
| 21 | pulling away is what we saw just before pausing |
| 22 | the video at 1:07, was Mr. Harris putting his |
| 23 | hands up, right? |
| 24 | A.    The first instance of him pulling away |
| 25 | from Lieutenant Lane in my eyes, yes. |

1          POLICE OFFICER MAXWELL BALTZER

2     Q.    Leaving that aside and focusing on the

3 subsequent interaction between Lieutenant Lane and

4 Mr. Harris, how many times did Lieutenant Lane

5 allegedly attempt to grab Mr. Harris?

6          MR. ARKO:   Objection.

7     A.    I can't tell you that, I can't put a

8 number on it.

9     Q.    Where were Lieutenant Lane's hands on

10 Mr. Harris' body?

11     A.    I don't remember.

12     Q.    Did Mr. Harris ever make contact with

13 Lieutenant Lane?

14     A.    I don't remember.

15     Q.    Describe how exactly Mr. Harris moved

16 his arms during the alleged tussling that you

17 described?

18          MR. ARKO:   Objection.

19     A.    He moved his arms in a very fast

20 motion, in my eyes from Lieutenant Lane's grasp in

21 order to place him under arrest.

22     Q.    In which direction did Mr. Harris move

23 his arms?

24     A.    Away from Lieutenant Lane.

25     Q.    Left, right, up, down, in, out --

```
1              POLICE OFFICER MAXWELL BALTZER
2              MR. ARKO:  Objection.
3      A.    Away from wherever he was trying to
4  grab him.
5      Q.    How was Lieutenant Lane trying to grab
6  him and how did Mr. Harris move in response?
7              MR. ARKO:  Objection.
8      A.    Again, I don't remember which
9  direction, I just remember that it was away from
10 Lieutenant Lane's grasp.
11     Q.    So you really can't describe anything
12 specific about this interaction other than
13 Lieutenant Lane was trying to make an arrest and
14 Mr. Harris was not cooperating, right?
15             MR. ARKO:  Objection.
16     A.    No, I can explain a lot about it.
17     Q.    How specifically was Lieutenant Lane
18 and Mr. Harris' body moving?
19             MR. ARKO:  Objection.
20     A.    Again, Lieutenant Lane was trying to
21 grab Mr. Harris and place him under arrest.  At
22 that point, Mr. Harris pulled away in an attempt
23 to resist being placed under arrest, and then in
24 my eyes Lieutenant Lane attempted to place him
25 under arrest again by moving towards him and
```

1              POLICE OFFICER MAXWELL BALTZER

2    grabbing him, and from my point of view Mr. Harris

3    again resisted multiple more times by pulling away

4    from Lieutenant Lane's grasp.

5         Q.    What physically did Lieutenant Lane do

6    to try and arrest Mr. Harris on the second

7    attempt?

8              MR. ARKO:  Objection.

9         A.    I can't speak for what he did, I can

10   only say that from what I saw he attempted to grab

11   him and place him under arrest again.

12        Q.    What specifically did Mr. Harris do in

13   response to the second attempt?

14             MR. ARKO:  Objection.

15        A.    In my eyes, he constantly pulled away

16   in resistance to being placed under arrest.

17        Q.    How did he do that?

18             MR. ARKO:  Objection.

19        A.    He pulled his arms away in a very fast

20   motion.

