1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------X
     BRIAN HARRIS,
3
                    Plaintiff,
4
                 -against-          No. 20-CV-10864(LGS)
5
     CITY OF NEW YORK; Lieutenant ANGEL
6    LEON; Detective KRISTEN SWINKUNAS (Shield #2190);
     Police Officer ANTONELLA JIMENEZ (Shield #5209);
7    Police Officer MAXWELL BALTZER (Shield No. 15451);
     and Lieutenant JOHN LANE,
8
                    Defendants.
9    -------------------------------X

10

11

12            DEPOSITION OF LIEUTENANT ANGEL LEON

13                  New York, New York

14                 November 17, 2021

15                   10:05 a.m.

16

17

18

19

20

21

22            ELLEN SANDLES REPORTING
23          145 East 16th Street, #9H
            New York, New York 10003
24               212-677-8739

25

```
1              LIEUTENANT ANGEL LEON
2   today's deposition?
3        A.    We had one meeting before this one.
4        Q.    When was that?
5        A.    I would say two to three weeks ago.
6        Q.    Was that an in-person meeting?
7        A.    In-person meeting.
8        Q.    About how long did that meeting last?
9              MR. ARKO:  Objection, you can answer
10  unless I tell you not to.
11       A.    Half an hour.
12       Q.    Have you ever seen any police paperwork
13  prepared by other members of the service that
14  pertains to the TASEing of Mr. Harris, such as a
15  TRI Report or a Criminal Complaint prepared
16  against Mr. Harris?
17             MR. ARKO:  Objection.
18       A.    No.
19       Q.    How old are you?
20       A.    I am 53.
21       Q.    How tall are you?
22       A.    I am 5'5".
23       Q.    How much do you weigh approximately?
24       A.    180.
25       Q.    Did you weigh approximately the same
```

```
 1              LIEUTENANT ANGEL LEON
 2    amount on the day of this incident, which I will
 3    represent to you was September 2nd of the 2020?
 4        A.    Yes.
 5        Q.    As of September 2nd of 2020, would you
 6    say you were in good physical condition at that
 7    time?
 8              MR. ARKO:  Objection.
 9        A.    Yes.
10        Q.    Had you recently experience any
11    injuries, physical injuries as of September 2,
12    2020?
13              MR. ARKO:  Objection.
14        A.    No.
15        Q.    Was there anything that affected your
16    mobility as of September 2nd of 2020?
17              MR. ARKO:  Objection.
18        A.    No.
19        Q.    What is the highest level of education
20    that you've completed?
21        A.    Bachelor's degree.
22        Q.    Where did you receive that degree from?
23        A.    John Jay.
24        Q.    Is it in criminal justice?
25        A.    In police science.
```

```
 1                 LIEUTENANT ANGEL LEON
 2        Q.    Did you receive that degree while you
 3   were a member of the New York City Police
 4   Department?
 5        A.    Correct.
 6        Q.    When did you receive it?
 7        A.    I graduated in 2009.
 8        Q.    When were you appointed to the police
 9   department?
10        A.    1996.
11        Q.    Did you hold any law enforcement
12   positions before you joined the New York City
13   Police Department?
14        A.    No.
15        Q.    Did you work before you joined the New
16   York City Police Department?
17        A.    Yes, I did.
18        Q.    In generally terms what was the nature
19   of your employment before joining the New York
20   City Police Department?
21        A.    I was an armor truck driver.
22        Q.    For what company?
23        A.    Wells Fargo.
24        Q.    Do you currently hold the rank of
25   lieutenant?
```

```
 1                LIEUTENANT ANGEL LEON
 2      A.    Correct.
 3      Q.    When did you achieve the rank of
 4  lieutenant?
 5      A.    I got promoted in 2018, June 5th of
 6  2018.
 7      Q.    Before being promoted to lieutenant in
 8  June of 2018, did you hold the rank of sergeant?
 9      A.    Correct.
10      Q.    How long were you a sergeant?
11      A.    Since 2003; 15 years as sergeant.
12      Q.    So, I guess from 1996 until you became
13  a sergeant in the '03 you held the rank of police
14  officer, correct?
15      A.    Correct.
16      Q.    Is there an examination you take for
17  promotion from sergeant to lieutenant?
18      A.    Yes.
19      Q.    How many times did you take that exam?
20            MR. ARKO:   Objection.
21      A.    From sergeant to lieutenant?
22      Q.    Yes.
23      A.    I am going to guesstimate three.
24      Q.    What's the first time that you recall
25  taking the lieutenant's exam?
```

```
1                    LIEUTENANT ANGEL LEON
2              MR. ARKO:  Sorry, you froze.  Can you
3   repeat that?
4         Q.    What is the first time that you recall
5   taking the lieutenant's exam?
6              MR. ARKO:  Objection.
7         A.    I don't remember.
8         Q.    What's your current command?
9         A.    The 26th Precinct.
10        Q.    When you became a lieutenant in June of
11  2018, was the 26th Precinct your first command as
12  a lieutenant?
13        A.    That was my first command.
14        Q.    Were you assigned to the 26th Precinct
15  as a sergeant at any point in time?
16        A.    No.
17        Q.    What was your command as a sergeant,
18  prior to becoming a lieutenant in the 26th
19  Precinct?
20        A.    I was at the 28th Precinct.
21              MR. LIEB:  We are having Internet
22  connection problems, I am getting frustrated --
23              MR. ARKO:  The last two depositions
24  with Alanna we didn't have issues, so I wasn't
25  expecting...
```

1          LIEUTENANT ANGEL LEON

2              (Discussion regarding technical

3   Internet issues.)

4       Q.    So we were discussing that your last

5   command as a sergeant was the 28th Precinct,

6   right?

7       A.    That's right.

8       Q.    About how many years were you assigned

9   to the 28th Precinct?

10      A.    I was there from '03 to 2018, until I

11  got promoted to lieutenant.

12      Q.    So all those approximately 15 years as

13  a sergeant was at the 28th Precinct?

14      A.    Correct.

15      Q.    Where is that?

16      A.    Harlem by 125th Street --

17      Q.    On St. Nicholas.

18      A.    It is close by; you know Fredrick

19  Douglas Boulevard?

20      Q.    Got it.  So you are currently at the

21  offices of the New York City Law Department for

22  today's deposition, is that correct?

23      A.    Correct.

24      Q.    Do you have any documents in front of

25  you?

```
 1              LIEUTENANT ANGEL LEON
 2       A.    No.
 3             MR. LIEB:  I am pasting into the chat
 4   and will share on the screen in a moment what I
 5   have marked as Plaintiff's Exhibit 13, which is a
 6   two-page document Bates numbered Defendants 35 to
 7   36.
 8             (Plaintiff's Exhibit No. 13 was
 9             marked for identification.)
10       Q.    Lieutenant, do you see the document on
11   the screen in front of you?
12       A.    Yes, I do.
13       Q.    For the record, the computer thinks the
14   document is oriented the other way and the exhibit
15   sticker is rotated 90 degrees, I'll fix that
16   another time, but for present purposes it will do.
17             So looking at the top of the page do
18   you understand this document to be a copy of your
19   activity log, otherwise known as a memo book, for
20   your tour of duty on the night of September 1st
21   and the morning of September 2, 2020?
22       A.    Yes.
23       Q.    Do you see on the top there it says
24   "chart/squad" and "other steady RDO"?
25       A.    Correct.
```

LIEUTENANT ANGEL LEON

1

2      Q.     Does RDO refer to "regular day off"?

3      A.     Right, steady RDO which is my Monday,

4  Tuesdays.

5      Q.     Got it.  Are you familiar with a

6  position known as "special operations lieutenant"?

7      A.     Yes.

8      Q.     That is a lieutenant within your

9  command who has particular responsibilities for

10  overseeing particular units within the command,

11  right?

12      A.     Yes.

13      Q.     Were you the special operations

14  lieutenant as of September 2, 2020?

15      A.     No, I wasn't.

16      Q.     Did you have other specialized

17  responsibilities within your command along those

18  lines, such as particular units that you were

19  charged with overseeing as of September 2, 2020?

20      A.     No.

21      Q.     On a regular tour at or around the time

22  of September 2020, what were your

23  responsibilities?

24      A.     I am a platoon commander and I

25  supervise three squads of regular patrol officers;

```
1              LIEUTENANT ANGEL LEON
2     they are not special to units, they are regular
3     patrol officers.
4          Q.    When you say "three units" are those
5     units divided by geographical sector or in some
6     other manner?
7          A.    By sectors, each squad consisting of
8     eight to ten cops.
9          Q.    How many sectors are there within the
10    26th Precinct?
11         A.    We average four to five sectors.
12         Q.    During a normal tour as a platoon
13    commander it would be your responsibility to
14    supervise three of those sectors, is that right?
15         A.    As the platoon commander one squad is
16    off, and then you always have two squads working;
17    that is why there are three squads.
18         Q.    So are there platoon commanders on a
19    given tour or just one?
20         A.    There is a platoon commander on each
21    tour; one on the midnight, one on the 4:00 to
22    12:00 and one on the day tour.
23         Q.    You indicated there were about eight to
24    ten cops in each unit.
25              Is that right?
```

```
 1                    LIEUTENANT ANGEL LEON
 2         A.     Each squad, correct.
 3         Q.     About how many officers would be under
 4    your command as a platoon commander on a given
 5    tour under normal circumstances?
 6         A.    I would say on average, approximately
 7    twenty cops.
 8         Q.    Would each of those units have a
 9    sergeant?
10         A.    Correct, each squad has a sergeant.
11    Squad sergeant for A-1, A-2 and A-3.
12         Q.    As a platoon commander, would you
13    typically go out into the field during your tour
14    or remain in the precinct?
15         A.    I go into the field.
16         Q.    When you are out in the field on a
17    typical tour, what kinds of things would you do?
18         A.    Supervise, not only my sergeant, but
19    also cops.
20         Q.    When you go out in the field as a
21    platoon commander, would you typically operate
22    your own vehicle or would there typically be an
23    officer or other member of the service assigned as
24    an operator?
25         A.    It is not uncommon for me to drive
```

```
 1              LIEUTENANT ANGEL LEON
 2   myself, if I have enough personnel I will assign a
 3   driver to drive me.
 4       Q.    A few questions prior you referred to
 5   three tours throughout the day, one of which is
 6   the midnight tour.  If you look at Plaintiff's
 7   Exhibit 13 this document indicates your tour began
 8   at 11:00 p.m. on September 1st and was scheduled
 9   to conclude at 7:45 on September 2nd.
10              Do you see that?
11       A.    Yes.
12       Q.    Is that what you refer to as a midnight
13   tour?
14       A.    Yes, those are my hours of operations,
15   23:00 to 07:45.  The sergeant is from 23:15 to
16   07:50.
17       Q.    Are you familiar with a member of the
18   service by the name of Kristen Swinkunas?
19       A.    Yes.
20       Q.    Was she a member of one of the units
21   under your command as of September 2nd of 2020 in
22   the 26th Precinct?
23       A.    Yes.
24       Q.    Do you know which unit she was assigned
25   to at the time?
```

1                   LIEUTENANT ANGEL LEON

2         A.     She's not in a steady sector, so she

3    would get bounced from Sector Adam to Boy to

4    Charleston; she's not in a steady sector.

5         Q.     Is there some group of officers within

6    the precinct who is not assigned to a steady

7    sector?

