1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------X
     BRIAN HARRIS,
3
                    Plaintiff,
4
              -against-          No. 20-CV-10864(LGS)
5
     CITY OF NEW YORK; Lieutenant ANGEL
6    LEON; Detective KRISTEN SWINKUNAS (Shield #2190);
     Police Officer ANTONELLA JIMENEZ (Shield #5209);
7    Police Officer MAXWELL BALTZER (Shield No. 15451);
     and Lieutenant JOHN LANE,
8
                    Defendants.
9    -------------------------------X

10

11

12          DEPOSITION OF DETECTIVE KRISTEN SWINKUNAS

13                   New York, New York

14                   November 4, 2021

15                     8:56 a.m.

16

17

18

19

20

21

22              ELLEN SANDLES REPORTING
23             145 East 16th Street, #9H
               New York, New York 10003
24                  212-677-8739

25

```
 1              DETECTIVE KRISTEN SWINKUNAS

 2       A.    I did, yes.

 3       Q.    What your prior shield number?

 4       A.    When I was a police officer it was

 5   2284.

 6       Q.    Was that your shield number as of

 7   September 2nd, 2020?

 8       A.    I was a detective as of September 2nd,

 9   2020.

10       Q.    So it was 2190 as of September 2020?

11       A.    Yes.

12       Q.    What is your approximate height?

13       A.    I am 5'6".

14       Q.    Was that your approximate height at the

15   time of September 2020 as well?

16       A.    Yes.

17       Q.    What was your approximate weight as of

18   September 2nd, 2020?

19       A.    At that time I was probably about 170.

20       Q.    Did you exercise regularly as of

21   September 2nd, 2020?

22       A.    I did.

23       Q.    What was your general exercise regimen

24   as of that date?

25              MR. ARKO:  Objection.
```

```
 1            DETECTIVE KRISTEN SWINKUNAS
 2       A.    I walked, I went to the gym three times
 3   a week.
 4       Q.    As of September 2020 when you would go
 5   to the gym would you lift weights regularly as
 6   part of your exercise regimen?
 7       A.    No.
 8       Q.    What is the highest level of education
 9   that you have obtained?
10       A.    I have a bachelor's degree.
11       Q.    When did you obtain that degree?
12       A.    2004.
13       Q.    Where did you obtain it from?
14       A.    Mount St. Mary College.
15       Q.    When did you join the NYPD academy?
16       A.    I joined in 2005.
17       Q.    Did you have any jobs in between
18   graduating from college and joining the NYPD?
19       A.    I did.
20       Q.    What jobs did you have in between
21   college and joining the NYPD?
22       A.    I was a preschool teacher, and I worked
23   briefly for an attorney doing administrative
24   stuff.
25       Q.    Were those positions in New York City
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2   or elsewhere?
 3         A.    Elsewhere.
 4         Q.    Did you ever hold any previous law
 5   enforcement jobs before joining the NYPD?
 6         A.    No.
 7         Q.    Were you ever a member of the military?
 8         A.    No.
 9         Q.    When did you graduate from the police
10   academy?
11         A.    In 2006.
12         Q.    What was your first command out of the
13   academy?
14         A.    The 32nd precinct.
15         Q.    Where is that located?
16         A.    In Manhattan.
17         Q.    Where in Manhattan?
18         A.    It is upper Manhattan.
19         Q.    What were your job responsibilities
20   when you joined the 32nd precinct?
21         A.    I was a patrol officer.
22         Q.    Can you explain generally what your job
23   duties were on a day-to-day basis as a patrol
24   officer in the 32nd precinct?
25         A.    We handled radio runs that came over
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    from Central Dispatch.
 3         Q.    How long were you a patrol officer in
 4    the 32nd precinct?
 5         A.    Approximately 11 years.
 6         Q.    After 11 years did you receive a new
 7    command?
 8         A.    Yes, I did.
 9         Q.    Would that have been in approximately
10    2017?
11         A.    Yes -- the end of 2015, actually, was
12    when I moved onto my next.
13         Q.    What was your next command after the
14    32nd precinct?
15         A.    I worked for Manhattan Special Victims.
16         Q.    Were you still an officer at that time
17    or had you been promoted?
18         A.    At that time I was still an officer.
19         Q.    What were your job responsibilities
20    working for Manhattan Special Victims?
21         A.    We investigated sexual assault cases.
22         Q.    How long were you in that position for?
23         A.    I was a detective with Special Victims
24    approximately four years.
25         Q.    I'm sorry, I thought you said you were
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2   still an officer when you were in that position.
 3              Was it during that position you were
 4   promoted to detective?
 5        A.   Yes.
 6        Q.   When were you promoted?
 7        A.   After 18 months of being at Manhattan
 8   Special Victims.
 9        Q.   So would that have been sometime in
10   2017-ish?
11        A.   Yes.
12        Q.   What grade detective are you currently?
13        A.   I am a third grade.
14        Q.   After Manhattan Special Victims Unit,
15   did you have any other commands?
16        A.   I am currently at the 26th Precinct.
17        Q.   Did you have any commands in between
18   Special Victims and the 26?
19        A.   I was inside Special Victims, but I did
20   various units inside of Special Victims.
21        Q.   What units did you do within that
22   division?
23        A.   I did Special Victims night watch, and
24   I was also administrative for Special Victims
25   Division.
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        Q.    What does that mean "administrative for
 3   Special Victims Division"?
 4        A.    We are essentially the wheel of Special
 5   Victims, any cases that come into our unit we
 6   filter them out to the appropriate squad that they
 7   need to go to.
 8        Q.    Why did you move from Special Victims
 9   to the 26th Precinct?
10              MR. ARKO:  Objection.
11        A.    There was an administrative issue with
12   a supervisor.
13        Q.    When you say "an administrative issue
14   with a supervisor" do you mean an issue between
15   you and a supervisor?
16        A.    Yes.
17        Q.    What was that issue?
18              MR. ARKO:  Objection.  I am going to
19   instruct the witness not to answer on the grounds
20   of privilege, it is a disciplinary issue that is
21   not related to allegations of excessive force or
22   false statements.  We had the same dispute
23   yesterday but I'm going to invoke the same
24   privilege and instruct the witness not to answer.
25              MS. KAUFMAN:  I will state for the
```

| | |
|---|---|
| 1 | DETECTIVE KRISTEN SWINKUNAS |
| 2 | record again I think that is an improper |
| 3 | objection, obviously there is no privilege there |
| 4 | and all disciplinary records are discoverable.  So |
| 5 | I think it is highly improper, particularly if it |
| 6 | bears on her reason for ending up in the command |
| 7 | where she is now; you are making a relevance |
| 8 | objection which is an improper basis to instruct |
| 9 | the witness not to answer. |
| 10 | Q.   I may ask a couple of additional |
| 11 | questions without getting at the substance of it, |
| 12 | and I will mark the substance for a ruling. |
| 13 | Did you receive discipline as a result |
| 14 | of this administrative issue that resulted in your |
| 15 | transfer? |
| 16 | MR. ARKO:  Objection.  I am instructing |
| 17 | the witness not to answer on the same grounds. |
| 18 | MS. KAUFMAN:  So you're not just |
| 19 | objecting as to the substance, you're objecting to |
| 20 | the question of whether or not she was discipline? |
| 21 | MR. ARKO:  Yes. |
| 22 | MS. KAUFMAN:  Again, I will say that is |
| 23 | improper. |
| 24 | Q.   Approximately when did you transfer to |
| 25 | the 26th Precinct? |

