Docket No.: 20 Civ. 10864 (LGS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN HARRIS,

Plaintiff,

-against-

CITY OF NEW YORK; Lieutenant ANGEL LEON;
Detective KRISTEN SWINKUNAS (Shield # 2190);
Police Officer ANTONELLA JIMENEZ (Shield # 5209);
Police Officer MAXWELL BALTZER (Shield No.
15451); and Lieutenant JOHN LANE,

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*HON. SYLVIA O. HINDS-RADIX*
*Corporation Counsel of the City of New York*
*Attorney for Defendants City of New York,*
*Leon, Swinkunas, Jimenez, Baltzer, and Lane*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Christopher G. Arko*
*Tel:  (212) 356-5044*
*Matter No.: 2021-002294*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 2

STANDARD OF REVIEW ....................................................................................... 8

ARGUMENT

      POINT I

            THE USE OF THE TASER WAS
            OBJECTIVELY REASONABLE UNDER THE
            CIRCUMSTANCES ................................................................ 9

            i. First Graham Factor: Plaintiff's criminal
               activity was serious ............................................ 9

            ii. Second Graham Factor: Plaintiff posed a
               threat to the defendants' safety .......................... 10

            iii. Third Graham Factor: Plaintiff actively
               resisted arrest .................................................... 13

      POINT II

            THE DEFENDANTS ARE ENTITLED TO
            QUALIFIED IMMUNITY BECAUSE THERE
            WAS NO CLEARLY ESTABLISHED LAW
            THAT PROHIBITED THEM FROM USING
            THE TASER, AND REASONABLE OFFICERS
            COULD DISAGREE AS TO WHETHER IT
            WAS LAWFUL ................................................... 18

      POINT III

            PLAINTIFF'S FAILURE TO INTERVENE
            CLAIM SHOULD BE DISMISSED ...................................... 21

      POINT IV

            PLAINTIFF'S STATE LAW CLAIMS SHOULD
            BE DISMISSED ................................................................ 22

**Page**

POINT V

      ANY CLAIM FOR LOST WAGES SHOULD BE
      DISMISSED ........................................................................................24

CONCLUSION.......................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**            **Pages**

Ackerson v. City of White Plains,
    702 F.3d 15 (2d Cir. 2012)...........................................................................................24

Battista v. United States,
    889 F. Supp. 716 (S.D.N.Y. 1995) ............................................................................24

Blouin v. Spitzer,
    356 F.3d 348 (2d Cir. 2004)........................................................................................22

Brown v. City of New York,
    862 F.3d 182 (2d Cir. 2017)........................................................................................19

Carroll v. Carman,
    574 U.S. 13 (2014)......................................................................................................19

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986).....................................................................................................8

Cordero v. City of New York,
    282 F. Supp. 3d 549 (E.D.N.Y. 2017) ......................................................................21

Crowell v. Kirkpatrick,
    400 Fed. Appx. 592 (2d Cir. 2010).............................................................13, 15, 16, 20, 21

Davis v. Callaway,
    No. 3:05CV127 (DJS), 2007 U.S. Dist. LEXIS 29468
    (D. Conn. Apr. 9, 2007) .............................................................................................17

DeVoe v. Rebant,
    No. 05-71836, 2006 U.S. Dist. LEXIS 5326
    (E.D. Mich. Feb. 13, 2006) ........................................................................................13

Draper v. Reynolds,
    369 F.3d 1270 (11th Cir. 2004) .............................................................................12, 13, 14

Eastman Kodak Co. v. Image Tech. Servs., Inc.,
    504 U.S. 451 (1992).....................................................................................................8

Felix v. City of New York,
    408 F. Supp. 3d 304 (S.D.N.Y. 2019).......................................................................22

Figueroa v. Mazza,
    825 F.3d 98 (2d Cir. 2016)..........................................................................................19

**Cases**                                                                                        **Pages**

Freeman v. Tuan Anh Nguyen,
    No. 13 Civ. 832 (JMA), 2015 U.S. Dist. LEXIS 4971
    (S.D.N.Y. Jan. 15, 2015).................................................................................24

Graham v. Connor,
    490 U.S. 386 (1989).................................................................9, 10, 13, 15

Grullon v. City of New Haven,
    720 F.3d 133 (2d Cir. 2013).......................................................................18

Hargroves v. City of New York,
    No. 03 CV 1668 (RRM)(VMS), 2014 U.S. Dist. LEXIS 41661
    (E.D.N.Y. Mar. 26, 2014) ....................................................................22, 23

Harsco v. Segui,
    91 F.3d 337 (2d Cir. 1996).........................................................................24

Henry-Lee v. City of New York,
    746 F. Supp. 2d 546 (S.D.N.Y. 2010)........................................................21

Humphrey v. Landers,
    344 Fed. Appx. 686 (2d Cir. 2009)............................................................22

Jaramillo v. Weyerhaeuser Co.,
    536 F.3d 140 (2d Cir. 2008).........................................................................8

Johnson v. City of New York,
    No. 05 Civ. 7519, 2011 U.S. Dist. LEXIS 72610
    (S.D.N.Y. June 30, 2011)...............................................................22-23, 24

Jones v. Treubig,
    963 F.3d 214 (2d Cir. 2020).............................................................9, 16, 19

Lennon v. Miller,
    66 F.3d 416 (2d Cir. 1995)...........................................................................9

Lore v. City of Syracuse,
    670 F.3d 127 (2d Cir. 2012).......................................................................22

Lynch v. City of Mt. Vernon,
    567 F. Supp. 2d 459 (S.D.N.Y. 2008).......................................................18

MacLeod v. Town of Brattleboro,
    548 Fed. Appx. 6 (2d Cir. 2013).....................................12, 13, 14, 15, 16, 17, 20, 21

**Cases**                                                                    **Pages**

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)..................................................................................................8

Mesa v. City of New York,
    No. 09 Civ. 10464 (JPO), 2013 U.S. Dist. LEXIS 1097
    (S.D.N.Y. Jan. 3, 2013).....................................................................................22, 23

Muschette v. Gionfriddo,
    901 F.3d 65 (2d Cir. 2018).........................................................................19, 20, 21

Papineau v. Parmley,
    465 F.3d 46 (2d Cir. 2006).................................................................................22, 23

Penree v. City of Utica,
    694 Fed. Appx. 30 (2d Cir. 2017)......................................................................16, 20

Pietra v. State,
    71 N.Y.2d 792 (1988) ............................................................................................22

Prive v. Wells,
    No. 5:13-cv-320, 2015 U.S. Dist. LEXIS 33215
    (D. Vt. Mar. 17, 2015) ......................................................................................12, 13

Ricciuti v. Gyzenis,
    834 F.3d 162 (2d Cir. 2016)..................................................................................19

Ricciuti v. New York City Transit Auth.,
    124 F.3d 123 (2d Cir. 1997)..................................................................................21

Schrader v. Manticof,
    No. 18 CV 1786 (ILG)(RLM), 2019 U.S. Dist. LEXIS 115760
    (E.D.N.Y. July 10, 2019),
    report and recommendation adopted 2019 U.S. Dist. LEXIS 203377
    (E.D.N.Y. Aug. 6, 2019).........................................................................................24

Scoma v. City of New York,
    No. 16 CV 6693 (KAM)(SJB), 2021 U.S. Dist. LEXIS 12727
    (E.D.N.Y. Jan. 22, 2021) ...................................................................10, 13, 14, 22

Scott v. Harris,
    550 U.S. 372 (2007)................................................................................................8

Stevens v. City of New York,
    No. 10 CV 2172, 2012 U.S. Dist. LEXIS 165936
    (S.D.N.Y. Nov. 14, 2012) ................................................................................ 23-24

**Cases**                                                                                                        **Pages**

Stoker v. Tarantino,
    126 A.D.2d 815 (3d Dept. 1987) ..............................................................................24

Towsley v. Frank,
    No. 5:09-cv-23, 2010 U.S. Dist. LEXIS 137005
    (D. Vt. Dec. 28, 2010)......................................................................12, 13, 14, 17

Tracy v. Freshwater,
    623 F.3d 90 (2d Cir. 2010)............................................................12, 13, 15, 19, 20

Triolo v. Nassau Cnty.,
    24 F.4th 98, 2022 U.S. App. LEXIS 1786 (2d Cir. Jan. 21, 2022)........................................23

**Statutes**

Fed. R. Civ. P. 50........................................................................................................23

Fed. R. Civ. P. 56......................................................................................................2, 8

Fed. R. Civ. P. 56(c)...................................................................................................8

42 U.S.C. § 1983.....................................................................................................18, 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

BRIAN HARRIS,

                                    Plaintiff,

              -against-

CITY OF NEW YORK; Lieutenant ANGEL LEON; Detective          20 Civ. 10864 (LGS)
KRISTEN SWINKUNAS (Shield # 2190); Police Officer
ANTONELLA JIMENEZ (Shield # 5209); Police Officer
MAXWELL BALTZER (Shield No. 15451); and Lieutenant
JOHN LANE,

                                    Defendants.

