UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRIAN HARRIS,

                     Plaintiff,

          -against-

CITY OF NEW YORK et al.,

                     Defendants.

No. 1:20-CV-10864 (LGS)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Kaufman Lieb Lebowitz & Frick LLP
10 E. 40th Street, Suite 3307
New York, New York 10016
(212) 660-2332

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ................................................................ 1

FACTS ..................................................................................................... 2

ARGUMENT ............................................................................................ 7

    I.    A RATIONAL JURY VIEWING THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO MR. HARRIS COULD FIND THAT DEFENDANTS USED OBJECTIVELY UNREASONABLE FORCE ...................................... 7

        A.    Viewing the Record in the Light Most Favorable to Mr. Harris, All Three *Graham* Factors Favor a Finding of Excessive Force ............ 8

            1.    Any Offense Was Not Severe As a Matter of Law ................... 8

            2.    Viewing the Record in the Light Most Favorable to Mr. Harris, He Was Not Dangerous At All ................................. 10

            3.    Viewing the Record in the Light Most Favorable to Mr. Harris, Any Resistance Was Passive and Ceased Before He Was Tased .......................................................................... 14

        B.    Leon's Order to Tase Mr. Harris Supports a Claim Against Him ... 19

        C.    Mr. Harris's Claims Against the City Must Proceed Regardless of Whether the Officers Are Entitled to Qualified Immunity ............. 19

    II.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE A GENUINE DISPUTE OF MATERIAL FACT EXISTS AS TO WHETHER MR. HARRIS WAS RESISTING ARREST WHEN TASED .... 21

    III.    A GENUINE DISPUTE OF MATERIAL FACT EXISTS AS TO WHETHER LANE, SWINKUNAS, AND JIMENEZ HAD A REASONABLE OPPORTUNITY TO INTERVENE ............................................................. 22

    IV.    A SUFFICIENT EVIDENTIARY BASIS EXISTS TO PRESENT THE LOST INCOME DAMAGES TO THE JURY ....................................................... 24

CONCLUSION ....................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994) ..........................................................22, 23

*Battista v. United States*, 889 F. Supp. 716 (S.D.N.Y. 1995)............................................25

*Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015) .............................................14, 15

*Bryant v. Meriden Police Dep't*, No. 3:13-CV-449, 2017 WL 1217090 (D. Conn. Mar. 31, 2017) .................................................................................................................... 10, 13

*Crowell v. Kirkpatrick*, 400 F. App'x 592 (2d Cir. 2010)............................................15, 16

*Doe v. Orange-Ulster BOCES*, No. 96 Civ. 0695, 1999 WL 34807339 (S.D.N.Y. Mar. 26, 1999) ........................................................................................ 21

*Dollard v. City of New York*, 408 F. Supp. 3d 231 (E.D.N.Y. 2019) ................................22

*Figueroa v. Mazza*, 825 F.3d 89 (2d Cir. 2016) .........................................................22, 23

*Freeman v. Tuan Anh Nguyen* No. 13-CV-832, 2015 WL 224801 (S.D.N.Y. Jan. 15, 2015)...............................................................................................25

*Garcia v. Dutchess County*, 43 F. Supp. 3d 281 (S.D.N.Y. 2014)................................12, 15

*Gersbacher v. City of New York*, 134 F. Supp. 3d 711 (S.D.N.Y. 2015).............................9

*Getlin v. Zoll*, 707 F. Supp. 2d 369 (E.D.N.Y. 2010).........................................................12

*Gomez v. City of Norwalk*, No. 3:15-CV-1434, 2018 WL 780213 (D. Conn. Feb. 8, 2018) .........................................................................................9

*Goonewardena v. Spinelli*, No. 15 Civ. 5239, 2021 WL 61876 (E.D.N.Y. Jan. 7, 2021) ........................................................................................ 19

*Graham v. Connor*, 490 U.S. 386 (1989) .................................................................7, 10, 14

*Hamell v. City of Utica*, No. 6:16 Civ. 0991, 2019 WL 1933938 (N.D.N.Y. May 1, 2019).......................................................................................... 15

*Hargroves v. City of New York*, 411 F. App'x 378 (2d Cir. 2011)....................................20

*Hemphill v. Schott*, 141 F.3d 412 (2d Cir. 1998) ............................................................ 12

*Jackson v. Tellado*, 295 F. Supp. 3d 164 (E.D.N.Y. 2018).................................................23

*Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501 (S.D.N.Y. 2008) ..................................23

*Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020) ...................................... 7, 16, 18, 21

*Joyner v. City of New York*, No. 11-CV-4958, 2012 WL 4833368
    (S.D.N.Y. Oct. 11, 2012) ........................................................ 21

*Kane v. Coundorous*, 11 A.D.3d 304 (1st Dep't 2004) ....................................24

*Ketcham v. City of Mount Vernon*, 992 F.3d 144 (2d Cir. 2021) .................................. 9, 16

*Koul v. Strong Memorial Hosp.*, 282 F. Supp. 3d 569 (W.D.N.Y. 2017) ......................... 21

*Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290 (E.D.N.Y. 2013 .................... 17

*Ledger v. City of New York*, No. 09 Civ.2227, 2011 WL 3206878
    (E.D.N.Y. July 27, 2011) ........................................................ 13

*Lewis v. Mollette*, 752 F. Supp. 2d 233 (N.D.N.Y. 2010) ....................................23

*MacLeod v. Town of Brattleboro*, 548 F. App'x 6 (2d Cir. 2013) ................... 11, 15, 16, 18

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc) ................................8

*Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65 (2d Cir. 2018) ....................................11

*Passino v. City of Plattsburgh*, No. 8:17-CV-1028, 2020 WL 509129
    (N.D.N.Y. Jan 31, 2020) ........................................................ 9, 15

*Prive v. Wells*, No. 5:13 Civ. 320, 2015 WL 1257524 (D. Vt. Mar. 17, 2015) ................... 12

*Read v. Town of Suffern Police Dep't*, No. 10-CV-9042, 2013 WL 3193413
    (S.D.N.Y. June 25, 2013) ........................................................7

*Rogoz v. City of Hartford*, 796 F.3d 236 (2d Cir. 2015) ....................................16

*Scoma v. City of New York*, No. 16-CV-6693, 2021 WL 230295
    (E.D.N.Y. Jan. 22, 2021) ........................................................11

*Stoker v. Tarantino*, 126 A.D.2d 815, 816 (3d Dept. 1987) ................................25

*Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) ........................................19

*Towsley v. Frank*, No. 5:09 Civ. 23, 2010 WL 5394837 (D. Vt. Dec. 28, 2010) ............. 18

*Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010) ........................................16

*Triolo v. Nassau County*, 24 F.4th 98 (2d Cir. 2022) ....................................20

*Whitfield v. City of Newburgh*, No. 08 Civ. 8516, 2015 WL 9275695
    (S.D.N.Y. Dec. 17, 2015) ....................................................................... 8, 12

**Rules**

2d Cir. Local Rule 32.1.1 .................................................................................20

## PRELIMINARY STATEMENT

Defendants claim they were justified as a matter of law in tasing Brian Harris, the distraught father of a shooting victim, because they thought he was dangerous and actively resisting arrest for a serious offense. But Defendants' own actions during the incident disprove the self-serving narrative they have constructed after the fact.

