UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN HARRIS,

                Plaintiff,

-against-

CITY OF NEW YORK; Lieutenant ANGEL
LEON; Detective KRISTEN SWINKUNAS
(Shield #2190); Police Officer ANTONELLA
JIMENEZ (Shield #5209); Police Officer
MAXWELL BALTZER (Shield No. 15451); and
Lieutenant JOHN LANE,

                Defendants.

No. 20-CV-10864 (LGS)

**PLAINTIFF'S RESPONSE
UNDER LOCAL CIVIL RULE
56.1(b)**

       Plaintiff Brian Harris submits this statement pursuant to Southern District of
New York Local Civil Rule 56.1(b), setting forth his responses to the material facts as to
which Defendants contend there is no genuine issue to be tried, as well as the additional
material facts as to which Plaintiff contends a genuine exists to be tried, all for purposes
of this motion only:

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF ALLEGEDLY
UNDISPUTED MATERIAL FACTS**

       1.    Plaintiff initiated this action by filing the Complaint on December 23,
2020, naming Lieutenant Leon, Detective Swinkunas, and Officer Jimenez as
defendants and alleging federal claims for excessive force, false arrest, and fabrication of
evidence rising from an incident that occurred on September 2, 2020.  Ex. A (Compl.).

       **RESPONSE**: Undisputed.

2.      Plaintiff thereafter filed his First Amended Complaint ("FAC") on April 30, 2021, adding three additional defendants – Officer Maxwell Baltzer, Lieutenant John Lane, and the City of New York.  Ex. B (FAC).

**RESPONSE**: Undisputed.

3.      In the FAC, plaintiff alleged a federal excessive force claim against the individual defendants, withdrew his claims for false arrest and fabrication of evidence, and added New York State law *respondeat superior* claims for assault and battery against the City of New York.  Ex. B (FAC) at p. 7-8.

**RESPONSE**: Undisputed.

4.      Defendants filed their Answer on June 3, 2021.[1]  Ex. C (Ans.).

**RESPONSE**: Undisputed, including as to the footnote.

5.      Plaintiff is six feet two inches tall and weighed approximately 280 pounds on September 2, 2020.  Ex. D (50-h) at 10: 21-24; 11: 4-6; Ex. E (Pl. Dep.) at 14: 16-17; 108: 13; Ex. M (Leon BWC #2) at 1:27 – 1:31.

**RESPONSE**: Undisputed.

6.      Officer Baltzer is five feet eight inches tall and weighs approximately 170 pounds.  Ex. F (Baltzer Dep.) at 12: 16-19.

**RESPONSE**: Undisputed.

7.      Lieutenant Leon is five feet five inches tall and weighed approximately 180 pounds on September 2, 2020.  Ex. G (Leon Dep.) at 10: 21 – 11: 4.

**RESPONSE**: Undisputed.

---

[1] Defendants filed an Answer to the First Amended Complaint attaching body-worn camera as an exhibit on May 28, 2021, which was rejected by Order of the Court on June 2, 2021.  See ECF Nos. 31, 33.

8.    Lieutenant Lane is five feet eight inches tall and weighed between 185 pounds and 190 pounds on September 2, 2020.  Ex. H (Lane Dep.) at 13: 22 – 14: 4.

**RESPONSE**: Undisputed.

9.    Detective Swinkunas is five feet six inches tall and weighed approximately 170 pounds on September 2, 2020.  Ex. I (Swinkunas Dep.) at 26: 12-19.

**RESPONSE**: Undisputed.

10.    Officer Jimenez is five feet seven inches tall and weighed approximately 160 pounds on September 2, 2020.  Ex. J (Jimenez Dep.) at 12: 13-17.

**RESPONSE**: Undisputed.

11.    On September 2, 2020, plaintiff and his wife Joy Harris were married but separated.  Ex. D (50-h) at 16: 16-20; Ex. E (Pl. Dep.) at 22: 7-25.

**RESPONSE**: Undisputed.

12.    Plaintiff has one child with Joy Harris named Brian Harris, Jr., who was 25 years old on September 2, 2020.  Ex. D (50-h) at 18: 8-11; Ex. E (Pl. Dep.) at 25: 8-12; 60: 7-8.

**RESPONSE**: Undisputed.

13.    It was plaintiff's understanding that sometime prior to September 2, 2020, his son was convicted of a gang conspiracy crime for which he spent six months incarcerated on Rikers Island.  Ex. E (Pl. Dep.) at 51: 24 – 52: 20.

**RESPONSE**: Objection that this fact is not just immaterial, but totally irrelevant. There is no evidence that Plaintiff's subjective understanding of his son's criminal history was ever communicated to Defendants before he was tased. To the extent a response is required, undisputed that this was Plaintiff's subjective understanding.

14.     On September 2, 2020, plaintiff was employed by the New York City Department of Sanitation ("DOS").  Ex. D (50-h) at 6: 23 – 7: 6.  Ex. E (Pl. Dep.) at 28: 18-21.

**RESPONSE**: Undisputed.

15.     His job responsibilities included driving a garbage truck and picking up garbage and putting it in the truck on a designated route in the Bronx.  Ex. E (Pl. Dep.) at 29: 11 – 30: 16.

**RESPONSE**: Undisputed.

16.     On September 2, 2020, plaintiff and Joy Harris co-owned a navy blue 2007 Chevy Tahoe SUV.  Ex. E (Pl. Dep.) at 20: 14-22; 21: 10-12.

**RESPONSE**: Undisputed.

17.     In the early morning hours of September 2, 2020, the individual defendants received a radio transmission about a shooting that had occurred within the confines of the 26 Precinct in Harlem.  Ex. F (Baltzer Dep.) at 46: 6-7, 12-13; 50: 23-24; Ex. G (Leon Dep.) at 25: 13 – 26: 2; Ex. H (Lane Dep.) at 17: 16-20; 24: 16-23; 25: 20-24; 26: 5-7; Ex. I (Swinkunas Dep.) at 42: 8-9; 43: 17-24.

**RESPONSE**: Undisputed.

18.     In response to the radio transmission, the individual defendants responded to Mt. Sinai Morningside Hospital on West 113th Street in Manhattan.  Ex. F (Baltzer Dep.) at 45: 25 – 46: 13; 50: 24-25; Ex. G (Leon Dep.) at 24: 11-16; 33: 15-20; Ex. H (Lane Dep.) at 27: 19 – 28: 9; Ex. I (Swinkunas Dep.) at 42: 2-5; 43: 25 – 44: 6; Ex. J (Jimenez Dep.) at 40: 12-24.

**RESPONSE**: Undisputed.

19.     A blue Chevy Tahoe was parked in front of the emergency room entrance with the front passenger door open. Ex. D (50-h) at 25: 13 – 26: 2; Ex. E (Pl. Dep.) at 80: 4-5; 81: 2-3; Ex. F (Baltzer Dep.) at 47: 7-22; 54: 24 – 55: 6; Ex. G (Leon Dep.) at 34: 15-16; 39: 14-19; Ex. H (Lane Dep.) at 28: 10-17; 46: 3-5; Ex. I (Swinkunas Dep.) at 45: 16 – 46: 25; Ex. J (Jimenez Dep.) at 43: 19 – 44: 16.

**RESPONSE**: Undisputed.

20.     The officers learned that the shooting victim was inside the hospital. Ex. F (Baltzer Dep.) at 48: 20-21; Ex. G (Leon Dep.) at 35: 17-20; Ex. H (Lane Dep.) at 29: 14-20; Ex. I (Swinkunas Dep.) at 49: 6-14; Ex. J (Jimenez Dep.) at 40: 23-24.

**RESPONSE**: Undisputed.

21.     There was blood visible on the passenger's seat of the vehicle.  Ex. E (Pl. Dep.) at 85: 11-12; Ex. H (Lane Dep.) at 30: 8-14; Ex. I (Swinkunas Dep.) at 63: 24 – 64: 10; Ex. J (Jimenez Dep.) at 44: 17 – 45: 6.

**RESPONSE**: Undisputed.

22.     The officers suspected the Tahoe was involved in the shooting.  Ex. F (Baltzer Dep.) at 48: 8-21; 50: 25 – 51: 3; Ex. G (Leon Dep.) at 35: 5-10; Ex. H (Lane Dep.) at 29: 14-20; 67: 5-6; Ex. I (Swinkunas Dep.) at 61: 18-19; 62: 20-25; Ex. J (Jimenez Dep.) at 48: 16-18.

**RESPONSE**: Undisputed.

23.     The officers secured the Tahoe to make sure no one went near it until it could be examined for evidence.  Ex. G (Leon Dep.) at 35: 9-10; 70: 19 – 71: 9; Ex. H (Lane Dep.) at 30: 18-22.; 32: 13-15; 67: 4-8; Ex. I (Swinkunas Dep.) at 61: 12-22; 63: 12-14; Ex. J (Jimenez Dep.) at 49: 14 – 50: 19.