21        Q.    You saw in the video that there was

22   female officer standing near the car door next to

23   Mr. Harris, right?

24        A.    Correct.

25        Q.    What, if anything, did that female

```
 1              POLICE OFFICER MAXWELL BALTZER
 2    officer do to help effectuate this arrest?
 3         A.    I don't remember.
 4         Q.    Did she ever touch Mr. Harris?
 5         A.    I don't remember.
 6         Q.    Did she try to help Lieutenant Lane in
 7    any way?
 8         A.    I don't remember.
 9         Q.    What about Lieutenant Leon, did he ever
10    touch Mr. Harris?
11         A.    I don't remember seeing it.
12         Q.    Did he attempt to help Lieutenant Lane
13    in any way?
14         A.    Again, I don't remember.
15         Q.    If one member of the service was
16    struggling to get compliance with a single
17    arrestee, wouldn't you expect other members of the
18    service standing right there to come to their aid?
19              MR. ARKO:  Objection.
20         A.    I can't speak for what they thought or
21    saw.
22         Q.    Well, if you were standing right there
23    wouldn't you usually come to your brother
24    officer's aid?
25              MR. ARKO:  Objection.
```

```
 1              POLICE OFFICER MAXWELL BALTZER

 2        A.    Me personally, yes.

 3        Q.    What was Lieutenant Lane doing at the

 4   time you pulled the trigger on the TASER?

 5        A.    At the time I pulled the trigger on the

 6   TASER, Lieutenant Lane was grabbing ahold of

 7   Mr. Harris as Mr. Harris attempted to enter the

 8   passenger side door of the vehicle.

 9        Q.    Where were Lieutenant Lane's hands on

10   Mr. Harris' body at the time you pulled the

11   trigger on the TASER?

12        A.    I don't remember where his hand

13   placement was.

14        Q.    You said Mr. Harris was attempting to

15   enter the passenger side door of the vehicle.

16              Correct?

17        A.    Correct.

18        Q.    Were his feet off the ground?

19        A.    Not that I remember, no.

20        Q.    Were his arms touching the door?

21        A.    I -- at this moment, I don't remember.

22        Q.    Was his body in the seat of the

23   passenger side seat of the car?

24        A.    Do you mean was his whole body in the

25   seat of the passenger side?
```

```
1            POLICE OFFICER MAXWELL BALTZER

2       Q.    Was any portion of his body in the

3    passenger side seat of the car?

4       A.    I don't remember.

5       Q.    Was any part of Mr. Harris' body

6    touching the vehicle at the time you pulled the

7    trigger on the TASER?

8       A.    I don't remember if it was or it

9    wasn't.

10      Q.    What specific action did Mr. Harris

11   take that led you to say that he was trying to

12   enter the passenger side of the vehicle?

13      A.    He was attempting to head towards that

14   way, and throughout the whole video you can see

15   him walking towards the passenger side door and

16   even telling us that in substance it's his vehicle

17   and he can do what he wants with it, and as he was

18   being placed under arrest you can see in the video

19   he was trying to get closer and closer to that

20   side of the door, and from my eyes I could see him

21   attempting to get in.

22      Q.    So your understanding of Mr. Harris'

23   intention in the whole interaction was that he was

24   trying to get into the vehicle, right?

25            MR. ARKO:   Objection.
```

POLICE OFFICER MAXWELL BALTZER

1

2       A.    I don't know what Mr. Harris was
3   thinking at that moment.
4       Q.    But your understanding at the time was
5   that he was trying to get into the passenger side
6   of the vehicle, right?
7       A.    All I know he was saying multiple times
8   "it is my vehicle, I can do what I want."
9       Q.    My question is, was he doing anything
10  specific at the moment of the TASing that led you
11  to believe he was trying to get inside the
12  passenger side of the vehicle or was that based
13  upon the totality of the interaction?
14      A.    Can you ask that again?  Sorry.
15      Q.    Sure.  You had indicated that at the
16  time you pulled the trigger on the TASER,
17  Mr. Harris was trying to get in the passenger side
18  seat of the vehicle.
19          Do you remember testifying to that a
20  couple of minutes ago?
21      A.    Correct.
22      Q.    My question is, was this based upon
23  something specific Mr. Harris was doing at the
24  time you pulled the trigger or based on the
25  totality of the interaction?

POLICE OFFICER MAXWELL BALTZER

1

2      A.     Based on that moment when he was trying

3  to enter the vehicle, which was a crime scene with

4  possible evidence inside of it, and he was

5  resisting arrest, and he was exhibiting

6  aggression.  That's the reason I pulled the

7  trigger on the TASER.

8      Q.     My question is, what at that specific

9  moment was he doing that led you to think he was

10  trying to enter the vehicle at that moment?

11          MR. ARKO:  Objection.

12     A.     He was leaning towards the door to get

13  inside of the vehicle.

14     Q.     The door was opened this whole time,

15  right?

16     A.     From what I believe, yes.

17     Q.     There was nothing physically blocking

18  Mr. Harris from getting into the car was there?

19          MR. ARKO:  Objection.

20     A.     Physically?  Not that I remember.

21     Q.     What was Officer Jimenez doing at the

22  time you pulled the trigger on the TASER?

23     A.     I don't remember.

24     Q.     After you deployed the TASER Mr. Harris

25  fell to the ground, correct?