8         A.     There are groups that are assigned to

9    steady sectors, and there are cops that float

10   around who are not assigned to steady sectors.

11        Q.     I will refer to them as "floaters"

12   since you refer to them as floating around, about

13   how many cops are floating around under your

14   command at any given time?

15             MR. ARKO:   Objection.

16        A.     I'm not sure.

17        Q.     Are you familiar with Police Officer

18   Antonella Jimenez?

19        A.     Yes, I am.

20        Q.     Was she assigned to a particular sector

21   as of September 2, 2020?

22        A.     She is not assigned to a steady sector,

23   she was assigned to A Sector.

24        Q.     When you say "A sector" you mean

25   "Sector A" as opposed to one sector, right?

```
1                  LIEUTENANT ANGEL LEON
2         A.    Correct.
3         Q.    As of the day of this incident,
4    Lieutenant Lane was the special operations
5    lieutenant, right?
6         A.    Yes.
7         Q.    Would there have been other lieutenants
8    on duty during this tour, other than yourself and
9    Lieutenant Lane?
10        A.    No, just me and him.
11        Q.    Do you know who the sergeant was for
12   Sector A as of this time?
13        A.    For that incident, the patrol
14   supervisor was Sergeant Cannariato.
15        Q.    When you say "the patrol supervisor"
16   tell me what you mean by that as it relates to
17   Sector A.
18        A.    In other words, he's a field supervisor
19   and then you have another sergeant who covers the
20   desk.
21        Q.    Was he the field supervisor for Sector
22   A specifically or for all of the units that were
23   on that tour?
24        A.    All of the units.
25        Q.    So on the day in question of this
```

```
 1              LIEUTENANT ANGEL LEON

 2   incident, September 2nd, you were in uniform?

 3        A.    Yes.

 4        Q.    What is your uniform?

 5        A.    White shirt, blue tie like I am wearing

 6   now.

 7        Q.    Did you have a firearm on your belt?

 8        A.    Yes.

 9        Q.    Did you have a TASER on your belt?

10        A.    Yes.

11        Q.    And you had a body-worn camera affixed

12   to your uniform, correct?

13        A.    It is affixed to my gun belt.

14              MR. ARKO:   Sorry, what was the

15   question?

16        Q.    The question was whether you had a

17   body-worn camera affixed to your uniform?

18        A.    Yes.

19        Q.    The TASER is on your belt, right?

20        A.    Correct.

21        Q.    Are you right handed or left handed?

22        A.    When it comes to the firearm?

23        Q.    Sure.

24        A.    The firearm is located on the right

25   side of my gun belt, and the TASER is located on
```

```
 1              LIEUTENANT ANGEL LEON
 2   the left side of my gun belt.
 3        Q.    Just in your every day life when you
 4   write something, are you left handed or right
 5   handed?
 6        A.    I am right handed.
 7        Q.    So because you're right hand dominant
 8   the firearm is on your dominant side and the TASER
 9   is on the other side, right?
10        A.    Correct.
11        Q.    On the morning of September 2nd of 2020
12   there came a time at which you responded to what
13   used to be called St. Luke's and now is called
14   Mount Sinai Morningside Hospital on Amsterdam
15   Avenue, correct?
16        A.    Correct.
17        Q.    There was a time prior to going to the
18   hospital that you responded to the vicinity of
19   125th Street and Amsterdam Avenue, correct?
20        A.    Correct.
21        Q.    So the 26th Precinct is on 126th
22   between --
23        A.    504 West 126th (sic) between Old
24   Broadway and Amsterdam Avenue.
25        Q.    So that is one east-west block and one
```

```
1              LIEUTENANT ANGEL LEON
2    north-south block from the intersection of 125 and
3    Amsterdam, correct?
4          A.    I believe it is one square mile.
5          Q.    125th and Amsterdam is close to the
6    precinct --
7          A.    Correct.
8          Q.    125th and Amsterdam is a location that
9    you are familiar with, correct?
10         A.    Yes.
11         Q.    What caused you to respond to 125th and
12   Amsterdam on the morning of September 2, 2020?
13         A.    There was a 911 call of shots fired at
14   125th and Amsterdam, and I responded over there.
15         Q.    How did you become aware of that 911
16   call?
17         A.    Central came over "shots fired" under
18   911 at 125th and Amsterdam, so from the precinct I
19   went over to that location.
20         Q.    I believe you began your answer by
21   saying "Central came over," is that right?
22         A.    In other words 911 call, "shots fired."
23         Q.    Did you hear a radio run that indicated
24   that this 911 call came in, did a human being
25   alert you -- how did you learn of it?
```

1              LIEUTENANT ANGEL LEON

2       A.    Radio run.

3       Q.    When you determined that you were going

4   to respond to 125th and Amsterdam, did you

5   activate your body-worn camera?

6       A.    Yes, I did.

7       Q.    Why did you do that?

8       A.    Because we are mandated to activate our

9   body-worn camera at all majors.

10      Q.    Majors meaning "major incident"?

11      A.    Yes.

12      Q.    And obviously, shots fired qualified as

13  a major event, right?

14      A.    Absolutely.

15      Q.    When you got to 125th and Amsterdam on

16  the morning of September 2nd of 2020 what, if

17  anything, did you observe?

18      A.    I got out of the car and...

19            THE STENOGRAPHER: (Stenographer and

20  lawyer indicates that Internet is lagging.)

21            MR. ARKO:  We will relocate to my

22  office, and we will rejoin shortly.

23            (Recess.)

24            MR. LIEB:  Do you have the last

25  question?

```
 1              LIEUTENANT ANGEL LEON
 2    (The following was read from the record by the
 3    stenographer:  "Q.  When you got to 125th and
 4   Amsterdam on the morning of September 2nd of 2020
 5   what, if anything, did you observe?"  The Witness
 6   started 'A. I got out of the car and...' when the
 7                 Internet went out")
 8              MR. ARKO:  Do you want to re-ask the
 9   question, and then we can start the answer again
10   for clarity?
11              MR. LIEB:  Sure.
12       Q.    So Lieutenant, when you got to 125th
13   and Amsterdam on the morning of September 2, 2020
14   what, if anything, did you observe?
15       A.    I was looking for shell casings on the
16   floor.
17       Q.    When you say "the floor" --
18       A.    The ground.
19       Q.    Did you find any?
20       A.    No.
21              MR. LIEB:  I am going to designate as
22   Plaintiff's Exhibit 14 body-worn camera footage
23   that was produced as Defendants 446.
24              (Plaintiff's Exhibit No. 14 was
25              marked for identification.)
```

```
 1                    LIEUTENANT ANGEL LEON
 2        Q.     Lieutenant, do you see a browser window
 3   on your screen with a small still image of
 4   body-worn camera footage on it?
 5        A.     I see a still photo.
 6        Q.     Did it just become larger on your
 7   screen?
 8        A.     It became larger.
 9        Q.     It started rolling when I opened the
10   file so it is presently at 5 seconds.  I am going
11   to play it.
12               (Video played.)
13        Q.     I've stopped the video at 53 seconds.
14               Do you recognize this video to be your
15   body-worn camera footage depicting yourself
16   exiting the 26th Precinct and entering a patrol
17   car on the morning of September 2, 2020?
18        A.     Yes.
19        Q.     I noticed you made sort of a bit of a
20   noise or grunt as you entered the vehicle.
21               Did you hear that?
22               MR. ARKO:  Objection.
23        A.     Yes.
24        Q.     Why did you do that?
25        A.     Heavy breathing.
```

```
1                   LIEUTENANT ANGEL LEON

2        Q.    Do you typically have heavy breathing?

3              MR. ARKO:   Objection.

4        A.    Yeah.

5        Q.    Was there anything bothering you about

6   your breathing or your overall physical condition

7   on the night in question?

8        A.    No.

9        Q.    Did you feel well?

10       A.    Yes.

11       Q.    I am going to resume the video from

12  53 seconds.

13             (Video played.)

14       Q.    So I stopped the video at 1:22.

15             You just drove south down Old Broadway

16  and turned left onto 125, right?

17       A.    Yes.

18       Q.    Resuming at 1:22.

19             (Video played.)

20       Q.    So, I have paused the video at 1:48.

21             You were driving in an easterly

22  direction down the block of 125 between Old

23  Broadway and Amsterdam, correct?

24       A.    Yes.

25       Q.    Then you made a U-turn to the other
```

```
1                  LIEUTENANT ANGEL LEON
2    side of 125th, correct?
3         A.    Yes.
4         Q.    You are now pulling on the northwest
5    corner of 125 and Amsterdam with your vehicle
6    facing in a westerly direction on 125, right?
7         A.    Yes.
8         Q.    There is a store on the northwest
9    corner of 125 and Amsterdam, correct?
10        A.    Yes.
11        Q.    Which was at the time a Dunkin Donuts?
12        A.    It is.
13        Q.    Resuming at 1:48.
14              (Video played.)
15        Q.    So I've had stopped the video at 2:10.
16              The current angle depicts -- you're
17   facing north up Amsterdam Avenue up a hill, right?
18        A.    Yes.
19        Q.    Do you see in this area of the screen,
20   the left third of the screen, there is a brightly
21   lit thing in the sidewalk?
22        A.    Yes.
23        Q.    What is that?
24        A.    I believe that is a kiosk.
25        Q.    It is one of those Wi-Fi kiosks --
```

```
 1                  LIEUTENANT ANGEL LEON

 2        A.     Correct.

 3        Q.     That is close to the corner of 125 and

 4   Amsterdam, a few steps north, right?

 5        A.     Yes.

 6        Q.     Resuming at 2:10.

 7               (Video played.)

 8        Q.     So I've stopped the video at 3:19.

 9               During the later stages of the segment

10   of video we just watched you made a phone call,

11   correct?

12        A.     Yes.

13        Q.     Who were you calling?

14        A.     The department of phones has a call

15   back number, so I was calling that number to get

16   further information.

17        Q.     The "call back number" of who?

18        A.     The person who called about the 911

19   call.

20        Q.     So the radio run provided you with the

21   caller ID of the person who placed the 911 call,

22   right?

23        A.     Yes.

24        Q.     You were calling that number from your

25   cell phone in an effort to elicit additional
```

```
 1                LIEUTENANT ANGEL LEON
 2   information from that person, correct?
 3        A.    Yes.
 4        Q.    They did not pick up, correct?
 5        A.    Correct.
 6        Q.    In addition to making that phone call
 7   during the minute and ten seconds we just watched,
 8   what else were you doing during that time period?
 9        A.    I was looking around to see if I found
10   any spent shell cases.
11        Q.    Resuming the video at 3:19.
12              (Video played.)
13        Q.    I just paused the video at 3:31.
14              Did you hear someone's voicemail that
15   was playing through your phone captured on the
16   body-worn camera footage just before I stopped it?
17        A.    Yes.
18        Q.    Whose voicemail was that?
19        A.    I don't know who it was, but that is
20   the call back number I called; when it rang and
21   rang it went to voicemail.
22              (Video played.)
23        Q.    At some point you got back in your
24   patrol car, correct?
25        A.    At some point.
```