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        A.    In February 2019.
 3        Q.    In connection with the administrative
 4   issue that you had mentioned, did you make any
 5   internal complaints to the NYPD about
 6   discrimination or unfair treatment or anything
 7   along those lines?
 8              MR. ARKO:  Objection.
 9        A.    Yes, I have.
10        Q.    Where have you filed internal
11   complaints with the NYPD relating to this
12   administrative issue?
13              MR. ARKO:  Objection.
14        A.    With supervisors that I had worked for.
15        Q.    Did you ever file any complaints
16   outside of that like with the New York City
17   Commission on Human Rights or any court related to
18   this issue?
19              MR. ARKO:  Objection.
20        A.    No, I did not.
21        Q.    After you transferred from Special
22   Victims to the 26th Precinct, what were your job
23   responsibilities in the 26th Precinct?
24        A.    I was a patrol officer.
25        Q.    Excuse my lack of understanding, were
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2     you still a detective at that point?
 3          A.    Yes.
 4          Q.    What were your responsibilities as a
 5     patrol officer in the 26th Precinct?
 6          A.    Answering radio runs.
 7          Q.    Have you ever taken the sergeant's
 8     exam?
 9          A.    I did.
10          Q.    When did you take that?
11          A.    I don't remember the exact dates, but I
12     took it twice.
13          Q.    What were the results of those tests?
14                MR. ARKO:   Objection.
15          A.    I missed it both times.
16          Q.    Do you intend to apply again?
17          A.    No.
18          Q.    Are you still a patrol officer in the
19     26th Precinct?
20          A.    Yes.
21          Q.    Had you had any other command changes
22     or promotions or demotions since you transferred
23     to the 26th Precinct in February of 2018 (sic)?
24          A.    It was February of '19, and no.
25          Q.    Did you have a regular tour as of
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2   September of 2020 when you were working for the
 3   26th Precinct?
 4        A.    Yes.
 5        Q.    What was your regular tour?
 6        A.    I worked 23:15 by 07:50 hours.
 7        Q.    For those of us less versed in military
 8   time is that approximately 11:15 p.m. to
 9   7:50 a.m.?
10        A.    Yes.
11              MS. KAUFMAN:  This is Plaintiff's
12   Exhibit 8, we are going to number consecutively.
13              (Plaintiff's Exhibit No. 8 was
14         marked for identification.)
15              MR. ARKO:  I will ask that after the
16   deposition you send them to me electronically
17   because I can't save them on this computer.
18              MS. KAUFMAN:  Of course.
19        Q.    Do you see this document?
20        A.    Yes.
21        Q.    Do you recognize this to be your
22   activity log report from your tour starting on
23   September 1, 2020 and ending on September 2, 2020?
24        A.    Yes.
25        Q.    Is this document also referred to as
```

1              DETECTIVE KRISTEN SWINKUNAS

2     your memo book?

3          A.    Yes.

4          Q.    Is this the document that you referred

5     to earlier when you said that you had reviewed

6     your memo book in advance of this deposition?

7          A.    Yes.

8          Q.    So, looking at the document we have

9     marked as Plaintiff's Exhibit 8, would you agree

10    that on your tour from September 1st to September

11    2nd, you worked your regular tour starting at

12    23:15 and ending at 7:50?

13         A.    On this date I ended up leaving earlier

14    than the end of 7:50.

15         Q.    What time did you leave on this tour?

16         A.    6:05 in the morning.

17         Q.    Why did you leave early?

18         A.    I took loss time.

19         Q.    Why did you take loss time on this

20    date?

21              MR. ARKO:  Objection, you can answer.

22         A.    I had a family emergency.

23         Q.    When you said "loss time" is that the

24    equivalent of sick time or paid leave, something

25    like that?

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        A.    It is paid leave, yes.
 3        Q.    When you reported to work on
 4   September 1, 2020, where did you report?
 5        A.    To the 26th Precinct.
 6        Q.    Do you recall the exact address of that
 7   precinct?
 8        A.    It is 520 West 126.
 9        Q.    When you reported to the precinct that
10   night were you assigned a partner to work with on
11   your tour?
12        A.    Yes.
13        Q.    Who was your partner on that night?
14        A.    Officer Jimenez.
15        Q.    What is Officer Jimenez's first name?
16        A.    I believe it is Antoinette (ph) or
17   Antoinetter (ph).
18        Q.    Was that the first time you had worked
19   with Officer Jimenez as your partner?
20        A.    Yes.
21        Q.    Have you worked Officer Jimenez as your
22   partner any time after that?
23        A.    No.
24        Q.    So that was the only night in your
25   career that you have worked with her as your
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2   partner?
 3         A.    Yes.
 4         Q.    Why were you and Officer Jimenez
 5   assigned as partners that night?
 6         A.    Our platoon commander put us together
 7   in a vehicle that night.
 8         Q.    Do you have any understanding of why
 9   that decision was made to make you partners that
10   night when you haven't been partners before or
11   since?
12         A.    No.
13         Q.    Who was your platoon commander?
14         A.    Lieutenant Leon.
15         Q.    Were you assigned to any particular
16   unit or divisions within the 26th Precinct at that
17   time?
18         A.    We were both assigned to a sector.
19         Q.    What sector was that?
20         A.    I don't recall what sector we were in,
21   I could reference back to my memo book if that
22   could be brought back up again.
23         Q.    Sure.
24               (Complying.)
25         A.    I can see it.
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        Q.    Does looking at this document refresh
 3    your recollection as to what sector you were
 4    assigned to?
 5        A.    Yes.
 6        Q.    What sector is that?
 7        A.    Sector Boy -- "B" as in boy.
 8        Q.    What does it mean that you were
 9    assigned to a sector?
10        A.    So being assigned to Sector Boy we
11    handled certain jobs within a certain block radius
12    of the 26th Precinct.
13        Q.    When you say "certain jobs" do you mean
14    certain types of calls?
15        A.    Radio runs that would come over from
16    Central Dispatch to that sector.
17        Q.    Do you recall what the geographic
18    boundary of that sector was?
19        A.    I do not.
20        Q.    Looking at your memo book, can you tell
21    the first call that you responded to that night of
22    September 1st to September 2nd of 2020?
23        A.    Yes.
24        Q.    What was that?
25        A.    We were on a directive at 23:47 hours,
```

```
 1                DETECTIVE KRISTEN SWINKUNAS
 2    the location being 125 and Marginal.
 3         Q.    What is "a directive"?
 4         A.    We sit at the location, it is a crime
 5    location, and we sit with our turret lights on
 6    which are the lights on top of the vehicle, and we
 7    make sure there are no criminal activities
 8    occurring at the location.
 9         Q.    Looking at your memo book, do you know
10    where you went or were directed or dispatched
11    after you were directed at 125 and Marginal?
12         A.    From there -- you can stop right
13    there -- at 12:05 a.m. we were assigned to do the
14    mail run.
15         Q.    What is "the mail run"?
16         A.    The mail run essentially is us picking
17    up vouchered property from several other
18    precincts, as well as mail that needs to be
19    brought to the patrol bureau Manhattan North
20    building.
21         Q.    What did you do after the mail run?
22         A.    We went 98 from that and were out on an
23    aided at 2:05 in the morning.
24         Q.    What is "an aided"?
25         A.    We were given a job from Central
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    Dispatch, it came over as a person needing medical
 3    assistance.
 4         Q.    What did you do after you responded to
 5    the person needing medical assistance?
 6         A.    We were scratched at 123 and Amsterdam
 7    by Lieutenant Leon, and that was at 2:26 in the
 8    morning.
 9         Q.    What does "scratched" means?
10         A.    Our supervisor comes by and makes sure
11    we are okay, and if we need anything for the
12    evening.
13         Q.    What happened after your scratch with
14    Lieutenant Leon at 2:26 in the morning?
15         A.    Then at 2:38 in the morning we were at
16    a vehicle check point with Sergeant Cannariato.
17         Q.    What is "a vehicle check point"?
18         A.    A vehicle safety check point is, we
19    look for any traffic infractions that may be going
20    on at that location; there are several stop signs
21    and several red lights at that location and we are
22    there to make sure that motorists are following
23    all safety rules.
24         Q.    What happened after that on the morning
25    of September 2nd?
```

DETECTIVE KRISTEN SWINKUNAS

1

2     A.    At 3:00 in the morning my partner and I

3  responded to St. Luke's Hospital, we were backing

4  the unit that was assigned to a radio run from

5  Central Dispatch.

6     Q.    When you say "backing the unit that

7  came from Central Dispatch," what does --

8     A.    It came over as a 10-34 male shot at

9  St. Luke's, and that's a heavy priority job, so we

10  went to the hospital to assist them in whatever

11  way they needed.

12     Q.    What does "10-34" indicate?

13     A.    It is a priority job, it is a person

14  that was assaulted, and essentially it was a male

15  shot.

16     Q.    When you say you were "assisting the

17  unit that was discharged" what unit was actually

18  discharged to the hospital?

19     A.    Sector Adam.

20     Q.    Is that Sector Adam out of the 126th

21  (sic) Precinct?

22     A.    Yes.

23     Q.    Why was Sector Adam the unit that was

24  discharged to respond to that?