------------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## PRELIMINARY STATEMENT

        While the defendant officers were securing a Chevy Tahoe that was evidence
related to a shooting, plaintiff relentlessly defied their multiple orders to stay away from the
vehicle.  The defendants told him repeatedly "this is a crime scene" and "do not touch this car."
Rather than complying with these directives, plaintiff continued approaching the Tahoe while
shouting "get away from me," "you cannot tell me what to do with my property," and "I'm not
stepping away from anything."  When the officers told plaintiff he would be placed under arrest,
he responded by repeatedly yelling "I don't care."  Plaintiff clearly demonstrated that nothing the
officers could say would gain his compliance.  When Lieutenant Lane tried to grab plaintiff to
place him under arrest, plaintiff pulled his arms away and raised them up by his head.  Officer
Baltzer deployed his taser one time at plaintiff, which under the law in this Circuit was a
reasonable means of obviating a hands-on confrontation that could have resulted in injury to the

defendants and plaintiff.  Accordingly, defendants respectfully move herein pursuant to Federal Rule of Civil Procedure 56 for summary judgment as to all claims in the complaint.

## STATEMENT OF FACTS

In the early morning hours of September 2, 2020, the defendants received a radio transmission about a shooting that occurred in the confines of the 26 Precinct in Harlem.  Ex. F (Baltzer Dep.) at 46: 6-7, 12-13; 50: 23-24; Ex. G (Leon Dep.) at 25: 13 – 26: 2; Ex. H (Lane Dep.) at 17: 16-20; 24: 16-23; 25: 20-24; 26: 5-7; Ex. I (Swinkunas Dep.) at 42: 8-9; 43: 17-24. In response they went to Mt. Sinai Morningside Hospital on West 113th Street in Manhattan.  Ex. F (Baltzer Dep.) at 45: 25 – 46: 13; 50: 24-25; Ex. G (Leon Dep.) at 24: 11-16; 33: 15-20; Ex. H (Lane Dep.) at 27: 19 – 28: 9; Ex. I (Swinkunas Dep.) at 42: 2-5; 43: 25 – 44: 6; Ex. J (Jimenez Dep.) at 40: 12-24.

When they arrived at the hospital, the defendants observed a blue Chevy Tahoe parked in front of the emergency room entrance with the front passenger door open and blood on the passenger's seat.  Ex. D (50-h) at 25: 13 – 26: 2; Ex. E (Pl. Dep.) at 80: 4-5; 81: 2-3; 85: 11-12; Ex. F (Baltzer Dep.) at 47: 7-22; 54: 24 – 55: 6; Ex. G (Leon Dep.) at 34: 15-16; 39: 14-19; Ex. H (Lane Dep.) at 28: 10-17; 30: 8-14; 46: 3-5; Ex. I (Swinkunas Dep.) at 45: 16 – 46: 25; 63: 24 – 64: 10; Ex. J (Jimenez Dep.) at 43: 19 – 45: 6.  The officers learned that the shooting victim was inside the hospital and, suspecting the Tahoe was involved in the shooting, they stood nearby to secure it and to make sure no one went near it until it could be examined for evidence. Ex. F (Baltzer Dep.) at 48: 8-21; 50: 25 – 51: 3; Ex. G (Leon Dep.) at 35: 5-10, 17-20; 70: 19 – 71: 9; Ex. H (Lane Dep.) at 29: 14-20; 30: 18-22; 32: 13-15; 67: 4-8; Ex. I (Swinkunas Dep.) at 49: 6-14; 61: 18-19; 61: 12-22; 62: 20-25; 63: 12-14; Ex. J (Jimenez Dep.) at 40: 23-24; 48: 16-18; 49: 14 – 50: 19.

As they stood safeguarding the car, plaintiff arrived on scene and approached the Tahoe.[1] Ex. D (50-h) at 26: 13-24; 27: 3-4; Ex. E (Pl. Dep.) at 81: 23 – 82: 4; 82: 20-22; 84: 16-23; Ex. F (Baltzer Dep.) at 52: 3-24; Ex. G (Leon Dep.) at 37: 12-20; Ex. H (Lane Dep.) at 33: 11 – 34: 3; 44: 3-25; 45: 20 – 46: 24; Ex. I (Swinkunas Dep.) at 67: 7 – 68: 2; 68: 11 – 69: 20; 72: 19 – 73: 12; Ex. J (Jimenez Dep.) at 56: 19-21; Ex. L (Leon BWC #1) at 00:00 – 00:30.  He was defiant, hostile, and argumentative. Ex. L (Leon BWC#1) at 00:01 – 1:12.  Plaintiff said he was the owner of the vehicle and it was his son who had been shot. Ex. D (50-h) at 27: 7-9; Ex. E (Pl. Dep.) at 83: 13-17, 18-19; Ex. F (Baltzer Dep.) at 54: 10-13; Ex. H (Lane Dep.) at 45: 17-19; Ex. I (Swinkunas Dep.) at 70: 2-11; Ex. J (Jimenez Dep.) at 57: 14 – 58: 3.  The defendants repeatedly told plaintiff to back away from the Tahoe. Ex. D (50-h) at 27: 14 – 28: 2; 28: 19-23; Ex. E (Pl. Dep.) at 84: 13-15 .  However, plaintiff ignored these commands and continued walking towards the vehicle until he was in the space between the open passenger door and the passenger seat. Ex. D (50-h) at 29: 8-9; Ex. E (Pl. Dep.) at 85: 6-7; 89: 7-12; 93: 6-13; 98: 20 – 99: 2; 103: 25 – 104: 1; Ex. J (Jimenez Dep.) at 58: 20-25; 61: 5-15; 73: 12-14; Ex. L (Leon BWC #1) at 00:01 – 1:05.

---

[1] Plaintiff's explanation of what happened before he arrived at the hospital is not material because it is not part of the totality of the circumstances the officers were aware of.  Nevertheless, he testified that at around 3:00 a.m. he received a phone call from his estranged wife Joy Harris informing him that that their son had been shot and was in Mt. Sinai Hospital. Ex. D (50-h) at 16: 8-12; 17: 24-25; 18: 2-5; Ex. E (Pl. Dep.) at 56: 6 – 57: 12.  Joy Harris had learned of the shooting from an anonymous male caller, who said he and some other people had dropped their son off at the hospital in a Tahoe that belonged to plaintiff. Ex. D (50-h) at 18: 12-21; 19: 9-14; Ex. E (Pl. Dep.) at 58: 2-15; 65: 5-12.  Joy Harris did not know where their son had been shot or what condition he was in. Ex. E (Pl. Dep.) at 57: 22 – 58: 2.  Plaintiff picked Joy Harris up in a car belonging to his friend and the two drove to the hospital. Ex. D (50-h) at 20: 3-10; Ex. E (Pl. Dep.) at 63: 13 – 64: 8; 68: 15-17.  When plaintiff picked Joy Harris up, she told him that the caller said he left the key to the Tahoe at a mailbox on 125th Street and Amsterdam Avenue next to a Dunkin Donuts. Ex. D (50-h) at 19: 15 – 20: 2; Ex. E (Pl. Dep.) at 67: 2-10; 68: 5-8.  Plaintiff dropped Joy Harris off at the emergency room and, without waiting to find out what condition his son was in, made a U-turn to retrieve the Tahoe key. Ex. D (50-h) at 20: 22-24; Ex. E (Pl. Dep.) at 71: 10-13; 72: 19-25, 73: 6-9.  Plaintiff found the key at 125th Street on the ground near a wifi/phone charging stand. Ex. D (50-h) at 20; Ex. E (Pl. Dep.) at 75: 9 – 76: 18.  Plaintiff then drove back to Mt. Sinai Hospital, parked near the entrance to the emergency room, and saw his Tahoe parked at an angle halfway on the sidewalk in the emergency room driveway. Ex. D (50-h) at 21: 8-10; 25: 13 – 26: 2; Ex. E (Pl. Dep.) at 78: 20 – 79: 10; 80: 4-5; 81: 2-3.  At that point he still did not know what condition his son was in and thought he might be dead. Ex. E (Pl. Dep.) at 80: 13; 84: 3-6.