Defendants did not act as though Mr. Harris was dangerous—because he was not, and they did not actually (let alone reasonably) believe he was. By Defendants' own admission, Mr. Harris did not use force against police officer at any time. He did not threaten anyone. His hands were visible. He was not armed. Defendants were not concerned that he was armed. He was not drunk or high. He was not an emotionally disturbed person. Defendants did not draw their firearms, call for backup, try to take Mr. Harris to the ground, or jump in to help their colleague arrest him. Except for one lieutenant's unreasonably hasty command to deploy a paralyzing electrical weapon, Defendants just stood around doing nothing. They did so because they did not in fact regard Mr. Harris as a threat.

Nor did Defendants act as though Mr. Harris was actively resisting the application of handcuffs—because he was not. When Lt. Lane initially tried to grab Mr. Harris to place him under arrest, Mr. Harris put his hands in the air in a gesture of surrender and appeasement. From that point forward, no officer told Mr. Harris to "stop resisting." None told him to put his hands behind his back. None stepped forward to help Lane. None tried to physically assist Lane or spontaneously drew his or her taser. No other member of the NYPD even touched Mr. Harris. They all just stood there looking on and doing nothing. Eventually, after being ordered by Lt. Leon to draw his taser four times, and after hesitating for six seconds, Officer Baltzer finally tased Mr.

1

Harris. According to Defendants' own testimony and common sense, that is not how police officers behave when a subject is actively resisting right in front of them.

Nor did Defendants act like Mr. Harris committed a serious crime—because he did not. They knew he was the owner of the vehicle and the father of the victim. They charged him with misdemeanors, gave him a desk appearance ticket, and released him. They acknowledge he did not tamper with evidence.

In truth, Defendants tased Mr. Harris not because he was dangerous or physically resisting, but because he was big, loud, and understandably upset. A trigger-happy lieutenant unreasonably escalated a mundane verbal back-and-forth based on Mr. Harris's size and his words alone. To be sure, Mr. Harris's emotional response to a traumatic situation was imperfect. But, viewing the facts in the light most favorable to him, a reasonable jury could find that Defendants' violent response was excessive, and that leaving Mr. Harris screaming in pain on the ground was unreasonable under the circumstances.

## FACTS

### After Learning His Son Has Been Shot, Mr. Harris Encounters Defendants Standing Around Near His Vehicle in the Street

In the middle of the night on September 2, 2020, Brian Harris received a phone call informing him that his son, Brian Harris, Jr., had been shot. Harris Dep. Tr. (Ds.' Ex. E) at 56:6-57:12. Mr. Harris and his wife learned that their son had been dropped off at Mt. Sinai Morningside Hospital in a vehicle belonging to the Harris family, and that the keys to the vehicle (a Chevy Tahoe) had been left at 125th Street and Amsterdam Avenue. *Id*. at 67:2-10, 68:5-8. Mr. Harris dropped his wife off at the hospital and went to 125th and Amsterdam to retrieve the keys. *Id*. at 72:7-15. Mr. Harris then drove back

to Mt. Sinai Morningside, parked on West 113th Street, and proceeded toward the emergency room. *Id.* at 78:20-79:12. Mr. Harris saw the Tahoe parked at an angle outside the emergency room on West 113th Street. As he approached the vehicle, Mr. Harris saw approximately five uniformed police officers—Defendants—standing around approximately 10-15 feet from his vehicle. *Id.* at 81:23-83:1. The time when Mr. Harris first encountered Defendants was 3:52 am. Leon BWC #1 (Ds.' Ex. L) at 00:01.

Defendants had responded to Mt. Sinai Morningside in response to a radio transmission about a shooting. 56.1 Stmt. ¶¶ 17-18. Det. Swinkunas and Officer Jimenez arrived at the hospital at 3:10 am. Swinkunas Tr. (Ds.' Ex. I) at 44:10-13; *see id.* at 37:13-38:7 (Swinkunas and Jimenez in same vehicle on night in question). Leon arrived no later than 3:15. Leon Tr. (Ds.' Ex. G) at 42:10-14. Lane and Baltzer arrived around 3:20 am. Lane Tr. (Ds.' Ex. H) at 27:19-28:5.

In the 30-40 minutes they were on scene before encountering Mr. Harris, Defendants took no action to cordon off the Tahoe or close off the area. Leon "did not think it was necessary." Leon Tr. 40:8-10. There was nothing to indicate to a member of the public that it was a "crime scene." Baltzer Tr. (Ds.' Ex. F) at 56:4-10; Swinkunas Tr. 62:5-13. West 113th Street remained open to vehicular traffic. Leon Tr. 39:23-40:7. No member of the NYPD placed any tape, barrier, or other physical marking around the Tahoe, Lane Tr. 31:3-8; Baltzer Tr. 51:17-52:2; Swinkunas Tr. 62:5-13; Leon Tr. 40:11-17, even though it is typical practice to do so, Jimenez Tr. (Ds.' Ex. J) at 53:14-21.

When Mr. Harris first approached Defendants, they were just "standing there not doing anything in particular." Lane Tr. 45:9-12; *see id.* at 46:13-16. Mr. Harris identified himself as the owner of the Tahoe and his son as the shooting victim. 56.1 Stmt. ¶ 27.

**Mr. Harris is Verbally Uncooperative But Non-Threatening**

Defendants and Mr. Harris had a verbal exchange, the contents of which are largely captured on video, *see* Leon BWC #1 at 00:30-1:12, and are accurately set forth, except for Defendants' characterization thereof, at paragraphs 27-35, 38, and 42-56 of the Local Rule 56.1 Statement. *See* 56.1 Stmt. ¶¶ 27-35, 38, 42-56.

"Mr. Harris did not use force against any members of the police department at any time during this interaction." Lane Tr. 75:20-24; *accord* TRI Report (Pl. Ex. O) ("Subject Used Force? No."); Baltzer Tr. 90:7-12. He did not "take any physical steps to assault or injure" any officer. Jimenez Tr. 80:12-20. He did not "physically threaten or otherwise threaten" any police officer at any point. Swinkunas Tr. 103:9-12; *accord* Jimenez Tr. 79:9-12 (cannot recall any physical or verbal threats made by Mr. Harris). He did not strike, kick, push, or punch anyone. Leon Tr. 87:6-13.

During their interaction with Mr. Harris, Defendants could see Mr. Harris's hands. Swinkunas Tr. 76:10-17; Leon Tr. 49:21-50:10. Police officers are trained to look for weapons or dangerous objects in a subject's hands. Swinkunas Tr. 76:24-77:9. Defendants knew that Mr. Harris did not have any weapons or dangerous objects in his hands. Swinkunas Tr. 76:14-23; Jimenez Tr. 78:11-19; Leon Tr. 50:11-13. At no point before Mr. Harris was tased were Defendants "concerned that he had a weapon or dangerous object on him." Swinkunas Tr. 102:15-19; Jimenez Tr. 78:6-10. Defendants did not regard Mr. Harris as an emotionally disturbed person. *See* TRI Report. They did not suspect him of being under the influence of drugs or alcohol. *See id.*; Swinkunas Tr. 102:20-103:3; Jimenez Tr. 78:20-79:3.