**RESPONSE**: Disputed that the officers "secured" the Tahoe. They did not create

any kind of perimeter around the vehicle. Ex. G (Leon Tr.) 40:11-15. Leon "did

not think it was necessary." Leon Tr. 40:8-10. There was nothing to indicate to a

member of the public that this was a crime scene. Baltzer Tr. 56:4-10; Swinkunas

Tr. 62:5-13. West 113th Street remained open to vehicular traffic. Leon Tr. 39:23-

40:7. No member of the NYPD placed any tape, barrier, or other physical

marking around the Tahoe, Lane Tr. 31:3-8; Baltzer Tr. 51:17-52:2; Swinkunas Tr.

62:5-13; Leon Tr. 40:11-17, even though it is typical practice to do so, Jimenez Tr.

53:14-21. In reality, Defendants were just "standing there not doing anything in

particular." Lane Tr. 45:9-12; *see id*. at 46:13-16.

24.     Plaintiff arrived on the scene as the individual defendants stood near the

Tahoe.  Ex. D (50-h) at 26: 13-24; Ex. E (Pl. Dep.) at 81: 23 – 82: 4; 82: 20-22; Ex. F

(Baltzer Dep.) at 52: 3-24; Ex. G (Leon Dep.) at 37: 12-20; Ex. H (Lane Dep.) at 33: 11 –

34: 3; 44: 3-25; 45: 20 – 46: 24; Ex. I (Swinkunas Dep.) at 67: 7 – 68: 2.

**RESPONSE**: Undisputed.

25.     Plaintiff did not enter the hospital, but rather immediately walked towards

the officers and the Tahoe.  Ex. D (50-h) at 27: 3-4; Ex. E (Pl. Dep.) at 84: 16-23; Ex. H

(Lane Dep.) at 44: 3-25; Ex. I (Swinkunas Dep.) at 68: 11 – 69: 20; 72: 19 – 73: 12; Ex. J

(Jimenez Dep.) at 56: 19-21; Ex. L (Leon BWC #1) at 00:00 – 00:30.

**RESPONSE**: Undisputed.

26.     He was defiant, hostile, and argumentative.  Ex. L (Leon BWC#1) at 00:01

– 1:12.

**RESPONSE**: Objection that this fact cannot be presented in a form that would

be admissible in evidence, Fed. R. Civ. P. 56(c)(2), as it is not a statement of fact,

but merely an argumentative characterization, consisting of ambiguous adjectives, of a course of conduct that speaks for itself on the cited portion of video. To the extent a response is required, undisputed that, at times, Plaintiff did not comply with police instructions and argued with police.

27.     Plaintiff said to the officers that he was the owner of the vehicle and it was his son who had been shot.  Ex. D (50-h) at 27: 7-9; Ex. E (Pl. Dep.) at 83: 13-17, 18-19; Ex. F (Baltzer Dep.) at 54: 10-13; Ex. H (Lane Dep.) at 45: 17-19; Ex. I (Swinkunas Dep.) at 70: 2-11; Ex. J (Jimenez Dep.) at 57: 14 – 58: 3.

**RESPONSE**: Undisputed.

28.     Plaintiff did not ask the officers whether they knew what condition his son was in.  Ex. E (Pl. Dep.) at 85: 3-5; 175: 7-12.

**RESPONSE**: Undisputed, as to the relevant time between when Plaintiff first approached the officers and when he was tased.

29.     The police officers told plaintiff to move away from the Tahoe.  Ex. D (50-h) at 27: 14-17; Ex. E (Pl. Dep.) at 84: 13-15.

**RESPONSE**: Undisputed.

30.     Detective Swinkunas told plaintiff that the Tahoe was under investigation and could not be removed from the location.  Ex. I (Swinkunas Dep.) at 71: 9-11; 79: 16-24.

**RESPONSE**: Disputed. The BWC footage reflects no such statement by Det. Swinkunas. Ex. L (Leon BWC) at 00:01-1:12.

31.     Plaintiff repeated that he was the owner of the car and that his son had been shot.  Ex. D (50-h) at 27: 18-22.

**RESPONSE**: Undisputed.

32.     The officers, using a higher tone of voice, responded by again telling plaintiff move away from the car.  Ex. D (50-h) at 27: 23 – 28: 2.

**RESPONSE**: Undisputed.

33.     Plaintiff repeated that he was the owner of the car and his son had been shot.  Ex. D (50-h) at 28: 3-9.

**RESPONSE**: Undisputed.

34.     An officer yelled at plaintiff to move away from the car.  Ex. D (50-h) at 28: 19-23.

**RESPONSE**: Undisputed.

35.     Plaintiff responded by saying his son had been shot.  Ex. D (50-h) at 28: 24 – 29: 7.

**RESPONSE**: Undisputed.

36.     Plaintiff testified at his deposition on October 25, 2021 that while he observed the officers telling him to back away from the Tahoe in a BWC video, he did not recall hearing them say that on September 2, 2020.  Ex. E (Pl. Dep.) at 87: 8 – 88: 1; 90: 15-22; 92: 23 – 93: 5; 97: 8-10; 98: 2-4, 17-19; 100: 7-12.

**RESPONSE**: Undisputed.

37.     However, at plaintiff's 50-h hearing on February 8, 2021 – over two months before the BWC video was produced to plaintiff[2] – he testified that he heard the police tell him to back away from the car three times.  Ex. D (50-h) at 27: 16 – 28: 23.

**RESPONSE**: Undisputed, except as to the assertion in the footnote that the BWC footage "depict[s] this incident," as a crucial portion of the incident—what

_____

[2] The BWC video, which is the only video depicting this incident, was first produced on April 16, 2021.

was happening when Mr. Harris was tased—is not depicted on the BWC footage. Leon BWC #1.

38.     Plaintiff did not comply with the officers' directives to back away from the car.  Ex. D (50-h) at 27: 14 – 30: 5; Ex. E (Pl. Dep.) at 93: 6-13; 98: 20 – 99: 2; Ex. J (Jimenez Dep.) at 58: 20-25; Ex. L (Leon BWC #1) at 00:30 – 1:05.

        **RESPONSE**: Undisputed.

39.     When asked if there was anything the police could have said to him that would have prompted him to back away from the Tahoe, plaintiff answered that he could not answer the question because he did not recall that particular moment.  Ex. E (Pl. Dep.) at 101: 11-18.

        **RESPONSE**: Objection that this fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). The cited question calls for Plaintiff to speculate about how he would have reacted had police hypothetically said unknown things to him. To the extent a response is required, undisputed that Plaintiff so testified.

40.     After police told plaintiff to back away from the car, he continued walking towards the Tahoe.  Ex. E (Pl. Dep.) at 85: 6-7; 89: 7-12; Ex. J (Jimenez Dep.) at 58: 20-25.

        **RESPONSE**: Undisputed.

41.     Plaintiff continued walking towards the Tahoe until he was standing in the space between the open passenger door and the passenger seat.  Ex. E (Pl. Dep.) at 103: 25 – 104: 1; Ex. J (Jimenez Dep.) at 61: 5-15; 73: 12-14; Ex L (Leon BWC #1) at 00:00 – 00:47.

        **RESPONSE**: Undisputed.

42.     Approximately three officers approached plaintiff as he stood by the passenger side door.  Ex. E (Pl. Dep.) at 103: 20 – 104: 1; 107: 9-10.

**RESPONSE**: Undisputed.

43.     Plaintiff raised his hands over his head and told the police "get away from me." Ex. E (Pl. Dep.) at 99: 6; Ex. L (Leon BWC #1) at 00:27 – 00:31.

**RESPONSE**: Undisputed.

44.     Lieutenant Leon responded by saying in substance "this is a crime scene you cannot touch this" and "this is a crime scene don't touch this car please, this is a crime scene." Ex. L (Leon BWC #1) at 00:30 – 00:39.

**RESPONSE**: Undisputed.

45.     Plaintiff responded by yelling "you cannot tell me what to do with my property, this is my property."  Ex. E (Pl. Dep.) at 99: 19-22; Ex. L (Leon BWC #1) at 00:39 – 00:43.

**RESPONSE**: Objection to the word "yelling," which is a nonfactual characterization of video that speaks for itself. Disputed as to the word "yelling," which the cited evidence does not establish, as Plaintiff's voice is not notably louder than Lieutenant Leon's. Ex. L (Leon BWC #1) at 00:39-00:49. Undisputed that Plaintiff said these words.

46.     Plaintiff then turned towards the Tahoe and took another step closer to it. Ex. L (Leon BWC #1) at 00:44 – 00:47.