1          POLICE OFFICER MAXWELL BALTZER

2      A.    Correct.

3      Q.    Did you see what part of his body made

4  physical contact with the ground?

5      A.    I don't remember.

6      Q.    Did watching the body-worn camera

7  footage in preparation for today's testimony

8  refresh your memory about what part of Mr. Harris'

9  body hit the ground when he fell?

10     A.    Again, I don't remember; it is all

11 blurry on the video.

12     Q.    So from both your recollection and the

13 video, you have no knowledge of what part of

14 Mr. Harris' body hit the ground when he fell,

15 correct?

16     A.    At this time I can' remember which part

17 of his body hit the ground first, no.

18     Q.    That is with the benefit of having

19 previously seen the portion of the video that

20 depicts the TASing and the fall, correct?

21          MR. ARKO:   Objection.

22     A.    Correct.  Again, the video is a little

23 blurry, I can't remember which part of his body

24 hit the ground first.

25     Q.    Just for orientation, I am going to go

```
1              POLICE OFFICER MAXWELL BALTZER
2    back to the still frame of Plaintiff's Exhibit 3
3    for a --
4              MR. ARKO:  For the record, we are at
5    1:07.
6         Q.   Yes, we're at 1:07.
7              Can you see the time stamp in the
8    upper-left corner?
9         A.   Again, it is a little blurry but I
10   think it says 03:54.
11        Q.   I agree, it is just for context for
12   where I am going next.
13             MR. LIEB:  I am going to designate as
14   Plaintiff's Exhibit 4 a body-worn camera footage
15   produced by defendants as Defendants 56.
16             (Plaintiff's Exhibit No. 4 was
17        marked for identification.)
18        Q.   Officer Baltzer, can you see a still
19   frame on your screen?
20        A.   Yes.
21        Q.   Do you see the time stamp of 5:14:05?
22        A.   Correct.
23        Q.   For context, would you agree with me
24   this appears to be some time after the TASing
25   incident with Mr. Harris?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2       A.    Yes.
 3       Q.    I am just going to play this video for
 4  a moment or two.
 5              (Video played.)
 6       Q.    There is a member of the service with a
 7  TASER on their belt in a blue shirt in the
 8  foreground of this frame.
 9              Do you see that?
10              MR. ARKO:  Stopped at three seconds.
11       A.    Yes.
12       Q.    Who's that?
13       A.    I can't make out his face, again our
14  screen is a lot blurrier.
15              (Video played.)
16       Q.    I have stopped it at 13 seconds.
17              Are you able to determine who that is?
18       A.    That looks like Sergeant Cannariato.
19       Q.    That's Lieutenant Lane in the white
20  shirt there, right?
21       A.    I believe so.
22       Q.    In any event, the member of the service
23  in the foreground with the blue shirt has sergeant
24  stripes on the blue sleeve, right?
25       A.    Correct.
```

```
 1                POLICE OFFICER MAXWELL BALTZER

 2                MR. LIEB:  I am pasting in the chat and

 3      will display on the screen what I have marked as

 4      Plaintiff's Exhibit 5, which is a three-page

 5      document although the third has no substance;

 6      bearing Bates number Defendants 21 to 23.

 7                (Plaintiff's Exhibit No. 5 was

 8          marked for identification.)

 9           Q.    So just looking at the top of the page

10      for a moment you recognize this document to be a

11      TRI or Threat Resistance and Injury Report,

12      Officer Baltzer?

13           A.    Yes.

14           Q.    That is standard NYPD paperwork that is

15      completed when there is a use-of-force, correct?

16           A.    Yes.

17           Q.    There is a section or portion completed

18      by the officer who used force and a section

19      completed by the supervisor, correct?

20           A.    Correct.

21           Q.    So I am going to go down to a portion

22      on page Defendant's 22 that says "completing

23      member."

24                Do you see that here, towards the top

25      of the screen?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2       A.    Yes.
 3       Q.    It has your name and tax ID number.
 4       Correct?
 5       A.    Correct.
 6       Q.    Does that indicate you completed this
 7   portion of the TRI Report?
 8       A.    Correct.
 9       Q.    So this is your TRI Report for the
10   use-of-force incident involving Mr. Harris,
11   correct?
12       A.    Yes.
13       Q.    So, do you see down here in the bottom
14   right of page, Defendant's 21, there is a question
15   "subject used force?"  Answer is "no."
16              Do you see that?
17       A.    Yes.
18       Q.    This is a computerized form you fill
19   out, right?
20       A.    Yes.
21       Q.    Whether the subject used force is one
22   of the standard questions on the form that you
23   have to complete, correct?
24       A.    Yes.
25       Q.    Here the subject is Mr. Harris, right?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2       A.     Yes.
 3       Q.     You answered "no," correct?
 4       A.     Correct.
 5       Q.     That is true, right, Mr. Harris didn't
 6  use any force against police during this
 7  interaction, correct?
 8       A.     Against me, no.
 9       Q.     So are you saying if Mr. Harris had
10  used force against a brother officer you still
11  would have answered this question "no"?
12              MR. ARKO:  Objection.
13       A.     It is completed by me, this form is
14  based on my interaction with Mr. Harris, and from
15  my interaction, Mr. Harris didn't use force
16  against me.
17       Q.     But the correct way to complete this
18  form is for if the subject used force against any
19  member of the service you're supposed to answer
20  "yes," right?
21              MR. ARKO:  Objection.
22       A.     I'm not sure if that's true or not, I
23  answered no because he didn't use force against
24  me.
25       Q.     You didn't observe him use force
```