1              LIEUTENANT ANGEL LEON

2      Q.    What did you do when you got back in

3 your patrol car?

4      A.    After that I went across the street

5 because there was a loud disturbance of music

6 coming out of the car across the street.

7      Q.    So you in sum and substance you said to

8 someone "it is 3 o'clock in the morning, you want

9 to turn that off," right?

10     A.    Yes.

11     Q.    They agreed to do that, is that right?

12     A.    Yes.

13     Q.    After that interaction with the music,

14 what did you do next?

15     A.    After that, I went over to St. Luke's

16 Hospital.

17     Q.    Why did you do that?

18     A.    Because a few minutes after that

19 St. Luke's called saying they had a gunshot

20 victim.

21     Q.    So did you proceed directly from the

22 area of 125th and Amsterdam to St. Luke's

23 Hospital?

24     A.    Yes.

25     Q.    How long did that take, a few minutes?

```
 1                LIEUTENANT ANGEL LEON
 2        A.    A few minutes.
 3        Q.    So when you got to St. Luke's Hospital
 4   where did you leave your -- the vehicle that you
 5   were driving?
 6        A.    On the corner of 114th and Amsterdam.
 7        Q.    Did you leave your vehicle on the
 8   corner of the same street on which you ultimately
 9   had the interaction with Brian Harris?
10        A.    Yes.
11        Q.    Was that 113th or 114th?
12        A.    113th.
13        Q.    So, when you got out of your vehicle at
14   113th and Amsterdam, what did you do?
15        A.    I saw a Yukon in front of the
16   vehicle -- in front of the hospital, along with
17   Lieutenant Lane.
18        Q.    You said "along with Lieutenant Lane,"
19   correct?
20        A.    Correct.
21        Q.    Meaning Lieutenant Lane was there at
22   the time you arrived?
23        A.    He got there before me.
24        Q.    What was Lieutenant Lane doing when you
25   first observed him?
```

```
 1              LIEUTENANT ANGEL LEON
 2      A.    He was by the SUV.
 3      Q.    What, if anything, was he doing while
 4  he was by the SUV when you first observed him?
 5      A.    I remember him standing next to the SUV
 6  along with his driver, securing the crime scene.
 7      Q.    When you say "securing the crime
 8  scene," what do you mean?
 9      A.    He was by the car making sure no one
10  goes near it.
11      Q.    He was standing near the vehicle --
12      A.    Right.
13      Q.    Did you have any conversation with
14  Lieutenant Lane at that point?
15      A.    He briefed me on what happened.
16      Q.    What did he say?
17      A.    About a male shot that walked to the
18  hospital.
19      Q.    Anything else?
20      A.    With a gunshot wound.
21      Q.    What, if anything, did Lieutenant Lane
22  tell you about the vehicle, by which I mean the
23  Yukon at that point?
24      A.    Not much, I can't remember exactly,
25  just a brief summary of what happened.
```

```
 1                  LIEUTENANT ANGEL LEON
 2       Q.    What did you do after that conversation
 3   with Lieutenant Lane?
 4       A.    I stood by Lieutenant Lane, special
 5   operations lieutenant.
 6       Q.    Meaning you were also standing out
 7   there near the vehicle, right?
 8       A.    Yes.
 9       Q.    Before you encountered Brian Harris,
10   Sr., the plaintiff in this case, did you at any
11   point go into the hospital?
12       A.    I went into the hospital to speak to
13   one of my officers.
14       Q.    Which officer was that?
15       A.    Fernandez.
16       Q.    Did you know Officer Fernandez was
17   inside the hospital when you went into the
18   hospital?
19             MR. ARKO:   Objection.
20       A.    I remember him being there and that's
21   it.
22       Q.    Let me ask it a little differently:
23             What was your purpose in going inside
24   the hospital?
25       A.    If Officer Fernandez got any
```

```
1                    LIEUTENANT ANGEL LEON
2   information from the gunshot victim.
3        Q.    Did you talk to Fernandez?
4        A.    Yes, I did.
5        Q.    What did Officer Fernandez say?
6        A.    The victim was not giving information
7   on where he was shot.
8        Q.    Did you do anything else, other than
9   speak with Officer Fernandez when you were inside
10  the hospital, prior to your interaction with Brian
11  Harris?
12       A.    After I spoke to Fernandez then I went
13  back out, and stood right next to Lieutenant Lane.
14       Q.    When you and Lieutenant Lane were
15  standing around outside the hospital next to the
16  Yukon, which other police officers were there?
17       A.    His driver, Officer Baltzer.
18       Q.    Anyone else?
19       A.    Officer Jimenez and Detective
20  Swinkunas.
21       Q.    Were Jimenez and Swinkunas there when
22  you first arrived?
23       A.    I'm not sure.
24       Q.    Do you know how or why they came to
25  respond to that location?
```

```
1                    LIEUTENANT ANGEL LEON
2               MR. ARKO:  Objection.
3        A.    I may have called for them.
4        Q.    For what purpose?
5        A.    They are in Sector Adam and Sector
6   Adam, the patrol car, covers that vicinity.
7        Q.    For what purpose did you want
8   additional units within Sector Adam to respond to
9   that scene?
10              MR. ARKO:  Objection.
11       A.    It was a serious crime, a person was
12  shot so I needed additional units.
13       Q.    Before you encountered plaintiff Brian
14  Harris, did you visually inspect the exterior of
15  the Yukon?
16       A.    Yes.
17       Q.    What, if anything, did you notice?
18       A.    I didn't notice anything, I was just
19  visually looking.
20       Q.    Before you encountered plaintiff Brian
21  Harris, did you visually inspect the interior of
22  the Yukon?
23       A.    I looked at it through the open door
24  that was left open.
25       Q.    That was the front passenger door,
```

```
 1                 LIEUTENANT ANGEL LEON
 2   correct?
 3        A.    Correct.
 4        Q.    When you looked inside through the
 5   front passenger door, what, if anything, did you
 6   observe?
 7        A.    I did not observe anything.
 8        Q.    Did you search the interior of the
 9   Yukon in any manner before you encountered
10   plaintiff Brian Harris?
11        A.    No.
12        Q.    Why not?
13        A.    You need a search warrant.
14        Q.    The Yukon was parked in a manner that
15   blocked at least one lane of traffic on 113th, is
16   that right?
17        A.    Yes, it was blocking the emergency
18   exit.  113th is a two way, but the way the Yukon
19   was parked it was blocking the emergency --
20        Q.    When you say "the emergency exit" you
21   mean to and from the hospital, correct?
22        A.    Yes.
23        Q.    Did any police go down to the end of
24   the block to restrict vehicular or pedestrian
25   traffic in any way?
```

1          LIEUTENANT ANGEL LEON

2          MR. ARKO:  Objection.

3     A.    No.

4     Q.    Why not?

5          MR. ARKO:  Objection.

6     A.    There was no vehicles -- I didn't

7  assign no cars to close off the 113th section.

8     Q.    You did not think it was necessary at

9  the time?

10    A.    No.

11    Q.    Were there any measures taken to create

12 some kind of perimeter around the Yukon, such as

13 putting out tape or cones or barriers or anything

14 like that?

15    A.    No.

16    Q.    Why not?

17    A.    Didn't cross my mind.

18    Q.    About how long were you at -- when I

19 say "at," outside or inside -- the hospital,

20 before you encountered plaintiff Brian Harris?