25     A.    They were assigned by Central Dispatch,

```
1              DETECTIVE KRISTEN SWINKUNAS
2    they cover St. Luke's Hospital.
3         Q.    So you're saying that St. Luke's is
4    within the geographic location of Sector A, and
5    even though you guys were in Sector B you were
6    discharged to go there as back up?
7         A.    Yes.
8         Q.    When it indicates that there is a
9    10-34, does that mean you got the dispatch over
10   the radio?
11        A.    Yes.
12        Q.    Where were you, if you could recall,
13   when you got the dispatch over the radio to
14   respond to St. Luke's?
15        A.    We were at the check point on 125 and
16   Riverside Drive.
17        Q.    When you got the discharge to go to
18   St. Luke's, what information did you receive from
19   the dispatcher?
20        A.    I had heard over Central Dispatch that
21   it was a 10:34 male shot at St. Luke's, and I
22   heard that Sector Adam was assigned to that.
23        Q.    Did you hear anything else?
24        A.    No.
25        Q.    What did you do after getting the radio
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2     dispatch to go to St. Luke's?
3          A.    We went to St. Luke's Hospital.
4          Q.    When you say "we" do you mean you and
5     Officer Jimenez?
6          A.    Yes.
7          Q.    Approximately how long did it take you
8     to get from your check point to St. Luke's?
9          A.    Approximately five, maybe six minutes.
10         Q.    So approximately what time do you think
11    you arrived at St. Luke's Hospital on the morning
12    of September 2nd?
13         A.    Probably by 10 after 3:00.
14         Q.    When you drove to St. Luke's Hospital,
15    did you park your police vehicle at some point and
16    get out of the car?
17         A.    Yes.
18         Q.    Where did you park your vehicle?
19         A.    Near the ambulance bay of St. Luke's.
20         Q.    When you arrived at the scene -- and
21    when I say "the scene" I am talking about the
22    scene outside of the emergency room at St. Luke's,
23    the ambulance bay -- when you arrived at the scene
24    were officers from Sector A already present?
25         A.    They were, yes.
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        Q.    Who was present from Sector A?
 3        A.    Officer Valdez and Officer Fernandez.
 4        Q.    Do you know their first names?
 5        A.    Officer Valdez's first name is Robby,
 6   and Officer Fernandez is Gabriel.
 7        Q.    Was anyone else from Sector A present
 8   when you arrived at the scene?
 9        A.    No.
10        Q.    Were any other members of service
11   present when you arrived at the scene?
12        A.    No.
13        Q.    When you arrived at the scene, what did
14   you see; what did it look like?
15        A.    We entered into the emergency room.
16   Prior to entering the emergency room I observed a
17   vehicle that was parked and left in the ambulance
18   bay, we continued, entered into the emergency room
19   where I was met with Officer Valdez and Fernandez.
20        Q.    So Officer Valdez and Fernandez were in
21   the hospital when you arrived?
22        A.    Yes.
23        Q.    I am going to break this down a little
24   bit:  So you said that in order to get into the
25   emergency room you walked past or observed a
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2   vehicle that was parked near the ambulance bay.
 3              Is that correct?
 4        A.    Yes.
 5        Q.    Do you remember what the vehicle was?
 6        A.    I remember it was a dark color SUV.
 7        Q.    If I told you that it was a navy blue
 8   2007 Chevy Tahoe, do you have any reason to
 9   disagree with that or any information to the
10   contrary?
11              MR. ARKO:  Objection.
12        A.    No.
13        Q.    How was the vehicle parked?
14        A.    The vehicle was parked on a slant
15   facing the ambulance, entryway to the emergency
16   room.
17        Q.    Did you observe that any doors or
18   windows were open?
19        A.    I did.
20        Q.    What doors or windows did you observe
21   were opened?
22        A.    The front passenger door was left ajar.
23        Q.    Any other doors or windows you observed
24   being opened?
25        A.    No.
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2        Q.    Did you inspect the vehicle before
3    going into the hospital?
4        A.    I did not.
5        Q.    Did you see anything in the car or on
6    the ground that you observed as you were walking
7    into the hospital?
8        A.    I did not.
9        Q.    Did you have any mental impressions
10   about what the car was doing there at the time you
11   first passed it and entered the hospital?
12              MR. ARKO:   Objection.
13       A.    No.
14       Q.    Did you have any conversations with
15   Detective Jimenez (sic) about the car as you were
16   walking past it?
17       A.    No, Officer Jimenez and I never spoke
18   about the vehicle.
19       Q.    After you entered the hospital, where
20   did you encounter Officer Valdez and Officer
21   Fernandez?
22       A.    They were inside the emergency room.
23       Q.    Did you have to look for them or find
24   them?
25       A.    I had to look for them.
```

```
1                DETECTIVE KRISTEN SWINKUNAS
2         Q.    How did you know to look for them, how
3    did you know they would be there?
4         A.    Staff members at the hospital had
5    stated the officers were on the other side of
6    where we were standing.
7         Q.    So when you entered the hospital you
8    had a conversation with hospital staff and they
9    directed you to the other officers.
10              Is that fair?
11        A.    Yes.
12        Q.    What else did you talk about with the
13   hospital staff when you first entered the
14   hospital?
15        A.    That was it.
16        Q.    Did they tell you anything about the
17   victim or the condition of the victim?
18        A.    No.
19        Q.    What happened after you encountered
20   Officer Valdez and Officer Fernandez?
21        A.    I was briefly speaking to them about
22   what essentially they had as far as the job that
23   came over, and how the victim was at this point,
24   and if they were able to get any information as to
25   where the location of the actual shooting
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    happened.
 3         Q.    When you say "what they had" do you
 4    mean what information they had?
 5         A.    Yes.
 6         Q.    What information did Officer Valdez and
 7    Officer Fernandez share with you about the
 8    shooting?
 9         A.    They did not have much information to
10    provide other than the victim was in the room
11    already, he had been seen and treated by medical
12    staff.  At that point his leg was wrapped and he
13    was medically treated, but he was not so
14    forthcoming with information.
15         Q.    Did you learn at that time that the
16    shooting victim was in stable condition?
17         A.    Yes.
18         Q.    Was the person you were talking to
19    Officer Valdez or Officer Fernandez or both?
20         A.    Both.
21         Q.    When you say "they were not so
22    forthcoming" do you mean they had information they
23    were not sharing or they didn't know a lot or
24    something else?
25         A.    They didn't get much information from
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2    the victim.
3         Q.    Did they share with you any information
4    about where the victim had been shot?
5         A.    They had stated that he was shot in the
6    leg.
7         Q.    Did they give you any information about
8    where like geographically in the City the victim
9    had been shot?
10        A.    No.
11        Q.    Did they give you any information about
12   how the victim had ended up in the hospital?
13        A.    No.
14        Q.    Did they give you any information about
15   who had shot the victim?
16        A.    No.
17        Q.    So other than telling you that the
18   victim had been seen and treated and his leg was
19   wrapped and he was stable, did they give you any
20   other information about the details of the
21   shooting?
22        A.    No.
23        Q.    What happened after your conversation
24   with Officer Fernandez and Officer Valdez?
25        A.    I went to speak to the victim myself.
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        Q.    Did Officer Jimenez accompany you when
 3    you went to the speak to the victim?
 4        A.    No.
 5        Q.    Where did she go at the time you went
 6    to speak to the victim?
 7        A.    She stayed outside of the room.
 8        Q.    Was she present when you were talking
 9    to Officer Fernandez and Officer Valdez?
10        A.    Yes.
11        Q.    Why did she stay outside of the
12    victim's room instead of going in to speak to him?
13              MR. ARKO:  Objection.
14        A.    I don't know.
15        Q.    Did you have a conversation about why
16    one of you would go inside and one outside?
17        A.    No.
18        Q.    Did you instruct her to stand outside
19    and wait?
20        A.    No.
21        Q.    So to the best of your knowledge, she
22    just decided on her own to wait outside?
23        A.    Yes.
24        Q.    About how long did your conversation
25    with Officer Fernandez and Officer Valdez last?
```

```
 1                  DETECTIVE KRISTEN SWINKUNAS
 2         A.    A minute, possibly two minutes.
 3         Q.    What happened after you entered the
 4    shooting victim's room?
 5         A.    He was laying on the bed, I introduced
 6    myself to him and I had told him that we were
 7    there to make sure he was okay, and to see if
 8    there was any other victims he was with that he
 9    may have known about.
10         Q.    What, if anything, did the victim say
11    in response?
12         A.    The victim had stated he was at a party
13    with friends when he had heard gunshots, and he
14    began running.
15         Q.    What else, if anything, did he say?
16         A.    That was it.
17         Q.    Did he say whether he was shot at the
18    party or on the way out or something else?
19         A.    He believed that he was shot when he
20    was exiting, when he was running from the party.
21         Q.    Did he say where the party was located?
22         A.    He stated that he was in a parking area
23    of a housing location.
24         Q.    So he was outdoors when he was shot?
25         A.    Yes.
```

```
 1                 DETECTIVE KRISTEN SWINKUNAS
 2        Q.    Did he say anything about how he got to
 3    the hospital?
 4        A.    No.
 5        Q.    Did he say anything about whether
 6    anyone else had been shot?
 7        A.    No.
 8        Q.    Did he say anything about who shot him?
 9        A.    No.
10        Q.    Did you ask him any additional or
11    follow-up questions, after he shared the
12    information about the circumstances of his injury?
13        A.    I asked him if he knew anything further
14    where the gunshots were coming from, he said he