Approximately three officers approached plaintiff as he stood by the open passenger door.  Ex. E (Pl. Dep.) at 103: 20 – 104: 1; 107: 9-10.  Plaintiff raised his hands over his head and told the police "get away from me."  Ex. E (Pl. Dep.) at 99: 6; Ex. L (Leon BWC #1) at 00:27 – 00:31.  Lieutenant Leon responded by twice saying in substance "this is a crime scene do not touch the car."  Ex. L (Leon BWC #1) at 00:30 – 00:39.  Plaintiff responded by yelling "you cannot tell me what to do with my property, this is my property," then he turned towards the Tahoe and took another step closer to it.  Ex. E (Pl. Dep.) at 99: 19-22; Ex. L (Leon BWC #1) at 00:39 – 00:47.  Several officers including Lieutenant Leon again told plaintiff in substance "do not touch the car," and Lieutenant Lane said "you're going to be under arrest." Ex. L (Leon BWC #1) at 00:47 – 00:49.  Plaintiff responded by yelling "I don't care" five times. Ex. L (Leon BWC #1) at 00:49 – 00:55.  Lieutenant Leon again said "this is a crime scene," and plaintiff responded by saying "please get away from me, please get away from me" while extending his arms out towards Lieutenant Leon.  Ex. L (Leon BWC #1) at 00:57 – 1:00. Plaintiff then said "you already looked inside the car," to which Lieutenant Leon responded "no we didn't" and Lieutenant Lane said "step away from the car, step away from the car."  Ex. L (Leon BWC #1) at 1:01 – 1:03.  The next thing plaintiff said was "I'm not stepping away from anything." Ex. L (Leon BWC #1) at 1:04 – 1:05.

At that point, Lieutenant Lane said "turn around" and Lieutenant Leon said "you're going to be placed under."  Ex. H (Lane Dep.) at 52: 8-13; Ex. L (Leon BWC #1) at 1:04 – 1:07.  Lieutenant Lane tried to grab plaintiff's arms, but plaintiff raised his hands up by his head, turned away from the officers towards the passenger seat of the Tahoe, and shouted "please don't touch me."  Ex. E (Pl. Dep.) at 103: 25 – 104: 11; 104: 23 – 105: 3; 106: 16-21; 107: 7-14; 107: 21 – 108: 1; Ex. F (Baltzer Dep.) at 74: 3-13; 77: 10-11; Ex. G (Leon Dep.) at 53: 12-13;

60: 12-17; 62: 7-10; 84: 14-17; Ex. H (Lane Dep.) at 52: 16 – 53: 5; 54: 9-15; 55: 14-16; 57: 4-7;

Ex. I (Swinkunas Dep.) at 82: 5-7; Ex. J (Jimenez Dep.) at 62: 6-7; 67: 2; 67: 23 – 68: 7; Ex. L

(Leon BWC #1) at 1:06 – 1:07.   When plaintiff raised his arms up, Lieutenant Lane thought

plaintiff was about to hit him because he had refused numerous orders to back away from the

Tahoe, said "you can't tell me what to do with my property," his behavior and demeanor were

aggressive, and he did not seem to care when he was told he would be placed under arrest.   Ex. H

(Lane Dep.) at 55: 5-9; 56: 7-22.   Officer Jimenez also thought plaintiff could have injured

someone because he was very big, seemed to be upset, and was being uncooperative.   Ex. J

(Jimenez Dep.) at 79: 17 – 80: 11.

Lieutenant Lane continued trying to grab plaintiff's arms but was unable to

because plaintiff was pulling them away and twisting and turning his body.   Ex. H (Lane Dep.) at

57: 8-24; 60: 23 – 61: 9; 61: 25 – 63: 4.   Plaintiff heard an officer say "tase him," which he

thought might be a "scare tactic."   Ex. D (50-h) at 29: 12-13; Ex. E (Pl. Dep.) at 103: 5-8; 106: 7-

11; 110: 22-24; 111: 3-5; 114: 3-10.   Plaintiff heard "tase him" a second time, which he

understood meant he might be tased.   Ex. D (50-h) at 29: 20-21; Ex. E (Pl. Dep.) at 110: 3-4;

114: 11-14.  Plaintiff heard "tase him" a third time, which he thought might still be "a threat" but

he "knew it was serious at that point.".   Ex. D (50-h) at 30: 6-8; Ex. E (Pl. Dep.) at 114: 24 –

115: 7.  Regardless, plaintiff still did not back away from the Tahoe and or put his hands behind

his back to be handcuffed.   Ex. D (50-h) at 27: 14 – 30: 5; Ex. E (Pl. Dep.) at 117: 18-23.

Lieutenant Leon said in substance "get your taser" and "taser him" four or five

times, which he intended as an order to Officer Baltzer.   Ex. F (Baltzer Dep.) at 59: 12 – 60: 10;

Ex. G (Leon Dep.) at 52: 10-19; 54: 15-21; 63: 11-17.  The situation was very fast-moving, Ex. E

(Pl. Dep.) at 95: 16-17; 97: 1-3; 101: 2-3; 105: 20-21; 109: 24; 115: 19, and Lieutenant Leon

made the decision to order Officer Baltzer to draw his taser in a split-second.  Ex. G (Leon Dep.) at 89: 20-21.  Lieutenant Leon directed Officer Baltzer to draw his taser because of plaintiff's size, he was flailing his arms and physically struggling with Lieutenant Lane to prevent himself from being handcuffed, said "don't touch me," and it appeared that he was trying to get into the Tahoe.  Ex. G (Leon Dep.) at 78: 16-25; 79: 10-14; 80: 6-9; 87: 22 – 88: 6; 94: 24 – 96:2.

       Officer Baltzer heard Lieutenant Leon say "tase him," but he drew his taser because he believed it was necessary, not because of what Lieutenant Leon said.  Ex. F (Baltzer Dep.) at 64: 20-23; 65: 20 – 67: 8.  Officer Baltzer felt it was necessary to use his taser because plaintiff had approached the vehicle in a very aggressive and irate manner and the situation escalated to the point where plaintiff was actively resisting arrest after multiple warnings and exhibiting extreme aggression.  Ex. F (Baltzer Dep.) at 66: 17 – 67: 25; 69: 17 – 71: 11; 71: 17-22; 72: 2-10; Ex. L (Leon BWC #1) at 1:03 – 1:07.  Plaintiff's tone of voice and the movement of his hands were aggressive and he was physically resisting arrest by struggling with Lieutenant Lane and pulling his arms away from him.  Ex. F (Baltzer Dep.) at 56: 14-15, 20-21; 68: 6-19; 69: 2-6; 71: 10-11; 72: 2-10; 73: 12-18; 74: 3-25; 89: 3-4; Ex. G (Leon Dep.) at 60: 8-17; 84: 14-17; 86: 25 – 87: 5; 87: 22 – 88: 6; Ex. H (Lane Dep.) at 56: 14-15, 20-21; 61: 25 – 63: 4; 69: 11-12; Ex. I (Swinkunas Dep.) at 82: 20 – 84: 17; 85: 16-20; 95: 21 – 96: 8; Ex. J (Jimenez Dep.) at 35: 2-8; 67: 16 – 68: 7; Ex. L (Leon BWC #1) at 1:06 – 1:07.