"At no point did any of the police officers present physically block Mr. Harris from entering the vehicle." Lane Tr. 64:10-14. Nothing physically prevented Mr. Harris

4

from getting into the Tahoe. Baltzer Tr. 82:7-10; Leon Tr. 79:15-20. Yet Mr. Harris did not enter the Tahoe. *See* Leon BWC #1.

**Mr. Harris Does Not Physically Resist, and Defendants Do Nothing Except Hastily Deploy a Taser**

Toward the conclusion of the verbal exchange between Defendants and Mr. Harris, Lane said: "[T]urn around." 56.1 Stmt. ¶ 56. Lane stepped toward Mr. Harris and reached out to grab him. Lane Tr. 52:20-22. "[T]hen [Mr. Harris] put his hands in the air." *Id.* at 52:23-53:5. Mr. Harris said "Please don't touch me" as he put his hands in the air. Leon BWC #1 at 1:06-1:07. Putting one's hands up is a widely understood gesture that communicates the absence of a threat. Lane Tr. 56:3-6; Baltzer Tr. 72:20-23.

Leon made the determination that Mr. Harris should be tased as soon as Mr. Harris said "don't touch me." Leon Tr. 53:7-18. Leon's decision to order the tasing was based upon Mr. Harris's "size coupled with the words 'don't touch me.'" *Id.* at 80:6-9. In no other case has Lt. Leon "ordered someone to be tased based upon their size and the words they used, as in this case." *Id.* at 87:14-18. Mr. Harris's statement "Don't touch me" was "verbal defiance." *Id.* at 91:23-92:8. According to Lt. Leon's NYPD training, tasers are not supposed to be used for verbal defiance. NYPD Annual CEW User Training Update (Pl. Ex. P.) at 466; Leon Tr. 94:17-20. Leon acknowledges that "if a big guy says 'don't touch me,'" that is not enough justification to order the person to be tased under the training and guidance he received from the NYPD. Leon Tr. 96:3-5.

Leon ordered Baltzer to draw his taser four times, in a progressively louder voice. Leon Tr. 53:22-54:21; Leon BWC #1 at 1:06-1:12. Taser-certified members of the NYPD are trained to draw their tasers quickly. Lane Tr. 34:17-22. The taser is carried with the cartridge inside. Baltzer Tr. 29:24-30:9; Lane Tr. 34:23-35:3. To use the taser, the

officer simply needs to draw it from the holster, click off the safety, and pull the trigger. Lane Tr. 35:8-10; Baltzer Tr. 30:15-31:8. Leon "would expect a police officer under his command to be able to draw their taser in an instant." Leon Tr. 54:22-55:2. Baltzer can draw a taser quickly to use it without hesitation when necessary. Baltzer Tr. 37:2-7.

Yet Baltzer hesitated to comply with Leon's order to draw his taser. Leon Tr. 55:12-15, 55:21-25 ("I don't know the reason why he hesitated."); Leon BWC #1 at 1:07-1:12. Lane, Jimenez, and Leon all had tasers on their belts during the incident as well. Swinkunas Tr. 86:9-24. None even considered using them. Jimenez Tr. 83:23-84:4; Lane Tr. 70:22-71:3 (thought of using taser "did not cross my mind"); Leon Tr. 56:7-10.

Between the time Mr. Harris put his hands in the air and the time he was tased, no police officer gave him any verbal commands. Leon BWC #1 at 1:06-1:12. It is "very common" for NYPD officers to say "stop resisting" to a resisting subject. Lane Tr. 38:18-22; *accord* Leon Tr. 45:16-46:7. Once Mr. Harris put his hands in the air, no officer told him to stop resisting. Leon BWC #1 at 1:06-1:12; Lane Tr. 58:17-24. Nor did any officer tell Mr. Harris to put his hands behind his back between the time he put his hands in the air and the time he was tased. Lane Tr. 61:14-18.

If Lane saw another officer struggling to gain compliance of a resisting subject, he would go help them because "that's [his] job." Lane Tr. 40:7-16. Baltzer would do the same. Baltzer Tr. 78:15-79:2. If Mr. Harris were "moving his arms away in the way [Lane] described for several seconds and evading [Lane's] attempt to gain control of him," Lane would "expect some kind of assistance" from his fellow officers. Lane Tr. 63:17-24. Leon would similarly expect his fellow officers to assist him if he were struggling to cuff someone. Leon Tr. 47:7-10. In this situation, he would have expected Swinkunas to go help Lt. Lane "[i]f Lane had been struggling with Mr. Harris between

6

the period when Mr. Harris said 'don't touch me' and the time when the taser was deployed." Leon Tr. 59:6-12.

Yet, other than Baltzer's belated drawing of the taser, none of the other officers lifted a finger to help Lane overcome Mr. Harris's supposed resistance. They all just stood there. Swinkunas "did not take any steps to physically intervene" to effectuate the arrest or to subdue or restrain Mr. Harris. Swinkunas Tr. 98:7-10, 100:10-13. She "didn't think it was necessary." Swinkunas Tr. 99:13-17. Jimenez did not physically intervene. Swinkunas Tr. 131:18-23. No one except Lt. Lane touched Mr. Harris before he was tased. Lane Tr. 62:11-15.

Leon directed that Mr. Harris be arrested for obstructing government administration (OGA) and resisting arrest. Leon Tr. 75:7-11. Leon did not direct that Mr. Harris be arrested for tampering with evidence because he did not believe that Mr. Harris committed that offense. Leon Tr. 75:25-76:10.

## ARGUMENT

### I.   A RATIONAL JURY VIEWING THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO MR. HARRIS COULD FIND THAT DEFENDANTS USED OBJECTIVELY UNREASONABLE FORCE

Defendants' analysis of reasonableness under the factors set forth in *Graham v. Connor*, 490 U.S. 386, 396 (1989), falters at the starting line. Defendants fail to recognize that tasing another person constitutes "significant force" that substantially intrudes upon protected Fourth Amendment interests. *Jones v. Treubig*, 963 F.3d 214, 226 (2d Cir. 2020); *accord Read v. Town of Suffern Police Dep't*, No. 10-CV-9042, 2013 WL 3193413, at *8 (S.D.N.Y. June 25, 2013) ("Needless to say . . . , a taser . . . is not a 'not-serious or trivial use of force' akin to a shove; rather, it is a serious intrusion into the core of the [constitutional] interests protected." (quotation marks omitted)).

When used in dart mode (as it was here, *see* Lane Tr. 65:9-66:4), a taser
"propel[s] a pair of probes—aluminum darts tipped with stainless steel barbs connected
. . . by insulated wires—toward the target at a rate of over 160 feet per second. Upon
striking a person, the [taser] delivers a 1200 volt, low ampere electrical charge . . . [that]
instantly overrides the victim's central nervous system, paralyzing the muscles
throughout the body, rendering the target limp and helpless." *Mattos v. Agarano*, 661
F.3d 433, 443 (9th Cir. 2011) (en banc) (second alteration in original) (quoting *Bryan v.
MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010)). Simply put, "[t]asers are designed for
the purpose of temporarily paralyzing a suspect by running electricity through their
body." *Whitfield v. City of Newburgh*, No. 08 Civ. 8516, 2015 WL 9275695, at *11
(S.D.N.Y. Dec. 17, 2015).