**RESPONSE**: Undisputed.

47.     Several police officers including Lieutenant Leon again told plaintiff in substance do not touch the car.  Ex. L (Leon BWC #1) at 00:47 – 00:48.

**RESPONSE**: Undisputed that one or more police officers, including Lieutenant Leon, so stated in sum and substance. Disputed as to "several" meaning four or more, which the cited evidence does not establish. *See* Ex. L (Leon BWC #1) at 00:47-00:48.

48.     Lieutenant Lane then told plaintiff "you're going to be under arrest."  Ex. L (Leon BWC #1) at 00:49.

**RESPONDED**: Undisputed.

49.     Plaintiff responded by yelling "I don't care, I don't care, I do not care, I don't care, I don't care."  Ex. L (Leon BWC #1) at 00:49 – 00:55.

**RESPONSE**:  Objection to the word "yelling," which is nonfactual characterization of video that speaks for itself.. Disputed as to the word "yelling," which the cited evidence does not establish, as Plaintiff's voice is not notably louder than Lieutenant Leon's. Ex. L (Leon BWC #1) 00:49-00:55. at Undisputed that Plaintiff so stated.

50.     Lieutenant Leon again said "this is a crime scene."  Ex. L (Leon BWC #1) at 00:57 – 00:58.

**RESPONSE**: Undisputed.

51.     Plaintiff responded by saying "please get away from me, please get away from me" while extending his arms out towards Lieutenant Leon.  Ex. L (Leon BWC #1) at 00:57 – 1:00.

**RESPONSE**: Undisputed.

52.     Lieutenant Leon responded "no."  Ex. L (Leon BWC #1) at 1:00.

**RESPONSE**: Undisputed.

53.     Plaintiff then said "you already looked inside the car."  <u>Ex. L</u> (Leon BWC #1) at 1:01 – 1:03.

**<u>RESPONSE</u>**: Undisputed.

54.     As plaintiff said this, Lieutenant Leon said "no we didn't" and Lieutenant Lane said "step away from the car, step away from the car."  <u>Ex. H</u> (Lane Dep.) at 52: 3-5; <u>Ex. L</u> (Leon BWC #1) at 1:01 – 1:03.

**<u>RESPONSE</u>**: Undisputed.

55.     Plaintiff responded by saying "I'm not stepping away from anything."  <u>Ex. L</u> (Leon BWC #1) at 1:04 – 1:05.

**<u>RESPONSE</u>**: Undisputed.

56.     Lieutenant Lane then said "turn around" and Lieutenant Leon said "you're going to be placed under."  <u>Ex. H</u> (Lane Dep.) at 52: 8-13; <u>Ex. L</u> (Leon BWC #1) at 1:04 – 1:07.

**<u>RESPONSE</u>**: Undisputed.

57.     Lieutenant Lane tried to grab plaintiff.  <u>Ex. E</u> (Pl. Dep.) at 106: 16-21; 107: 7-14; <u>Ex. F</u> (Baltzer Dep.) at 74: 3-13; 77: 10-11; <u>Ex. G</u> (Leon Dep.) at 53: 12-13; 60: 12-17; 84: 14-17; <u>Ex. H</u> (Lane Dep.) at 52: 16-22; 57: 4-7; <u>Ex. I</u> (Swinkunas Dep.) at 82: 5-7; <u>Ex. J</u> (Jimenez Dep.) at 62: 6-7; 67: 2; <u>Ex. L</u> (Leon BWC #1) at 1:06 – 1:07.

**<u>RESPONSE</u>**: Undisputed.

58.     When Lieutenant Lane tried to grab plaintiff, plaintiff raised his hands up by his head, turned away from the officers towards the passenger seat of the Tahoe, and said "please don't touch me."  <u>Ex. E</u> (Pl. Dep.) at 103: 25 – 104: 11; 104: 23 – 105: 3; 107: 21 – 108: 1; <u>Ex. G</u> (Leon Dep.) at 62: 7-10; <u>Ex. H</u> (Lane Dep.) at 52: 23 – 53: 5; 54: 9-15; 55: 14-16; <u>Ex. J</u> (Jimenez Dep.) at 67: 23 – 68: 7; <u>Ex. L</u> (Leon BWC #1) at 1:06 – 1:07.

**RESPONSE**: Undisputed.

59.    When plaintiff raised his arms up, Lieutenant Lane believe plaintiff "might strike [him] from up top."  Ex. H (Lane Dep.) at 55: 5-9; 56: 7-22.

**RESPONSE**: Disputed. Lane took no action consistent with a belief that Plaintiff was about to assault him. Putting one's hands up is a widely understood gesture that commonly communicates the absence of a threat. Lane Tr. 56:3-6; Baltzer Tr. 72:20-23. Lane did not even consider drawing his taser. Lane Tr. 70:22-71:3. He did not give verbal commands after Plaintiff put his hands up. Leon BWC #1 at 1:06-1:12; Lane Tr. 61:14-18.

To the extent Lane did have such a belief, it would have been unreasonable. "Mr. Harris did not use force against any members of the police department at any time during this interaction." Lane Tr. 75:20-24; Baltzer Tr. 90:7-12.[3] He did not "take any physical steps to assault or injure" any officer. Jimenez Tr. 80:12-20. He did not "physically threaten or otherwise threaten" any police officer at any point. Swinkunas Tr. 103:9-12. He did not strike, kick, push, or punch anyone. Leon Tr. 87:6-13. During the interaction with Mr. Harris, Defendants could see Mr. Harris's hands. Swinkunas Tr. 76:10-17; Leon Tr. 49:21-50:10. They knew that he did not have any weapons or dangerous objects in his hands. Swinkunas Tr. 76:14-23; Jimenez Tr. 78:11-19; Leon Tr. 50:11-13. At no point before Mr. Harris was tased were Defendants concerned that he had a weapon or dangerous object on him. Swinkunas Tr. 102:15-19; Jimenez Tr. 78:6-10. Defendants did not regard Mr. Harris as an emotionally disturbed person.

---

[3]    Baltzer completed the TRI Report; Lane reviewed it and determined that it was complete and accurate. Lane Tr. 74:13-16.

TRI Report (Pl. Ex. O). They did not suspect him of being under the influence of drugs or alcohol. *Id.*; Swinkunas Tr. 102:20-103:3; Jimenez Tr. 78:20-79:3.

60.     Lieutenant Lane thought plaintiff might be about to hit him because plaintiff had refused numerous orders to back away from the Tahoe, said "you can't tell me what to do with my property," his behavior and demeanor were aggressive, and he did not seem to care when he was told he would be placed under arrest.  Ex. H (Lane Dep.) at 56: 7-22.

**RESPONSE**: Disputed. Lane took no action consistent with a belief that Plaintiff was about to assault him. Lane did not even consider drawing his taser. Lane Tr. 70:22-71:3. He did not give verbal commands after Plaintiff put his hands up. Leon BWC #1 at 1:06-1:12;  Lane Tr. 61:14-18.

To the extent Lane did have such a belief, it would have been unreasonable. "Mr. Harris did not use force against any members of the police department at any time during this interaction." Lane Tr. 75:20-24; Baltzer Tr. 90:7-12.[4] He did not "take any physical steps to assault or injure" any officer. Jimenez Tr. 80:12-20. He did not "physically threaten or otherwise threaten" any police officer at any point. Swinkunas Tr. 103:9-12. He did not strike, kick, push, or punch anyone. Leon Tr. 87:6-13. During the interaction with Mr. Harris, Defendants could see Mr. Harris's hands. Swinkunas Tr. 76:10-17; Leon Tr. 49:21-50:10. They knew that he did not have any weapons or dangerous objects in his hands. Swinkunas Tr. 76:14-23; Jimenez Tr. 78:11-19; Leon Tr. 50:11-13. At no point before Mr. Harris was tased were Defendants concerned that he had a

---

[4]   Baltzer completed the TRI Report; Lane reviewed it and determined that it was complete and accurate. Lane Tr. 74:13-16.

weapon or dangerous object on him. Swinkunas Tr. 102:15-19; Jimenez Tr. 78:6-10. Defendants did not regard Mr. Harris as an emotionally disturbed person. TRI Report (Pl. Ex. O). They did not suspect him of being under the influence of drugs or alcohol. *Id*.; Swinkunas Tr. 102:20-103:3; Jimenez Tr. 78:20-79:3.

61.     Officer Jimenez also believed plaintiff could have injured one of the officers or himself because he was very big, seemed to be upset, and was being uncooperative.  Ex. J (Jimenez Dep.) at 79: 17 – 80: 11.