1            POLICE OFFICER MAXWELL BALTZER

2      against anyone else, right?

3          A.    I observed a physical struggle between

4      him and Lieutenant Lane.

5          Q.    But you didn't observe Mr. Harris use

6      force against anyone else, correct?

7                MR. ARKO:   Objection.

8          A.    How do you describe "force"?

9          Q.    Well, you fill out this form, right?

10         A.    Correct.

11         Q.    So based upon whatever you understand

12     force to mean and the NYPD use-of-force paperwork,

13     you didn't observe Mr. Harris use force against

14     anyone else, correct?

15         A.    Against me, no.

16         Q.    What about against anyone else?

17               MR. ARKO:   Objection.

18         A.    In my personal view of the incident, I

19     observed a physical struggle, and it depends what

20     your term of force is, but this form is filled out

21     by me, against me; so no, he didn't use force

22     against me.

23         Q.    You have an understanding of what

24     "force" means on this document, right?

25               MR. ARKO:   Objection.

1            POLICE OFFICER MAXWELL BALTZER

2       A.    Yes, I do.

3       Q.    This is a standard form you have to

4  fill out in the regular performance of your duties

5  as a police officer, right?

6       A.    Correct.

7       Q.    Based on that understanding of force,

8  the meaning of the word "force," did you observe

9  Mr. Harris use force against any member of the

10  NYPD, "yes" or "no"?

11            MR. ARKO:   Objection.

12       A.    No, I did not, it depends on your

13  definition of force.   A physical struggle does not

14  constitute the use-of-force.

15       Q.    At the top of page Defendant's 22 you

16  indicate that you did not suspect alcohol

17  intoxication or drug use.