21    A.    I'm not sure.

22         MR. LIEB:  I am going to back to the

23 body-worn camera footage marked as Plaintiff's

24 Exhibit 14, Defendants 446.

25    Q.    Do you see that is an image from the

```
1                 LIEUTENANT ANGEL LEON
2  footage on your screen?
3       A.    Yes, I see it.
4       Q.    I am going to make it into full screen,
5  and I am going to play the video from 5:29.
6             (Video played.)
7       Q.    Stopped at 5:34.
8             Did you hear yourself say to an
9  individual "it is 3 o'clock in the morning, do you
10 want to turn that off"?
11      A.    Yes.
12      Q.    This depicts the encounter you
13 mentioned earlier where someone was playing loud
14 music at the vicinity of 125 and Amsterdam,
15 correct?
16      A.    Correct.
17      Q.    Do you see on the top of the screen
18 there is a time stamp of 3:08:49?
19      A.    Yes.
20      Q.    Do you have any reason to doubt the
21 accuracy of the time stamp from the body-worn
22 camera footage?
23      A.    No, I don't doubt it; that is the
24 accurate time.
25      Q.    I am going to resume the video at 5:34.
```

```
1                LIEUTENANT ANGEL LEON

2                (Video played. )

3      Q.    So I have stopped the video at 5:55.

4            At this point you have returned to the

5  patrol car and began driving, correct?

6      A.    Yes.

7      Q.    The time stamp reflects it is 3:09 and

8  10 seconds, correct?

9      A.    Yes.

10     Q.    It is fair to say you would have

11 arrived at the hospital no later than 3:15 a.m.,

12 correct?

13           MR. ARKO:  Objection.

14     A.    Yes.

15     Q.    Is it your usual practice to have a

16 TASER on your belt during your tour of duty?

17           MR. ARKO:  Objection.

18     A.    Yes.

19     Q.    When you would carry the TASER on your

20 belt it has a cartridge already in the TASER,

21 correct?

22     A.    Yes.

23     Q.    So if you want to use the TASER you

24 would remove it from its holster, correct?

25     A.    Yes.
```

```
 1              LIEUTENANT ANGEL LEON

 2       Q.    And there is a button that you have to

 3  push in order to remove it from the holster,

 4  right?

 5       A.    Yes.

 6       Q.    Then you push a button on the grip to

 7  activate the TASER, right?

 8       A.    Yes.

 9       Q.    And at that point the TASER is ready

10  for use, right?

11       A.    Yes.

12       Q.    Obviously, you are trained as a police

13  officer to be able to draw your firearm quickly

14  should the need arise, right?

15       A.    Yes.

16       Q.    One thing that you may do as a police

17  officer is you may confront life or death

18  situations where the ability to get your weapon

19  out very quickly is important, right?

20       A.    Yes.

21       Q.    So you can draw your weapon pretty much

22  immediately, right?

23             MR. ARKO:  Objection.

24       A.    Yes.

25             MR. ARKO:  Objection.
```

```
1                    LIEUTENANT ANGEL LEON

2        Q.    And the same is true of your TASER

3   right?

4              MR. ARKO:  Objection.

5        A.    Yes.

6        Q.    So you joined the NYPD in 1996, did you

7   say?

8        A.    Yes.

9        Q.    Well more than 20 years; so you have

10  been on the job for 25 years, right?

11       A.    Yes.

12       Q.    In the course of your 25-year career as

13  a member of the police department you have

14  encountered many people who have resisted arrest,

15  right?

16       A.    Yes.

17       Q.    It is unfortunately something that

18  happens with some frequency, right?

19       A.    Yes.

20       Q.    Has it happened dozens of times in your

21  career?

22             MR. ARKO:  Objection.

23       A.    Yes.

24       Q.    Hundreds of time even?

25             MR. ARKO:  Objection.
```

```
 1                LIEUTENANT ANGEL LEON
 2        A.    I don't know about a hundred.
 3        Q.    But you have had people resist your
 4   attempts to place them under arrest on numerous
 5   occasions, right?
 6        A.    Yes.
 7        Q.    You have also been present when people
 8   have resisted other officers' efforts to put them
 9   under arrest on numerous occasions, right?
10        A.    Yes.
11        Q.    What are some strategies you have used
12   in the past to try and overcome the resistance of
13   someone who is resisting your efforts to place
14   them under arrest?
15        A.    Talking to them, de-escalate.
16        Q.    Have you ever spoken the words to a
17   subject "stop resisting"?
18              MR. ARKO:  Objection.
19        A.    Yes.
20        Q.    In fact, that is something that police
21   officers frequently say when someone is resisting
22   their efforts to place them under arrest, right?
23              MR. ARKO:  Objection.
24        A.    Yes.
25        Q.    You have heard your colleagues say that
```

```
1                LIEUTENANT ANGEL LEON
2    lots of times before, right?
3              MR. ARKO:  Objection.
4        A.   Yes.
5        Q.   When you used those words in the past,
6    what was the purpose of saying those words?
7        A.   So he can comply with the orders.
8        Q.   Can you give me some examples of other
9    verbal commands that you might use so you can try
10   to gain compliance once someone has started to
11   physically resist?
12             MR. ARKO:  Objection.
13       A.   I would say "it is not that serious."
14       Q.   What do you mean by that?
15       A.   "I am going to place you under arrest,
16   such and such, to get some compliance."
17       Q.   What about "put your hands behind your
18   back"?
19       A.   Yes.
20       Q.   Have you ever been in a situation where
21   you saw another officer struggling to get someone
22   in cuffs, and you came to that officer's aid?
23       A.   Yes.
24       Q.   Why did you do that?
25       A.   Because I see that he is struggling,
```

```
 1                LIEUTENANT ANGEL LEON
 2    okay, and to have compliance to help him to
 3    handcuff the individual's hands together.
 4         Q.    If you see a fellow officer struggling
 5    to cuff someone you go help them, right?
 6         A.    Yes.
 7         Q.    And you would expect if you were
 8    struggling to cuff someone your fellow officers
 9    would come help you, right?
10         A.    Yes.
11         Q.    Have you ever been in a situation where
12    you were struggling to cuff someone and you either
13    ordered -- if you had that authority -- or asked a
14    fellow officer to come to your assistance?
15              MR. ARKO:  Objection.
16         A.    I have asked.
17         Q.    Tell me about a circumstance in which
18    you did that.
19              MR. ARKO:  Objection.
20         A.    I have told the other half to grab the
21    other hand while I grab the other hand (sic), so
22    we can handcuff him.
23         Q.    What about the use of physical force to
24    try to gain compliance, have you ever taken a
25    subject to the ground?
```

```
 1                    LIEUTENANT ANGEL LEON

 2        A.    Yes.

 3              (Recess.)

 4              MR. LIEB:  Lieutenant Leon, I am going

 5   to share with you what was previously designated

 6   Plaintiff's Exhibit 3, the body-worn camera

 7   footage that was Defendants 54.  I will start from

 8   the beginning.

 9              (Plaintiff's Exhibit No. 3 was

10              previously marked for identification.)

11              (Video played.)

12        Q.    Stopping the footage at 7 seconds.

13              Do you recognize this to be your

14   body-worn camera footage from the morning of

15   September 2, 2020 depicting a portion of your

16   interaction with plaintiff Brian Harris?

17        A.    Yes.

18        Q.    You are facing in a westerly direction

19   down 113th Street towards Amsterdam, is that

20   correct?

21        A.    Yes.

22        Q.    Towards the bottom right of the frame

23   here that is the Yukon, right?

24        A.    Yes.

25        Q.    We saw Lieutenant Lane standing over to
```

```
 1              LIEUTENANT ANGEL LEON
 2   your left now out of the frame on the left side,
 3   correct?
 4       A.    Yes.
 5       Q.    Where were officers -- where was
 6   Swinkunas and Jimenez at this point?
 7       A.    To my right.
 8       Q.    Was anyone standing in front of the
 9   open front passenger door to the Yukon?
10       A.    Swinkunas and Jimenez.
11       Q.    Skipping ahead to 30 seconds where the
12   sound turns on.
13             (Video played.)
14       Q.    I am stopping the video at 37 seconds.
15             We have heard some verbal exchange
16   between you and Mr. Harris, correct?
17       A.    Yes.
18       Q.    About how far away from each other were
19   you standing during this exchange?
20       A.    I want to say at least three feet.
21       Q.    You can see that he was holding an
22   object in his right hand, correct?
23       A.    Yes.
24       Q.    You can tell it was a phone, right?
25       A.    Yes.
```

```
 1                  LIEUTENANT ANGEL LEON

 2                  (Video played.)

 3       Q.    Stopping at 43 seconds.

 4             You saw that his other hand didn't have

 5   anything in it, right?

 6       A.    Right.

 7       Q.    And you could tell that when you were

 8   having this verbal exchange with him on the day in

 9   question, right?

10       A.    Yes.

11       Q.    You knew that he didn't have any

12   weapons in his hands, right?

13       A.    No weapons.

14             (Video played).

15       Q.    Stopping the video at 53 seconds.

16             The person depicted in the right side

17   of the frame here is Swinkunas, correct?

18       A.    Yes.

19       Q.    So she was standing closer to the open

20   passenger side door than you were, right?

21       A.    Closer, yes.

22       Q.    But not physically blocking access to

23   the door, correct?

24       A.    No.

25       Q.    "No," meaning I am wrong or --
```

```
 1                  LIEUTENANT ANGEL LEON
 2       A.    She's not blocking access to the door.
 3       Q.    Okay.
 4             (Video played.)
 5       Q.    So stopped the video at 1 minute 7
 6   seconds.
 7             We heard Lieutenant Lane tell
 8   Mr. Harris "turn around," correct?
 9       A.    Yes.
10       Q.    Then Lieutenant Lane reached towards
11   Mr. Harris to grab him, right?
12       A.    Yes.
13       Q.    And Mr. Harris put his hands up in the
14   air, right?
15       A.    Yes.
16       Q.    Going back to 1:03 briefly.
17             (Video played.)
18       Q.    Stopped the video at 1:07.
19             Did you hear yourself just say "get
20   your TASER"?
21       A.    No, you got to play it again.
22       Q.    No problem.
23             (Video played.)
24       A.    Now I did.
25       Q.    With the video stopped at 1 minute and
```

```
 1              LIEUTENANT ANGEL LEON
 2   7 seconds here we have just seen Mr. Harris place
 3   his hands in the air, and then you say get your
 4   TASER, right?
 5       A.    Yes.
 6       Q.    You said -- not in this segment of the
 7   video, but in the course of these events you said
 8   "get your TASER" more than once, right?
 9       A.    Yes.
10       Q.    When you said "get your TASER" who were
11   you talking to?
12       A.    Officer Baltzer.
13       Q.    You were giving an order to Officer
14   Baltzer to get his TASER, right?
15              MR. ARKO:  Objection.
16       A.    Yes.
17       Q.    You wanted Officer Baltzer to draw his
18   TASER, right?
19       A.    Yes.
20       Q.    You made that determination as soon as
21   Mr. Harris put his hands in the air?
22       A.    I made that determination when
23   Lieutenant Lane was trying to grab him and then
24   Brian Harris said "don't touch me."
25       Q.    So actually before Mr. Harris puts his
```

```
 1                   LIEUTENANT ANGEL LEON
 2   hand in the air, correct?
 3        A.    When Lieutenant Lane went to grab him
 4   Brian Harris said "don't touch me."  I made that
 5   determination to direct Officer Baltzer to get the
 6   TASER.
 7        Q.    So the point at which you determined
 8   the TASER was necessary was when Mr. Harris said
 9   "don't touch me," correct?
10        A.    When Lieutenant Lane told him to "put
11   your hands behind your back" he said "don't touch
12   me."  Okay.  When Lieutenant Lane went to
13   physically grab him that's when I said to Officer
14   Baltzer "get your TASER."
15        Q.    That's the point in time at which you
16   made the determination that the TASER was
17   necessary, right?
18        A.    Yes.
19        Q.    Back to 1:05.
20              (Video played.)
21        Q.    I stopped the video at 1:09.
22              Did you hear yourself say "get your
23   TASER" four times during that section of the
24   video?
25        A.    I heard myself say "get the TASER."
```

```
 1              LIEUTENANT ANGEL LEON
 2      Q.    Going back to 1:05.
 3            (Video played.)
 4      Q.    Stopping at 1:09 again.
 5            Did you hear yourself saying "get your
 6   TASER" four times during that section of the
 7   video?
 8      A.    I didn't count it, but it was more than
 9   once.
10      Q.    I want to make sure we can agree on how
11   many times you said it, so let's go back through
12   it one more time.
13            (Video played.)
14      Q.    Stopped at 1:10 this time.
15            But did you hear yourself say "get your
16   TASER" four times during that portion of the
17   video?
18      A.    Yes.
19      Q.    All four times you said it you were
20   giving an order to Officer Baltzer, right?
21      A.    Yes.
22      Q.    You would expect a police officer under
23   your command to be able to draw his TASER in an
24   instant, right?
25            MR. ARKO:  Objection.
```

1              LIEUTENANT ANGEL LEON

2        A.    Yes.

3        Q.    Were you surprised that it took Officer

4    Baltzer that much time to comply with your orders

5    to draw his TASER?