15    just heard them and he took off running.
16        Q.    Did you ask him about how he ended up
17    at the hospital?
18        A.    I did not, no.
19        Q.    Did you ask the shooting victim for his
20    name or did you already know his name at that
21    point?
22        A.    I did not ask him for his name.
23        Q.    Did you know his name at that point?
24        A.    I did not.
25        Q.    Did you or the shooting victim say
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2   anything else in that initial conversation that we
 3   have not already discussed here today?
 4        A.    No.
 5        Q.    Approximately how long did your
 6   conversation with the shooting victim last?
 7        A.    Approximately two minutes.
 8        Q.    What did you do after that
 9   conversation?
10        A.    I exited the room where the victim was.
11        Q.    Where did you go next?
12        A.    I went into the lobby of the emergency
13   room.
14        Q.    Did Detective Jimenez go with you?
15        A.    Officer Jimenez did go with me, yes.
16        Q.    What happened after you got to the
17   lobby of the ER?
18        A.    I was greeted by my supervisor,
19   Sergeant Cannariato.
20        Q.    Did you have a conversation with
21   Sergeant Cannariato?
22        A.    I did.
23        Q.    What was the sum and substance of that
24   conversation?
25        A.    Just informing him that the victim had
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    already been seen by medical staff, he had been
 3    shot in the leg, and the only information I had
 4    where the shooting had happened was in a housing
 5    location right outside of a parking lot.
 6         Q.    Did the shooting victim tell you where
 7    geographically that housing authority and parking
 8    lot were located?
 9         A.    No.
10         Q.    Did you ask him that question?
11         A.    I did.
12         Q.    What did he say in response?
13         A.    He wasn't sure.
14         Q.    What else, if anything, did you say to
15    Sergeant Cannariato when you encountered him in
16    the ER lobby?
17         A.    That was the extent of the
18    conversation.
19         Q.    Did he give you any orders or
20    instructions at that point?
21         A.    No.
22         Q.    Did he ask any further questions of
23    you?
24         A.    No.
25         Q.    Was Officer Jimenez present for that
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    conversation?
 3         A.    Yes, she was.
 4         Q.    Approximately how long did that
 5    conversation last?
 6         A.    Approximately two minutes.
 7         Q.    Where did -- to the best of your
 8    knowledge -- Sergeant Cannariato go after that?
 9         A.    Cannariato stayed in the emergency room
10    as well.
11         Q.    Where did you go after that
12    conversation?
13         A.    I exited the emergency room doors.
14         Q.    Why did you exit the emergency room at
15    that time?
16         A.    We were going to leave the location.
17         Q.    When you say "we" do you mean you and
18    Officer Jimenez?
19         A.    Yes.
20         Q.    Why were you going to leave the
21    location at that time?
22         A.    We were going to resume patrol.
23         Q.    Did Sergeant Cannariato instruct you to
24    resume patrol at some point?
25         A.    No.
```

```
1            DETECTIVE KRISTEN SWINKUNAS
2       Q.   Did anyone else instruct you to resume
3   patrol at that point?
4       A.   At that point, no.
5       Q.   Where were intending to go when you
6   left the hospital?
7       A.   We were going to resume patrol, so
8   anything that came over from Central Dispatch; she
9   would know that we were 98 (sic) and would be able
10  to handle any jobs that came over.
11      Q.   So you were going to inform Central
12  Dispatch that you were leaving that scene so you
13  would be available for future calls?
14      A.   Yes.
15      Q.   At any point, did you actually make
16  that call to Central Dispatch to let them know
17  that you were available?
18      A.   No, we did not get a chance to; no.
19      Q.   Did you tell Sergeant Cannariato that
20  you were intending to resume patrol?
21      A.   No, we were not needed any further at
22  that hospital.
23      Q.   That assessment that you weren't needed
24  there was an assessment you made and not anyone
25  else told you, correct?
```

```
 1                 DETECTIVE KRISTEN SWINKUNAS
 2         A.    Yes.
 3         Q.    Did you discuss with Officer Jimenez
 4     that that was your intention, to resume patrol?
 5         A.    No.
 6         Q.    Did she know that that was what you
 7     were going to do, you were going to call Dispatch
 8     to resume patrol or she did not know that yet?
 9         A.    She knew, she followed me out of the
10     hospital.
11         Q.    Did you inform her at some point you
12     were intending to resume patrol?
13         A.    Once we exited the hospital we did not
14     get a chance to resume patrol, we were greeted by
15     our lieutenant that was outside.
16         Q.    Did you guys have a conversation and
17     decide together you were going to resume patrol or
18     was that something you decided?
19         A.    That was something I decided.
20         Q.    What happened when you exited the
21     emergency room?
22         A.    We were greeted by Lieutenant Leon.
23         Q.    Did you observe any other members of
24     service outside the ER, other than Lieutenant
25     Leon?
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        A.    Yes.
 3        Q.    Who else did you observe?
 4        A.    Lieutenant Lane and his driver, Officer
 5   Baltzer.
 6        Q.    Anyone else?
 7        A.    That was it.
 8        Q.    Were Lieutenant Lane and Lieutenant
 9   Leon your supervisors within the 26th Precinct?
10        A.    Lieutenant Lane is not my supervisor,
11   Lieutenant Leon is my supervisor.
12        Q.    Is that because of the sector division?
13   Why is it that one is your supervisor and one is
14   not?
15        A.    Lieutenant Lane is assigned to special
16   operations, Lieutenant Leon is the platoon
17   commander for the midnight patrol.
18        Q.    Does that -- as platoon commander does
19   Lieutenant Leon oversee multiple sectors?
20        A.    Yes.
21        Q.    You mentioned also seeing Officer
22   Baltzer, who you described as Lieutenant Lane's
23   driver.
24              Is that correct?
25        A.    Yes.
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2         Q.    Do you know Officer Baltzer?
3         A.    I do not.
4         Q.    Had you ever worked with him prior to
5    this date?
6         A.    No.
7         Q.    Have you ever worked with him since the
8    date of this incident?
9         A.    No.
10        Q.    Do you know Lieutenant Leon?
11        A.    Yes.
12        Q.    As your supervisor, was he someone you
13   interacted with regularly?
14        A.    Yes.
15        Q.    What about Lieutenant Lane, did you
16   know him or interact with him regularly?
17        A.    No.
18        Q.    Where were Lieutenant Lane, Lieutenant
19   Leon and Officer Baltzer situated when you exited
20   the emergency room?
21        A.    Lieutenant Leon was standing next to a
22   vehicle outside of the ambulance bay, and
23   Lieutenant Lane and his driver, Officer Baltzer,
24   were exiting their vehicle.
25        Q.    When you say "Lieutenant Lane was
```

```
1                DETECTIVE KRISTEN SWINKUNAS
2     standing next to a vehicle" was that the same dark
3     SUV you described earlier or a different vehicle?
4          A.    It was the vehicle that I described
5     earlier.
6          Q.    And where was Lieutenant Lane and
7     Officer Baltzer getting out -- where was their
8     vehicle parked?
9          A.    Their vehicle was parked across from
10    the ambulance bay, outside of a parking garage at
11    that location.
12         Q.    What happened when you encountered
13    Lieutenant Leon standing next to the vehicle?
14         A.    He had instructed us that we were to
15    safeguard the vehicle at the location.
16         Q.    Did he provide any further instructions
17    as to what that would entail?
18         A.    He had stated they believed the vehicle
19    to be involved in the shooting from earlier, and
20    he instructed that the vehicle was not to be
21    removed and nothing was to be touched inside or
22    outside of the vehicle.
23         Q.    Did he give you instructions as to
24    whether or not you should conduct a search of the
25    vehicle?
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        A.    No.
 3        Q.    He didn't say either way?
 4        A.    No.
 5        Q.    Did he instruct you to put up any
 6   caution tape or barriers in order to safeguard the
 7   vehicle?
 8        A.    No.
 9        Q.    Did you at any point safeguard the
10   vehicle by putting up any caution tape or barriers
11   to indicate to the public that the car was part of
12   a crime scene?
13        A.    No.
14        Q.    When you communicated with Lieutenant
15   Leon when you exited the ER, did you have any
16   conversation with him, other than him instructing
17   you to safeguard the vehicle?
18        A.    I had told him the information that I
19   learned of the victim inside from the hospital.
20        Q.    Did he tell you anything that he had
21   learned about the shooting incident?
22        A.    He had stated he believed that the
23   vehicle was involved in the incident of what had
24   happened, and what led to the victim being in the
25   hospital.
```

```
1                 DETECTIVE KRISTEN SWINKUNAS
2        Q.    Did he state what the source of that
3     information was, how he learned that?
4        A.    No.
5        Q.    Other than the exchange of information
6     you just described and Officer Leon (sic)
7     instructing you to safeguard the car, was there
8     anything else said or discussed with Lieutenant
9     Leon when you exited the emergency room and
10    encountered him?
11       A.    No.
12       Q.    Did you and Officer Jimenez then
13    proceed to safeguard the vehicle?
14       A.    Yes.
15       Q.    Let me back up.  How long did your
16    conversation with Lieutenant Leon last?
17       A.    Approximately a minute.
18       Q.    During the time -- after that
19    conversation when you were safeguarding the
20    vehicle, did you observe anything additional about
21    the vehicle that you hadn't observed when you
22    walked past it into the emergency room?
23       A.    Yes.
24       Q.    What else did you observe about the
25    vehicle at that time?
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2         A.    There was a baseball hat on the ground
3    and I had noticed there was blood on the inside of
4    the vehicle from the door being left open; I was
5    able to see that from the outside.
6         Q.    Where was the blood in the car located?
7         A.    On the seat.
8         Q.    On the passenger seat or the driver
9    seat?
10        A.    The passenger seat.