       Before deploying the taser, Officer Baltzer shouted "taser" three times.  Ex. F (Baltzer Dep.) at 93: 15-16; Ex. J (Jimenez Dep.) at 74: 4-8; Ex. L (Leon BWC #1) at 1:10 – 1:11.  When Officer Baltzer pulled the taser trigger, he and Lieutenant Leon believed plaintiff was attempting to enter the Tahoe through the open passenger door because he was facing the

vehicle and leaning into it.  Ex. E (Pl. Dep.) at 104: 23 – 105: 3 Ex. F (Baltzer Dep.) at 79: 5-8, 14-17; 80: 10-21; 81: 15 – 82: 13; Ex. G (Leon Dep.) at 62: 7-20; Ex. L (Leon BWC #1) at 1:09.

Plaintiff was tased one time on his left hip, causing him to fall to the ground on his left side.  Ex. D (50-h) at 30: 9-11, 14-15; Ex. E (Pl. Dep.) at 117: 10-14; 118: 24 – 119: 13. It was only at that point that the defendants were able to place him in handcuffs.  Ex. D (50-h) at 30: 20-24; Ex. E (Pl. Dep.) at 119: 14-15; Ex. I (Swinkunas Dep.) at 111: 17-19; Ex. J (Jimenez Dep.) at 76: 15-18.

After plaintiff was tased, he told the defendants what information he knew about the shooting of his son.  Ex. E (Pl. Dep.) at 126: 25 – 127: 11; Ex. G (Leon Dep.) at 66: 9-13; Ex. I (Swinkunas Dep.) at 112: 12-15; Ex. L (Leon BWC #1) at 2:28 – 5:35; Ex. N (Jimenez BWC) at 00:30 – 4:08.  A few minutes after the tasing, Joy Harris asked him "why you got tased," and plaintiff responded "because I was going to take the truck.  They said it's a crime scene."  Ex. N (Jimenez BWC) at 4:08 – 4:12.  Plaintiff was taken into the hospital where the taser prongs were removed from his left hip and he was given stitches that later dissolved on their own.  Ex. D (50-h) at 34: 9-16; 35: 2-10; Ex. E (Pl. Dep.) at 127: 19-22; 129: 6-8; 132: 1-15; 133: 3-6.  He did not complain of any other injuries at the hospital.  Ex. E (Pl. Dep.) at 136: 13 – 137: 3.  He was transported from the hospital to the 26th Precinct where he was arrested for resisting arrest and obstructing governmental administration and released with a desk appearance ticket.  Ex. D (50-h) at 37: 20-22; 38: 2-3; 40: 10-12, 21-24; Ex. E (Pl. Dep.) at 139: 1-9; 144: 9-10; 145: 2-3; Ex. G (Leon Dep.) at 75: 9-11; Ex. J (Jimenez Dep.) at 91: 24-25.

Plaintiff alleges he sustained an injury to his left wrist when he fell that required outpatient surgery.  Ex. D (50-h) at 32: 21-25; 43: 21 – 47: 18; Ex. E (Pl. Dep.) at 150: 10 – 151: 6; 159: 22-23; 160: 7-8.  As a result, he was on sick leave for eight weeks beginning November

17, 2020.  Ex. D (50-h) at 7: 7-14; Ex. E (Pl. Dep.) at p. 165: 5-13.  The eight weeks fell within his unlimited sick leave at the Department of Sanitation, and while on sick leave he was paid his full base salary plus any "differentials" associated with his civil service title.  Ex. D (50-h) at 9:8-17; Ex. E (Pl. Dep.) at 165: 14 – 166:1; 166: 11-12; Ex. K (Wright Dep.) at 28: 6 – 29: 14; 45: 20-25.  He was not paid overtime or "extra money" for "picking the garbage up physically." Ex. E (Pl. Dep.) at 166: 2 – 167: 3; Ex. K (Wright Dep.) at 46: 2-11; 48: 10-17.  After being on sick leave for eight weeks he made a full return to work.  Ex. E (Pl. Dep.) at 167: 21-24.

## STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-movant, the court determines that no genuine issue of material fact exists. See Fed. R. Civ. P. 56; Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 456 (1992).  A motion for summary judgment, therefore, requires plaintiff to "make a showing sufficient to establish the existence of an element essential to that party's case…since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Thus, in order to avoid summary judgment, the non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial.  Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  The non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the non-moving party must "cit[e] to particular parts of the materials in the record to show that a fact is generally disputed." Fed. R. Civ. P. 56(c); see also Matsushita, 475 U.S. at 587.  While the evidence must be viewed in the light most favorable to the non-moving party, when there is reliable objective evidence, the evidence may speak for itself. Scott v. Harris, 550 U.S. 372, 378-81 (2007).

**ARGUMENT**

**POINT I**

**THE USE OF THE TASER WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES**

Considering the totality of the circumstances here – including the need to preserve evidence of the shooting and plaintiff's repeated defiance of police orders, resistance to arrest, hostility and aggression, apparent lack of concern that he was about to be arrested, and size – it was objectively reasonable to use the taser to avoid a "hands-on" confrontation.  Evaluating a claim for excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham v. Connor, 490 U.S. 386, 396 (1989).  Courts should determine whether a use of force was reasonable by "considering the totality of the circumstances faced by the officer on the scene."  Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995) (citation omitted).  Further, "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving,"  Graham, 490 U.S. at 396-97, and "the Supreme Court has emphasized [that] it is extremely important to evaluate the record 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  Jones v. Treubig, 963 F.3d 214, 236 (2d Cir. 2020) (quoting Graham, 490 U.S. at 396)).

### i.   First Graham Factor: Plaintiff's criminal activity was serious

In the context of this situation, plaintiff's criminal activity certainly ranks as serious.  The defendants correctly suspected that the Tahoe was related to the shooting, a crime of the utmost severity, and were safeguarding it to be examined for evidence.  As Lieutenant

Lane aptly explained, "In this situation there was a shooting victim, there was a vehicle that was considered a crime scene involved in a shooting, so us trying to preserve the evidence, I think that's a serious situation." Ex. H (Lane Dep.) at 67: 4-8.  Plaintiff posed an imminent threat of interfering in that effort by relentlessly approaching the car in defiance of police orders.  Indeed, Officer Baltzer and Lieutenant Leon suspected plaintiff was trying to get into the car at the moment he was tased.  Ex. F (Baltzer Dep.) at 79: 5-8; Ex. G (Leon Dep.) at 62: 7-16.  Their belief was reasonable considering it is undisputed that plaintiff was standing directly next to the open passenger door, Ex. L (Leon BWC #1) at 1:06, he never backed away from the Tahoe, Ex. D (50-h) at 27:14 – 30:5; Ex. E (Pl. Dep.) at 117: 18-20, and he turned towards the open passenger door when the officers "rushed" him.  Ex. E (Pl. Dep.) at 103: 25 – 104: 3; 104: 23 – 105: 3; Ex. L (Leon BWC #1) at 1:06 – 1:10.  Minutes after the tasing, plaintiff even said that he was tased because he was "was going to take the truck.  They said it's a crime scene."  Ex. N (Jimenez BWC) at 4:08 – 4:12.  Any attempt by plaintiff to portray his criminal conduct as minor because he was arrested for misdemeanors thus misses the mark, and this factor weighs in favor of finding that the use of the taser was reasonable.

### ii. Second Graham Factor: Plaintiff posed a threat to the defendants' safety

"Courts assessing the threat to officer safety look both to the officers' statements about their perception of a threat and objective factors that would justify such a fear." Scoma v. City of New York, No. 16 CV 6693 (KAM)(SJB), 2021 U.S. Dist. LEXIS 12727 at *23 (E.D.N.Y. Jan. 22, 2021) (quotation marks and citation omitted).  Considering both objective and subjective factors, the defendants could reasonably have perceived plaintiff as a threat to their safety.  From the moment he arrived on scene until he was tased he was hostile, defiant, and argumentative.  Ex. G (Leon BWC #1) at 00:01 – 1:12.  He never complied with the officers'

verbal commands to back away from the vehicle and never put his hands behind his back to be handcuffed.  Ex. D (50-h) at 27: 17 – 30: 5; Ex. E (Pl. Dep.) at 117: 18-23.  He is six inches taller and nearly 100 pounds heavier than the largest officer on scene.