Here, viewing the record in the light most favorable to Mr. Harris, each of the
three *Graham* factors supports the conclusion that deploying a taser was excessive. The
severity of Mr. Harris's offense was slight. Mr. Harris did not pose a threat, and
Defendants did not believe he did. Any resistance by Mr. Harris was passive and, even if
active, had ceased by the time the taser was deployed. A reasonable jury could easily find
that the force used by Defendants was unreasonable.

### A. Viewing the Record in the Light Most Favorable to Mr. Harris, All Three *Graham* Factors Favor a Finding of Excessive Force

#### 1. Any Offense Was Not Severe As a Matter of Law

The severity of the crime for which Mr. Harris was arrested was minimal as a
matter of law.

Defendants sought to arrest Mr. Harris for obstructing government
administration (OGA) in the second degree under N.Y. Penal Law § 195.05, a

misdemeanor. 56.1 Stmt. ¶ 120. Mr. Harris was not charged with anything more than OGA because, by Leon's own admission, there was no basis to charge him with the more serious offense of tampering with evidence. Leon Tr. 75:25-76:10. Nothing physically blocked Mr. Harris from entering the Tahoe at any time—no yellow caution tape, no barrier, no police officer. Lane Tr. 64:10-14; Baltzer Tr. 82:7-10; Leon Tr. 79:15-20. Yet he did enter the vehicle—debunking Defendants' suggestion that he was somehow tampering with a crime scene. *See* Leon BWC #1.

The Second Circuit has made clear that a misdemeanor, for purposes of the *Graham* factors, is not a severe crime. *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 150 (2d Cir. 2021) ("[A]ll of the *Graham* factors point in favor of [plaintiff] at the summary judgment stage: the offense was a misdemeanor . . . ."); *accord Passino v. City of Plattsburgh*, No. 8:17-CV-1028, 2020 WL 509129, at *3 (N.D.N.Y. Jan 31, 2020) ("[T]he fact that Plaintiff committed only . . . a non-violent misdemeanor weighs in his favor."); *Gomez v. City of Norwalk*, No. 3:15-CV-1434, 2018 WL 780213, at *4 (D. Conn. Feb. 8, 2018) (misdemeanor conviction for breach of peace for being "drunk and belligerent" was not severe under *Graham*). Indeed, at least one court has held that the specific offenses at issue here are not severe under *Graham. Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 723 (S.D.N.Y. 2015) ("Obstruction of Governmental Administration . . . and Resisting Arrest are not severe.").

Defendants' contrary argument cites not a single case. *See* Ds.' Br. 9-10. This factor weighs in Mr. Harris's favor as a matter of law.

### 2. Viewing the Record in the Light Most Favorable to Mr. Harris, He Was Not Dangerous At All

Defendants' argument that Mr. Harris was somehow dangerous is replete with conclusory adjectives: "hostile," "defiant," "argumentative," "defiant," "uncooperative." Ds.' Br. 10-12. What it lacks are facts. Those facts would easily allow a reasonable jury to find that Mr. Harris did not "pose[] an immediate threat to the safety of the officers or others"—and that Defendants did not believe he did. *Graham*, 490 U.S. at 395. Mr. Harris's utter lack of dangerousness—which "many courts have viewed . . . as the most important *Graham* factor," *Bryant v. Meriden Police Dep't*, No. 3:13-CV-449, 2017 WL 1217090, at *8 (D. Conn. Mar. 31, 2017) (collecting cases)—alone warrants the denial of Defendants' motion as to whether a constitutional violation occurred.

Defendants concede that "Mr. Harris did not use force against any members of the police department at any time during this interaction." Lane Tr. 75:20-24; *accord* TRI Report; Baltzer Tr. 90:7-12. He did not "take any physical steps to assault or injure" any officer. Jimenez Tr. 80:12-20. He did not "physically threaten or otherwise threaten" any police officer at any time. Swinkunas Tr. 103:9-12; *accord* Jimenez Tr. 79:9-12. He did not strike, kick, push, or punch anyone. Leon Tr. 87:6-13.

Defendants could see Mr. Harris's hands throughout the interaction. Swinkunas Tr. 76:10-17; Leon Tr. 49:21-50:10. They knew he did not have any weapons or dangerous objects in his hands. Swinkunas Tr. 76:14-23; Leon Tr. 50:11-13. At no point before Mr. Harris was tased were Defendants "concerned that he had a weapon or dangerous object on him." Swinkunas Tr. 102:15-19; Jimenez Tr. 78:6-10. He identified himself as the father of the shooting victim and the owner of the Tahoe. 56.1 Stmt. ¶ 27.

These facts make this case a far cry from those cited by Defendants in which courts held tasing reasonable as a matter of law because the plaintiff was dangerous.

The plaintiff in *MacLeod v. Town of Brattleboro*, 548 F. App'x 6 (2d Cir. 2013), was tased after "leading [a] police officer . . . on a high-speed chase through the rainy, 'slick' streets of Brattleboro in the pre-dawn hours." *Id.* at 7. After being pulled over for speeding, the driver "sped off without warning—nearly sideswiping [an officer]—and a chase ensued that placed the officers, the passenger, and other motorists and any pedestrians in substantial, immediate danger." *Id.* at 8. After entering a "deserted parking lot," exiting the car, and kneeling, the plaintiff then "rose to his feet" and "turned to face the officers with his hands free and outstretched." *Id.* In short, the officer defendants in *MacLeod* had ample reason to believe that the plaintiff "posed a real and imminent threat to the safety of the officers and any bystanders." *Id.*

Similarly, in *Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65 (2d Cir. 2018), the plaintiff was tased after police responded to a 911 call reporting that he was "out of control" and "dangerous." *Id.* at 68. When police arrived on the scene, they found the plaintiff "sitting with a large rock in his hands," which he refused to drop after being repeatedly instructed to drop it. *Id.* The officer who deployed the taser "had been informed that [the plaintiff] had thrown a folding chair at a staff member, struck [the staff] member with a stick, and hurled rocks at . . . staff members." *Id.* at 70. In other words, the *Muschette* plaintiff, like the *MacLeod* plaintiff, was demonstrably violent and actively threatening officer safety.[1]

---

[1]     The same goes for other authority on which Defendants rely. *See, e.g.*, *Scoma v. City of New York*, No. 16-CV-6693, 2021 WL 230295, at *7-8 (E.D.N.Y. Jan. 22, 2021) (relying on fact that officers were responding to "serious and dangerous crime" of domestic assault and encountered plaintiff in his home, where he could have had access to secreted weapons, to conclude that officers "had reason to

Mr. Harris did not engage in any conduct remotely comparable to instigating a high-speed chase, hurling rocks, or assaulting his spouse or an officer. He did not use force against anyone. He did not threaten anyone. He did not even push anyone.