**RESPONSE**: Disputed. Jimenez acknowledges that Plaintiff did not physically or verbally threaten anyone. Jimenez Tr. 79:9-12. She took no action consistent with a belief that Plaintiff posed a risk of injuring himself or others. Jimenez "did not take any steps to intervene or restrain or arrest Plaintiff at any point before he was tased." Jimenez Tr. 65:2-6. She did not grab the taser she had on her belt. Swinkunas Tr. 86:9-24. She just did nothing. Jimenez Tr. 65:2-6.

To the extent Jimenez did have such a belief, it would have been unreasonable. "Mr. Harris did not use force against any members of the police department at any time during this interaction." Lane Tr. 75:20-24; Baltzer Tr. 90:7-12.[5] He did not "take any physical steps to assault or injure" any officer. Jimenez Tr. 80:12-20. He did not "physically threaten or otherwise threaten" any police officer at any point. Swinkunas Tr. 103:9-12. He did not strike, kick, push, or punch anyone. Leon Tr. 87:6-13. During the interaction with Mr. Harris, Defendants could see Mr. Harris's hands. Swinkunas Tr. 76:10-17; Leon Tr. 49:21-50:10. They knew that he did not have any weapons or dangerous objects

---

[5]    Baltzer completed the TRI Report; Lane reviewed it and determined that it was complete and accurate. Lane Tr. 74:13-16.

in his hands. Swinkunas Tr. 76:14-23; Jimenez Tr. 78:11-19; Leon Tr. 50:11-13. At no point before Mr. Harris was tased were Defendants concerned that he had a weapon or dangerous object on him. Swinkunas Tr. 102:15-19; Jimenez Tr. 78:6-10. Defendants did not regard Mr. Harris as an emotionally disturbed person. TRI Report (Pl. Ex. O). They did not suspect him of being under the influence of drugs or alcohol. *Id*.; Swinkunas Tr. 102:20-103:3; Jimenez Tr. 78:20-79:3.

62.     Lieutenant Lane was not able to grab ahold of plaintiff's arms because plaintiff pulled his arms away.  Ex. H (Lane Dep.) at 57: 8-19.

**RESPONSE**: Disputed. Plaintiff did not pull his arms away or move them up and down or side to side as Defendants have claimed. Harris Decl. ¶ 4; Leon BWC #1 at 1:06-1:12 (depicting no such event).

63.     Lieutenant Lane continued to attempt to grab ahold of plaintiff's arms. Ex. H (Lane Dep.) at 57: 20-24; 61: 7-9; 62: 8-9.

**RESPONSE**: Disputed. Plaintiff did not pull his arms away or move them up and down or side to side as Defendants have claimed. Harris Decl. ¶ 4; Leon BWC #1 at 1:06-1:12 (depicting no such event).

64.     Before plaintiff was tased, Lieutenant Lane was no table to grab ahold of plaintiff's arms because plaintiff was moving them and twisting and turning his body. Ex. H (Lane Dep.) at 60: 23 – 61: 9; 61: 25 – 63: 4.

**RESPONSE**: Disputed. Plaintiff did not pull his arms away or move them up and down or side to side as Defendants have claimed. Harris Decl. ¶ 4; Leon BWC #1 at 1:06-1:12 (depicting no such event).

65.     Aside from putting his hands up, plaintiff did not do anything else intended to signal to the officers that he was not a threat to them.  Ex. E (Pl. Dep.) at 108: 18-22.

**RESPONSE**: Undisputed.

66.     In total, plaintiff heard police say "tase him" between three and five times. Ex. D (50-h) at 29: 12 – 30:8; Ex. E (Pl. Dep.) at 112: 14-20.

**RESPONSE**: Undisputed.

67.     Plaintiff did not say anything between when he heard "tase him" for the first time and when he was actually tased.  Ex. D (50-h) at 29: 12 – 30: 8; Ex. E (Pl. Dep.) at 118: 9-12.

**RESPONSE**: Undisputed.

68.     Plaintiff heard an officer in a white shirt say "tase him."  Ex. D (50-h) at 29: 12-13; Ex. E (Pl. Dep.) at 103: 5-8; 106: 7-11; 110: 22-24; 111: 3-5.

**RESPONSE**: Undisputed.

69.     Plaintiff knew what a taser was and what it did.  Ex. E (Pl. Dep.) at 113: 19-23.

**RESPONSE**: Objection that this fact is immaterial, as Plaintiff's undisclosed subjective thoughts about tasers are irrelevant to whether Defendants used reasonable force. To the extent a response is required, undisputed.

70.     When plaintiff heard "tase him" for the first time, he thought "maybe that was a scare tactic." Ex. E (Pl. Dep.) at 114: 3-10.

**RESPONSE**: Objection that this fact is immaterial, as Plaintiff's undisclosed subjective thoughts are irrelevant to whether Defendants used reasonable force. To the extent a response is required, undisputed.

71.     Plaintiff did not do anything in response to hearing "tase him."  <u>Ex. E</u> (Pl. Dep). at 111: 13-15.

**<u>RESPONSE</u>**: Undisputed.

72.     Plaintiff does not recall where his hands were when he heard "tase him" for the first time.  <u>Ex. E</u> (Pl. Dep.) at 111: 21-23.

**<u>RESPONSE</u>**: Undisputed that Plaintiff did not know where his hands *were*, meaning where if anywhere Lane had moved his hands by that point. Disputed to the extent it is meant to imply that Plaintiff does not recall or does not know what he was doing with his hands at that time. Plaintiff was not moving his hands up and down or side to side. Harris Decl. ¶ 4. Plaintiff did not attempt to evade the application of handcuffs after putting his hands in the air. *Id*. ¶ 5.

73.     Plaintiff heard an officer say "tase him" a second time.  <u>Ex. D</u> (50-h) at 29: 20-21; <u>Ex. E</u> (Pl. Dep.) at 110: 3-4.

**<u>RESPONSE</u>**: Undisputed.

74.     After hearing "tase him" for the second time, plaintiff understood that meant he might be tased.  <u>Ex. E</u> (Pl. Dep.) at 114: 11-14.

**<u>RESPONSE</u>**: Undisputed.

75.     After hearing "tase him" for the second time, plaintiff did not move away from the Tahoe.  <u>Ex. D</u> (50-h) at 29: 24 – 30: 5.

**<u>RESPONSE</u>**: Undisputed.

76.     Plaintiff heard an officer say "tase him" for a third time.  <u>Ex. D</u> (50-h) at 30: 6-8; <u>Ex. E</u> (Pl. Dep.) at 114: 24 – 115: 1.

**<u>RESPONSE</u>**: Undisputed.

77.     After hearing "tase him" for the third time, plaintiff thought maybe it was still "a threat" but he "knew it was serious at that point."  Ex. E (Pl. Dep.) at 115: 2-7.

**RESPONSE**: Undisputed.

78.     Between the time that plaintiff first heard the words "tase him" and the time he was tased, the only thing plaintiff did that was meant to show the officers he was not a threat was raise his hands up by his head.  Ex. E (Pl. Dep.) at 115: 21 – 116: 12.

**RESPONSE**: Undisputed.

79.     Before plaintiff was tased, the only action he took that in his mind complied with the officers' directives was to put his hands up.  Ex. E (Pl. Dep.) at 117: 24 – 118: 8.

**RESPONSE**: Undisputed.

80.     Before plaintiff was tased, he never backed away from the Tahoe.  Ex. D (50-h) at 27:4 – 30: 5; Ex. E (Pl. Dep.) at 117: 18-20.

**RESPONSE**: Undisputed.

81.     Before plaintiff was tased, he never put his hands behind his back to be handcuffed.  Ex. E (Pl. Dep.) at 117: 21-23.

**RESPONSE**: Undisputed.

82.     Before plaintiff was tased Lieutenant Leon said in substance "get your taser" and "taser him" four or five times. Ex. F (Baltzer Dep.) at 59: 12 – 60: 10; Ex. G (Leon Dep.) at 54: 15-18; 63: 11-17; Ex. L (Leon BWC #1) at 1:07 – 1:10.

**RESPONSE**: Undisputed.

83.     Lieutenant Leon intended this as an order for Officer Baltzer to draw his taser.  Ex. G (Leon Dep.) at 52: 10-19; 54: 19-21.

**RESPONSE**: Undisputed.

84.     Lieutenant Leon directed Officer Baltzer to draw his taser because of plaintiff's size, plaintiff was resisting arrest, plaintiff was physically struggling with Lieutenant Lane, plaintiff was trying to prevent himself from being handcuffed, plaintiff was flailing his arms, plaintiff said "don't touch me," and it appeared that plaintiff was trying to get into the Tahoe.  Ex. G (Leon Dep.) at 78: 16-25; 79: 10-14; 80: 6-9; 87: 22 – 88: 6; 94: 24 – 96:2.