18            Correct?

19       A.    Correct.

20       Q.    That is also true, right, you did not

21  suspect during this interaction suspect alcohol

22  intoxication or drug use on the part of

23  Mr. Harris, right?

24       A.    Correct.

25       Q.    Then there is a question "emotionally

```
 1              POLICE OFFICER MAXWELL BALTZER
 2   disturbed person?"
 3              Do you see that?
 4       A.    Yes.
 5       Q.    The answer there is "no," correct?
 6       A.    Correct.
 7       Q.    That is also true, you did not perceive
 8   Mr. Harris to be an emotionally disturbed person
 9   during your interaction with him on September 2nd,
10   correct?
11       A.    Correct.
12       Q.    On page Defendant's 22 there is a
13   portion of the form "CEW Use."
14              Do you see that?
15       A.    Yes.
16       Q.    That is a portion of the TRI Report
17   that you fill out if a TASER has been deployed,
18   correct?
19       A.    Correct.
20       Q.    There is a question "de-escalation
21   tactics utilized" question mark.
22              Do you see that?
23       A.    Yes.
24       Q.    And you indicated there was a "display
25   of the TASER (sic) and verbal warnings."
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2              Right?
 3      A.      Correct.
 4      Q.      The question there is whether you
 5  attempted to de-escalate the situation by any
 6  means, prior to the deployment of the TASER,
 7  correct?
 8              MR. ARKO:  Objection.
 9      A.      That is not so true.
10      Q.      What do you understand to be the
11  meaning of the question "de-escalation tactics
12  utilized" question mark?
13      A.      I believe that is what it says, but in
14  the situation I believe that there was an imminent
15  use for the TASER at that specific moment.
16      Q.      But taking it one step at a time, I am
17  not getting to why you used the TASER against
18  Mr. Harris on the day, I just want to understand
19  what you understand the meaning of these words to
20  be.
21              What do you understand to be the
22  meaning of the words "de-escalation tactics
23  utilized" question mark, on the TRI Report?
24      A.      Steps used to de-escalate the
25  situation.
```

```
1              POLICE OFFICER MAXWELL BALTZER
2       Q.    Right, it is asking you whether you
3    undertook any steps to de-escalate the situation
4    before using the TASER, right?
5              MR. ARKO:  Objection.
6       A.    Correct.
7       Q.    In answer to that question you said
8    that you displayed the TASER and gave verbal
9    warnings, right?
10      A.    Correct.
11      Q.    You didn't display the TASER as a
12   de-escalation tactic, did you?
13             MR. ARKO:  Objection.
14      A.    I displayed it in use as a
15   de-escalation tactic, and I also gave verbal
16   warnings with "TASER, TASER, TASER."
17      Q.    How long did you display the TASER
18   before firing it?
19             MR. ARKO:  Objection.
20      A.    I can't put a time frame on it.
21      Q.    Was it more than a second?
22             MR. ARKO:  Objection.
23      A.    It might have been or it might not have
24   been, I can't put a time frame on it.
25      Q.    Was Mr. Harris facing in your direction
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2   at the time you displayed the TASER?
 3        A.     In my direction face-to-face, I don't
 4   believe so.
 5        Q.     Could you see his eyes when you
 6   displayed the TASER?
 7               MR. ARKO:  Objection.
 8        A.     I don't believe so.
 9        Q.     I am going to go back to the
10   Plaintiff's Exhibit 3 of the body camera footage.
11               Can you see the still frame on your
12   screen Officer Baltzer?
13        A.     Yes.
14               MR. ARKO:  That's at 1 minute zero
15   seconds.
16        Q.     Starting the video at 1:00.
17               (Video played.)
18               MR. ARKO:  One second Doug, I think
19   there is a lag between the sound and the video for
20   that portion.
21               MR. LIEB:  I will try it one more time.
22        Q.     Back to one minute.
23               (Video played.)
24               MR. ARKO:  Doug, the video is moving
25   very, very slowly on our end, there is a lag
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    between the sound and the video.
3              MR. LIEB:  I'm not really sure what to
4    do...let me try this again and I will turn off the
5    sound for purposes of this question.
6              MR. ARKO:  Okay.
7    Q.    Starting at one minute, sound off.
8              (Video played without sound.)
9    Q.    I am stopping the video at 1:13.
10             Do you see that you, Mr. Harris and
11   Lieutenant Lane are at this point in the video on
12   the way to the ground? (sic)
13   A.    Yes.
14   Q.    So you understand that at this point in
15   the video the TASER has already been deployed,
16   yes?
17   A.    Can you go back a couple of seconds?
18   Q.    Starting at 1:07.
19             (Video played.)
20   Q.    Stopping at 1:14.
21             Do you understand the TASER has been
22   deployed at this point?
23   A.    Yes.
24   Q.    Did you see yourself at that point of
25   the video, 1:07 to 1:14 (sic), displaying the
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    TASER as a de-escalation tactic?