6              MR. ARKO:   Objection.

7        A.    It's common for an officer to hesitate

8    to pull out their TASER.

9        Q.    Why do you believe that's so?

10       A.    There may have been officers who have

11   never pulled out their TASER before.

12       Q.    But based on your observation Officer

13   Baltzer did hesitate to draw his TASER, correct?

14             MR. ARKO:   Objection.

15       A.    Yes.

16       Q.    One reason why an officer might

17   hesitate to draw their TASER is that they don't

18   have a lot of experience doing it, right?

19             MR. ARKO:   Objection.

20       A.    I don't know.

21       Q.    But you don't know the reason why

22   Officer Baltzer hesitated to draw his TASER, do

23   you?

24       A.    I don't, I don't know the reason why he

25   hesitated.

1          LIEUTENANT ANGEL LEON

2     Q.    Why did you direct Officer Baltzer to

3  draw his TASER as opposed to someone else?

4          MR. ARKO:  Objection.

5     A.    Swinkunas on my right doesn't have a

6  TASER, she is not TASER qualified.

7     Q.    Why did you direct Officer Baltzer to

8  draw his TASER as opposed to drawing yours?

9     A.    Because as a supervisor I am accustomed

10  to directing and giving orders.

11     Q.    Officer Baltzer didn't need your

12  approval to draw his TASER if he saw fit, right?

13          MR. ARKO:  Objection.

14     A.    He can think on his own if it seems

15  fit.

16     Q.    He has the authority if he deems it

17  reasonably necessary under the circumstances to

18  draw his TASER and use it, right?

19     A.    Yes.

20     Q.    I am going back to 1:05.

21          (Video played.)

22     Q.    So, I've stopped the video now at 1:12.

23          At this certain point, did you hear

24  yourself say "TASER him"?

25     A.    Yes.

```
1               LIEUTENANT ANGEL LEON
2       Q.     That was an order that you were giving
3   to Officer Baltzer?
4       A.     Yes.
5       Q.     That was an order to deploy his TASER
6   on plaintiff Brian Harris, right?
7       A.     Yes.
8       Q.     In the segment of the video we just
9   watched that ended at 1:12 we heard the sound of
10  the TASER actually being deployed, right?
11      A.     Yes.
12      Q.     At the moment Mr. Harris said "don't
13  touch me" and the moment that the TASER was
14  deployed, what did Swinkunas do?
15      A.     You mean after it got deployed?
16      Q.     No, between the moment Mr. Harris said
17  "don't touch me" --
18      A.     I'm not sure.
19      Q.     Sorry, let me finish the question.
20  Between the moment Mr. Harris said "don't touch
21  me" and the moment when the TASER was deployed,
22  what did Swinkunas do?
23      A.     I'm not sure.
24      Q.     Did you hear her give any verbal
25  commands like "stop resisting, put your hands
```

```
 1                 LIEUTENANT ANGEL LEON
 2   behind your back"?
 3        A.    I wouldn't remember.
 4        Q.    Did you see her take any action to
 5   physically assist Lieutenant Lane in effecting the
 6   arrest?
 7        A.    Yes.
 8        Q.    What did you see her do?
 9        A.    After Brian Harris was on the ground I
10   noticed there were several hands behind Brian
11   Harris' back so we could handcuff him.
12        Q.    So Mr. Harris went to the ground after
13   being TASED, right?
14        A.    Yes.
15        Q.    So the TASER caused Mr. Harris to fall
16   to the ground, right?
17        A.    Correct.
18        Q.    So once Mr. Harris was on the ground
19   Swinkunas assisted in putting his hands in cuffs,
20   right?
21        A.    She assisted, I also grabbed his hands,
22   we all tried to assist in putting his hands back
23   so we could handcuff him.
24        Q.    So now focusing on the period before
25   the deployment of the TASER, not after the TASEing
```

```
 1                   LIEUTENANT ANGEL LEON
 2      but just before the TASEing, did you see Swinkunas
 3      do anything to try to physically assist Lane to
 4      effect the arrest?
 5           A.    I wouldn't remember.
 6           Q.    If Lane had been struggling with
 7      Mr. Harris between the period when Mr. Harris said
 8      "don't touch me" and the time when the TASER was
 9      deployed, would you have expected Swinkunas to go
10      help him?
11                 MR. ARKO:   Objection.
12           A.    Yes.
13           Q.    Between the moment when Mr. Harris said
14      "don't touch me" and when the TASER was
15      deployed -- again, just focusing on that period of
16      time -- what did Jimenez do?
17           A.    I'm not sure.
18           Q.    Did you hear her give any verbal
19      commands during that period like "stop resisting"
20      or "put your hands behind your back"?
21           A.    I did not.
22           Q.    Did you see her do anything during that
23      period to try and physically help effect the
24      arrest?
25                 MR. ARKO:   Objection.
```

```
 1                    LIEUTENANT ANGEL LEON

 2        A.    No.

 3        Q.    Between the moment when Mr. Harris said

 4   "don't touch me" and the moment when the TASER was

 5   deployed what, if anything, did Lieutenant Lane

 6   do?

 7        A.    Between the TASER being deployed?

 8        Q.    No, between the moment when Mr. Harris

 9   says "don't touch me" and you decide that the

10   TASER is necessary, and the moment that the TASER

11   is deployed, what did Lieutenant Lane do?

12        A.    I see Lieutenant Lane struggling with

13   Brian Harris.

14        Q.    When you say "struggling" what

15   specifically was Lieutenant Lane doing?

16        A.    He was trying to grab his hands so he

17   could handcuff him.

18        Q.    Did you hear Lieutenant Lane give any

19   verbal commands during that period like "stop

20   resisting" or "put your hands behind your back"?

21        A.    "Put your hands behind your back."

22        Q.    So you heard Lane say "put your hands

23   behind your back" between when Mr. Harris says

24   "don't touch me" and when the TASER goes off?

25        A.    Before.
```

```
 1                LIEUTENANT ANGEL LEON

 2      Q.    Before what?

 3      A.    Before he says "don't touch me."

 4      Q.    Between when Mr. Harris says "don't

 5  touch me" and the TASER is deployed, did you hear

 6  Lane give any verbal commands?

 7      A.    I wouldn't remember.

 8      Q.    So when you said Lane was trying to

 9  grab Mr. Harris' hands, where was Lane putting his

10  hands on Mr. Harris' body during that period of

11  time?

12      A.    I noticed that Brian Harris was facing

13  towards where the passenger side is, and

14  Lieutenant Lane is right behind him.

15      Q.    So, Mr. Harris was facing towards the

16  vehicle at that point you're saying?

17      A.    The opening of the vehicle.

18      Q.    We had heard Lane say "turn around,"

19  right?

20      A.    In the beginning, prior to when he says

21  "don't touch me," prior to that you hear

22  Lieutenant Lane say "put your hands behind your

23  back."

24      Q.    I just want to understand when

25  Mr. Harris says "don't touch me" he's facing you
```

```
1                    LIEUTENANT ANGEL LEON
2    and Lane, right?
3         A.    Yes.
4         Q.    At some point between when he says
5    "don't touch me" and the TASER is deployed,
6    according to you he's facing the vehicle, correct?
7         A.    When he says "don't touch me" and the
8    TASER is deployed and Lieutenant Lane was grabbing
9    him, Brian Harris had turned around into the
10   opening of the passenger side vehicle.
11        Q.    So he had turned around?
12        A.    Yes.
13        Q.    Was he standing up?
14        A.    No, no, his head was in -- he was
15   trying to enter through the passenger side vehicle
16   (indicating).
17        Q.    What portion of Mr. Harris' body was
18   touching the vehicle?
19        A.    His head was leaning towards inside the
20   opening of the door (indicating).
21        Q.    Was any portion of Mr. Harris' body
22   touching the vehicle during this period between
23   when he says "don't touch me" and the TASER is
24   deployed?
25        A.    I couldn't see because he's such a big
```

```
 1              LIEUTENANT ANGEL LEON
 2    guy, so I don't know if his body when he was
 3    crouching down like that I don't know if he was
 4    touching the seat.
 5         Q.    During this period of time, what did
 6    Lieutenant Lane do physically to try and grab
 7    Mr. Harris' hands?
 8         A.    Lieutenant Lane was behind Brian
 9    Harris, so it was the kind of difficult for me to
10    determine what he was doing with his hands.
11         Q.    During the period between when
12    Mr. Harris said "don't touch me" and the TASER was
13    deployed, you gave a series of verbal orders to
14    Officer Baltzer, correct?
15         A.    "Get the TASER, get the TASER."
16         Q.    And then TASER him, right?
17         A.    Yes.
18         Q.    Other than giving the verbal orders,
19    did you do anything else?
20         A.    After he was TASED he went to the
21    ground, I assisted in grabbing Brian Harris' hands
22    and trying to help Lane handcuff him.
23         Q.    Just during the period between when he
24    said "don't touch me" and the TASER was deployed,
25    did you do anything else other than give those
```

```
1                    LIEUTENANT ANGEL LEON
2    verbal orders to Officer Baltzer?
3         A.    I wouldn't remember.
4         Q.    Did you attempt to physically assist to
5    effect the arrest in any way during that period
6    between when Mr. Harris said "don't touch me" and
7    the TASER was deployed?
8         A.    No.
9         Q.    That's because at that point you had
10   determined that the way this was going to happen
11   was by TASEing him, right?
12             MR. ARKO:   Objection.
13        A.    Yes.
14        Q.    Did you see which part or parts of
15   Mr. Harris' body made contact with the ground
16   after being TASED?
17        A.    It is unclear.
18        Q.    You don't know?
19        A.    No.
20        Q.    I am going back to Plaintiff's
21   Exhibit 3 for a minute, starting at 1:05 again.
22             (Plaintiff's Exhibit No. 3 was
23             previously marked for identification.)
24             (Video played.)
25        Q.    I stopped the video at 1:14.
```

```
1              LIEUTENANT ANGEL LEON
2              Did you hear yourself just say "there
3  you go"?
4       A.    Can you play that again?
5       Q.    Absolutely.  I will go back to 1:10.
6              (Video played.)
7       Q.    Actually, I think you may say it twice
8  more clearly the second time let me play it
9  longer; starting at 1:07.
10             (Video played.)
11      Q.    I stopped the video at 1:16.
12             Did you hear yourself say "there you
13 go, there you go, put your hands behind your
14 back"?
15      A.    Yes.
16      Q.    When you said "there you go" what did
17 you mean by that?
18      A.    No reason whatsoever.
19      Q.    Who were you talking to?
20      A.    I just blurted it out.
21      Q.    Did you think Mr. Harris kind of got
22 what he deserved in this situation?
23             MR. ARKO:  Objection.
24      A.    No, no.
25      Q.    Do you have any explanation of the
```

```
 1                LIEUTENANT ANGEL LEON
 2    meaning of those words as you said them in the
 3    context of what we just saw?
 4         A.    No.
 5         Q.    So, after the TASEing caused Mr. Harris
 6    to fall to the ground you all were able to put him
 7    in handcuffs behind his back, correct?
 8         A.    Yes.
 9         Q.    There was some further conversation
10    with Mr. Harris when he was sitting on the ground
11    on the pavement outside of the hospital after
12    being TASED, right?
13         A.    Yes.
14         Q.    Then at a certain point Mr. Harris was
15    placed into a wheelchair and wheeled inside the
16    hospital, correct?
17         A.    That is correct.
18         Q.    After Mr. Harris was wheeled into the
19    hospital, did you see him again?
20         A.    After he was wheeled into the hospital?
21         Q.    Yes.
22         A.    Yes.
23         Q.    When and where did you see him again?
24         A.    At the precinct.
25         Q.    After Mr. Harris was wheeled inside the
```