11        Q.    Anything else other than the blood and
12   the baseball hat that you observed that you hadn't
13   observed previously about the car?
14        A.    No.
15        Q.    At any point did you search the
16   vehicle?
17        A.    No.
18        Q.    At any point did anyone else search the
19   vehicle?
20             MR. ARKO:  Objection.
21        A.    No.
22        Q.    Are you personally aware of whether at
23   any point any contraband or illegal substances
24   were recovered from that vehicle?
25        A.    I do not know of that, no.
```

```
 1               DETECTIVE KRISTEN SWINKUNAS
 2        Q.    What did Lieutenant Lane and Officer
 3   Baltzer do, after they exited their vehicle at the
 4   scene?
 5        A.    They approached where Lieutenant Leon
 6   was standing.
 7               (Technical issue.)
 8        Q.    Okay.  I think my question was, what
 9   did Lieutenant Lane and Officer Baltzer do after
10   they exited their vehicle?
11        A.    They exited the vehicle and were
12   beginning to walk towards Lieutenant Leon.
13        Q.    Were you still having a conversation
14   with Lieutenant Leon or was he farther away from
15   you somewhere else?
16        A.    He was further away from me.
17        Q.    Where was Officer Leon (sic) located
18   and where were you located at the time that
19   Lieutenant Lane and Officer Baltzer approached
20   him?
21        A.    Lieutenant Leon was by the end part of
22   the vehicle and I was standing at the hood part,
23   the front end of the vehicle.
24        Q.    When you say "the end part" do you mean
25   the trunk?
```

```
1              DETECTIVE KRISTEN SWINKUNAS

2        A.   Yes.

3        Q.   Was Lieutenant Leon also safeguarding

4   the vehicle at that time?

5        A.   No.

6        Q.   What was your understanding of why he

7   was standing at the trunk of the vehicle at that

8   time?

9             MR. ARKO:  Objection.

10       A.   I don't know why he was standing there.

11       Q.   After Lieutenant Lane and Officer

12  Baltzer approached Lieutenant Leon, did they have

13  a conversation with him?

14       A.   They did.

15       Q.   Were you able to hear that

16  conversation?

17       A.   No.

18       Q.   Approximately how long did that

19  conversation last between Lieutenant Leon,

20  Lieutenant Lane and Officer Baltzer?

21       A.   From what I observed, approximately a

22  minute.

23       Q.   Where was the detective -- where was

24  Officer Jimenez standing at the time where you

25  were standing near the hood of the car and
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    Lieutenant Leon was standing at the trunk having a
 3    conversation with the other two members of
 4    service?
 5         A.    She was standing next to me.
 6              (Recess.)
 7         Q.    I think when we left off we were up to
 8    the point where you were standing at the hood of
 9    the vehicle with Officer Jimenez, and Lieutenant
10    Leon was standing at the trunk having a
11    conversation with Lieutenant Lane and Officer
12    Baltzer which you said lasted approximately one
13    minute.
14              Do you recall that?
15         A.    Yes.
16         Q.    What happened next?
17         A.    Next, I observed a vehicle pull up
18    behind the parked vehicle that was there, the
19    vehicle was blocking a parking garage for hospital
20    staff so I was approaching the vehicle, a
21    gentleman had exited the vehicle, and I asked him
22    to move the vehicle, that he couldn't leave the
23    vehicle at that location.
24         Q.    Was that gentleman the plaintiff, Brian
25    Harris; you now know that to be the case?
```

```
1                DETECTIVE KRISTEN SWINKUNAS
2         A.    Yes.
3         Q.    What vehicle, if you can remember, did
4    he pull up and park in?
5         A.    It was a dark colored SUV as well.
6         Q.    Did you approach Mr. Harris and ask him
7    to move his car after he had already exited the
8    vehicle or was he still in the vehicle at that
9    time?
10        A.    He had already exited the vehicle.
11        Q.    What happened in response to your
12   request that he move his vehicle?
13        A.    I had asked him several times to move
14   the vehicle, and Mr. Harris continued walking past
15   me towards the parked vehicle outside of the
16   ambulance bay.
17        Q.    Did he respond to you verbally at all
18   in response to your request?
19        A.    No.
20        Q.    Approximately what's the distance where
21   Mr. Harris' car was parked and the vehicle that
22   you were safeguarding?
23        A.    Approximately ten to fifteen feet.
24        Q.    Did anyone else come with you to ask
25   Mr. Harris to move his vehicle?
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2       A.    No.
 3       Q.    When Mr. Harris did not respond and
 4   walks towards the parked -- we will call it the
 5   "Chevy SUV" -- did you follow him back towards the
 6   car or did you do something else?
 7       A.    I stayed by the vehicle, Mr. Harris
 8   continued walking towards the vehicle.
 9       Q.    When you say you "stayed by the
10   vehicle" do you mean the Chevy SUV or Mr. Harris'
11   vehicle?
12       A.    I stayed by the Chevy SUV.
13       Q.    Did you walk over to Mr. Harris'
14   vehicle he had parked in order to request that he
15   move it?
16       A.    I was standing in the street when
17   Mr. Harris exited the vehicle, I had asked him
18   several times to move the vehicle, he refused, he
19   continued walking; I walked back towards the Chevy
20   vehicle.
21       Q.    You were both walking back towards the
22   Chevy when he didn't respond to your request?
23       A.    Yes.
24       Q.    Did Mr. Harris say anything as he was
25   approaching the vehicle, the Chevy?
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2        A.    From what I heard he was stating he was
3    there, his son had been shot.
4        Q.    When you heard Mr. Harris saying his
5    son had been shot, did you understand at that
6    point he was the father of the shooting victim you
7    had encountered inside the hospital?
8        A.    Yes.
9        Q.    Did you also hear him identify himself
10   as the owner of the Chevy?
11       A.    Yes.
12       Q.    Did Mr. Harris say anything else as he
13   was approaching the Chevy?
14       A.    He said he was going to move the car
15   from that location.
16       Q.    He was going to move the Chevy?
17       A.    Yes.
18       Q.    Did he say where he was going to move
19   the Chevy to?
20       A.    No.
21       Q.    Did he say anything else other than
22   that his son had been shot, he was the owner of
23   the Chevy, and he was going to move the Chevy at
24   the time he was approaching the vehicle?
25       A.    That was all that I observed and heard
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2   him say.
 3        Q.    At any point when Mr. Harris was
 4   approaching the vehicle, did you respond to him
 5   verbally or say anything in response to the three
 6   things you identified he just said?
 7        A.    Yes.
 8        Q.    What did you say back to him?
 9        A.    I told him the vehicle was under
10   investigation and the vehicle could not be removed
11   from that location.
12        Q.    Did anyone else say anything in
13   response to Mr. Harris as he was approaching the
14   vehicle?
15              MR. ARKO:  You just froze; can you
16   repeat the question?
17        Q.    Did any of the other members of service
18   say anything to Mr. Harris as he was approaching
19   the vehicle?
20        A.    Yes.
21        Q.    Who else spoke to Mr. Harris at the
22   time he was approaching the vehicle?
23        A.    Lieutenant Lane and Lieutenant Leon.
24        Q.    What did Lieutenant Lane say to
25   Mr. Harris as he was approaching the vehicle?
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        A.    Lieutenant Leon told him that the
 3   vehicle could not be removed.
 4        Q.    That's "Leon" you said?
 5        A.    Leon, yes.
 6        Q.    What about Lieutenant Lane, what did he
 7   say?
 8        A.    Lieutenant Lane told him as well
 9   several times that the vehicle could not be
10   removed, it was under investigation.
11        Q.    What about Officer Baltzer or Jimenez,
12   did they say anything to Mr. Harris as he was
13   approaching the vehicle?
14        A.    No.
15        Q.    When Mr. Harris was approaching the
16   vehicle what part of the vehicle was he heading
17   towards; the front, the back, the passenger side,
18   the driver side?
19        A.    He was going towards the passenger side
20   of the vehicle.
21        Q.    In order to get to the passenger side,
22   did he have to walk around either the front of the
23   vehicle or the back of the vehicle?
24        A.    No, he walked from the back of the
25   vehicle to the front of vehicle.
```

```
 1                  DETECTIVE KRISTEN SWINKUNAS
 2        Q.    Let me sort of back up.  Mr. Harris,
 3   when he was approaching the vehicle from his car,
 4   was he approaching from the driver side or
 5   approaching from the passenger side?
 6        A.    He was approaching from the driver side
 7   of his vehicle to the passenger side of the
 8   vehicle that was parked, which was the Chevy.
 9        Q.    In order to get to the passenger side
10   from the diver side, did he go around the back of
11   the vehicle or the front of vehicle?
12        A.    He went around the back.
13        Q.    At that point, were you still
14   positioned at the front of vehicle or were you
15   somewhere else?
16        A.    I was at the driver's side rear of the
17   vehicle when I first engaged in conversation with
18   Mr. Harris and then I turned around and walked to
19   the front of vehicle, from where I was standing I
20   continued walking around towards the front of the
21   vehicle.
22        Q.    Were Lieutenant Leon and Lieutenant
23   Lane and Officer Baltzer still at the back of the
24   vehicle?
25        A.    Yes.
```

```
1                   DETECTIVE KRISTEN SWINKUNAS
2        Q.     So did Mr. Harris pass them in order to
3    walk around to the passenger side of the vehicle?
4        A.     He didn't pass them, he walked in front
5    of them.
6        Q.     You said that Mr. Harris stated that he
7    wanted to move the car.
8               Is that correct?
9        A.     Yes.
10       Q.     Do you have any understanding of why if
11   he wanted to move the car he was going to the
12   passenger side as opposed to the driver side?
13              MR. ARKO:   Objection.
14       A.     I don't know.
15       Q.     Did he say anything about why he was
16   going to the passenger side instead of the
17   driver's side if he wanted to move the vehicle?
18       A.     No.
19       Q.     What happened after you and Lieutenant
20   Lane and Lieutenant Leon stated that the vehicle
21   could not be removed?
22       A.     Mr. Harris became very upset, he was
23   adamant that he was going to be removing that
24   vehicle from the location.
25       Q.     How did you know that he was upset?
```