When Lieutenant Lane tried to grab plaintiff to place him under arrest, he raised his hands up by his head.  Ex. E (Pl. Dep.) at 103: 25 – 104: 11; 104: 23 – 105: 3; 107: 21 – 108: 1; Ex. L (Leon BWC #1) at 1:06 – 1:07.  Plaintiff's testimony that this was intended as signal he was not a threat to the officers, Ex. E (Pl. Dep.) at 108: 18-22, rings hollow.  When plaintiff raises his hands up at Ex. L (Leon BWC #1) 1:06 – 1:07, he does so while saying "please don't touch me," hardly a conciliatory statement under the circumstances.  Further, thirty seconds earlier at Ex. L (Leon BWC #1) 00:27 – 00:32, he raised his hands up over his head while saying "please get away from me," also not a sign of capitulation because he thereafter continued his defiant approach toward the Tahoe.  Moreover, Lieutenant Lane interpreted plaintiff raising his hands at Ex. L (Leon BWC #1) at 1:06 – 1:07 as a sign that plaintiff was about to hit him because he had refused numerous orders to back away from the Tahoe, said "you can't tell me what to do with my property," his behavior and demeanor were aggressive, and he did not seem to care when he was told he would be placed under arrest.  Ex. H (Lane Dep.) at 55: 5-9; 56: 7-22.  Officer Jimenez similarly believed plaintiff could have injured one of the officers or himself because he was very big, seemed upset, and was being uncooperative.  Ex. J (Jimenez Dep.) at 79: 17 – 80: 11.  All of the defendants perceived plaintiff's conduct as physically resisting Lieutenant Lane's efforts to place him under arrest.  Ex. F (Baltzer Dep.) at 68: 6-10, 17-19; 71: 10-11; 73: 12-18; 74: 3-25; 89: 3-4; Ex. G (Leon Dep.) at 60: 8-17; 84: 14-17; 86: 25 – 87: 5; 87: 22 – 88: 6; Ex. H (Lane Dep.) at 61: 25 – 63: 4; Ex. I (Swinkunas Dep.) at 82: 20 – 84: 17; 95: 21 – 96: 8; Ex. J (Jimenez Dep.) at 67: 16 – 68: 7.

In light of the threat plaintiff posed given his hostile behavior, size, defiance of orders, and the fact that he was not handcuffed, Officer Baltzer's use of the taser to bring him under control was a reasonable alternative to a "hands-on" confrontation which could have resulted in injury to everyone involved.  See MacLeod v. Town of Brattleboro, 548 Fed. Appx. 6, 8 (2d Cir. 2013) (finding use of taser against non-compliant suspect was reasonable to "avoid[] a 'hands-on' situation with an unrestrained, dangerous individual," citing Tracy v. Freshwater, 623 F.3d 90, 97 (2d Cir. 2010)); Prive v. Wells, No. 5:13-cv-320, 2015 U.S. Dist. LEXIS 33215 at *38 (D. Vt. Mar. 17, 2015) ("Because 'hands-on' contact posed a risk of injury to both the officers and Plaintiff, the use of the taser was a 'reasonable step[] to minimize' the continued use of 'actual,' 'hands-on' force," quoting MacLeod v. Town of Brattleboro, No. 5:10-cv-286, 2012 U.S. Dist. LEXIS 73481 at *38 (D. Vt. May 25, 2012), aff'd 548 Fed. Appx. 6); Towsley v. Frank, No. 5:09-cv-23, 2010 U.S. Dist. LEXIS 137005 at *22-*23 (D. Vt. Dec. 28, 2010) (finding use of taser reasonable where it "avoided a situation in which the officers would have had to go 'hands-on' with a combative suspect, a situation that could result in serious injury" to plaintiff and the officers, citing Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004)); Draper, 369 F.3d at 1278 (finding "single use of the taser gun" reasonable because it "may well have prevented a physical struggle and serious harm to either" plaintiff or defendant).

Significantly, plaintiff was standing inches away from the Tahoe in the narrow space between the open passenger door and the passenger seat.  Ex. E (Pl. Dep.) at 103: 25 – 104: 1; Ex L (Leon BWC #1) at 00:47.  A "hands-on" confrontation in that confined area could very well have brought about precisely what the defendants were trying to prevent – contaminating the Tahoe before it could be processed for evidence.  This factor should therefore be weighed against plaintiff.

### iii.    Third <u>Graham</u> Factor: Plaintiff actively resisted arrest

Numerous courts in this Circuit and others have found that repeated defiance of police orders constitutes active resistance justifying the use of a taser.  <u>See</u>, <u>e.g.</u>, <u>Crowell v. Kirkpatrick</u>, 400 Fed. Appx. 592, 594-95 (2d Cir. 2010) (finding use of taser reasonable where plaintiffs actively resisted arrest by refusing orders to release themselves from heavy barrels they had chained themselves to); <u>MacLeod</u>, 548 Fed. Appx. at 6 (finding repeated defiance of police orders "do[es] not evince 'passive resistance' merely because [plaintiff] was not actually in the act of" physically resisting immediately prior to being tased); <u>Scoma</u>, 2021 U.S. Dist. LEXIS 12727 at *26 ("Although neither the Supreme Court nor the Second Circuit has specifically defined 'active resistance,' the Second Circuit has upheld uses of force involving tasers where the suspect was actively non-compliant with the Officers' directions," citing <u>MacLeod</u>, 548 Fed. Appx. at 8 and <u>Crowell</u>, 400 Fed. Appx. at 595); <u>Prive</u>, 2015 U.S. Dist. LEXIS 33215 at *37-*40 (finding non-compliance with police commands constitutes active resistance justifying use of taser, citing <u>MacLeod</u>, 2012 U.S. Dist. LEXIS 73481, aff'd 548 Fed. Appx. 6); <u>Draper</u>, 369 F.3d at 1278 (finding use of taser reasonable where plaintiff, who yelled at police and was "hostile, belligerent, and uncooperative," defied five orders to produce documents from the cab of his truck); <u>DeVoe v. Rebant</u>, No. 05-71836, 2006 U.S. Dist. LEXIS 5326 at *21-*22 (E.D. Mich. Feb. 13, 2006) (finding use of taser reasonable where plaintiff  was "hostile and uncooperative," argued with officers, refused multiple orders to produce ID, and refused to get into patrol car, citing <u>Draper</u>, 369 F.3d 1270); <u>see</u> <u>also</u> <u>Towsley</u>, 2010 U.S. Dist. LEXIS 137005 at *20-*24 (finding tasing reasonable where plaintiff, among other things, refused 26 orders to submit to arrest); <u>Tracy</u>, 623 F.3d at 97 (finding use of force reasonable where plaintiff "appeared to fail to comply with a direct order and instead actively resist arrest").

In all of these cases, the plaintiffs never physically or forcefully interfered with their arrest,[2] yet the courts nevertheless found they *actively* resisted, justifying the use of a taser. The salient point is that courts agree officers need not resort to a "hands-on" confrontation, putting themselves and plaintiff at risk of injury, to gain compliance of a recalcitrant arrestee who has demonstrated he will never obey a verbal order no matter how many times it is given.

Here, it is undisputed that plaintiff refused to comply with every order the defendants gave him and did not submit to being arrested.  He never moved away from the Tahoe, Ex. D (50-h) at 27: 16 – 30: 5; Ex. E (Pl. Dep.) at 117: 18-20; Ex. L (Leon BWC #1) at 00:01 – 1:07, said "I'm not stepping away from anything," Ex. L (Leon BWC #1) at 1:03 – 1:05, and never put his hands behind his back to be handcuffed.  Ex. E (Pl. Dep.) at 117: 21-23.  The officers had no reason to doubt plaintiff heard and understood their orders yet consciously and deliberately refused to follow them[3]; indeed, he responded directly to their commands by saying "get away from me," "you cannot tell me what to do with my property," "you already looked inside the car," and "I'm not stepping away from anything," Ex. L (Leon BWC #1) at 00:30 – 1:05, none of which would indicate he had any intention of complying.  Perhaps most important from the defendants' perspective, when he was told he would be placed under arrest he responded by yelling "I don't care" five times.  Ex. G (Leon BWC #1) at 00:49 – 00:55.  Under Second Circuit precedent, this repeated defiance of directives clearly and unequivocally constitutes active resistance.