The only facts that Defendants can point to support an inference of supposed dangerousness are Mr. Harris's physical stature, his verbal uncooperativeness with officer instructions, and his putting his hands in the air. *See* Ds.' Br. 10-11. That is not nearly enough to support a finding of dangerousness as a matter of law. *See, e.g.*, *Whitfield*, 2015 WL 9275695, at *12 (genuine issue of fact as to whether plaintiff posed imminent threat when tased, even though he had previously engaged in violent conduct and was subdued by a police dog, because he was on the ground and being "bitten repeatedly and held" by the dog at the time the taser was deployed); *Garcia v. Dutchess County*, 43 F. Supp. 3d 281, 291 (S.D.N.Y. 2014) (genuine issue of fact as to whether plaintiff suspected of potential overdose who was "opening and closing kitchen drawers and muttering about knives" posed an imminent threat to officer safety).

Defendants' through-the-looking-glass suggestion that Mr. Harris was dangerous *because* he put his hands in the air is contrary to the case law. *See, e.g.*, *Hemphill v. Schott*, 141 F.3d 412, 417 (2d Cir. 1998) ("Officer Schott's alleged decision to use potentially deadly force upon a suspect who stopped and put his hands in the air . . . does not qualify as reasonable . . . ."); *Getlin v. Zoll*, 707 F. Supp. 2d 369, 378 (E.D.N.Y. 2010) (officer "would not have had probable cause to believe that [p]laintiff posed a

---

believe that plaintiff posed an immediate threat" and "no reasonable juror could conclude otherwise"); *Prive v. Wells*, No. 5:13 Civ. 320, 2015 WL 1257524, at *14 (D. Vt. Mar. 17, 2015) (plaintiff's wife was "intoxicated" and "physically assaultive" to police and plaintiff was tased when he interfered with officers' efforts to subdue his wife," as the level of aggression in the encounter was escalating").

significant threat . . . once . . . [p]laintiff had stopped the car, turned off the engine, threw the keys on the dash, and *put his hands in the air*" (emphasis added)); *Ledger v. City of New York*, No. 09 Civ.2227, 2011 WL 3206878, at *4 (E.D.N.Y. July 27, 2011) (if jury credited plaintiff's assertion that he "st[ood] up slowly with his hands above his head," it could find that plaintiff "posed no significant or immediate threat"). It is also contrary to common sense. As Defendants acknowledged—and as everyone knows— putting one's hands up is a widely understood gesture that communicates the absence of a threat. Lane Tr. 56:3-6; Baltzer Tr. 72:20-23. At minimum, a reasonable jury could find that a reasonable police officer would have so understood this act.

Beyond the fact that Mr. Harris was not actually dangerous, the record viewed in the light most favorable to him also supports the inference that Defendants did not *believe* him to be dangerous. *See Bryant*, 2017 WL 1217090, at *13 (jury could reasonably disbelieve defendants' assertion that they believed plaintiff to have been dangerous, based on their contemporaneous conduct of "casually enter[ing] [a] holding cell with him"). Defendants simply did not act like they were in danger. Swinkunas, Jimenez, and Leon did not think it was necessary to physically intervene to help Lane effect the arrest. Jimenez Tr. 65:2-6; Leon Tr. 64:4-8; Swinkunas Tr. 98:7-10, 100:10-13. Lane, Leon, and Jimenez did not take any steps to draw the tasers on their belts. Jimenez Tr. 71:9-72:13; Lane Tr. 70:22-71:3; Ex. L (Leon BWC #1) at 1:06-1:12. No one except Lane even touched Mr. Harris. Lane Tr. 62:11-15. A reasonable jury could find that this conspicuous inaction by a group of police officers is inconsistent with their claim to have felt endangered.

Viewing the record in the light most favorable to Mr. Harris, he was not threatening or dangerous at all during this incident—period.

### 3.     Viewing the Record in the Light Most Favorable to Mr. Harris, Any Resistance Was Passive and Ceased Before He Was Tased

For two independent reasons, the final *Graham* factor—"whether [the plaintiff] was actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396—also favors Mr. Harris. First, viewing the record in the light most favorable to Mr. Harris, a jury could find that his behavior amounted at most to passive resistance. Second, viewing the record in the light most favorable to Mr. Harris, any resistance, whether active or passive, had ceased by the time he was tased.

In *Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015), police responded to a 911 call reporting that a group of people were banging on the door of a locked Starbucks at 5:00 am to get in. *Id.* at 97. The plaintiff refused repeated police directives to provide her identification, despite being instructed that she would be arrested if she did not comply. *Id.* at 97. The plaintiff was taken to the ground and moved her arm away from her body to prevent the application of handcuffs. *Id.* A "struggle with considerable shouting" occurred between the plaintiff and the defendant officers. *Id.* The plaintiff was then pepper sprayed in the face.[2] *Id.* The Second Circuit held:

> As for actively resisting arrest, [the plaintiff] was not fleeing, nor physically attacking an officer, nor even making a move that an officer could reasonably interpret as threatening an attack. At most, her "resistance" was a refusal to permit the easy application of handcuffs by placing her hands behind her back.
>      The officers could be entitled to summary judgment only if there existed a *per se* rule that an arrestee's refusal to submit to the easy application of handcuffs always permitted police officers to use substantial force . . . to accomplish handcuffing. We know of no such rule.

*Id.* at 102 (citations omitted).

_____

[2]     Pepper spraying and tasing are comparable levels of force. *Jones*, 963 F.3d at 225-26.

In keeping with *Brown*, case after case holds that refusing to move one's arms as directed by police to facilitate being handcuffed is not active resistance—or at minimum that a reasonable jury could find it is not. *See Passino*, 2020 WL 509129, at *4 (genuine issue of fact as to whether "struggling on the ground and refusing to offer one's hands" constitutes passive or active resistance); *Hamell v. City of Utica*, No. 6:16 Civ. 0991, 2019 WL 1933938, at *14 (N.D.N.Y. May 1, 2019) (jury had to resolve whether "[p]laintiff's failure . . . to remove his arm from under his body" for handcuffing constituted sufficient resistance to make the use of a taser reasonable); *Garcia*, 43 F. Supp. 3d at 293 (issue of fact existed as to whether plaintiff's "largely passive refusal to submit his hands to the officer's cuffs," which was "limited to making it more challenging for the officers to handcuff him" by "ma[king] efforts to 'tug' his arms 'underneath his body,'" was active resistance).