**RESPONSE**: Disputed. Lt. Leon made the determination that Mr. Harris should be tased as soon as Mr. Harris said "don't touch me." Leon Tr. 53:7-18. Lt. Leon's decision to order the tasing was based upon Mr. Harris's "size coupled with the words 'don't touch me.'" Leon Tr. 80:6-9.

85.     Lieutenant Leon had to make a "split-second" decision to direct Officer Baltzer to draw his taser.  Ex. G (Leon Dep.) at 79:8-9; 89: 20-21.

**RESPONSE**: Objection that this fact cannot be presented in a form that would be admissible in evidence, Fed. R. Civ. P. 56(c)(2), as the phrase "split-second" is vague and ambiguous. To the extent a response is required, disputed that Leon "had" to make such a decision. The thought of using a taser did not even occur to Leon's colleagues at the scene. Lane Tr. 70:22-71:3 ("did not cross my mind"); Jimenez Tr. 83:23-84:4 (did not consider using her taser). Baltzer hesitated to draw his taser in response to Leon's order. Leon Tr. 55:12-15. Undisputed that Leon made a quick decision to order the use of a taser against Mr. Harris.

86.     Plaintiff repeatedly emphasized at his deposition that the situation unfolded very fast.  Ex. E (Pl. Dep.) at 95: 16-17; 97: 1-3; 101: 2-3; 105: 20-21; 109: 24; 115: 19.

**RESPONSE**: Disputed that Plaintiff "emphasized" this point, which none of the cited testimony establishes. Undisputed that Plaintiff testified that the events unfolded quickly from his perspective.

87.    It was Officer Baltzer's understanding that Lieutenant Leon was speaking to him when he said in substance "get your taser" and "taser him."  Ex. F (Baltzer Dep.) at 59: 19-20; 62: 5-11

**RESPONSE**: Undisputed.

88.    However, Officer Baltzer did not hear Lieutenant Leon the first few times because he was more focused on the situation involving plaintiff than on Lieutenant Leon. Ex. F (Baltzer Dep.) at 64: 20-23.

**RESPONSE**: Disputed. Leon's orders were plainly audible on video, Leon BWC #1 at 1:06-1:12, and were audible to Mr. Harris, *e.g.*, *supra* ¶ 66. In reality, Baltzer "hesitated" when Leon ordered him to draw his taser. Leon Tr. 51:12-25; Leon BWC #1 at 1:06-1:12. Baltzer is trained to—and is expected to—draw his taser in an instant without hesitation so he can use it when he believes it reasonably necessary. Leon Tr. 54:22-55:2; Baltzer Tr. 37:2-7. He did not do so here. Leon Tr. 51:12-25; Leon BWC #1 at 1:06-1:12. Drawing all reasonable inferences in Plaintiff's favor, Baltzer hesitated because he was caught off guard by a surprising and unexpected order to draw his taser, which he was not considering doing and which he did not believe to be reasonable under the circumstances.

89.    Officer Baltzer drew his taser because he believed it was necessary, not because of what Lieutenant Leon said.  Ex. F (Baltzer Dep.) at 65: 20 – 67: 8.

**RESPONSE**: Disputed. This assertion is not credible. Leon's orders were plainly audible on video, Leon BWC #1 at 1:06-1:12, and were audible to Mr. Harris, *e.g.*, *supra* ¶ 66. In reality, Baltzer "hesitated" when Leon ordered him to draw his taser. Leon Tr. 51:12-25; Leon BWC #1 at 1:06-1:12. Baltzer is trained to—and is expected to—draw his taser in an instant without hesitation so he can use it when he believes it reasonably necessary. Leon Tr. 54:22-55:2; Baltzer Tr. 37:2-7. He did not do so here. Leon Tr. 51:12-25; Leon BWC #1 at 1:06-1:12. Drawing all reasonable inferences in Plaintiff's favor, Baltzer hesitated because he was caught off guard by an unexpected and surprising order to draw his taser, which he was not considering doing and did not believe to be reasonable under the circumstances.

90.    A police officer can decide for himself or herself when it was necessary to use the taser and is not required to wait for an order from a superior officer. Ex. F (Baltzer Dep.) at 33: 9-13; Ex. G (Leon Dep.) at 56: 11-15; Ex. J (Jimenez Dep.) at 83: 13-18.

**RESPONSE**: Undisputed.

91.    Officer Baltzer felt it was necessary to use his taser because plaintiff had approached the vehicle in a very aggressive and irate manner and the situation escalated to the point where plaintiff was actively resisting arrest after multiple warnings and exhibiting extreme aggression. Ex. F (Baltzer Dep.) at 66: 17 – 67: 25; 69: 17 – 71: 11; 71: 17-22; 72: 2-10; Ex. L (Leon BWC #1) at 1:03 – 1:07.

**RESPONSE**: Objection that this statement is compound and fails to comply with the requirement of Local Rule 56.1(a) to set forth a "separate, short, and concise statement" of each material fact. Objection that this statement is

ambiguous as to whether it is purporting to establish that Plaintiff *was* "aggressive," "irate," and "exhibiting extreme aggression," or simply whether Baltzer so believed. Construing it to mean the latter, disputed. Baltzer used his taser because he was ordered to do so. Baltzer hesitated to use his taser, Leon Tr. 51:12-25; Leon BWC #1 at 1:06-1:12, despite being trained to draw it in an instant, Leon Tr. 54:22-55:2; Baltzer Tr. 37:2-7, because he did not believe it was reasonably necessary. *See supra* ¶¶ 88-89. To the extent this statement purports to set forth as fact that Plaintiff was "aggressive," "irate," or "exhibiting extreme aggression," objection as duplicative, vague, and ambiguous, and nonfactual characterization, and disputed as set forth in other relevant paragraphs. *See, e.g.*, *supra* ¶¶ 59-61; *infra* ¶¶ 92, 93.

92.     Plaintiff's tone of voice was aggressive.  Ex. F (Baltzer Dep.) at 72: 2-10; Ex. H (Lane Dep.) at 56: 14-15, 20-21; 69: 11-12.

**RESPONSE**: Objection that this fact cannot be presented in a form that would be admissible in evidence, Fed. R. Civ. P. 56(c)(2), as it is not a statement of fact, but merely an argumentative characterization. Objection that what it means for a "tone of voice" to be "aggressive" is vague, ambiguous, and subjective. To the extent a response is required, disputed. While upset, Plaintiff did not curse. Leon BWC #1 at 0:00-1:12. He did not make any verbal threats. Swinkunas Tr. 103:9-12; Jimenez Tr. 79:9-12. He did not insult or denigrate the police. BWC #1 at 0:00-1:12.

93.     The movement of plaintiff's hands was aggressive.  Ex. F (Baltzer Dep.) at 72: 2-10; Ex. H (Lane Dep.) at 56: 14-15, 20-21; 69: 11-12.

**RESPONSE**: Disputed. Putting one's hands up is a widely understood gesture that commonly communicates the absence of a threat. Lane Tr. 56:3-6; Baltzer Tr. 72:20-23. Moreover, beyond putting his hands in the air, Plaintiff did not engage in the purported hand movements that Defendants claim to have been aggressive. *See infra* ¶ 95 (citing Harris Decl. ¶¶ 4-5; Lane Tr. 38:18-22, 61:14-18; 63:17-24; Leon Tr. 45:16-46:7; Swinkunas Tr. 98:7-10; 100:10-13, 131:24, 132:6-10; Leon BWC #1 at 1:06-1:12).

94.     Lieutenant Lane attempted to grab plaintiff to place him under arrest. Ex. E (Pl. Dep.) at 106: 16-21; Ex. F (Baltzer Dep.) at 74: 3-13; 77: 10-11; Ex. H (Lane Dep.) at 57: 8-19; 61: 7-9; Ex. I (Swinkunas Dep.) at 97: 6-9, 20-24; Ex. J (Jimenez Dep.) at 38: 4.

**RESPONSE**: Undisputed.

95.     Plaintiff resisted arrest by physically struggling with Lieutenant Lane.  Ex. F (Baltzer Dep.) at 68: 6-10, 17-19; 71: 10-11; 73: 12-18; 74: 3-25; 89: 3-4; Ex. G (Leon Dep.) at 60: 8-17; 84: 14-17; 86: 25 – 87: 5; 87: 22 – 88: 6; Ex. H (Lane Dep.) at 61: 25 – 63: 4; Ex. I (Swinkunas Dep.) at 82: 20 – 84: 17; 95: 21 – 96: 8; Ex. J (Jimenez Dep.) at 35: 2-8; 67: 16 – 68: 7.