3              MR. ARKO:  Objection.
4        A.    I believe so, yes.
5        Q.    How did you do that during that
6    portion -- what was it that you did depicted in
7    that portion of the video that you consider to be
8    a de-escalation tactic?
9              MR. ARKO:  Objection.
10       A.    I drew my TASER and I gave him verbal
11   warnings with "TASER, TASER, TASER."
12       Q.    By definition you need to draw the
13   TASER in order to fire it, right?
14       A.    Correct.
15       Q.    Separate and apart from taking it out,
16   what, if anything, did you do as a de-escalation
17   tactic when it came to displaying the TASER?
18             MR. ARKO:  Objection.
19       A.    I displayed it.  I take it out of the
20   holster and I display it.
21       Q.    Okay.
22             MR. LIEB:  It is almost 12:30, I don't
23   have a huge amount more but I believe it's
24   probably a good idea to take a lunch break, so can
25   we come back at 1:10.
```

```
1              POLICE OFFICER MAXWELL BALTZER
2              (Lunch Recess.)
3         Q.    Officer Baltzer, we were discussing
4    this morning whether you had a body-worn camera on
5    the day of this incident.  When you do have a
6    body-worn camera on your person while you're on
7    patrol where on your body do you generally put it?
8         A.    Generally, I put it in the middle of --
9              THE STENOGRAPHER: (Asks Witness to
10   repeat due to technical issue.)
11        A.    -- the front my body.
12        Q.    That answer was garbled, can you repeat
13   your answer Officer Baltzer?
14        A.    Of course.  In the middle of my
15   chest...
16             (Technical issue.)
17             MR. LIEB:  The connection is not good.
18             MR. ARKO:  Let me leave the meeting and
19   come back in one second.
20        Q.    One more time, Officer Baltzer.  Where
21   do you generally wear your body camera when you
22   wear it?
23        A.    In the middle of my chest.
24             (Continued discussion regarding the
25   connection issues.)
```

```
1              POLICE OFFICER MAXWELL BALTZER
2        Q.    One more time, where do you usually
3   wear your body camera?
4        A.    In the middle of my chest.
5        Q.    Does it clip onto your uniform shirt?
6        A.    Yes.
7        Q.    Do you usually clip it -- does your
8   uniform shirt have buttons or a zipper in front?
9        A.    I don't remember what shirt I was
10  wearing at the time, but it could be buttons or a
11  zipper.
12       Q.    If it was a buttons you would clip it
13  between two buttons?
14       A.    Usually, somewhere in the middle of my
15  chest.
16       Q.    And your radio would be up by your
17  shoulder so you can activate it without your
18  hands, right?
19       A.    No, I didn't haven't one of those buff
20  mics, I just have the regular radio so it was on
21  my hip.
22       Q.    Got it.  Would there be anything else
23  in the middle of your chest as part of your normal
24  uniform other than a body-worn camera?
25       A.    Not that I can think of.
```

```
1                POLICE OFFICER MAXWELL BALTZER

2        Q.     Have you ever downloaded or accessed

3   your body-worn camera footage through the Axon

4   online platform or evidence.com?

5                MR. ARKO:  Objection.

6        A.     For this case or any case?

7        Q.     For any case.

8        A.     Yes, I have done this before.

9        Q.     Are you familiar with something called

10  an "audit trail" or an "audit log" that is like a

11  spreadsheet that indicates what was going on with

12  your body-worn camera at any given time?

13               MR. ARKO:  Objection.

14       A.     No, I am not familiar with that.

15       Q.     Do you know whether a document exists

16  that would reflect whether your body-worn camera

17  was charging or on standby at any given moment in

18  time?

19               MR. ARKO:  Objection.

20       A.     I'm not aware that any document like

21  that exists.

22               MR. LIEB:  I am going to put in the

23  chat and share on the screen what I have marked as

24  Plaintiff's Exhibit 6...

25               (Plaintiff's Exhibit No. 6 was
```

```
 1                 POLICE OFFICER MAXWELL BALTZER
 2         marked for identification.)
 3                 MR. LIEB:   Which is an eight-page
 4   document that I accessed in the public domain,
 5   which is the portion of the NYPD patrol guide
 6   pertaining to use of body-worn cameras with the
 7   effective date of January 8, 2018.
 8        Q.    I am going down to paragraph four which
 9   is entitled "mandatory activation of BWC."
10                 Do you see that Officer Baltzer?
11        A.    Yes.
12        Q.    You understand that BWC stands for
13   "body-worn camera," correct?
14        A.    Yes.
15        Q.    One of times when it is mandatory to
16   activate a body-worn camera is 4(c), "public
17   interactions that escalate and become
18   adversarial."
19                 Do you see that?
20        A.    Yes.
21        Q.    Mr. Harris was obviously a member of
22   the public on September 2nd of 2020, correct?
23                 MR. ARKO:   Objection.
24        A.    He is a member of the public, yes.
25        Q.    You testified earlier that his verbal
```