1              LIEUTENANT ANGEL LEON
2   hospital, what did you do?
3        A.    After that, later on, I stood by the
4   Yukon; I don't know how long, but I stood by the
5   Yukon for a bit.
6        Q.    Do you have an approximate estimate of
7   how much longer you stood by the Yukon after
8   Mr. Harris went into the hospital?
9        A.    No, I don't.
10        Q.    Did you have any interaction with Joy
11   Harris, Mr. Harris' wife at any point on
12   September 2nd of 2020?
13        A.    I never had an interaction with her,
14   but I did hear her voice and I put two and two
15   together that was her husband when I heard her
16   say, "what are you doing to him?"
17        Q.    When did she say that?
18        A.    After he got TASERed.
19        Q.    So you became aware of the presence of
20   a woman standing out on the street after the TASER
21   was deployed, is that right?
22        A.    Yes.
23        Q.    Did you have any interaction with that
24   woman before Mr. Harris was TASED?
25        A.    No, afterwards.

```
 1                  LIEUTENANT ANGEL LEON

 2       Q.    All right.  Mr. Harris was wheeled into

 3   the hospital and you stood by the Yukon for some

 4   additional period of time.  What did you do next?

 5       A.    I secured the scene and I remember

 6   there was an additional officer on the scene.  I

 7   called him over so he could secure it.

 8       Q.    When you say "secure the scene" first

 9   of all, what are you referring to as "the scene"?

10       A.    First the car itself, and there was a

11   baseball cap on the ground.

12       Q.    When you directed that officer to

13   secure the scene what did you want that officer do

14   with the car?

15       A.    Basically secure the car and make sure

16   no one touched the car.

17       Q.    Secure it by having people stand

18   outside of it, by taping it off, by moving it to a

19   more secure location; how did you want this person

20   to secure the vehicle?

21       A.    To stand by and make sure that no one

22   touches the car.

23       Q.    So you directed an officer on your

24   command to do that?

25       A.    Yes.
```

```
 1              LIEUTENANT ANGEL LEON

 2        Q.    What did you do next?

 3        A.    After that I noticed Brian Harris'

 4   wife, she picked up the baseball cap that was on

 5   the ground.

 6        Q.    Was she permitted to do that?

 7        A.    It was a miscommunication where the

 8   officer who was guarding the scene gave her

 9   authorization.

10        Q.    Did you then have to get her to give

11   the cap back?

12        A.    We got the cap back and we put it back

13   on the ground.

14        Q.    So, how did you become aware that

15   Ms. Harris had picked up the cap?

16        A.    I noticed that she picked it up, and I

17   remember telling her about the cap that it was

18   evidence, but she replied that she got

19   authorization from the officer.

20        Q.    When you say you "noticed that she

21   picked it up," did you see her pick it up off the

22   ground or you noticed that it was in her hand?

23        A.    I saw her pick it up.

24        Q.    Do you know the name of the officer who

25   you had directed to secure the vehicle?
```

```
1                    LIEUTENANT ANGEL LEON
2          A.    Yes.
3          Q.    Who was that?
4          A.    His name is Oszmanski.
5          Q.    Was it Officer Oszmanski who had
6     erroneously given Ms. Harris to pick the cap up?
7          A.    Correct.
8          Q.    What did you say to Ms. Harris to
9     direct her to relinquish the cap?
10         A.    I remember her saying that it was her
11    husband's cap. I told her it was not her husband's
12    hat, words to that effect, and we put it back on
13    the floor.
14         Q.    What did you do after that?
15         A.    After that, after we put the cap on the
16    floor I stood additional -- I don't know how long
17    more -- but I stood by the car longer, a little
18    bit more.
19         Q.    Was there some plan formulated at some
20    point about what to do with the car?
21         A.    We secure it until we find the exact
22    location where the crime occurred, about where his
23    son was shot.
24         Q.    Why is that?
25         A.    Because at first the son was not giving
```

1              LIEUTENANT ANGEL LEON
2    us details of where he was shot.
3         Q.    What is the relationship between
4    securing the car and getting the information about
5    the location of the shooting; why is securing the
6    car until you learn that information?
7         A.    Because it is a serious crime, a person
8    was shot, so we secure the car to see if there is
9    evidence in the vehicle.
10        Q.    All right.  So, you have this
11   interaction with Ms. Harris about the hat, you
12   secure the car for a later time, then what did you
13   do?
14        A.    In the beginning Brian Harris Jr., was
15   hesitant to give us the location about where the
16   actual shooting occurred.  Officer Fernandez later
17   finally got him to speak and through Google maps
18   he pinpointed exactly where the shooting location
19   occurred.
20        Q.    Where was that?
21        A.    The rear parking lot at 3150 Broadway.
22        Q.    Once you got that information what, if
23   anything, did you do?
24        A.    I eventually went over to the parking
25   lot to confirm if I could see any shell casings

```
1              LIEUTENANT ANGEL LEON
2    that were in the parking lot.
3         Q.    Could you find any?
4         A.    Yes, I did.
5         Q.    I don't need to go into detail about
6    the processing of that scene or anything like
7    that, but roughly how long were you at the rear
8    parking lot of 3150 Broadway?
9         A.    That I can't tell you.  We were looking
10   for additional shell casings, but I can't tell you
11   how long I was there.
12        Q.    Where did you go from 3150 Broadway?
13        A.    Once it was discovered that shell
14   casings were found in that location and that it
15   happened in housing jurisdiction, then we notified
16   housing, PSA6, and they took over the crime scene
17   because they have it under their jurisdiction.
18        Q.    For the sake of clarity, 3150 Broadway
19   is a NYCHA property, right?
20        A.    That's correct.
21        Q.    That is why it was under the housing
22   jurisdiction, right?
23        A.    Correct.
24        Q.    What happened with the vehicle at that
25   point, the Yukon?
```

```
1                LIEUTENANT ANGEL LEON
2       A.      Housing eventually vouchered it.
3       Q.      When you say "vouchered" what do you
4   mean?
5       A.      Invoiced the vehicle.
6       Q.      They took it into their possession and
7   towed it somewhere?
8       A.      Yeah.
9       Q.      So you said that you saw Mr. Harris
10  again back at the precinct, is that correct?
11      A.      That is correct.
12      Q.      Did you seek him out in some way or did
13  you happen to see him in the course of performing
14  your duties?
15              MR. ARKO:  Objection.
16      A.      Just happened to see him to perform my
17  official duties by releasing the desk officer for
18  a meal.
19      Q.      Where was Mr. Harris within the
20  precinct when you saw him?
21      A.      He was in the front desk along with
22  Officer Jimenez and Detective Swinkunas.
23      Q.      As far as you know, was he being
24  processed in or released out or something else?
25              MR. ARKO:  Objection.
```

```
 1                LIEUTENANT ANGEL LEON
 2       A.    In other words, he was going to be
 3  processed for a desk appearance ticket.
 4       Q.    He was being processed for a DAT when
 5  you saw him, right?
 6       A.    He was being processed for DAT.
 7       Q.    What, if anything, did you say to him
 8  when you saw him?
 9       A.    I didn't, I didn't talk to him.
10       Q.    Did he say anything to you?
11       A.    No.
12       Q.    I am going to go back to your memo
13  book, Plaintiff's Exhibit 13.
14            (Plaintiff's Exhibit No. 13 was
15            earlier marked for identification.)
16       Q.    Do you see it on the screen?
17       A.    Yes, I see it.
18       Q.    I am going down to the second page,
19  Bates number Defendants 36.  Do you see you
20  indicated here at "10-92C" and then "one under by
21  Sector B-1 for tampering with evidence front of
22  St. Luke's Hospital."
23            Do you see that?
24       A.    Yes.
25       Q.    So "one under" refers to one person
```

```
1                    LIEUTENANT ANGEL LEON
2    being placed under arrest, right?
3         A.    That is correct.
4         Q.    And the person you're referring to here
5    is plaintiff Brian Harris, right?
6         A.    Yes.
7         Q.    Did you direct that Mr. Harris be
8    arrested for tampering with evidence?
9         A.    I directed Officer Jimenez to arrest
10   him for OGA, obstructing governmental
11   administration and resisting arrest.
12        Q.    So you did not direct that he be
13   arrested for tampering with evidence, right?
14        A.    No, that was my error.
15        Q.    So what's in the memo book here, this
16   is a mistake, right?
17        A.    Yes.
18        Q.    But the reason you didn't direct he be
19   arrested for tampering with evidence is that he
20   did not, in fact, commit the offense of tampering
21   with evidence, correct?
22             MR. ARKO:   Objection.
23        A.    He was charged with OGA and resisting
24   arrest; those two charges.
25        Q.    Why didn't you direct that he be
```

```
 1              LIEUTENANT ANGEL LEON
 2   charged with tampering with evidence?
 3              MR. ARKO:  Objection.
 4       A.    That didn't fall into the category that
 5   OGA does, and the resisting arrest.
 6       Q.    The offense you thought he committed
 7   was OGA and resisting arrest, not tampering with
 8   evidence, correct?
 9              MR. ARKO:  Objection.
10       A.    Correct.
11              MR. LIEB:  I am going to share with you
12   what I have marked -- one second -- I am going to
13   put into the chat for counsel and share what I
14   have marked as Plaintiff's Exhibit 16, which is a
15   three-page document Bates numbered Defendants 443
16   to 445.
17              (Plaintiff's Exhibit No. 16 was
18               marked for identification.)
19       Q.    Do you see screen shots of text
20   messages on your screen Lieutenant?
21       A.    Yes.
22       Q.    Looking at the first message here, do
23   you recognize this to be screen shots of a portion
24   a text message thread between you and a captain
25   from the morning of September 2nd of 2020?
```

```
 1              LIEUTENANT ANGEL LEON
 2      A.    Yes.
 3      Q.    Who were you texting?
 4      A.    That was my commanding officer.
 5      Q.    What is his or her name?
 6      A.    Captain Sarrubi, S-A-R-R-U-B-I.
 7      Q.    So, you said according to the screen
 8  shot you sent this message at 4:04 a.m.
 9            Do you see that?
10      A.    Yes.
11      Q.    This was after Mr. Harris had been
12  TASED, correct?
13      A.    Yes.
14      Q.    So, can you just take a minute and read
15  to yourself the messages that are on the screen; I
16  am going to scroll through the document and give
17  you a chance to read it, okay?
18      A.    Okay.
19            (Witness reading, directs scrolling.)
20      Q.    Do you see the first message is a photo
21  of the vehicle and then it goes to the message
22  "Good morning Captain."
23            Do you see that?
24      A.    Yes.
25      Q.    I am not trying to confuse you, I
```

```
 1              LIEUTENANT ANGEL LEON
 2   accidentally started on page 2.  You didn't
 3   mention anything to the captain about your
 4   interaction with Brian Harris Sr, correct?
 5        A.    Correct.
 6        Q.    Why not?
 7        A.    I mentioned more the gunshot victim.
 8        Q.    You didn't think it was information
 9   that the captain needed at that point?
10        A.    That is correct.
11        Q.    It wasn't really relevant, was it?
12              MR. ARKO:  Objection.
13        A.    It never crossed my mind.
14        (A discussion was held off the record.)
15              (Recess.)
16        Q.    Lieutenant, before ordering Officer
17   Baltzer to get his TASER, what factors do you
18   consider in deciding whether a TASER was necessary
19   under the circumstances?
20        A.    The size of the subject.
21        Q.    Anything else?
22        A.    Just his verbal words about his saying
23   "don't touch me."
24        Q.    So, Mr. Harris is a big guy?
25        A.    Yes, yes.
```