DETECTIVE KRISTEN SWINKUNAS

1

2        A.      He was screaming, using obscenities,

3    his hands were raised very violently above his

4    head, and he was stating over and over he was

5    moving the car from the location.

6        Q.      When you said "he was screaming" was he

7    screaming he was going to move the car or

8    something else?

9        A.      He was using obscenities, that he

10   didn't care with the direction he was being told,

11   and he was going to move the vehicle from that

12   location, it was his vehicle.

13       Q.      What obscenities was he using?

14       A.      The "F word."

15       Q.      It's okay for the record, can you state

16   what you remember him saying?

17       A.      He stated he "did not give a fuck, he

18   was going to take the car."

19       Q.      Do you recall him saying that

20   specifically or is that something that you recall

21   from observing it on the video you watched in

22   preparation for this deposition?

23       A.      I recall him stating that.

24       Q.      Other than saying that "he did not give

25   a fuck" were there any other obscenities you heard

```
1              DETECTIVE KRISTEN SWINKUNAS
2    him use during this conversation?
3         A.    That was it that I recall him stating.
4         Q.    Other than stating that he was going to
5    move the car and he did not give a fuck, do you
6    recall anything else he was saying or screaming
7    during this conversation?
8         A.    He was just very adamant he was going
9    to be taking the vehicle, that it was his vehicle.
10        Q.    You said that Mr. Harris' hands were up
11   and he was waving them around.
12              Do you recall that?
13        A.    Yes.
14        Q.    When his hands were up, were you able
15   to observe what, if anything, he was holding in
16   his hands?
17        A.    A recall a pair of keys in his hands.
18        Q.    Anything else?
19        A.    That's all I recall seeing in his
20   hands.
21        Q.    Do you recall any weapons or dangerous
22   objects in his hands?
23        A.    No.
24        Q.    Is that something you're trained to
25   look for when you're interacting with someone,
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2     whether they are holding a weapon or something
 3     dangerous?
 4          A.    Yes.
 5          Q.    Is it fair to say if he had been
 6     holding a weapon or dangerous object that's
 7     something you would have taken note of?
 8              MR. ARKO:  Objection.
 9          A.    Yes.
10          Q.    Can you describe what you mean when you
11     say "he was waving his hands around during this
12     conversation"?
13          A.    Mr. Harris was very upset, his hands
14     were above his head and he was waving his arms in
15     a manner that he was going to move the car, and
16     what he was being instructed to do he was not
17     going to do it.
18          Q.    Was his hands in the air for the entire
19     conversation that you had or were they in the air
20     for some of the conversations that you had?
21          A.    Majority of the conversation.
22          Q.    Just to clarify, when I say "the
23     conversation you had," I am talking about the
24     conversation generally that was going on with you,
25     Lieutenant Leon, Lieutenant Lane and the
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    plaintiff.
 3              So after Mr. Harris was "screaming" as
 4    you describe it and flailing his arms in the air
 5    saying that he was going to move the car, did you
 6    say anything else to him?
 7         A.   I just calmly told him again "sir, the
 8    vehicle is under investigation, you cannot remove
 9    this vehicle from this location."
10         Q.   Is it your testimony you said that
11    again after Mr. Harris began screaming and
12    flailing his arms?
13         A.   Yes.
14         Q.   Did Lieutenant Leon or Lieutenant Lane
15    or Officer Baltzer or Officer Jimenez say anything
16    to Mr. Harris, after he allegedly started
17    screaming and waiving his hands around?
18              MR. ARKO:   Objection.
19         A.   Yes.
20         Q.   What did they say to him at that point?
21         A.   Lieutenant Leon again was telling him
22    again he cannot move the vehicle, Lieutenant Lane
23    was stating if he was not going to comply that he
24    was going to be placed under arrest.
25         Q.   What happened after that?
```

```
 1            DETECTIVE KRISTEN SWINKUNAS
 2        A.    Mr. Harris again began screaming back
 3    at Lieutenant Lane that he didn't care if he was
 4    going to get arrested, that he was going to take
 5    the vehicle and from there Lieutenant Lane kept
 6    telling him "you're going to be arrested" and from
 7    there Lieutenant Leon had instructed that he be
 8    TASED.
 9        Q.    How many times did Lieutenant Lane tell
10    Mr. Harris that he would be arrested?
11        A.    To my knowledge, twice.
12        Q.    After Lieutenant Lane told Mr. Harris
13    that he would be arrested and Lieutenant Leon
14    instructed that he'd be TASED, did you say
15    anything else to Mr. Harris at that point?
16        A.    I just kept telling him that he needed
17    to step away from the vehicle, that the vehicle
18    could not be removed.
19        Q.    Approximately how many times did you
20    tell Mr. Harris he needed to step away from the
21    vehicle and it could not be removed, during the
22    course of that conversation up until Mr. Harris
23    was TASED?
24        A.    At least three or four times.
25        Q.    Did you say anything to Mr. Harris
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    other than that he needed to step away from the
 3    vehicle?
 4         A.    No.
 5         Q.    Did you ever tell Mr. Harris that he
 6    would be arrested?
 7         A.    No.
 8         Q.    Did you ever tell Mr. Harris that he
 9    was going to be TASED?
10         A.    No.
11         Q.    So you mentioned -- which came first
12    chronologically in time, Lieutenant Leon
13    instructing the TASEing or Lieutenant Lane saying
14    that plaintiff would be arrested?
15         A.    Lieutenant Lane stating that the
16    plaintiff would be arrested.
17         Q.    You testified earlier that he stated
18    that at least two times.
19              Is that correct?
20         A.    Yes.
21         Q.    Did he state that at least two times
22    before Lieutenant Leon gave the TASER order?
23         A.    Yes.
24         Q.    At the time that Lieutenant Lane was
25    telling the plaintiff he could be arrested, where
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2   was Lieutenant Lane standing in connection to the
 3   plaintiff?
 4        A.    Lieutenant Lane was standing closest to
 5   the parked Chevy, approximately an arm's reach
 6   next to the plaintiff.
 7        Q.    Where was Lieutenant Leon standing at
 8   that time?
 9        A.    Lieutenant Leon was standing next to me
10   in front of the plaintiff, and in front of
11   Lieutenant Lane.
12        Q.    Where was Officer Baltzer standing?
13        A.    Officer Baltzer was standing slightly
14   behind Lieutenant Lane, but to the right of him.
15        Q.    Where was Officer Jimenez standing?
16        A.    Officer Jimenez was standing behind me.
17        Q.    Was Lieutenant Leon standing in front
18   of you such that he was obstructing your view or
19   were you standing next to him, in between him and
20   the plaintiff?
21        A.    I was standing to the right of him, I
22   was closest to the plaintiff.
23        Q.    Was anything obstructing your view of
24   plaintiff during this time?
25        A.    No.
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2         Q.    At some point did Officer Lane
 3    (sic)move towards plaintiff in an effort to arrest
 4    him?
 5         A.    Yes, Lieutenant Lane did approach
 6    plaintiff and did attempt to place him under
 7    arrest.
 8         Q.    Was that before or after Lieutenant
 9    Leon gave the TASER order?
10         A.    That was after.
11         Q.    So it is your testimony that Lieutenant
12    Leon gave the TASER order, and then at that point
13    Lieutenant Lane moved in to approach and arrest
14    the plaintiff?
15         A.    Yes.
16         Q.    So at the time that Lieutenant Leon
17    gave the TASER order, Lieutenant Lane had not yet
18    taken any physical steps to arrest the plaintiff,
19    correct?
20         A.    He had stated to him twice that he was
21    going to be arrested if he did not comply.  At
22    that point, the plaintiff began flailing his arms
23    and Lieutenant Lane again instructed "you're going
24    to be arrested" and he said "I don't care."
25    Lieutenant Lane went to grab him, as he went to
```

```
 1               DETECTIVE KRISTEN SWINKUNAS
 2    grab him the plaintiff pushed back off of
 3    Lieutenant Lane, and that's when Lieutenant Leon
 4    made the call to have him TASERed.
 5         Q.    Your testimony a moment ago was that
 6    Lieutenant Leon gave the TASER order before
 7    Lieutenant Lane approached plaintiff to arrest
 8    him.
 9               Is that correct?
10         A.    I mistakenly -- everything just
11    happened so fast, the call was made that he was
12    going to be arrested if he didn't comply, from
13    there when he approached everything happened all
14    in the same time frame, so...
15         Q.    Sitting here today do you know whether
16    Lieutenant Leon gave the TASER order before or
17    after Lieutenant Lane approached the plaintiff to
18    arrest him?
19         A.    I mistakenly stated that, but it all
20    happened at the same time.  The call was made once
21    Lieutenant Lane went in to grab the plaintiff and
22    the plaintiff pushed back, that's when Lieutenant
23    Leon stated for him to be TASED.
24         Q.    So now it's your testimony that the
25    TASER order came after Lieutenant Lane approached
```

```
1                DETECTIVE KRISTEN SWINKUNAS
2    plaintiff --
3         A.    Yes.
4               MR. ARKO:  Objection, you can answer.
5         A.    Yes, it was after he went to approach.
6         Q.    When Lieutenant Lane approached
7    plaintiff to place him under arrest, did you
8    observe plaintiff put his hands in the air and
9    turn his body?
10        A.    No, he was still flailing his arms.
11        Q.    So is it your testimony that plaintiff
12   was flailing his arms at the time that Lieutenant
13   Lane approached him to arrest him, and he
14   continued to flail his arms as Lieutenant Lane was
15   attempting to arrest him?
16              MR. ARKO:  Objection.
17        A.    Yes.
18        Q.    It's your testimony that at no point
19   did plaintiff put his hands in the air when
20   Lieutenant Lane approached him?
21              MR. ARKO:  Objection.
22        A.    No, he was not compliant.
23        Q.    That wasn't my question.  My question
24   is, is it your testimony that plaintiff did not
25   put his hands in the air and turn at the time that
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2    Lieutenant Lane approached him?
3              MR. ARKO:  Objection.
4         A.   He did not put his hands up, no.
5         Q.   So you corrected your testimony to say
6    that Lieutenant Leon gave the TASER order after
7    Lieutenant Lane approached plaintiff.
8              Correct?
9         A.   Yes.
10        Q.   Approximately how long after Lieutenant
11   Lane approached plaintiff did it take for
12   Lieutenant Leon to give the TASER order?
13        A.   Seconds.
14        Q.   How many seconds?
15        A.   Maybe a second.
16        Q.   Just to be clear, after Lieutenant Lane
17   approached plaintiff to arrest him, what did
18   plaintiff -- your testimony is that plaintiff
19   continued to flail his arms, is that correct?
20        A.   Yes.
21        Q.   When Lieutenant Leon gave the TASER
22   order, who did you understand him to be giving
23   that order to?
24             MR. ARKO:  Objection.
25        A.   I don't know who he was directing that
```

```
 1                DETECTIVE KRISTEN SWINKUNAS
 2   to.
 3        Q.   Did you know whether anyone at the
 4   scene had a TASER?
 5        A.   I do know, yes.
 6        Q.   At the time of the incident, did you
 7   know whether anyone at the scene had a TASER?
 8        A.   Yes.
 9        Q.   Who did you know to have a TASER who
10   was present at the scene?
11        A.   Lieutenant Leon had a TASER, Officer
12   Jimenez had a TASER, Officer Baltzer had a TASER
13   and Lieutenant Lane had a TASER.
14             (Noise interruption.)
15        Q.   So, is it fair to say that everyone who
16   was a member of service at the scene, except for
17   you, had a TASER?
18        A.   Yes.
19        Q.   Did you know at the time that all of
20   the rest of them had TASERs except for you?
21        A.   Yes.
22        Q.   How did you know that?
23        A.   You can visually see it on their gun
24   belt.
25        Q.   Did you make note of that at the time
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    Lieutenant Leon gave that order or had you already
 3    observed all four of the other people there had
 4    TASERs?
 5              MR. ARKO:  Objection.
 6         A.   I had already observed they had them on
 7    their gun belt.
 8         Q.   Is that something that you typically
 9    look at when you're talking to other members of
10    service?