---

[2] In many cases (i.e. MacLeod, Scoma, Draper, and Towsley), the officers and plaintiff were separated by some distance and did not even come into physical contact before the taser was deployed.

[3] While plaintiff claimed at his deposition that he did not hear the officers' orders, Ex. E (Pl. Dep.) at 87: 8 – 88: 1; 90: 15-22; 92: 23 – 93: 5; 97: 8-10; 98: 2-4, 17-19; 100: 7-12, this is immaterial because the defendants had no reason to doubt that plaintiff heard and understood them.  Moreover, it is belied by his 50-h testimony (which occurred months before he had the benefit of viewing the BWC video), where he testified that he heard the police tell him to back away from the car three times.  Ex. D (50-h) at 27: 16 – 28: 23.

This case is similar to MacLeod where, after leading police on a car chase, plaintiff "contravene[ed] clear, repeated instructions that he acknowledge[d] he understood[,] rose to his feet, turned to face the officers with his hands outstretched, and refused to return to the ground.  Rising from the ground rather than submitting to arrest exacerbated a 'tense, uncertain, and rapidly evolving' situation…" MacLeod, 548 Fed. Appx. at 8 (quoting Graham, 490 U.S. at 397).  The Court found "it was reasonable for [defendant] – after repeated, clear commands that [plaintiff] return to the ground – to decide that using the taser was required to effect the arrest.  This avoided a 'hands-on' situation with an unrestrained, dangerous individual."  Id. (quoting Tracy, 623 F.3d at 97).  Plaintiff here, who was unrestrained, defiant, and hostile, refused repeated, clear commands to back away from the Tahoe and turn around to be placed under arrest during what he himself characterized as a fast-moving situation.  Ex. E (Pl. Dep.) at 95: 16-17; 97: 1-3; 101: 2-3; 105: 20-21; 109: 24; 115: 19.  As in MacLeod, it was therefore reasonable for Officer Baltzer to deploy the taser to effect the arrest and avoid a "hands-on" confrontation with plaintiff, who is substantially larger than the officers on scene.

This calculus does not change even assuming, *arguendo*, that plaintiff's criminal behavior in MacLeod was of a greater severity than plaintiff's here.  In Crowell, the Court found the use of a taser was reasonable even where "plaintiffs were arrested for the relatively minor crimes of trespass and resisting arrest and were not threatening the safety of any other person with their behavior" because they were nevertheless "actively resisting their arrest" where they chained themselves to several hundred pound barrels and refused police orders to release themselves.  Crowell, 400 Fed. Appx. at 594-95.  Certainly if it was reasonable to use a taser against the non-threatening yet non-compliant plaintiffs in Crowell, it was reasonable here as well.

Moreover, plaintiff cannot dispute that he was warned he might be tased.  The Second Circuit has held that "'our precedent suggests it is *not* excessive force to deploy tasers, after a warning, against arrestees who are dangerous or resisting arrest.'" Jones, 963 F.3d at 228 (emphasis in original) (quoting Penree v. City of Utica, 694 Fed. Appx. 30, 33 (2d Cir. 2017) and citing MacLeod, 548 Fed. Appx. 6-7 and Crowell, 400 Fed. Appx. at 595-96).  Plaintiff heard "tase him" between three and five times before he was tased.  Ex. D (50-h) at 29: 12 – 30: 10; Ex. E (Pl. Dep.) at 112: 14-20.  After the first time, he thought "maybe it was a scare tactic."  Ex. E (Pl. Dep.) at 114: 3-10.  After the second time, he understood "tase him" meant he might be tased.  Ex. Ex. E (Pl. Dep.) at 114: 11-14.  After the third time, he thought maybe it was still "a threat" but he "knew it was serious at that point."  Ex. E (Pl. Dep.) at 115: 2-7.  A "scare tactic" or "threat" is simply another way of saying a warning.  Plaintiff knew what a taser was and what it did, Ex. E (Pl. Dep.) at 113: 19-23, so he cannot dispute that he was aware of the potential consequences of failing to obey the officers' commands.  Despite this warning, plaintiff took no actions to comply with the officers' orders.

Certainly none of plaintiff's actions at any point before he was tased would have suggested to a reasonable officer that he was going to submit to arrest; on the contrary, his behavior demonstrated the exact opposite.  Nor did he say anything between hearing "tase him" for the first time and when he was actually tased that could have informed the defendants he was going to relent, Ex. D (50-h) at 29: 12 – 30: 8; Ex. E (Pl. Dep.) at 118: 9-12, and everything he said up until that point was oppositional and defiant.  His alleged subjective belief that he never tried to resist, Ex. E (Pl. Dep.) at 115: 18, is highly dubious in light of his actions and in any event is immaterial.  Further, it is immaterial that he is not visible on the BWC for several seconds before he was tased.  The BWC and his own testimony prove that the defendants

reasonably believed he heard their orders and intentionally defied them. Indeed, at his deposition plaintiff was unable to state whether the officers could have said anything to induce him to move away from the Tahoe. Ex. E (Pl. Dep.) at 101: 11-18. Even if, in plaintiff's estimation, he had decided to surrender seconds before he was tased, the defendants, taking into consideration his previous noncompliance, reasonably concluded otherwise.

In MacLeod, the Second Circuit rejected plaintiff's argument that the use of a taser was unreasonable because he had "voluntarily ceased his criminal conduct and was attempting to surrender at the time he was tased." MacLeod, 548 Fed. Appx. at 7 (quotation marks omitted). The Court found that "whatever [plaintiff's] subjective intent," id., from the officers' perspective, his repeated defiance of orders to return to the ground exacerbated a "tense, uncertain, and rapidly evolving" situation justifying the use of the taser. Id. The Circuit also noted the defendant "'could reasonably have interpreted [plaintiff's] previous noncompliance, i.e. standing up, as indicative of the possibility of further resistance.'" MacLeod, 58 Fed. Appx. at 7 (quoting Davis v. Callaway, No. 3:05CV127 (DJS), 2007 U.S. Dist. LEXIS 29468 at *14 (D. Conn. Apr. 9, 2007)). Similarly in Towsley, the Court rejected plaintiff's last-minute surrender argument, finding it was objectively reasonable for the officers to conclude that, in light of his previous non-compliance with their orders, he was continuing to defy their commands when he was tased. Towsley, 2010 U.S. Dist. LEXIS 137005 at *23-*24.

As in MacLeod and Towsley, any self-serving argument from plaintiff that he had decided to surrender at the last second does not negate his prior defiance of police orders. Even if plaintiff subjectively believed he was showing submission just before he was tased, the officers reasonably interpreted his previous noncompliance as indicative of the possibility of further resistance. It was thus reasonable to conclude that a physical confrontation would have

been necessary to subdue him without the taser, precisely the "hands-on" confrontation the defendants were lawfully permitted to prevent.  In any event, whatever else plaintiff may claim he was doing when the taser was deployed, he cannot dispute that up to that moment he never moved away from the Tahoe, put his hands behind his back to be handcuffed, or told the defendants he was surrendering.  Ex. D (50-h) at 27:4 – 30: 8; Ex. E (Pl. Dep.) at 117: 18-23; 118: 9-12.  His non-compliance and refusal to submit to arrest thus indisputably continued up until the moment he was tased and this factor should be weighed heavily against him.

At a minimum, the excessive force claim should be dismissed against all of the defendants except Officer Baltzer because they were not personally involved in tasing plaintiff. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013).  While plaintiff was handcuffed, he does not allege in the First Amended Complaint that the handcuffs were applied with excessive tightness, that he asked for them to be loosened, or that they caused injury.  The handcuffing therefore cannot be the basis of an excessive force claim.  See, generally, Lynch v. City of Mt. Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).