Any resistance here by Mr. Harris, such as it was, was similarly limited to verbal noncooperation and putting his hands in a different position (in the air) than the one police wanted to facilitate handcuffing (behind his back). Just like the plaintiff in *Brown*, he "was not fleeing." 798 F.3d at 102; Leon BWC #1; Jimenez Tr. 80:21-23. He was not "physically attacking an officer." *Brown*, 798 F.3d at 102; Jimenez Tr. 80:12-20; Swinkunas Tr. 103:9-12; Leon Tr. 87:6-13. He was not "even making a move that an officer could reasonably interpret as threatening an attack." *Brown*, 798 F.3d at 102; *see supra* § I.A.2. A genuine dispute of material fact therefore exists as to whether Mr. Harris ever actively resisted arrest.[3]

---

[3]     *MacLeod*, 548 F. App'x 6, and *Crowell v. Kirkpatrick*, 400 F. App'x 592, 593 (2d Cir. 2010), on which Defendants principally rely, are consistent with this result. *Cf.* Ds.' Br. 13-17. In *MacLeod*, the Second Circuit held that the plaintiff's "actions immediately prior to being tased do not evince 'passive resistance' merely because MacLeod was not actually in the act of fleeing" at that moment. 548 F. App'x at

A reasonable jury could also find that any resistance, whether active or passive, had stopped by the time the tasing occurred. If so, the use of the taser would certainly be unreasonable. *See, e.g.*, *Jones*, 963 F.3d at 240 ("[A] police officer cannot use significant force, such as a taser, against an individual who is no longer resisting or posing a threat to the officers or others."); *Tracy v. Freshwater*, 623 F.3d 90, 98-99 (2d Cir. 2010) (jury could reasonably find excessive force where officer pepper sprayed plaintiff "offering no further active resistance"); *see also Rogoz v. City of Hartford*, 796 F.3d 236, 248 (2d Cir. 2015) (rejecting as "meritless" defendants' contention that it was "immaterial" whether plaintiff "was complying with officers' directions at the *very moment in time* that force was used" (emphasis added)).

Here, at least three aspects of the record, viewed in the light most favorable to Mr. Harris, support a reasonable inference that his resistance ceased before the tasing.

*First*, Defendants' idle standing around belies their claim that Mr. Harris actively evaded the application of handcuffs after putting his hands in the air. It is a police officer's "job" to go help a fellow officer who is struggling to gain compliance of a resisting arrestee. Lane Tr. 40:7-16. Had Mr. Harris been "moving his arms away" as

---

8. The plain import of this statement is that the officers could "objectively" understand the plaintiff's refusal to get on the ground *after he led them on a dangerous high-speed car chase* as part of a continuing course of actively resistant conduct. *Id.* Mr. Harris, of course, did nothing remotely comparable.

    In *Crowell*, the plaintiffs were in the highly unusual scenario of "having chained themselves to a several hundred pound barrel drum and refused to free themselves despite being able to do so." *Id.* at 595. In concluding that the use of a taser was reasonable, the Second Circuit relied on the fact that the officers "attempted to use other means to effectuate the arrest, none of which proved feasible, and used the taser only as a last resort" after the chaining made more "conventional means" impossible, as well as the fact that the taser was used in drive-stun mode, neither of which occurred here. *Id.* Defendants certainly point to no Second Circuit precedent, *contra Brown*, that verbal defiance alone constitutes active resistance. *See Ketcham*, 992 F.3d at 150 ("[Defendants] do not . . . offer case law that suggests that force of any quantum is reasonable in response to purely verbal protestations. Indeed, this would violate *Graham*, which allows only the force necessary to make an arrest.").

Lane claimed and "evading [Lane's] attempt to gain control of him," Lane would have expected his fellow officers to step in and assist. Lane Tr. 63:17-24. But they didn't. Jimenez Tr. 65:2-6; Leon Tr. 64:4-8; Swinkunas Tr. 98:7-10, 100:10-13. Similarly, "if Lane had been struggling with Mr. Harris between the period when Mr. Harris said 'don't touch me' and the time when the taser was deployed," Leon would have expected Swinkunas to provide assistance. Leon Tr. 59:6-12. But she didn't. Swinkunas Tr. 98:7-10, 100:10-13. None of the officers even said "stop resisting"—a "very common" statement by NYPD officers to resisting subjects. Lane Tr. 38:18-22. *See* Leon BWC #1 at 1:07-1:12 Nor did the officers give any other verbal commands. *Id.* They just stood around watching. *Id.* And Baltzer "hesitated" to comply with Leon's order to deploy his taser, Leon Tr. 55:12-15, 55:21-25; Leon BWC #1 at 1:06-1:12, despite being trained to deploy it in an instant, Leon Tr. 54:22-55:2, Baltzer Tr. 37:2-7. The jury could reasonably infer that Defendants did not actually respond as expected to what they now claim Mr. Harris was doing because Mr. Harris was not in fact doing it.

*Second*, Plaintiff so testified: "At no point did I try to resist them. There was no resistance at all." Harris Dep. Tr. 115:12-18. All Plaintiff did was hold his hands up to demonstrate that he was not a threat. *Id.* at 115:21-116:12. After putting his hands and arms in the air, he did not move them side to side or up and down.[4] Harris Decl. ¶ 4. He did not do anything else with his hands or arms after putting them in the air to evade the application of handcuffs. *Id.* ¶ 5.

---

[4]     Defense counsel did not asked Plaintiff at his deposition what he did with his hands after putting them in the air, or whether he moved them to avoid being handcuffed. *See generally* Harris Dep. Tr. Accordingly, Mr. Harris supplements the record with a declaration on this issue. *See, e.g.*, *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 309-10 (E.D.N.Y. 2013).

*Third*, Jimenez's deposition in support of the criminal complaint against Mr. Harris provides a complete account of the factual basis to support the charge of resisting arrest against Mr. Harris. Jimenez Tr. 33:15-34:11, 35:15-36:12. The factual account of Mr. Harris's alleged resistance set forth there is that he "twisted away from [police], and flailed and tensed his arms, thereby making it difficult to arrest him." Criminal Complaint (Pl. Ex. Q). According to Jimenez's testimony, the entirety of Mr. Harris's alleged resistance is visible on the body-worn camera footage before the 1:10 mark— before Mr. Harris is tased. Jimenez Tr. 39:4-40:6 (Q: "Is there anything you described in your Criminal Complaint as the basis for resisting arrest that we did not just see on the body worn camera footage [through 1:10]? . . . A: No."). The supposed "twist[ing]," "flail[ing]" and "tens[ing]" to which Jimenez referred is in fact just Mr. Harris putting his hands in the air. *See* Leon BWC #1 at 1:06-1:10.

Finally, Defendants misstate the law in arguing that they should be granted summary judgment because they "could reasonably have" or did reasonably believe that Mr. Harris was continuing to resist based upon his previous verbal noncompliance. Ds.' Br. 17-18 (citing *MacLeod*, 58 F. App'x at 7; *Towsley v. Frank*, No. 5:09 Civ. 23, 2010 WL 5394837, at *8 (D. Vt. Dec. 28, 2010)). On their motion for summary judgment as to liability, Defendants must do more than show their interpretation of events was or could have been reasonable. They must prove that no rational jury could find it to have been *un*reasonable. For example, the jury in *Jones* found in a special interrogatory that the defendant *believed* the plaintiff was resisting arrest at the time of the relevant tasing. 963 F.3d at 222 (special interrogatory #7). But this was still insufficient to entitle the defendant to summary judgment because, viewing the record in the light most favorable to the plaintiff, the jury could have found that belief unreasonable. *See id.* at 230-32.

18

**B.      Leon's Order to Tase Mr. Harris Supports a Claim Against Him**

The Court should reject Defendants' argument that "the excessive force claim should be dismissed against all of the defendants except Officer Baltzer because they were not personally involved in tasing plaintiff." Ds.' Br. 18.