**RESPONSE**: Disputed. Plaintiff did not do so. Harris Decl. ¶¶ 4-5.

Had Plaintiff actually been "moving his arms away in the way [Lane] described for several seconds and evading [Lane's] attempt to gain control of him," Lt. Lane would "expect some kind of assistance" from his fellow officers. Lane Tr. 63:17-24. Leon would have expected Det. Swinkunas to go help Lane "[i]f Lane had been struggling with Mr. Harris between the period when Mr. Harris said 'don't touch me' and the time when the taser was deployed." Leon Tr.

59:6-12. Yet the other officers did not intervene in any way to help Lane effect the arrest. Swinkunas Tr. 98:7-10; 100:10-13, 131:24, 132:6-10.

It is "very common" for NYPD officers to say "stop resisting" to a resisting subject. Lane Tr. 38:18-22; *accord* Leon Tr. 45:16-46:7. But, once Mr. Harris put his hands in the air, no one told Mr. Harris to stop resisting. Leon BWC #1 at 1:06-1:12. Once Mr. Harris put his hands in the air, no police officer ordered him to put his hands behind his back. Lane Tr. 61:14-18.

Drawing all reasonable inferences in Plaintiff's favor, the officers did not act like Mr. Harris was actively resisting because he was not.

96.    Plaintiff physically resisted arrest by quickly pulling his arms away from Lieutenant Lane when Lieutenant Lane tried to grab and handcuff him.  Ex. E (Pl. Dep.) at 104: 5-11; 106: 20-23; 107: 17-25; Ex. F (Baltzer Dep.) at 68: 6-8,13-15; 69: 7-12; 73: 12-18; 74: 8-10; 75: 15 – 76: 4; 76: 20 – 77: 4; 77: 12-20; Ex. H (Lane Dep.) at 61: 25 – 63: 4; Ex. L (Leon BWC #1) at 1:06 – 1:07.

**RESPONSE**: Disputed. Plaintiff incorporates by reference his response to *supra* ¶ 95.

97.    Plaintiff physically resisted arrest by flailing and waiving his arms in a very aggressive manner to avoid having the police grab them.  Ex. F (Baltzer Dep.) at 68: 8-9, 15-16; 69: 2-6; Ex. G (Leon Dep.) at 88: 2; Ex. H (Lane Dep.) at 61: 25 – 63: 4; Ex. I (Swinkunas Dep.) at 84: 10; 85: 16-20; Ex. J (Jimenez Dep.) at 35: 2-8.

**RESPONSE**: Disputed. Plaintiff incorporates by reference his response to *supra* ¶ 95.

98.     Before deploying the taser, Officer Baltzer shouted "taser" three times.  Ex. F (Baltzer Dep.) at 93: 15-16; Ex. J (Jimenez Dep.) at 74: 4-8; Ex. L (Leon BWC #1) at 1:10 – 1:11.

**RESPONSE**: Undisputed.

99.     When Officer Baltzer pulled the taser trigger, Officer Baltzer and Lieutenant Leon believed plaintiff was attempting to enter the passenger side door of the Tahoe because he was facing the vehicle and leaning into it.  Ex. E (Pl. Dep.) at 104: 23 – 105: 3 Ex. F (Baltzer Dep.) at 79: 5-8, 14-17; 80: 10-21; 81: 15 – 82: 13; Ex. G (Leon Dep.) at 62: 7-20; Ex. L (Leon BWC #1) at 1:09.

> **RESPONSE**: Disputed. Had Mr. Harris wanted to enter the Tahoe despite police commands, he could and would have simply done so. "At no point did any of the police officers present physically block Mr. Harris from entering the vehicle." Lane Tr. 64:10-14. Nothing physically prevented Mr. Harris from getting into the Tahoe. Baltzer Tr. 82:7-10; Leon Tr. 79:15-20. Yet Mr. Harris did not in fact enter the Tahoe. *See* Leon BWC #1.

100.    Officer Baltzer believed the Tahoe was a crime scene which potentially contained evidence of the shooting.  Ex. F (Baltzer Dep.) at 82: 3-4.

**RESPONSE**: Undisputed.

101.    Plaintiff was tased one time on his left hip.  Ex. D (50-h) at 30: 9-11, 14-15; Ex. E (Pl. Dep.) at 117: 10-14.

**RESPONSE**: Undisputed.

102.    Approximately five seconds elapsed between when Lieutenant Leon said "get your taser" for the first time and when Officer Baltzer deployed the taser.  Ex. L (Leon BWC #1) at 1:07 – 1:12.

**RESPONSE**: Undisputed.

103.    When plaintiff was tased, he fell to the ground and landed on his left side. Ex. E (Pl. Dep.) at 118: 24 – 119: 2.

**RESPONSE**: Undisputed.

104.    Plaintiff's knee hit the ground first.  Ex. E (Pl. Dep.) at 119: 4-5, 9-11.

**RESPONSE**: Undisputed.

105.    Then plaintiff landed sideways on his hip.  Ex. E (Pl. Dep.) at 119: 5, 12-13.

**RESPONSE**: Undisputed.

106.    Then plaintiff's left hand broke his fall.  Ex. E (Pl. Dep.) at 119: 5-6.

**RESPONSE**: Undisputed.

107.    After plaintiff fell he was placed in handcuffs.  Ex. D (50-h) at 30: 20-24; Ex. E (Pl. Dep.) at 119: 14-15; Ex. I (Swinkunas Dep.) at 111: 17-19; Ex. J (Jimenez Dep.) at 76: 15-18.

**RESPONSE**: Undisputed.

108.    Moments after plaintiff was tased Lieutenant Leon called for an ambulance.  Ex. I (Swinkunas Dep.) at 110: 2-5; Ex. L (Leon BWC #1) at 1:57 – 2:06.

**RESPONSE**: Objection that this post-tasing conduct is not relevant, let alone material, to any disputed issue of fact. To the extent a response is required, undisputed.

109.    Plaintiff testified at his deposition that he did not understand why the officers had tased him.  Ex. E (Pl. Dep.) at 116: 13 – 117: 9.

**RESPONSE**: Undisputed.

110.     However, in BWC video, approximately four minutes after plaintiff was tased, Joy Harris asked him "why you got tased." <u>Ex. E</u> (Pl. Dep.) at 122: 9-12, 17; <u>Ex. N</u> (Jimenez BWC) at 4:08.

**RESPONSE**: Disputed as to the word "however," which is characterization and not fact; none of the cited evidence establishes any contradiction between this statement and a previous one. Otherwise undisputed.

111.     Plaintiff responded "because I was going to take the truck.  They said it's a crime scene." <u>Ex. N</u> (Jimenez BWC) at 4:08 – 4:12.

**RESPONSE**: Undisputed.

112.     The police did not use any force on plaintiff after he was placed in handcuffs.  <u>Ex. D</u> (50-h) at 32: 17-20; <u>Ex. E</u> (Pl. Dep.) at 125: 12-17; <u>Ex. L</u> (Leon BWC #1) at 1:12 – 8:10; <u>Ex. N</u> (Jimenez BWC) at 00:00 – 7:28.

**RESPONSE**: Objection that this post-tasing conduct is not relevant, let alone material, to any disputed issue of fact. To the extent a response is required, undisputed.

113.     The police were not disrespectful towards plaintiff and did not curse at him after he was tased.  <u>Ex. E</u> (Pl. Dep.) at 125: 9-11, 18-20; <u>Ex. G</u> (Leon BWC #1) at 1:12 – 8:10; <u>Ex. J</u> (Jimenez BWC) at 00:30 – 7:28.

**RESPONSE**: Objection that this post-tasing conduct is not relevant, let alone material, to any disputed issue of fact. Objection that this statement is ambiguous as to whether the phrase "after he was tased" applies to both the police not being disrespectful and the police not cursing. To the extent it does and to the extent a response is required, undisputed.

114.     After plaintiff was tased he told the officers what he knew about the shooting of his son. <u>Ex. E</u> (Pl. Dep.) at 126: 25 – 127: 11; <u>Ex. G</u> (Leon Dep.) at 66: 9-13; <u>Ex. I</u> (Swinkunas Dep.) at 112: 12-15; <u>Ex. L</u> (Leon BWC #1) at 2:28 – 5:35; <u>Ex. N</u> (Jimenez BWC) at 00:30 – 4:08.

> **<u>RESPONSE</u>**: Objection that this post-tasing conduct is not relevant, let alone material, to any disputed issue of fact. To the extent a response is required, undisputed.

115.     Plaintiff told an EMT that he was fine and did not want to go into the hospital.  <u>Ex. L</u> (Leon BWC #1) at 4:35 – 4:44.

> **<u>RESPONSE</u>**: Objection that this post-tasing conduct is not relevant, let alone material, to any disputed issue of fact. To the extent a response is required, undisputed.