1                POLICE OFFICER MAXWELL BALTZER

2       exchange with you and your colleagues was quote,

3       unquote "irate" and quote, unquote "aggressive."

4                Correct?

5       A.      Correct.

6       Q.      You actually used the word "escalate"

7       to describe the situation that unfolded with

8       Mr. Harris, you said it "progressively escalated."

9                Right?

10      A.      Correct.

11      Q.      This whole interaction with Mr. Harris

12      clearly falls within paragraph 4(c)for mandatory

13      activation of body-worn camera, right, it is a

14      public interaction that's escalating and becoming

15      adversarial; in your assessment, right?

16                MR. ARKO:  Objection.

17      A.      In my estimate, my belief, yes.

18      Q.      So if you had had a body-worn camera on

19      you on the morning of September 2nd of 2020, you

20      would agree that based upon how you understood the

21      situation you would have been required to activate

22      it, correct?

23                MR. ARKO:  Objection.

24      A.      If I had my body-worn camera at the

25      time I believe that I would have activated it,

```
 1              POLICE OFFICER MAXWELL BALTZER
 2    yes.
 3         Q.    Not only do you believe you would have,
 4    but you believe you would been required to do so,
 5    right?
 6              MR. ARKO:   Objection.
 7         A.    With the situation at hand, yes.
 8         Q.    I want to go back to Plaintiff's
 9    Exhibit 3, which is the body-worn camera video
10    Bates numbered Defendants 54.  I am going to start
11    the video -- can you see the still frame on your
12    screen Officer Baltzer?
13         A.    Yes.
14         Q.    I am going to start the video at 1
15    minute 34.
16              (Video played.)
17         Q.    Stopping the video at 1:40.
18              First of all, in context you understand
19    from Mr. Harris screaming that this is after the
20    TASER was deployed, yes?
21         A.    I believe this moment, this was after
22    the TASER was deployed.
23         Q.    We have Lieutenant Lane in the white
24    shirt, right?
25         A.    His face is blurry, I can't tell, but I
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2    believe so.
 3         Q.    The big black thing in the middle of
 4    his chest is a body-worn camera, right?
 5         A.    From my belief, that's what it looks
 6    like.
 7         Q.    I will keep playing.
 8               (Video played.)
 9         Q.    Stopping at 1:42.
10               There was a member of the service in
11    the near foreground who quickly looked up toward
12    the body-worn camera and then looked back down.
13               Did you see that?
14         A.    Are you talking about the one wearing a
15    mask?
16         Q.    No, I will play it again.  Starting at
17    1:39 the person all the way to the right, keep
18    your focus on that person please.
19               (Video played.)
20         Q.    Did you see that person just look
21    towards the camera and then look back down?
22         A.    What do you mean "look towards the
23    camera"?
24         Q.    Withdrawn.  That's you, right?
25         A.    Yeah, that's me.
```

1              POLICE OFFICER MAXWELL BALTZER

2      Q.    That is what I wanted to establish,

3   that that's you.

4      A.    Okay.

5            (Video played.)

6      Q.    I stopped it at 1:59.

7            Did you see yourself just grab an area

8   in the center of your chest and adjust something?

9      A.    Yes.

10      Q.    What were you adjusting?

11      A.    It could have been my vest.

12      Q.    Could it have been your body-worn

13   camera?

14            MR. ARKO:  Objection.

15      A.    Negative, because I wasn't wearing my

16   body camera at the time.

17      Q.    Are you saying you're sure you didn't

18   have your body-worn camera on the day in question?

19      A.    To my best knowledge of this situation,

20   right now, I was not wearing my body camera.

21      Q.    Is that based upon your recollection or

22   your assumption if you had it on you would have

23   turned it on or something else?