1             LIEUTENANT ANGEL LEON

2      Q.    So, that played an important part in

3  your determination that a TASER was necessary?

4      A.    Yes.

5      Q.    Did you consider the fact that there

6  were five officers there and one subject?

7             MR. ARKO:   Objection.

8      A.    If never crossed my mind, it was a

9  split-second decision.

10     Q.    Did you consider whether he had done

11  anything to try and flee at that point?

12             MR. ARKO:   Objection.

13     A.    I thought about him trying to go inside

14  the vehicle.

15     Q.    But you would agree with me that there

16  is nothing blocking him from getting inside the

17  vehicle if that is what he was determined to do,

18  right?

19             MR. ARKO:   Objection.

20     A.    Correct.

21     Q.    Did you consider whether there was a

22  crowd present or any other civilians that might

23  interfere?

24     A.    No.

25     Q.    He was the only civilian out on the

```
 1                LIEUTENANT ANGEL LEON
 2   street at that point, right; there wasn't a bunch
 3   of people around?
 4        A.   At that time, there was not a lot of
 5   people out there.
 6        Q.   First and foremost the decision was
 7   based on his size, right?
 8        A.   His size coupled with the words "don't
 9   touch me."
10        Q.   Have you ever TASED someone while on
11   duty?
12             MR. ARKO:  Objection.
13        A.   Yes.
14        Q.   On how many occasions?
15             MR. ARKO:  Objection.
16        A.   As lieutenant, once, as lieutenant.
17        Q.   And as a sergeant?
18             MR. ARKO:  Objection.
19        A.   I am going to say less than five times.
20        Q.   Describe the circumstances of the
21   occasion where you TASED someone while you were a
22   lieutenant?
23             MR. ARKO:  Objection.
24        A.   There was a shoplifting incident, it
25   was just me and my driver only, we responded to a
```

```
 1              LIEUTENANT ANGEL LEON
 2   shoplifting in progress and my driver at the time
 3   was struggling with the individual, he did not
 4   want to get handcuffed -- I remember that -- and
 5   they were struggling until they both fell to the
 6   floor.
 7       Q.    At the point where they fell to the
 8   floor that's when you made the decision to use the
 9   TASER, right?
10       A.    That's right.
11       Q.    What about the most recent instances in
12   which you deployed your TASER as a sergeant, do
13   you remember the circumstances of that event?
14            MR. ARKO:  Objection.
15       A.    Not as a sergeant, I couldn't remember
16   that.
17       Q.    Do you remember any of the
18   circumstances personally when you used the TASER
19   as a sergeant?
20            MR. ARKO:  Objection.
21       A.    No.
22       Q.    On any other occasions as a lieutenant,
23   have you ordered another officer to TASE someone?
24       A.    Yes.
25       Q.    How many times?
```

```
1                LIEUTENANT ANGEL LEON

2           MR. ARKO:  Objection.

3      A.    For the three years that I have been

4  assigned as a lieutenant, I am going to say less

5  than five.

6      Q.    Has there been any such occasions since

7  the incident with Mr. Harris, so since September

8  of last year?

9           MR. ARKO:  Objection.

10     A.    No.

11     Q.    So tell me about the time before

12 Mr. Harris when you ordered another officer to

13 TASE someone.

14          MR. ARKO:  Objection.

15     A.    We responded to an emotional EDP, I

16 forgot what location it was, he was under the

17 influence of some sort of narcotic and he was

18 acting very irrational, and I remember ordering an

19 officer because he was not willing to go willingly

20 with EMS at the time.

21     Q.    So you're trained that the situation

22 involving an emotionally disturbed person or EDP

23 is a situation that in which a TASER might be

24 helpful because those people might not respond to

25 the same kinds of commands or physical actions
```

```
 1                  LIEUTENANT ANGEL LEON
 2   that you could take with a person who wasn't in an
 3   altered state, right?
 4              MR. ARKO:  Objection.
 5       A.    Yes.
 6       Q.    So one time you ordered someone on your
 7   command to TASE an EDP.  Do you remember other
 8   circumstances in which you, as a lieutenant,
 9   ordered another officer to TASE someone other than
10   that EDP and Mr. Harris?
11              MR. ARKO:  Objection.
12       A.    I wouldn't remember.
13       Q.    So the times you do remember doing it,
14   it was an EDP, which was when you ordered someone,
15   and then this struggle where your operator was
16   down on the floor struggling with the subject when
17   you did it yourself, right?
18       A.    Yes.
19       Q.    Can you ever remember TASEing someone
20   who wasn't an EDP and wasn't using force against
21   officers?
22              MR. ARKO:  Objection.
23       A.    No.
24       Q.    Can you ever remember ordering the use
25   of a TASER against someone who wasn't an EDP and
```

```
1                    LIEUTENANT ANGEL LEON
2    wasn't using force against officers?
3               MR. ARKO:  Objection.
4         A.   No.
5         Q.   This was the only situation you have
6    ever done that?
7         A.   When I ordered someone in a non-EDP
8    situation this has been, if I could remember -- I
9    can't remember, I can't remember.
10        Q.   But just to be clear, other than -- you
11   would agree with me that Mr. Harris was not using
12   force against your fellow officers, right?
13              MR. ARKO:  Objection.
14        A.   Lieutenant Lane was struggling with him
15   during a scuffle, so he was preventing Lieutenant
16   Lane from handcuffing him for to us to place him
17   under arrest.
18        Q.   The TRI Report completed by Officer
19   Baltzer and Lieutenant Lane, have you seen that
20   document?
21        A.   No.
22              MR. LIEB:  Let me show it to you.  I am
23   sharing with you what was previously marked
24   Plaintiff's Exhibit 5.
25              (Plaintiff's Exhibit No. 5 was
```

```
1                  LIEUTENANT ANGEL LEON

2              previously marked for identification.)

3        Q.    Looking at the top, do you recognize

4   this type of document to be a Threat Resistance

5   and Injury or TRI Report that the police

6   department completes after a use-of-force

7   incident?

8        A.    Yes.

9        Q.    Here the "reporting MOS" is Officer

10  Baltzer?

11       A.    Yes.

12       Q.    Do you see the "subject" here is Brian

13  Harris?

14       A.    Yes.

15       Q.    You see on the bottom of this page

16  there is a question "subject used force," question

17  mark.

18              Do you see that?

19       A.    Yes.

20       Q.    You have filled out a TRI Report before

21  under similar circumstances, right?

22              MR. ARKO:  Objection.

23       A.    Yes.

24       Q.    That "subject used force" is a standard

25  question on this computer generated form that is
```

```
 1              LIEUTENANT ANGEL LEON

 2     asking the completing MOS whether the subject, the

 3     civilian subject used force against officers,

 4     right?

 5              MR. ARKO:  Objection.

 6         A.    Yes.

 7         Q.    Here the answer is "no."

 8              Do you see that?

 9         A.    Yes.

10         Q.    Indicating that Mr. Harris did not use

11     force, right?

12              MR. ARKO:  Objection.

13         A.    Yes.

14         Q.    I will represent to you that Officer

15     Baltzer and Lieutenant Lane have both testified

16     that is accurate.

17              Do you disagree?

18              MR. ARKO:  Objection.

19         A.    "Subject used force."  This is the

20     first time I have seen this report done by

21     Lieutenant Lane, I thought physical force was, in

22     fact, a type of force.

23         Q.    Is it your testimony that Mr. Harris

24     used physical force against the police?

25         A.    He was preventing himself by resisting
```

```
 1              LIEUTENANT ANGEL LEON
 2   arrest by not being handcuffed, so I say by
 3   "physical force" meaning he was preventing himself
 4   by not trying to get handcuffed by Lieutenant
 5   Lane.
 6        Q.    Did he strike anyone?
 7        A.    No, he did not.
 8        Q.    Did he push anyone?
 9        A.    No, he did not.
10        Q.    Did he grab anyone?
11        A.    No.
12        Q.    Did he punch anyone?
13        A.    No.
14        Q.    Have you ever ordered someone to be
15   TASED based upon their size and the words they
16   used, as in this case?
17              MR. ARKO:  Objection.
18        A.    No.
19        Q.    This is the only time you have done
20   this, right?
21              MR. ARKO:  Objection.
22        A.    This is the time, coupled with the
23   words "don't touch me" and he was flailing his
24   arms.  In other words, we wanted compliance
25   because he was being placed under arrest and by
```

```
 1                  LIEUTENANT ANGEL LEON
 2   flailing his arms and preventing Lieutenant Lane
 3   from handcuffing him, I decided to have Officer
 4   Baltzer use the TASER so we could TASER him and
 5   handcuff him to get compliance, and place him
 6   under arrest.
 7        Q.    Did you have any conversations with