11              MR. ARKO:  Objection.
12         A.   Yes.
13         Q.   When Lieutenant Leon gave the TASER
14    order, did you think he was talking to any other
15    individual member of service?
16         A.   I don't know who he was directing that
17    to.
18         Q.   Did you see him look at anyone else in
19    particular?
20         A.   No.
21         Q.   Did you see him point to anyone in
22    particular?
23         A.   No.
24         Q.   What was the TASER order you heard
25    Lieutenant Leon give?
```

```
1                 DETECTIVE KRISTEN SWINKUNAS
2        A.    To TASE him.
3        Q.    You heard him say "TASE him"?
4        A.    Yes.
5        Q.    Did you hear him give that command once
6    or multiple times?
7        A.    From my recollection, I heard it once.
8        Q.    In response to Lieutenant Leon saying
9    "TASE him," did Officer Jimenez get out her TASER?
10             MR. ARKO:  Objection.
11       A.    Not that I am aware of.
12       Q.    Do you have any understanding of why
13   Officer Jimenez did not respond to Lieutenant
14   Leon's command to TASE the plaintiff?
15             MR. ARKO:  Objection.
16       A.    I don't know.
17       Q.    Did you ever talk to her about that?
18       A.    No.
19       Q.    Are you surprised that she didn't
20   respond to the command when she had a TASER --
21             MR. ARKO:  Objection.
22       A.    No.
23       Q.    Why is that not surprising to you given
24   the directive to follow the commanding officer's
25   orders?
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2              MR. ARKO:  Objection.
3       A.    Officer Jimenez was standing behind
4    myself and Lieutenant Leon at that time.
5       Q.    My question is, why are you not
6    surprised that she didn't follow Lieutenant Leon's
7    order to TASE the plaintiff, given my
8    understanding that generally you are supposed to
9    follow commanding officer's orders?
10             MR. ARKO:  Objection.
11      A.    We were blocking her view, we were
12   standing in front of her so I don't know what she
13   saw from her standing behind me.
14      Q.    It is possible that Officer Jimenez
15   could have taken her TASER and TASED plaintiff in
16   that situation had she heard the command and
17   decided to follow it, correct?
18             MR. ARKO:  You froze; can you repeat
19   the question?
20      Q.    Nothing about the way you were standing
21   would have prevented Officer Jimenez from drawing
22   her TASER and TASEing plaintiff had she heard the
23   command and decided to follow through, correct?
24             MR. ARKO:  Objection.
25      A.    Officer Jimenez was standing behind us.
```

```
1                DETECTIVE KRISTEN SWINKUNAS
2      For her to remove her TASER and take it off of her
3      gun belt, we still were blocking her view, so she
4      would have to stand in front of us to execute
5      utilize her TASER.
6           Q.   Is it your testimony it would have been
7      physically impossible for her to execute her TASER
8      because you were blocking her and she could not
9      have done it?
10               MR. ARKO:  Objection.
11          A.   Yes.
12          Q.   So you don't think there was any way
13     she could have found a way to get around you in
14     order to follow that instruction?
15               MR. ARKO:  Objection.
16          A.   If she could have, yes.
17          Q.   Sorry.  Are you saying she could have
18     gone around you?
19          A.   Yes, she could have gone around us.
20          Q.   When Lieutenant Leon gave the TASER
21     order, did Lieutenant Lane take any steps to get
22     his TASER?
23          A.   Not that I am aware of.
24          Q.   Do you have any understanding of why
25     Lieutenant Lane did not respond to Lieutenant
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2    Leon's order to TASE the plaintiff?
3              MR. ARKO:  Objection.
4         A.    I don't know.
5         Q.    Did you ever have any conversations
6    with Lieutenant Lane about why he did not respond
7    to the order to TASE the plaintiff?
8         A.    No.
9         Q.    You testified that Lieutenant Leon also
10   had a TASER on him, correct?
11        A.    Yes.
12        Q.    Lieutenant Leon was standing across
13   from the plaintiff, correct?
14        A.    Yes.
15        Q.    There was no one blocking his access to
16   the plaintiff, correct?
17        A.    No.
18        Q.    Do you have any understanding of why
19   Lieutenant Leon didn't take out his own TASER to
20   TASE the plaintiff?
21             MR. ARKO:  Objection.
22        A.    No.
23        Q.    Did you ever have any conversations
24   with him about why he didn't TASE the plaintiff
25   himself?
```

```
 1              DETECTIVE KRISTEN SWINKUNAS

 2        A.    No.

 3        Q.    Lieutenant Lane at that point was

 4    directly next to the plaintiff, correct?

 5        A.    Yes.

 6        Q.    So there was no one impeding his access

 7    to the plaintiff, correct?

 8              MR. ARKO:  Objection.

 9        A.    No.

10        Q.    When Lieutenant Leon gave the command

11    to TASE plaintiff what, if anything, did Officer

12    Baltzer do in response?

13        A.    He removed his TASER from his gun belt

14    and TASED the plaintiff.

15        Q.    Did he do that immediately or was there

16    any delay in his TASEing the plaintiff in response

17    to Lieutenant Leon's command?

18        A.    From my recollection it was pretty much

19    an immediate response.

20        Q.    It was also your testimony that it was

21    in response to one command in which Lieutenant

22    Leon said "TASE him."

23              Correct?

24              MR. ARKO:  Objection.

25        A.    Yes.
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2         Q.    What was plaintiff doing with his body
 3    at the time that Officer Baltzer TASED him?
 4         A.    Once the plaintiff was TASERed he fell
 5    to the ground.
 6         Q.    My question was, at the time he was
 7    TASED, like milliseconds before he was TASED, what
 8    was he doing with his body?
 9              MR. ARKO:  Objection.
10         A.    The plaintiff was pushing his body
11    against the inside door panel of the vehicle.
12         Q.    Do you mean the inside of the car door?
13         A.    Yes.
14              (Technical issue.)
15         Q.    Let me ask that question again.  When
16    you say "the inside door panel" do you mean inside
17    interior of the front passenger side door?
18         A.    Yes.
19              (Technical issue.)
20              MS. KAUFMAN:  Can you read back the
21    last question?
22       (The following was read from the record by the
23    stenographer:  "Q. Let me ask that question again.
24     When you say "the inside door panel" do you mean
25     inside interior of the front passenger side door?
```

```
 1                 DETECTIVE KRISTEN SWINKUNAS

 2                      A.   Yes.")

 3         Q.    How did Mr. Harris come to be from

 4    standing up and flailing his arms around, to

 5    leaning against the front, inside passenger door?

 6         A.    He was -- Mr. Harris was standing --

 7    pretty much the length of the conversations that

 8    we were having with him, he was standing with his

 9    back on the inside frame the whole time we were

10    having a conversation with him.  So he was inside

11    the door panel of the open door the entire time we

12    were speaking to him.

13         Q.    Had Lieutenant Lane like backed him

14    further or pinned him against that door such that

15    he was touching it at the time he was TASED?

16         A.    He was already touching.

17         Q.    Was any part of Mr. Harris' body ever

18    inside the interior of the vehicle during this

19    conversation?

20         A.    No, he was standing on the outside

21    panel of the door.

22         Q.    Before Officer Baltzer deployed his

23    TASER, did he say anything to indicate that he was

24    going to deploy it?

25         A.    Not to my knowledge.
```

```
1                    DETECTIVE KRISTEN SWINKUNAS
2          Q.    You didn't hear him give any warning to
3     you as officers or to plaintiff?
4                    MR. ARKO:  Objection.
5          A.    No.
6          Q.    Typically in your experience working
7     for the NYPD, are officers supposed to give a
8     warning before deploying a TASER?
9                    MR. ARKO:  Objection.
10         A.    Not to my knowledge.
11         Q.    So it's your testimony that it's
12    appropriate to deploy a TASER without giving a
13    warning either to the person you're going to TASE
14    or to surrounding officers that you're going to
15    TASE?
16                   MR. ARKO:  Objection.
17         A.    Not to my knowledge.
18         Q.    To your knowledge, you're not required
19    to give that warning, correct?
20         A.    That is correct.
21         Q.    Between the time that plaintiff was
22    flailing his arms and Lieutenant Lane approached
23    him and the time that plaintiff was actually TASED
24    what, if anything, was plaintiff doing with his
25    body?
```

```
 1                DETECTIVE KRISTEN SWINKUNAS
 2        A.    He was pushing off of Lieutenant Lane
 3   as he approached.
 4        Q.    When you say "pushing off," what do you
 5   mean by that?
 6        A.    He now had his hands in front of his
 7   body and was pushing Lieutenant Lane back from
 8   him.
 9        Q.    So it is your testimony that he went
10   from flailing his arms around to putting his hands
11   in front of his body while Lieutenant Lane
12   approached him.
13              Is that --
14              MR. ARKO:  Objection --
15        A.    Yes.
16        Q.    Did plaintiff ever touch Lieutenant
17   Lane before he was TASED?
18        A.    His hands physically touched him when
19   Lieutenant Lane was approaching him, his hands
20   were on Lieutenant Lane.
21        Q.    Where was plaintiff's hands located on
22   Lieutenant Lane?
23        A.    From what I recall, they were in front
24   like on his front panel of his body.
25        Q.    On Lieutenant Lane's chest?
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        A.    Yes.
 3        Q.    Did Lieutenant Lane touch plaintiff at
 4   all as he was attempting to arrest him?
 5        A.    Yes.
 6        Q.    Where did Lieutenant Lane touch
 7   plaintiff?
 8        A.    Lieutenant Lane went to grab the
 9   plaintiff's right arm that was closest to him.
10        Q.    Did he actually touch plaintiff and
11   grab his arm at any point?
12        A.    Yes.
13        Q.    Were there any other ways in which
14   Lieutenant Lane and plaintiff touched each other
15   between the time that Lieutenant Lane approached
16   plaintiff and the time that plaintiff was TASED,
17   other than Lieutenant Lane grabbing his arm and
18   plaintiff touching Lieutenant Lane's chest?
19        A.    Not to my knowledge.
20        Q.    Did Lieutenant Lane grab plaintiff's
21   arm once or multiple times?
22        A.    From what I observed he went to grab
23   his right arm, so in that instance it was that one
24   time he went to grab his arm.
25        Q.    Between the time that Lieutenant Lane
```

```
 1               DETECTIVE KRISTEN SWINKUNAS
 2    approached plaintiff and the time that plaintiff
 3    was TASED what, if anything, did you do?
 4         A.    I was standing to the left side of
 5    Mr. Harris, and again I am telling him that he
 6    needs to move away from the vehicle.
 7         Q.    Did you take any steps to physically
 8    intervene between the time that Lieutenant Lane
 9    approached plaintiff and the time he was TASED?
10         A.    No.
11         Q.    Why did you not take any steps to
12    physically intervene during that time?
13         A.    Lieutenant Lane was engaging in
14    conversation with the plaintiff, I had stated to
15    the plaintiff that he needed to move away from the
16    vehicle, he was not complying even with my request
17    of him moving away from the vehicle.
18         Q.    Is it your testimony you didn't
19    physically intervene because you didn't think it
20    was necessary?
21               MR. ARKO:   Objection.
22         A.    At that moment I was having a
23    conversation trying to get Mr. Harris to move away
24    from the vehicle and he was not complying with
25    what I was stating, and at that point Mr. Harris
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    was now engaged in conversation with Lieutenant
 3    Lane.
 4         Q.    My question is, you didn't think it was
 5    necessary for you to intervene further to assist
 6    Lieutenant Lane in effectuating Mr. Harris'
 7    arrest --
 8              MR. ARKO:  Objection.
 9         A.    No.
10         Q.    No, you didn't think it was necessary?
11         A.    No.
12         Q.    I don't think I'm understanding your
13    testimony.  Is it your testimony that you didn't
14    think it was necessary to intervene further in
15    order to help Lieutenant Lane effectuate the
16    arrest?
17         A.    That is correct.
18         Q.    What, if anything, did you do when
19    Lieutenant Leon gave the TASER order?
20         A.    I stepped to the right side of me.
21         Q.    Why was that?
22         A.    In the hopes that I wouldn't get TASED.
23         Q.    At no point did you have any physical
24    interaction with Mr. Harris, correct?
25         A.    No.
```