### POINT II

**THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THERE WAS NO CLEARLY ESTABLISHED LAW THAT PROHIBITED THEM FROM USING THE TASER, AND REASONABLE OFFICERS COULD DISAGREE AS TO WHETHER IT WAS LAWFUL**

In the alternative, the defendants are entitled to qualified immunity because there was no clearly established law that they could not use the taser on plaintiff, and reasonable officers could disagree as to whether using the taser was lawful.  In analyzing whether an official

is entitled to qualified immunity, "the court must consider whether '(1)…the official violated a statutory or constitutional right, and (2)…the right was 'clearly established' at the time of the challenged conduct.'" Jones, 963 F.3d at 224 (alterations in original) (quoting Ricciuti v. Gyzenis, 834 F.3d 162, 167 (2d Cir. 2016)). "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violated that right.'" Muschette v. Gionfriddo, 901 F.3d 65, 69 (2d Cir. 2018) (quoting Carroll v. Carman, 574 U.S. 13, 17 (2014)). "An officer is entitled to qualified immunity if 'any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful. [O]ur inquiry [on qualified immunity] is not whether the officer *should have* acted as he did. Nor is it whether a singular, hypothetical entity exemplifying the 'reasonable officer'…*would have* acted in the same way." Id. at 70 (emphasis and alterations in original) (quoting Figueroa v. Mazza, 825 F.3d 98, 100 (2d Cir. 2016)).

On September 2, 2020, "it [was] clearly established that officers may not use a taser against a compliant or non-threatening suspect." Muschette, 901 F.3d at 70 (quoting Tracy, 623 F.3d at 96-98). However, plaintiff was neither compliant nor non-threatening. In Jones, decided less than three months before plaintiff's arrest, the Second Circuit stressed that "a critical fact for purposes of qualified immunity…is whether [plaintiff] was resisting arrest *in any way* at the time of the [] tasing, because there was no clearly established law that would fairly warn police officers that a taser could not be used against a *resisting* arrestee." Jones, 963 F.3d at 228 (emphasis added); see also Brown v. City of New York, 862 F.3d 182, 190 (2d Cir. 2017) (finding "no precedential decision of the Supreme Court or this Court 'clearly establishes' that [using pepper spray and other force], viewed in the circumstances in which they were taken, were in violation of the Fourth Amendment," where "those circumstances involved a person's

- 19 -

repeatedly refusing to follow the instructions of police officers who were attempting to apply handcuffs to accomplish an arrest").  As shown in Point I(iii), at the time plaintiff was tased, he was resisting arrest by defying repeated police orders to back away from the Tahoe.  There was therefore no clearly established law that the defendants could not use the taser against him.

Further, it cannot be said that no reasonable officer would have tased plaintiff to subdue him.  In Muschette, police were called to a school for the deaf after plaintiff, a student, hit and threw rocks at staff members and fled the campus to a nearby construction site. Muschette, 910 F.3d at 70.  The defendant officer gave verbal instructions to plaintiff and warned him that he would be tased if he did not comply, which the defendant reasonably believed were communicated to plaintiff in sign language.  Id.  "It was only then – when it appeared to [defendant] that [plaintiff] was ignoring his instructions – that [defendant] deployed the taser."  Id.  The Second Circuit found "under these circumstances, we cannot say that no reasonable officer would have believed that the use of the taser to subdue [plaintiff] was lawful," and the defendant was therefore entitled to qualified immunity.  Id. (citing Tracy, 623 F.3d at 97).  The Court explained that "we have repeatedly concluded in summary orders that it is not unreasonable for an officer to use a taser in analogous circumstances."  Id. at 71 (citing Penree, 694 Fed. Appx. at 33, MacLeod, 548 Fed. Appx. at 8, and Crowell, 400 Fed. Appx. at 595).

Thus Muschette was simply reiterating the Second Circuit's many previous holdings that it is not unlawful for police to use a taser against a suspect who is actively resisting arrest by defying repeated orders the officers believe the suspect heard.  Muschette's reasoning applies to this case even assuming, *arguendo*, that the Muschette plaintiff's conduct posed a heightened level of danger to the officer than plaintiff's here.  Muschette cites to Crowell as a case involving "analogous circumstances," where plaintiffs were committing a minor, nonviolent

crime and posed no danger to anyone.  <u>Muschette</u>, 910 F.3d at 71.  Further, plaintiff in <u>Muschette</u>

was a 12-year-old boy, <u>id</u>. at 70, a far cry from the six-foot-two, 280 pound adult plaintiff here.

Moreover, plaintiff in <u>Muschette</u> was sitting down and 15 feet away from the defendant when he

was tased, <u>id</u>. at 68, whereas plaintiff here was within arms' length of the defendants and

standing on his feet.  The bottom line is that if using a taser was objectively reasonable under the

circumstances in <u>MacLeod</u> and <u>Crowell</u>, and arguably reasonable under the circumstances in

<u>Muschette</u>, certainly in this instance it was *at least* arguably reasonable and the defendants are

entitled to qualified immunity.

### POINT III

### PLAINTIFF'S   FAILURE   TO   INTERVENE <u>CLAIM SHOULD BE DISMISSED</u>

"An underlying constitutional violation is an essential element of a failure to

intercede claim under § 1983."  <u>Henry-Lee v. City of New York</u>, 746 F. Supp. 2d 546, 566

(S.D.N.Y. 2010) (citing <u>Ricciuti v. New York City Transit Auth.</u>, 124 F.3d 123, 129 (2d Cir.

1997)).  As set forth above, plaintiff fails to show any constitutional violation and his failure to

intervene claim should be dismissed.  Moreover, "An officer will only be liable [for failure to

intervene] if (1) he had a realistic opportunity to intervene and prevent the harm; (2) a reasonable

person in the officer's position would know that the victim's constitutional rights were being

violated; and (3) the officer does not take reasonable steps to intervene."  <u>Cordero v. City of New

York</u>, 282 F. Supp. 3d 549, 562 (E.D.N.Y. 2017) (quotation marks and citation omitted).  As

demonstrated in Point II, no reasonable officer would have known that using the taser violated

plaintiff's constitutional rights.  Further, the records shows that events unfolded so rapidly, <u>Ex. E</u>

(Pl. Dep.) at 95: 16-17; 97: 1-3; 101: 2-3; 105: 20-21; 109: 24; 115: 19, Lieutenant Lane,

Detective Swinkunas, and Officer Jimenez did not have a realistic opportunity to prevent officer

Baltzer from deploying the taser.   The failure to intervene claim should accordingly be dismissed.

**POINT IV**

**PLAINTIFF'S   STATE   LAW   CLAIMS
SHOULD BE DISMISSED**

"Federal excessive force claims and state law assault and battery claims against police officers are nearly identical." <u>Scoma</u>, 2021 U.S. Dist. LEXIS 12727 at *43 (citing <u>Humphrey v. Landers</u>, 344 Fed. Appx. 686, 688 (2d Cir. 2009)).  Plaintiff's assault and battery claims should therefore be dismissed for the same reasons as his excessive force claim. <u>See</u> <u>id.</u> at *44.  This is true even if the Court finds the defendants are entitled to qualified immunity.  "The finding of qualified immunity on [an] excessive force claim[] requires a grant of summary judgment on assault and battery as well."  <u>Felix v. City of New York</u>, 408 F. Supp. 3d 304, 312 (S.D.N.Y. 2019) (citing <u>Papineau v. Parmley</u>, 465 F.3d 46, 63 (2d Cir. 2006)).   "New York courts recognize the defense of qualified immunity to shield government officials from liability unless that action is taken in bad faith or without a reasonable basis."  <u>Blouin v. Spitzer</u>, 356 F.3d 348, 364 (2d Cir. 2004).   Thus "while qualified immunity under federal law is an objective inquiry, New York's qualified immunity has both an objective component (reasonableness) and a subjective component, making qualified immunity unavailable if there are 'undisturbed findings of bad faith.'" <u>Hargroves v. City of New York</u>, No. 03 CV 1668 (RRM)(VMS), 2014 U.S. Dist. LEXIS 41661 at *10 (E.D.N.Y. Mar. 26, 2014) (quoting <u>Lore v. City of Syracuse</u>, 670 F.3d 127, 166 (2d Cir. 2012) and <u>Pietra v. State</u>, 71 N.Y.2d 792, 795 (1988)).   "The objective components of both federal and New York qualified immunity analysis – the reasonableness inquiry – are essentially coextensive."  <u>Id.</u> (citing <u>Papineau</u>, 465 F.3d at 64, <u>Mesa v. City of New York</u>, No. 09 Civ. 10464 (JPO), 2013 U.S. Dist. LEXIS 1097 at *38 (S.D.N.Y. Jan. 3, 2013), and <u>Johnson v.</u>

City of New York, No. 05 Civ. 7519, 2011 U.S. Dist. LEXIS 72610 at *4 (S.D.N.Y. June 30, 2011)).  "Thus, where an officer's actions are deemed objectively reasonable, that officer will be immune under both federal and state law."  Mesa, 2013 U.S. Dist. LEXIS 1097 at *38 (citing Papineau, 465 F.3d at 64)).  Here, there is no evidence that the defendants acted in bad faith, and they would therefore be entitled to qualified immunity under both federal and state law.