Leon undisputedly ordered Officer Baltzer to tase Mr. Harris. *See* 56.1 Stmt. ¶ 83. This direct order constitutes "personal involvement" in the violation of Mr. Harris's constitutional rights and plainly supports a § 1983 claim against Leon. "In this Circuit, a 'direct participant' includes a person who . . . *orders* . . . the unlawful acts, even if he or she does not commit the acts personally." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) (emphasis added); *accord Goonewardena v. Spinelli*, No. 15 Civ. 5239, 2021 WL 61876, at *8 (E.D.N.Y. Jan. 7, 2021). In *Terebesi*, for example, the Second Circuit upheld excessive force claims against defendants who devised a deficient tactical plan for executing a warrant that foreseeably resulted in the use of excessive force against the plaintiff, even though the defendants did not use force themselves. 764 F.3d at 233-35.[5]

**C.      Mr. Harris's Claims Against the City Must Proceed Regardless of Whether the Officers Are Entitled to Qualified Immunity**

If the Court concludes that a rational jury could find that Defendants used excessive force, Plaintiff's state-law claims against the City of New York must proceed to trial regardless of whether the individual officers are entitled to qualified immunity.

In *Triolo v. Nassau County*, the Second Circuit held that "when an employee-officer commits an underlying violation, such as false arrest without probable cause, but

---

[5]      Mr. Harris seeks to proceed against Defendants Lane, Swinkunas, and Jimenez only on a failure to intervene theory and does not contend that they personally used excessive force. *See infra* § III. Plaintiff does not bring any claim for excessively tight handcuffing against any Defendant. *See generally* Am. Compl. (Ds.' Ex. B).

is personally shielded by qualified immunity, the municipal employer, like any other principal under New York law, remains vicariously liable for its agent's conduct." 24 F.4th 98, 110 (2d Cir. 2022). Here, as Defendants acknowledge, the substantive elements of Plaintiff's federal excessive force claim and his state-law assault and battery claims are effectively identical. *See* Ds' Br. 22-23. Thus, as in *Triolo*, even if judgment were to enter in favor of the individual Defendants on the basis of qualified immunity—which it certainly should not, *see infra* § II—Plaintiff's state-law claim against the City must proceed to the jury. *See* 22 F.4th at 110, 113.

Defendants' attempt to evade the clear holding of *Triolo* verges uncomfortably on misleading the Court. Their suggestion that the Second Circuit's unpublished summary order in *Hargroves v. City of New York*, 411 F. App'x 378, 382 (2d Cir. 2011), somehow "survives" *Triolo* is deceptive at best. Ds.' Br. 23 n.4. "Rulings by summary order do not have precedential effect," 2d Cir. Local Rule 32.1.1, so there is no precedent found in *Hargroves* to "survive" anything. Moreover, the Second Circuit's citation in *Triolo* to the district court's decision in *Hargroves* clearly means the opposite of what Defendants claim it does. *Cf.* Ds.' Br. 23 n.4. As *Triolo* explains, the district court's opinion in *Hargroves* is an example of "caselaw involving no underlying violation"—that is, a case in which state-law claims against a municipality were properly dismissed because the officers *acted lawfully*, not because they were immune. *Triolo*, 11 F.4th at 112.

The upshot of Defendants' position would be that a plaintiff could prevail on state-law claims against municipalities where individual officers win qualified immunity at trial, but not where they win qualified immunity on summary judgment. That distinction in the ultimate substantive outcome of a state-law claim based on the procedural posture of a federal lawsuit appears nowhere in *Triolo*, makes no sense, and

is not the law. Under *Triolo*, Plaintiff's state-law claim against the City must proceed to

the jury regardless of whether the officers are entitled to qualified immunity.[6]

## II.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE A GENUINE DISPUTE OF MATERIAL FACT EXISTS AS TO WHETHER MR. HARRIS WAS RESISTING ARREST WHEN TASED

Viewing the record in the light most favorable to Mr. Harris, the individual

Defendants are not entitled to qualified immunity. In *Jones*, decided before this incident

in June 2020, the Second Circuit held that a reasonable jury could find a constitutional

violation "for tasing an uncuffed arrestee . . . where the arrestee was no longer resisting

and was not posing a threat to the safety of officers or others." 968 F.3d at 230. Thus, a

reasonably competent police officer interacting with Mr. Harris outside Mt. Sinai

Morningside on the morning of September 2, 2020, would have known that he could be

held personally liable for tasing someone who was not yet handcuffed but was "no

longer resisting" by the time the taser was deployed. *Id.* at 240.

For the reasons spelled out at length above, a genuine dispute of material fact

exists as to whether Mr. Harris fell within this category, and thus as to whether

Defendants are entitled to qualified immunity. *See supra* § I.A.3. The fact that

Defendants just stood around watching instead of giving verbal commands like "stop

resisting" or "give us your hands" or physically intervening to assist with the arrest—as

---

[6]      If the Court does hold that the officers are entitled to qualified immunity even though Mr. Harris's state-law claims against the City can proceed, it should continue to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3). *See, e.g.*, *Joyner v. City of New York*, No. 11 Civ. 4958, 2012 WL 4833368, at *6 (S.D.N.Y. Oct. 11, 2012) (continuing to exercise jurisdiction over state-law claims that "do not present novel issues of state law" after granting summary judgment on federal claims); *Koul v. Strong Memorial Hosp.*, 282 F. Supp. 3d 569, 570-71 (W.D.N.Y. 2017) (same); *Doe v. Orange-Ulster BOCES*, No. 96 Civ. 0695, 1999 WL 34807339, at *9-10 (S.D.N.Y. Mar. 26, 1999) (same). This case has been pending since December 2020; the Court is already familiar with the relatively straightforward issues presented; and discovery is complete except for any medical experts. Under these circumstances, sending the matter to state court would be wasteful and would frustrate all parties' interest in a prompt resolution.

they would have expected one another to do had Mr. Harris really been continuing to resist, *see* Leon Tr. 59:6-12, Lane Tr. 63:17-24—supports such a finding by the jury. So do Baltzer's marked hesitation in complying with Leon's order to draw his taser, Leon Tr. 55:12-15, 55:21-25; Leon BWC #1 at 1:07-1:12; Mr. Harris's testimony, *see* Harris Decl.; Harris Dep. Tr. 115:12-116:12; and Jimenez's criminal complaint and corresponding testimony, *see* Jimenez Tr. 33:15-34:11, 35:15-36:12, 39:4-40:6; Criminal Complaint.

### III.  A GENUINE DISPUTE OF MATERIAL FACT EXISTS AS TO WHETHER LANE, SWINKUNAS, AND JIMENEZ HAD A REASONABLE OPPORTUNITY TO INTERVENE

"Whether an officer had sufficient time to intercede is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (cleaned up). Defendants conclusorily assert that "events unfolded [too] rapidly" for Lane, Jimenez, and Swinkunas to prevent Leon and Baltzer from tasing Plaintiff, Ds.' Br. 21, but drawing all inferences in Mr. Harris's favor, a reasonable jury could find otherwise.