116.     However, plaintiff was taken into the hospital where the taser prongs were removed from his left hip and he was given stitches that later dissolved on their own. <u>Ex. D</u> (50-h) at 34: 9-16; 35: 2-10; <u>Ex. E</u> (Pl. Dep.) at 127: 19-22; 129: 6-8; 132: 1-15; 133: 3-6.

> **<u>RESPONSE</u>**: Objection that this post-tasing conduct is not relevant, let alone material, to any disputed issue of fact. To the extent a response is required, undisputed.

117.     Plaintiff did not complain of injury to his knees, hips, or wrists in the emergency room. <u>Ex. E</u> (Pl. Dep.) at 136: 13 – 137: 3.

> **<u>RESPONSE</u>**: Objection that this post-tasing conduct is not relevant, let alone material, to any disputed issue of fact. To the extent a response is required, undisputed.

118.    Plaintiff was not given any pain medication in the emergency room.  <u>Ex. E</u> (Pl. Dep.) at 133: 7-9.

**RESPONSE**: Objection that this post-tasing conduct is not relevant, let alone material, to any disputed issue of fact. To the extent a response is required, undisputed.

119.    Plaintiff learned for the first time in the emergency room that his son was alive and going to be fine.  <u>Ex. D</u> (50-h) at 36: 3 – 37: 12; <u>Ex. E</u> (Pl. Dep.) at 130: 19-24; 131: 18-25.

**RESPONSE**: Objection that this post-tasing conduct is not relevant, let alone material, to any disputed issue of fact. To the extent a response is required, undisputed.

120.    Plaintiff was transported from the hospital to the 26th Precinct where he was arrested for resisting arrest and obstructing governmental administration ("OGA") and released with a desk appearance ticket.  <u>Ex. D</u> (50-h) at 37: 20-22; 38: 2-3; 40: 10-12, 21-24; <u>Ex. E</u> (Pl. Dep.) at 139: 1-9; 144: 9-10; 145: 2-3; <u>Ex. G</u> (Leon Dep.) at 75: 9-11; <u>Ex. J</u> (Jimenez Dep.) at 91: 24-25.

**RESPONSE**: Undisputed.

121.    Resisting arrest and OGA can be serious offenses, depending on the circumstances under which they are committed.  <u>Ex. F</u> (Baltzer Dep.) at 107: 11 – 109: 14; <u>Ex. H</u> (Lane Dep.) at 66: 18 – 68: 5; <u>Ex. J</u> (Jimenez Dep.) at 80: 24 – 81: 9.

**RESPONSE**: Objection that this is not a statement of fact, and that these officers' subjective opinions of whether or not an offense is serious cannot be presented in a manner that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). To the extent a response is required, disputed. *Gersbacher v. City of New York*,

- 30 -

134 F. Supp. 3d 711, 723 (S.D.N.Y. 2015) ("Obstruction of Governmental Administration . . . and Resisting Arrest are not severe.").

122.    Plaintiff alleges that he sustained an injury to his left wrist as a result of falling to the ground after he was tased that required outpatient surgery.  Ex. D (50-h) at 32: 21-25; 43: 21 – 47: 18; Ex. E (Pl. Dep.) at 150: 10 – 151: 6; 159: 22-23; 160: 7-8.

**RESPONSE**: Undisputed.

123.    Plaintiff alleges that as a result of the wrist surgery he was on sick leave from his job for eight weeks beginning on November 17, 2020.  Ex. D (50-h) at 7: 7-14; Ex. E (Pl. Dep.) at p. 165: 5-13.

**RESPONSE**: Undisputed.

124.    The eight weeks fell within his unlimited sick leave at the DOS.  Ex. E (Pl. Dep.) at 165: 14-19; Ex. K (Wright Dep.) at 28: 6-9.

**RESPONSE**: Undisputed.

125.    When a Sanitation Worker is on sick leave, he is paid a base salary plus any differentials associated with his job title.  Ex. K (Wright Dep.) at 29: 10-14; 45: 20-25.

**RESPONSE**: Undisputed, except to clarify that while a sanitation worker receives any differentials associated with his job title while on sick leave, he does *not* receive additional differentials that are associated with specific tasks he performs, such as picking up the garbage. Ex. K (Wright Dep.) at 24:3-14 (categorizing payments for specific tasks as differentials).

126.    In addition to his base pay, a DOS worker may be paid differentials for performing a specific type of job such as physically picking up garbage, and overtime for working more hours on a particular day or week.  Ex. K (Wright Dep.) at 24: 17 – 25: 16.

**RESPONSE**: Undisputed to the extent this fact pertains to a DOS worker who is *not* on sick leave, except to clarify that a DOS worker ordinarily receives base pay, differentials associated with his position title, differentials associated with specific tasks he performs, and overtime, but does not receive the two latter categories while on sick leave. Ex. K (Wright Dep.) at 24:3-14

127.    Certain differentials are also associated with specific job titles and are paid to a Sanitation Worker regardless of what job they perform on any given day.  Ex. K (Wright Dep.) at 28: 23 – 29: 9.

**RESPONSE**: Undisputed.

128.    During the eight weeks that plaintiff was on sick leave, he was paid his basic salary.  Ex. D (50-h) at 9:8-17; Ex. E (Pl. Dep.) at 165: 24 – 166:1; 166: 11-12; Ex. K (Wright Dep.) at 28: 10 – 29: 14.

**RESPONSE**: Undisputed, except to clarify that "basic salary" includes only base pay and differentials associated with the worker's position title.

129.    During the eight weeks that plaintiff was on sick leave, he was not paid overtime or "extra money" for "picking the garbage up physically."  Ex. E (Pl. Dep.) at 166: 2 – 167: 3; Ex. K (Wright Dep.) at 46: 2-11; 48: 10-17.

**RESPONSE**: Undisputed, except to clarify that "extra money" for "picking the garbage up physically" is a differential associated with specific tasks Plaintiff performs, not a differential associated with his job title.

130.    After being on sick leave for eight weeks plaintiff made a full return to work. Ex. E (Pl. Dep.) at 167: 21-24.

**RESPONSE**: Undisputed.

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE DISPUTE TO BE TRIED**

131.    No member of the NYPD placed any tape, barrier, or other physical marking around the Tahoe, even though it is typical practice to do so. Lane Tr. 31:3-8; Baltzer Tr. 51:17-52:2; Swinkunas Tr. 62:5-13; Leon Tr. 40:11-17; Jimenez Tr. 53:14-21.

132.    Leon "didn't think it was necessary" to block off or cordon off the area. Leon Tr. 40:8-10.

133.    There was nothing to indicate to a member of the public that police regarded the vehicle as a crime scene. Baltzer Tr. 56:4-10; Swinkunas Tr. 62:5-13.

134.    West 113th Street remained open to vehicular traffic. Leon Tr. 39:23-40:7. No member of the NYPD placed any tape, barrier, or other physical marking around the Tahoe, Lane Tr. 31:3-8; Baltzer Tr. 51:17-52:2; Swinkunas Tr. 62:5-13; Leon Tr. 40:11-17.

135.    When Mr. Harris first approached Defendants, they were just "standing there not doing anything in particular." Lane Tr. 45:9-12; *see id.* at 46:13-16.

136.    "At no point did any of the police officers present physically block Mr. Harris from entering the vehicle." Lane Tr. 64:10-14.

137.    Nothing physically prevented Mr. Harris from getting into the Tahoe. Baltzer Tr. 82:7-10; Leon Tr. 79:15-20.

138.    Mr. Harris did not enter the Tahoe. *See* Ex. Leon BWC #1.

139.    "Mr. Harris did not use force against any members of the police department at any time during this interaction." Lane Tr. 75:20-24; TRI Report (Pl. Ex. O) ("Subject Used Force? No."); Baltzer Tr. 90:7-12.

140.    Mr. Harris did not "take any physical steps to assault or injure" any officer. Jimenez Tr. 80:12-20.

141.    Mr. Harris did not "physically threaten or otherwise threaten" any police officer at any point. Swinkunas Tr. 103:9-12; *accord* Jimenez Tr. 79:9-12 (cannot recall any physical or verbal threats made by Mr. Harris).

142.    Mr. Harris did not strike, kick, push, or punch anyone at any time during the interaction. Leon Tr. 87:6-13.

143.    During the interaction with Mr. Harris, Defendants could see Mr. Harris's hands. Swinkunas Tr. 76:10-17; Leon Tr. 49:21-50:10.

144.    Police officers are trained to look for weapons or dangerous objects in a subject's hands. Swinkunas Tr. 76:24-77:9.

145.    Defendants knew that Mr. Harris did not have any weapons or dangerous objects in his hands. Swinkunas Tr. 76:14-23; Jimenez Tr. 78:11-19; Leon Tr. 50:11-13.

146.    At no point before Mr. Harris was tased were Defendants "concerned that he had a weapon or dangerous object on him." Swinkunas Tr. 102:15-19; Jimenez Tr. 78:6-10.