24            MR. ARKO:  Objection.

25      A.    It is based upon my knowledge of the

```
1              POLICE OFFICER MAXWELL BALTZER
2    incident and my knowledge of me working a double
3    and that the batteries on the body camera don't
4    usually last over eight to nine hours -- and I
5    already testified if there was an incident my body
6    camera would have been activated so I believe --
7    so if I didn't activate my body camera at the
8    moment, I believe I would have activated it.
9         Q.    Continuing from 1:59.
10             (Video played.)
11        Q.    Did you see yourself twice adjust
12   something on your chest there?
13        A.    I touched my chest, yes.
14        Q.    That was your vest again you think?
15        A.    It could have been, yes.
16        Q.    Resuming at 2:04.
17             (Video played.)
18        Q.    Do you see yourself just grab with your
19   hand in a U-Shape something in the middle of your
20   chest?  Stopped at 2:08?
21        A.    I saw myself touch my chest again, yes.
22        Q.    Let's focus on what you're doing when
23   you're touching your chest.  Resuming at 2:03.
24             (Video played.)
25        Q.    Can you see yourself grab something in
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    the middle of your chest with your hand?  Stopping
3    the video at 2:08.
4         A.   I can't tell if I grabbed anything, but
5    I can tell that I twist my hand on my chest.
6         Q.   But there is nothing else that would be
7    there other than a body-worn camera, right?
8              MR. ARKO:  Objection.
9         A.   Not that I can see and that I can
10   remember.
11             (Video played.)
12        Q.   2:16 you were grabbing your chest
13   again, right?
14        A.   I touched my chest again, yes.
15        Q.   Are you generally in the habit of
16   touching your chest that frequently when there is
17   nothing there?
18             MR. ARKO:  Objection.
19        A.   I don't know what was going through my
20   head at the time, I don't know if it was a nervous
21   habit because of the situation that just happened.
22        Q.   But you would agree with me that from
23   this video you can't tell there is a body-worn
24   camera on your chest one way or the other, you
25   can't see conclusively that part of your uniform,
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2   right?
 3        A.    A black body camera on a dark blue
 4   shirt you couldn't really tell, no.
 5        Q.    It is tough to see, right?
 6        A.    Yes.
 7        Q.    You would agree with that, yes?
 8        A.    I would agree that looking at this
 9   video for the first time that it would be hard to
10   tell.
11        Q.    You're familiar with the criminal
12   offense under the Penal Law known as "Obstructing
13   Governmental Administration"?
14        A.    Yes.
15        Q.    Also known as "OGA"?
16        A.    Yes.
17        Q.    It is a misdemeanor, right?
18        A.    Yes.
19        Q.    Not a particularly serious offense?
20              MR. ARKO:  Objection.
21        A.    I believe that it could be.
22        Q.    Do you consider misdemeanors serious
23   offenses?
24              MR. ARKO:  Objection.
25        A.    A misdemeanor is a crime, and it
```

```
1              POLICE OFFICER MAXWELL BALTZER
2    depends on what they're doing during that OGA, it
3    could be serious.
4         Q.    In the continuum of crimes, would you
5    consider OGA less serious or more serious?
6              MR. ARKO:   Objection.
7         A.    OGA is a crime, whether it being
8    serious or not serious it is not either more or
9    less, it is still a crime.
10        Q.    Is murder a serious crime?
11             MR. ARKO:   Objection.
12        A.    Murder is a very serious crime.
13        Q.    There are a lot of crimes out there and
14   they range from less serious to more serious,
15   right?
16        A.    Right.
17        Q.    Where does OGA fall on the scale from
18   less serious to more serious?
19             MR. ARKO:   Objection.
20        A.    Again, as I testified it depends what
21   they are doing during the OGA to make it either
22   serious or less serious.
23        Q.    If someone is, for example, physically
24   assaulting an officer that could be OGA but it is
25   also a felony assault on an officer, right?
```

```
 1              POLICE OFFICER MAXWELL BALTZER
 2              MR. ARKO:  Objection.
 3       A.    Yes, it could be.
 4       Q.    So assume that OGA is the most serious
 5   charge, okay?  Understand what I am saying?
 6       A.    I understand.
 7       Q.    In the circumstance in which OGA is the
 8   top charge you are arresting someone for, would
 9   you consider that to be a relatively more serious
10   or relatively less serious offense?
11              MR. ARKO:  Objection.
12       A.    Again, it depends on why they are being
13   arrested, what their -- request -- it depends
14   whether it could be serious or not serious.
15              (Technical issue.)
16              MR. LIEB:  We definitely got to get off
17   the record and get a better Internet connection.
18              MR. ARKO:  Let's take a break and I
19   will see if I can get a better connection.
20              (Recess.)
21       Q.    Let's try again:  Officer Baltzer,
22   you're familiar with something called a desk
23   appearance ticket, right?
24       A.    Yes.
25       Q.    When you arrest someone there are
```