 8   Swinkunas or Jimenez about this incident when you
 9   were back at the precinct?
10        A.    Back -- you mean this was after?
11        Q.    Yes, after the incident you were at
12   some point back at the precinct, you encountered
13   Mr. Harris back at the desk, right?
14        A.    I encountered him --
15        Q.    At any point after Mr. Harris was
16   TASED, did you discuss the circumstances of what
17   had just happened and why it had happened with any
18   of your fellow officers?
19        A.    I spoke to Officer Jimenez about the
20   charges, what charges would be brought against
21   officer Brian Harris (sic).
22             MR. ARKO:  Not officer Brian Harris.
23        A.    I mean Officer Jimenez, not officer
24   Brian Harris.
25        Q.    Understood.  When did you speak with
```

```
1                    LIEUTENANT ANGEL LEON
2    Officer Jimenez about that?
3         A.    I told her on the field and also there
4    is an online booking sheet she fills out that I
5    have to verify.
6         Q.    When you say you spoke with her out in
7    the field, do you mean outside the hospital?
8         A.    Yes, outside the hospital I assigned
9    that arrest to her.
10        Q.    When you had that conversation with
11   Officer Jimenez, did you explain to her the
12   reasons why you had ordered Baltzer to deploy the
13   TASER?
14             MR. ARKO:   Objection.
15        A.    No.
16        Q.    Did you at any point have a
17   conversation with any of your colleagues about why
18   you had ordered Baltzer to use the TASER in these
19   circumstances?
20        A.    I had to make a split-second decision,
21   I directed Officer Baltzer to use his TASER, I
22   don't have to explain to anybody else why.
23        Q.    Irrespective of why you had to or
24   wanted to, have you ever had a conversation with
25   your fellow officers where you explained why you
```

```
 1               LIEUTENANT ANGEL LEON
 2  made that decision?
 3               MR. ARKO:  Objection.
 4        A.    I wouldn't remember.
 5        Q.    Have you ever been the subject of
 6  discipline or reprimand in your NYPD career?
 7               MR. ARKO:  Objection.  As with the last
 8  depositions I am going to instruct the witness to
 9  limit his answer only to allegations of use of
10  excessive force and false statements.
11               MR. LIEB:  We disagree and are
12  scheduled to confer about that later...
13        Q.    But for purposes of that limitation you
14  should answer the question.
15        A.    Can you repeat the question?
16        Q.    Sure.  I asked you if you have ever
17  been the subject of reprimand or discipline in
18  your NYPD career, and your counsel is instructing
19  you to limit your answer to events related to
20  excessive force or allegations of dishonesty,
21  which I don't agree with but for present purposes
22  that's how you should answer the question.
23               MR. ARKO:  Do you understand what the
24  question is?
25               THE WITNESS:  I have been disciplined
```

```
 1              LIEUTENANT ANGEL LEON
 2   for administrative purposes.
 3              MR. ARKO:  No, limit your answer only
 4   to whether you have been subject to allegations of
 5   excessive force or making a false statement.
 6        A.    The answer is no.
 7        Q.    To your knowledge, has a court ever
 8   found that your testimony was not credible, for
 9   example, in granting a criminal defendant's motion
10   to suppress evidence?
11        A.    No.
12              MR. LIEB:  Just give me a couple of
13   minutes to look over my notes.
14              MR. ARKO:  Okay.
15              (Recess.)
16        Q.    I do have a little bit more.
17              Lieutenant, you would agree with me
18   that Mr. Harris saying "don't touch me" is verbal
19   defiance, right?
20              MR. ARKO:  Objection.
21        A.    Can you explain more specific, what do
22   you mean by that?
23        Q.    Mr. Harris was told to do something, he
24   said "don't touch me," right?
25        A.    Right.
```

```
1              LIEUTENANT ANGEL LEON

2      Q.    So he's verbally defying a command that

3  was given to him, right?

4              MR. ARKO:  Objection.

5      A.    Yes.

6      Q.    So fair to call it "verbal defiance,"

7  right?

8              MR. ARKO:  Objection.

9      A.    Yes.

10             MR. LIEB:  I am going to put in the

11  chat for everyone's benefit and share on the

12  screen what I have marked as Plaintiff's

13  Exhibit 17, which is a 25 page document Bates

14  numbered defendants 452 to 476.

15             (Plaintiff's Exhibit No. 17 was

16             marked for identification.)

17     Q.    I will represent to you that your

18  counsel has produced this document as the

19  materials for a re-certification training for

20  TASER re-certification that you participated in at

21  some point in the course of your duties.

22             Have you seen these training materials

23  before?

24     A.    Yes.

25     Q.    These were materials that were used by
```

```
 1              LIEUTENANT ANGEL LEON
 2   the NYPD to re-certify you in how to use your
 3   TASER, right?
 4        A.    Yes.
 5        Q.    And also in how to appropriately
 6   command others in the use of their TASERS,
 7   correct?
 8              MR. ARKO:  Objection.
 9        A.    Yes.
10        Q.    I am going to go down to page 466,
11   which is called "smart use considerations."
12              Do you see that?
13        A.    Yes, I see it.
14        Q.    So you understand this is guidance from
15   the NYPD to you about things you should consider
16   when deciding whether to use your TASER or order a
17   subordinate to use their TASER?
18        A.    Yes.
19        Q.    You see here it says "if no exigency or
20   immediate safety risk exists, slow down and
21   consider alternative force options/solutions
22   including negotiations, commands, or physical
23   skills."
24              Do you see that?
25        A.    I see that.
```

```
 1                   LIEUTENANT ANGEL LEON
 2        Q.    It says "do not immediately resort to
 3   CEW."
 4              Do you see that?
 5        A.    I see that.
 6        Q.    "CEW" being the TASER, right?
 7        A.    Right.
 8        Q.    It says "physical resistance or mental
 9   illness alone does not indicate immediate threat."
10              Do you see that?
11        A.    Yes, I see it.
12        Q.    Then on page 467 it says "use CEW
13   within the law and department policies and
14   training."
15              Do you see that?
16        A.    Yes.
17        Q.    It says "do not use CEW for verbal
18   defiance."
19              Do you see that?
20        A.    Yes.
21        Q.    As soon as Mr. Harris said "don't touch
22   me" you immediately determined that TASER was
23   necessary, right?
24        A.    No, when Lieutenant Lane was struggling
25   physically, grabbing his hands trying to handcuff
```

```
 1                    LIEUTENANT ANGEL LEON
 2    him, that's resisting arrest right there, he was
 3    trying to prevent himself from being handcuffed.
 4    In that situation then I decided to have Officer
 5    Baltzer use the TASER on him.
 6         Q.    You remember you testified a couple of
 7    hours ago that you determined that the TASER was
 8    necessary when Mr. Harris said "don't touch me,"
 9    right?
10         A.    Right, I did say that.
11         Q.    That was a decision that you made
12    immediately after he said those words, right?
13         A.    Yes, but I also said when Lieutenant
14    Lane was physically struggling trying to handcuff
15    him, Brian Harris was trying to flail his hands
16    and not get handcuffed.
17         Q.    You would agree with me that under
18    these training materials, based on how you were
19    taught to do your job it would be wrong to TASE
20    someone just because he was a big guy who said
21    "don't touch me," right?
22              MR. ARKO:  Objection.
23         A.    That alone won't suffice, but coupled
24    if somebody is having a struggle to handcuff you,
25    physically grabbing your hand to place you under
```

```
1                    LIEUTENANT ANGEL LEON
2    arrest, then a TASER is going to be used.
3         Q.    But if a big guy says "don't touch me"
4    that's not enough, right?
5         A.    That alone, no.
6         Q.    So this morning when I asked you if you
7    had been previously deposed you indicated that you
8    had been deposed once in a civil lawsuit relating
9    to your NYPD duties.
10             Do you recall that testimony?
11        A.    Yes.
12        Q.    What was that case about?
13             MR. ARKO:  Objection.
14        A.    I remember I was working on the 4:00 to
15   12:00, there was an individual arrested for a
16   suspended license and hitting a pedestrian and
17   leaving the scene of a crime; that vehicle was
18   vouchered in our precinct.  It turned out that the
19   subject's father took the car, he had an extra
20   spare key and took that car from the lot.
21        Q.    Were you accused of some kind of --
22   understanding the accusation may have been
23   inaccurate or baseless -- but did the plaintiff
24   allege you had engaged in some kind of wrongdoing?
25             MR. ARKO:  Objection.
```