1          DETECTIVE KRISTEN SWINKUNAS

2      Q.    You didn't take any action to subdue

3  him or you didn't put your hands on him in any

4  way, is that correct?

5          MR. ARKO:  Objection.

6      A.    Once Mr. Harris was placed (sic), after

7  he had been TASED and was on the ground, I

8  assisted with putting him under arrest.

9      Q.    I will clarify that, that was helpful.

10  So up until the point that the plaintiff was TASED

11  you didn't take any physical action to subdue or

12  restrain the plaintiff, correct?

13      A.    I did not, no.

14      Q.    And up until the point that plaintiff

15  was TASED you did not physically interact with him

16  and he did not physically interact with you,

17  correct?

18      A.    That is correct.

19      Q.    What was your mental impression or

20  reaction at the time that Lieutenant Leon gave the

21  TASER order?

22          MR. ARKO:  Objection.

23      A.    I didn't have any reaction.

24      Q.    Were you surprised at all that he gave

25  that order?

```
1                 DETECTIVE KRISTEN SWINKUNAS
2          A.    No.
3          Q.    Were you surprised at all that
4    Lieutenant Lane and Officer Jimenez did not
5    respond to that TASER order by getting their own
6    TASERs out?
7                MR. ARKO:  Objection.
8          A.    No.
9          Q.    Were you surprised at all that Officer
10   Leon (sic) gave a TASER order rather than getting
11   his own TASER out?
12               MR. ARKO:  Objection.
13         A.    No.
14         Q.    Based on your experience in the NYPD,
15   do you have any understanding of why a commanding
16   officer would give a TASER order rather than
17   TASing someone themselves?
18               MR. ARKO:  Objection.
19         A.    I don't know.
20         Q.    You testified previously when plaintiff
21   approached you could see he had his keys in one
22   hand.
23               Correct?
24         A.    Yes.
25         Q.    Or he had some keys in one hand.
```

```
 1              DETECTIVE KRISTEN SWINKUNAS

 2         Correct?

 3    A.    Yes.

 4    Q.    You observed at that point he did not

 5  appear to have any weapons or any dangerous

 6  objects on him, correct?

 7              MR. ARKO:  Objection.

 8    A.    Yes.

 9    Q.    Did that ever change up until the point

10  that plaintiff was TASED?  In other words, at any

11  point before plaintiff was TASED, did you ever

12  observe him to have a weapon or a dangerous object

13  on him?

14    A.    No.

15    Q.    Was there any time up until the point

16  where plaintiff was TASED where you could not see

17  his hands or were concerned that he had a weapon

18  or dangerous object on him?

19    A.    No.

20    Q.    Did you ever smell any alcohol or

21  marijuana on the plaintiff up until the point he

22  was TASED?

23    A.    I personally did not, no.

24    Q.    Did you believe that plaintiff was

25  under the influence of drugs or alcohol up until
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    the point that he was TASED?
 3         A.    I did not, no.
 4         Q.    Did plaintiff, during the course of
 5    that conversation up until the point that he was
 6    TASED, make any threats to you about physical harm
 7    or anything else?
 8         A.    No.
 9         Q.    Did you hear plaintiff physically
10    threaten or otherwise threaten any of the other
11    members of service?
12         A.    Not to my knowledge.
13         Q.    Were there any civilians around on the
14    street that you observed during this conversation
15    up until the point plaintiff was TASED?
16         A.    There was another person standing on
17    the sidewalk.
18         Q.    Was that person a civilian or someone
19    else?
20         A.    She was a civilian.
21         Q.    Did you know who that person was?
22         A.    I later came to know that that was the
23    victim's mom.
24         Q.    Was the victim's mom present at the
25    time that this conversation was happening and that
```

```
 1                  DETECTIVE KRISTEN SWINKUNAS
 2     plaintiff was TASED?
 3          A.    Yes.
 4          Q.    Is it your understanding she observed
 5     plaintiff being TASED firsthand?
 6          A.    I don't recall whether or not she
 7     actually saw it herself.
 8          Q.    When did you first observe that the
 9     victim's mom was present on the sidewalk?
10          A.    She was engaged in a conversation on
11     her phone.
12          Q.    My question was, when did you first
13     observe that she was present on the sidewalk?
14          A.    When I had exited the emergency room,
15     she had exited the emergency room shortly after I
16     did.
17          Q.    After plaintiff was TASED, did you
18     observe that she was still there standing on the
19     sidewalk?
20          A.    She was on the sidewalk still on her
21     phone.
22          Q.    So she was on the sidewalk on her phone
23     at the time you left the emergency room, and she
24     was on the sidewalk on her phone after the
25     plaintiff was TASED, correct?
```

1          DETECTIVE KRISTEN SWINKUNAS

2      A.    She exited the hospital shortly after I

3   did, and then got on her phone and engaged in a

4   conversation.

5      Q.    My question is, you know that she was

6   on her phone on the sidewalk at the time that

7   plaintiff approached the vehicle, and she was also

8   on her phone on the sidewalk after plaintiff was

9   TASED, correct?

10      A.    She was no longer on the phone after he

11   was TASED.

12      Q.    But she was still present on the

13   sidewalk?

14      A.    Yes.

15      Q.    Do you have any knowledge if she went

16   back into the ER in between the time that you

17   observed her exit the first time and the time you

18   observed her after plaintiff was TASED?

19      A.    I don't recall, my back now was at this

20   point towards the hospital, towards the emergency

21   room side.

22      Q.    So to be clear, you know she was there

23   when he approached and she was there after, but

24   you don't know whether she went inside or observed

25   the actual TASing --

```
1                   DETECTIVE KRISTEN SWINKUNAS
2          A.    That is correct.
3          Q.    Did you have any concern that plaintiff
4     would injure that person who you later learned to
5     be the shooting victim's mother?
6          A.    No.
7          Q.    At any point did Mr. Harris attempt to
8     run away from the scene or flee the police?
9          A.    No.
10         Q.    Did you have any fear that plaintiff
11    would injure you at any point?
12         A.    No.
13         Q.    Did you have any fear that plaintiff
14    would injure any of the other officers at any
15    point?
16         A.    To my recollection, no.
17         Q.    You did not have a TASER on the night
18    in question, correct?
19         A.    That is correct.
20         Q.    Are you certified to use a TASER?
21         A.    I am not.
22         Q.    Why are you not certified to use a
23    TASER?
24               MR. ARKO:  Objection.
25         A.    I was never qualified to use a TASER or
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2    to carry.
 3         Q.    How does one qualify to use or carry a
 4    TASER?
 5              MR. ARKO:  Objection.
 6         A.    Prior to, you have to go through
 7    training for it.
 8         Q.    Is that something you decide to do or
 9    someone else decides that you should do?
10              MR. ARKO:  Objection.
11         A.    The training officer or sergeant at the
12    precinct would determine who would be sent to get
13    TASER qualified.
14         Q.    Have you ever attempted to be qualified
15    to use a TASER, and that hasn't come to fruition
16    for one reason or another?
17         A.    No.
18         Q.    Other than this incident, have you ever
19    been present when a TASER has been deployed
20    against a civilian?
21         A.    Yes.
22         Q.    Approximately how many times have you
23    been present when a TASER has been deployed
24    against a civilian?
25         A.    One other time.
```

```
 1              DETECTIVE KRISTEN SWINKUNAS
 2        Q.    Approximately when did that happen?
 3        A.    Approximately a year ago.
 4        Q.    So that was before or after this
 5   incident?
 6        A.    It was before.
 7        Q.    How long approximately -- approximately
 8   how long before this incident was the other time
 9   you witnessed a TASER being deployed against a
10   civilian?
11        A.    A year prior to this.
12        Q.    So not a year prior to now, a year
13   prior to September 2020?
14        A.    Yes.
15        Q.    What were the circumstances of that
16   other occasion in which you witnessed a TASER
17   being deployed against a civilian?
18              MR. ARKO:   Objection.
19        A.    An emotionally disturbed person was
20   refusing to put his hands behind his back, it was
21   later determined that there was a weapon that was
22   at the location as well.
23        Q.    Were you working in the 26th Precinct
24   at this time?
25        A.    Yes.
```

```
 1                DETECTIVE KRISTEN SWINKUNAS
 2        Q.    Who was the officer that deployed the
 3   TASER in that case?
 4              MR. ARKO:  Objection.
 5        A.    That I don't remember.
 6        Q.    Why was it necessary to deploy a TASER
 7   in that case where the EDI person was refusing to
 8   put his hands behind his back?
 9              MR. ARKO:  Objection.
10        A.    The emotionally disturbed person
11   approached and attempted to assault the officer at
12   the location.
13        Q.    What do you mean by "attempted to
14   assault the officer"?
15              MR. ARKO:  Objection.
16        A.    He reached in and went to grab the
17   officer.
18        Q.    Is the officer that he tried to grab
19   the same officer who deployed the TASER?
20        A.    No.
21        Q.    A different officer deployed the TASER?
22        A.    Yes.
23        Q.    Did the officer who deployed the TASER
24   give a warning prior to deploying the TASER?
25        A.    Not to my knowledge.
```

```
1                 DETECTIVE KRISTEN SWINKUNAS
2         Q.    What happened immediately after Officer
3    Baltzer TASED the plaintiff?
4         A.    Lieutenant Leon had asked for medical
5    assistance for the plaintiff.
6         Q.    So even before that, after he was
7    TASED, did plaintiff fall to the ground?
8         A.    Yes.
9         Q.    Did you observe plaintiff falling to
10   the ground?
11        A.    Yes.
12        Q.    Did you observe on what part of
13   plaintiff's body he first made contact with the
14   ground?
15        A.    He landed on his right side.
16        Q.    On his right side?
17        A.    Yes.
18        Q.    Did you observe what part of his body
19   hit the ground first?
20        A.    I did not.
21        Q.    Can you describe the way that plaintiff
22   was acting immediately after he was TASED, and as
23   he fell to the ground?
24        A.    As he was falling to the ground
25   plaintiff was screaming that he was in pain.
```

```
 1                DETECTIVE KRISTEN SWINKUNAS
 2         Q.    What happened after plaintiff hit the
 3    ground?
 4         A.    Lieutenant Leon had went over to
 5    Central Dispatch and asked for emergency
 6    assistance to come and aid the plaintiff.
 7         Q.    Was plaintiff handcuffed at some point?
 8         A.    Once plaintiff was TASERed he was
 9    handcuffed, yes.
10         Q.    Was that before or after Lieutenant
11    Leon called Central Dispatch?
12         A.    He was TASED before the call was made.
13         Q.    Sorry, was he handcuffed before or
14    after Lieutenant Leon called Central Dispatch?
15         A.    He was handcuffed prior to Lieutenant
16    Leon making the call to Central Dispatch.
17         Q.    Who handcuffed the plaintiff?
18         A.    I believe I did; I assisted in
19    handcuffing.
20         Q.    Whose handcuffs were used?
21         A.    I believe they were mine.
22         Q.    At what point did you approach
23    plaintiff in order to handcuff him?
24         A.    Once plaintiff was on the ground we had
25    gone in and arrested him; placed him under arrest.
```

```
1              DETECTIVE KRISTEN SWINKUNAS
2         Q.    What happened after plaintiff was on
3    the ground and placed under arrest?
4         A.    A short time Lieutenant Leon had asked
5    for medical assistance, the plaintiff was actually
6    asked several times if he wanted to sit up and he
7    said "yes."  Lieutenant Lane, Officer Baltzer and
8    myself helped him sit up on the ground, so he was
9    in a sitting position.
10        Q.    What happened after plaintiff was in a
11   sitting position on the ground?
12        A.    The plaintiff just began trying to
13   understand why his son was shot, he was genuinely
14   upset about what had happened to his son, and then
15   from there EMS workers who were inside the
16   emergency room, they came out to assist.
17        Q.    Did plaintiff receive any medical
18   attention by you or anyone else before entering
19   the hospital?
20        A.    No.
21        Q.    Did you share any information with
22   Mr. Harris about his son's shooting at the time he
23   was sitting on the ground handcuffed?
24        A.    No.
25        Q.    Did you personally speak to Mr. Harris
```