Moreover, were the Court to dismiss the assault and battery claim for any reason, including qualified immunity, plaintiff's *respondeat superior* claim would fail as well.  When any state law claims pled against an individual defendant officer fail, "plaintiff's same claims against the City must also be dismissed.  There being no underlying offense for which the City could be held vicariously liable, the same claims must be dismissed against the City.  In other words, by dismissing these claims as against [the individual defendant officers], there is no tort upon which *respondeat superior* liability may be predicated…where an individual officer is protected by qualified immunity, the same claims against the City predicated on a vicarious liability theory must also be dismissed."[4]  Hargroves, 2014 U.S. Dist. LEXIS 41661 at *12-*13 (citing Stevens v. City of New York, No. 10 CV 2172, 2012 U.S. Dist. LEXIS 165936 at *4 n.6

---

[4] The Second Circuit's recent decision in Triolo v. Nassau Cnty., 24 F.4th 98, 2022 U.S. App. LEXIS 1786 (2d Cir. Jan. 21, 2022) does not change this analysis.  Triolo was a decision on a Rule 50 motion made after the defendant detective was found liable by a jury for falsely arresting plaintiff.  Id. at *2, *11.  The Second Circuit found that even though the individual defendant was entitled to immunity under state law because he had arguable probable cause to arrest, the county was still liable under a theory of *respondeat superior*.  Id. at *23-*28. However, in Hargroves, the Second Circuit reversed a district court's denial of summary judgment, finding that the defendants were entitled to qualified immunity because there was arguable probable cause to arrest and they had therefore acted objectively reasonably.  Hargroves, 411 Fed. Appx. 378, 382 (2d Cir. 2011).  The Circuit remanded, ordering that "Judgment for defendants shall enter on the basis of qualified immunity on all of plaintiffs' claims."  Id. at 386.  The district court dutifully entered judgment for the individual defendants on the basis of qualified immunity, then dismissed the *respondeat superior* claim against the City because there was "no underlying offense for which the City could be held vicariously liable."  Hargroves, 2014 U.S. Dist. LEXIS 41661 at *12.  Hargroves explicitly survived Triolo.  2022 U.S. App. LEXIS 1786 at *27.  Thus were the Court to grant qualified immunity here, it would fall within the ambit of Hargroves, not Triolo, because unlike Triolo, where a jury had found in favor of plaintiff, in this case there would be no determination that the defendants had in fact violated plaintiff's rights.

(S.D.N.Y. Nov. 14, 2012), <u>Harsco v. Segui</u>, 91 F.3d 337, 349 (2d Cir. 1996), <u>Johnson</u>, 2011 U.S. Dist. LEXIS 72610 at *4, and <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 22 (2d Cir. 2012)).

## POINT V

### ANY CLAIM FOR LOST WAGES SHOULD BE DISMISSED

Plaintiff is not entitled to damages for purported lost overtime pay. "An award for 'overtime is not appropriate in most cases since it is generally speculative whether the employee would have been entitled to it.'" <u>Battista v. United States</u>, 889 F. Supp. 716, 725 (S.D.N.Y. 1995) (quoting <u>Stoker v. Tarantino</u>, 126 A.D.2d 815, 816 (3d Dept. 1987)); <u>see</u> <u>also</u> <u>Freeman v. Tuan Anh Nguyen</u>, No. 13 Civ. 832 (JMA), 2015 U.S. Dist. LEXIS 4971 at *9 (S.D.N.Y. Jan. 15, 2015) (finding "income that [plaintiff] may have lost for weekend and holiday work is too speculative to warrant an additional award" where the record showed he "may have [] missed some sporadic weekend and holiday assignments while he was on leave and light duty"); <u>Schrader v. Manticof</u>, No. 18 CV 1786 (ILG)(RLM), 2019 U.S. Dist. LEXIS 115760 at *12-*13 (E.D.N.Y. July 10, 2019), report and recommendation adopted 2019 U.S. Dist. LEXIS 203377 (E.D.N.Y. Aug. 6, 2019).

It is undisputed that plaintiff was paid his full basic salary, including any differentials he was entitled to, while on sick leave. <u>Ex. D</u> (50-h) at 9:8-17; <u>Ex. E</u> (Pl. Dep.) at 165: 24 – 166:1; 166: 11-12; <u>Ex. K</u> (Wright Dep.) at 28: 10 – 29: 14. He alleges that during his sick leave he missed overtime pay for "tak[ing] care of the snow, driving the plow, and everything like that." <u>Ex. E</u> (Pl. Dep.) at 166: 7-8. However, it is speculative to say that it would have snowed or he would have been assigned such duties during the period at issue. Further, plaintiff claimed that he was "pay[ed] [] double time for working Sundays which I missed out on." <u>Ex. E</u> (Pl. Dep.) at 166: 24-25. But there is no evidence in the record showing how many

Sundays he would have worked had he not been on sick leave.  While he testified he was not paid "extra money" for "picking the garbage up physically," Ex. E (Pl. Dep.) at 166: 8-9, there is no evidence as to how much or how frequently he was paid for this task.  Nor did he establish how much overtime he would have been paid for snow-clearing duties versus working on Sunday.  In fact there is no evidence showing the specific amounts he would have been paid for designated categories of overtime or whether he would have actually collected such categories of overtime had he not been on sick leave.  His lost wages claim is therefore based on conjecture and speculation and should thus be dismissed.

## **CONCLUSION**

This case is a prime example of a scenario where plaintiff provoked and was at fault for his own injury.  Had he simply complied with the officers' reasonable commands to back away from the Tahoe, he would not have been arrested or tased and this complaint would never have been filed.  Plaintiff should not be permitted turn his intentional disobedience into a claim for damages against the defendants, who gave him every opportunity to comply before resorting to the taser.  This is not a situation where police were overly hasty to use force, heavy-handed in their efforts to gain compliance, or being unreasonable in ordering plaintiff to back away from the car in the first place.  Certainly any police officer would have secured a crime scene like the Tahoe and arrested anyone who tried to interfere with the potential evidence.  By the time Officer Baltzer deployed the taser, plaintiff had unequivocally demonstrated that nothing the officers could have said would get him to comply.  Under these circumstances, the defendants were not required to run the risk of injuring themselves or plaintiff by engaging in a physical fight to get him handcuffed.  For the foregoing reasons, defendants City of New York, Lieutenant Angel Leon, Detective Kristen Swinkunas, Officer Antonella Jimenez, Officer Maxwell Baltzer, and Lieutenant John Lane respectfully request that the Court grant their motion

for summary judgment, together with such other and further relief as this Court may deem just

and proper.

Dated:         New York, NY
               March 2, 2022

                                        **HON. SYLVIA O. HINDS-RADIX**
                                        Corporation Counsel of the City of New York
                                        *Attorney for Defendants City of New York, Lane,*
                                        *Swinkunas, Jimenez, Baltzer, and Leon*
                                        100 Church Street, Room 3-200
                                        New York, New York 10007
                                        (212) 356-5044


                                 By:    */s/ Christopher G. Arko*
                                        ————————————————————
                                        Christopher G. Arko
                                        Senior Counsel
                                        Special Federal Litigation Division


cc:    Doug Lieb, Esq. (by ECF)
       Alanna Kaufman, Esq. (by ECF)
       *Attorneys for plaintiff*