At minimum, six seconds elapsed between Leon's initial order and Baltzer's effectuation of that order. Leon BWC at 1:07-1:12. Rational jurors could conclude that this time provided Lane, Jimenez, and Swinkunas adequate opportunity to countermand Leon's initial instruction. *See Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016) (no "hard-and-fast temporal cutoff" controls analysis); *Dollard v. City of New York*, 408 F. Supp. 3d 231, 236 (E.D.N.Y. 2019) (nine seconds sufficient time to permit intervention). That Defendants were able to give *seven* commands about the taser in this same period, 56.1 Stmt. ¶¶ 82, 98, provides a sufficient basis to conclude that one of them could have spoken up about it at least once. *See Anderson*, 17 F.3d at 558 (realistic

opportunity to intervene evinced by fact officer intervened to restrain victim); *see also Figueroa,* 825 F.3d at 108 (communicating with fellow officers cognizable method of intervention); *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512-13 (S.D.N.Y. 2008) (denying four correctional officers summary judgment for failure to intervene where officers did not countermand instruction of captain to fifth officer to strip search plaintiff), *aff'd*, 461 F. App'x 18 (2d Cir. 2012).

That a reasonable jury could so find is further underscored by the proximity of Lane, Jimenez, and Swinkunas to Baltzer and Mr. Harris. All four stood only feet away with no "obstacles that might have hindered [their] ability to intercede." *Figueroa,* 825 F.3d at 108; Leon BWC at 1:07-1:12. In such circumstances, Courts routinely deem intervention feasible even where a fellow officer's use of force came without any warning and was not—as here—prompted by a direct order. *See, e.g., Lewis v. Mollette*, 752 F. Supp. 2d 233, 244 (N.D.N.Y. 2010) (realistic opportunity to intervene where was "standing directly next" to colleague who abruptly twisted Plaintiff's arm); *Jackson v. Tellado*, 295 F. Supp. 3d 164, 179-80 (E.D.N.Y. 2018) ("[W]hile the suddenness of [Officer] Reo's act of hitting Plaintiff in the head [with a baton] might be viewed as negating any opportunity to intervene, the Court finds that the evidence was sufficient for the jury to conclude that because [Officer] Boneta was positioned so closely to Reo— one or two feet . . . —Boneta had a reasonable opportunity to intervene, *even with respect to a relatively sudden or spontaneous act* by Reo." (emphasis added)). Some of these officers, unlike Defendants, even had their back turned to their fellow officers' use of force. *Jackson,* 295 F. Supp. 3d at 179; *Anderson*, 17 F.3d at 558 (ordering new trial where court declined to instruct jury on failure to intervene claim where officer was facing away during incident).

**IV.   A SUFFICIENT EVIDENTIARY BASIS EXISTS TO PRESENT THE LOST INCOME DAMAGES TO THE JURY**

The record extensively corroborates that Mr. Harris lost overtime and differential pay while he was on sick leave for eight weeks following Defendants' assault. In addition to his and Iris Wright's deposition testimony on the subject, Mr. Harris has substantiated this loss by producing four years of tax returns, eleven weeks of paystubs, and three years of his "NYC [Weekly] Payment Summaries," all pre- and post-dating Plaintiff's leave.[7] There is no question that this evidence—which Defendants' motion assiduously ignores—would suffice to substantiate Plaintiff's losses at trial. *Cf. Kane v. Coundorous*, 11 A.D.3d 304, 305 (1st Dep't 2004) (lost earnings damages may be awarded "based solely on plaintiff's testimony without supporting documentation").

The record thoroughly substantiates that Mr. Harris regularly made hundreds of dollars per pay period in overtime and differential pay that he missed out on while on leave. *See, e.g.,* Paystubs (Pl. Ex. S) at PL 106-07 (reflecting Plaintiff made only $1606.23 per week in base pay and partial differential pay while on leave); Annual Pay Summary Sheets (Pl. Ex. T) at PL 110-11 (reflecting Plaintiff's average weekly salary was $2,197.23, with a median of $2,229.45, for 46 weeks pre-dating his leave, and that he received overtime and/or additional differential pay 39 of these weeks); *id.* at PL 112-13 (reflecting average weekly salary of $2,760.11, with median of $2392.12, for 29 weeks post-dating leave, with overtime and/or additional differential pay each week).

In the face of this record, Defendants rely on three cases in which courts actually *awarded* overtime and differential pay. In *Battista v. United States*, the plaintiff—

---

[7]      *See* Wright Tr. (Ds'. Ex. K) at 20-43; Harris Dep. Tr. (Ds'. Ex. E) at 165-67; Annual Pay Summary Sheets (Pl. Ex. S); Paystubs (Pl. Ex. R); Check to Check Comparison (Pl. Ex. T).

following a bench trial—was found to have adequately *supported* his claim for lost *future* wages where "he worked overtime with regularity throughout [his] tenure." 889 F. Supp. 716, 725-26 (S.D.N.Y. 1995). In *Stoker v. Tarantino*, the Third Department held that a petitioner had sufficiently *supported* her damages where "respondents [did] not deny she [had] worked overtime in the past" and her collective bargaining agreement provided overtime was assigned on a rotating basis. 126 A.D.2d 815, 816 (3d Dep't 1987). And in *Freeman v. Tuan Anh Nguyen,* the court determined that the plaintiff (also a City sanitation worker) was entitled to a "$60 daily premium for driving the sanitation truck" that he had not received for the duration of his leave—one of the precise categories of lost wages that Mr. Harris seeks here. No. 13-CV-832, 2015 WL 224801, at *3 (S.D.N.Y. Jan. 15, 2015). And unlike the *Freeman* plaintiff, who failed to substantiate his lost income for weekend and holiday work because he testified that he only had such assignments "sporadically," *id.* at *2-3, Mr. Harris routinely worked weekends and holidays when at full health, *see* Paystubs (Pl. Ex. S) at PL 105-06.

Given the marked drop in Mr. Harris's earnings while on leave on leave, and the regularity with which he received pay differentials and overtime pay before and after, as documented in his paystubs, a jury could reasonably award him lost income damages.[8]

## CONCLUSION

The Court should deny Defendants' motion for summary judgment in its entirety.

---

[8]   Beyond the fact that Mr. Harris has extensively corroborated his damages, Defendants' internally contradictory motion is itself sufficient to create material disputes precluding summary judgment on this issue. Defendants represent that it is "undisputed" plaintiff received differential pay while on leave. Defs' Br. at 21. This is incorrect and directly contradicted by their Rule 56.1 statement. *See* Defs' 56.1 Stmt. ¶ 129 ("During the eight weeks that plaintiff was on sick leave, he was not paid overtime or "extra money" for "picking the garbage up physically."); *id.* ¶ 126 (referring to payments associated with particular tasks as differentials). Puzzlingly, Defendants' briefing attempts to square this circle by referring to the category of differentials that Plaintiff did *not* receive while on leave—those associated with particular tasks—as "overtime," which is again controverted by the record, *see* Wright Tr. 24:3-14.

Dated:      March 25, 2022
            New York, New York


                              KAUFMAN LIEB LEBOWITZ
                              & FRICK LLP


                              _____/s/_____
                              Douglas E. Lieb
                              Alanna Kaufman

                              10 E. 40th Street, Suite 3307
                              New York, New York 10016
                              (212) 660-2332
                              dlieb@kllf-law.com
                              akaufman@kllf-law.com

                              *Attorneys for Plaintiff Brian Harris*