147.    Defendants did not regard Mr. Harris as an emotionally disturbed person. TRI Report.

148.    Defendants did not suspect Mr. Harris of being under the influence of drugs or alcohol. TRI Report; Swinkunas Tr. 102:20-103:3; Jimenez Tr. 78:20-79:3.

149.    Lt. Leon made the determination that Mr. Harris should be tased as soon as Mr. Harris said "don't touch me." Leon Tr. 53:7-18.

150.    Lt. Leon's decision to order the tasing was based upon Mr. Harris's "size coupled with the words 'don't touch me.'" Leon Tr. 80:6-9.

151.    In no other case has Lt. Leon "ordered someone to be tased based upon their size and the words they used, as in this case." Leon Tr. 87:14-18.

152.    Mr. Harris's statement, "Don't touch me," was "verbal defiance." Leon Tr. 91:23-92:8.

153.    According to Lt. Leon's NYPD training, tasers are not supposed to be used for verbal defiance. NYPD Annual CEW User Training Update (Pl. Ex. P.) at 466; Leon Tr. 94:17-20.

154.    Leon acknowledges that "if a big guy says 'don't touch me,'" that alone is not enough justification to order the person to be tased under the training and guidance he received from the NYPD. Leon Tr. 96:3-5.

155.    Putting one's hands in the air is a widely understood gesture that commonly communicates the absence of a threat. Lane Tr. 56:3-6; Baltzer Tr. 72:20-23.

156.    It is "very common" for NYPD officers to say "stop resisting" to a resisting subject. Lane Tr. 38:18-22; *accord* Leon Tr. 45:16-46:7.

157.    Once Mr. Harris put his hands in the air, no one told Mr. Harris to stop resisting. *See* Leon BWC #1 at 1:06-1:12.

158.    Once Mr. Harris put his hands in the air, no police officer ordered him to put his hands behind his back. Lane Tr. 61:14-18.

159.    Once Mr. Harris put his hands in the air, no police officer gave him further verbal commands. Leon BWC #1 at 1:06-1:12.

160.    If Lane saw another officer struggling to gain compliance of a resisting subject, he would go help them because "that's his job." Lane Tr. 40:7-16.

161.    Baltzer would also help a fellow officer who was struggling to gain compliance of a resisting subject. Baltzer Tr. 78:15-79:2.

162.    Leon would assist a fellow officer if he observed them struggling to handcuff a subject. Leon Tr. 47:4-6.

163.    Lane expects his colleagues to come to his aid when he is struggling to control a resisting subject, unless there are other hostile civilians nearby. Lane Tr. 41:16-22.

164.    If Mr. Harris had been "moving his arms in the way [Lane] described for several seconds and evading [Lane's] attempt to gain control of him," Lane would have "expect[ed] some kind of assistance from his fellow officers." Lane Tr. 63:17-24.

165.    "If Lane had been struggling with Mr. Harris between the period when Mr. Harris said 'don't touch me' and the time when the taser was deployed," Leon would have expected Swinkunas to help Lane effect the arrest.

166.    Swinkunas "did not take any steps to physically intervene" to help Lane effectuate the arrest. Swinkunas Tr. 98:7-10, 100:10-13.

167.    Swinkunas "didn't think it was necessary to intervene further in order to help Lieutenant Lane effectuate the arrest." Swinkunas Tr. 99:13-17.

168.    Jimenez "did not take any steps to intervene or restrain or arrest [Mr. Harris] at any point before he was tased." Jimenez Tr. 65:2-6.

169.    Leon "did not attempt to physically assist to effect the arrest in any way" between when Mr. Harris said "don't touch me" and when the taser was deployed. Leon Tr. 64:4-8.

170.    Other than deploying a taser, Baltzer did not physically intervene to help Lane effect the arrest. Swinkunas Tr. 132:6-10.

171.    No one except Lt. Lane touched Mr. Harris before he was tased. Lane Tr. 62:11-15.

172.    None of the other officers gave verbal commands or physically intervened to help Lane effect the arrest, as they would be expected to do if Mr. Harris had been

actively resisting handcuffing, because Mr. Harris was not actively resisting handcuffing. *Supra* ¶¶ 156-171.

173.    Lane, Jimenez, Baltzer, and Leon all had tasers on their belts at the scene during the incident. Swinkunas Tr. 86:9-24.

174.    Taser-certified members of the NYPD are trained to draw their tasers quickly. Lane Tr. 34:17-22.

175.    The taser is carried with the cartridge already inside. Baltzer Tr. 29:24-30:9; Lane Tr. 34:23-35:3.

176.    To use the taser, the officer simply needs to draw it from the holster, click off the safety, and pull the trigger. Lane Tr. 35:8-10; Baltzer Tr. 30:15-31:8.

177.    Leon "would expect a police officer under his command to be able to draw their taser in an instant." Leon Tr. 54:22-55:2.

178.    Baltzer can draw a taser quickly to use it without hesitation when necessary. Baltzer Tr. 37:2-7.

179.    Baltzer hesitated to draw his taser after being ordered to do so multiple times by Leon. Leon Tr. 55:12-15, 55:21-25; Leon BWC #1 at 1:07-1:12.

180.    During the incident, the thought of grabbing his taser off his belt and using it "did not cross [Lane's] mind." Lane Tr. 70:22-71:3.

181.    Jimenez did not consider using her taser during the incident. Jimenez Tr. 83:23-84:4 (did not consider using her taser).

182.    Defendants did not come to each other's aid, give verbal commands, or draw their tasers of their own accord because they did not actually regard Mr. Harris as dangerous. *See supra* ¶¶ 156-181.

183.    After putting his hands and arms in the air, Mr. Harris did not move them

side to side or up and down. Harris Decl. ¶ 4.

184.    After putting his hands and arms in the air, Mr. Harris did not do anything else with them to evade the application of handcuffs. Harris Decl. ¶ 5.

185.    Mr. Harris was not resisting arrest at the time he was tased. Harris Decl. ¶¶ 4-5; *Supra* ¶¶ 156-172.

186.    Leon directed that Mr. Harris be arrested for obstructing government administration (OGA) and resisting arrest. Leon Tr. 75:7-11.

187.    Leon did not direct that Mr. Harris be arrested for tampering with evidence because he did not believe Mr. Harris committed that offense. Leon Tr. 75:25-76:10.

188.    A New York City Department of Sanitation ("DOS") worker ordinarily receives base pay, differentials associated with his position title, differentials associated with specific tasks he performs (e.g., picking up the garbage), and overtime, but does not receive the two latter categories of payment while on sick leave. Wright Tr. (Ds'. Ex. K) at 24:3-14; Paystubs (Pl. Ex. R) at PL105-06.

189.    Plaintiff did not receive overtime or differentials associated with specific tasks he performed when on sick leave. Paystubs at PL105-06; Wright Tr. 166:2-167; 46:2-11; 48:10-17; Harris Dep. Tr. 166:2-167:3.

190.    While on leave, Plaintiff received only his base salary and differentials associated with his position title, totaling $1606.23 per week. Paystubs at PL106-07; Annual Pay Summary Sheets (Pl. Ex. S) at PL 110, 113.

191.    Any additional payments reflected on Plaintiff's paystubs while he was on leave over and above $1606.23 per week reflect a one-week "lag time" between the time ordinary work is performed and the time a timekeeper inputs it, and a two-week-plus

lag time between the time overtime work is performed and the time a timekeeper inputs it. Wright Tr. 29:17-31:18.

192.   Plaintiff made income from overtime and/or differentials associated with specific tasks 39 of the 46 weeks preceding his leave in 2020. Annual Pay Summary Sheets at PL 110-11.

193.   Plaintiff's average weekly salary in 2020, for the 46 weeks immediately preceding his leave, was $2,197.23, with a median of $2,229.45. Annual Pay Summary Sheets at PL 110-11.

194.   Plaintiff made income from overtime and/or differentials associated with specific tasks during each of the 29 weeks immediately following his leave in 2021. Annual Pay Summary Sheets at PL 112-13.

195.   Plaintiff's average weekly salary in 2021, for the 29 weeks immediately following his leave, was $2,760.11, with a median of $2392.12. Annual Pay Summary Sheets at PL 112-13.

Dated:      March 25, 2022
            New York, New York

                              KAUFMAN LIEB LEBOWITZ
                              & FRICK LLP


                              _____/s/_____
                              Douglas E. Lieb
                              Alanna Kaufman

                              10 E. 40th Street, Suite 3307
                              New York, New York 10016
                              (212) 660-2332
                              dlieb@kllf-law.com
                              akaufman@kllf-law.com

                              *Attorneys for Plaintiff Brian Harris*