UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

BRIAN HARRIS,

                         Plaintiff,

             -against-

CITY OF NEW YORK; Lieutenant ANGEL LEON;
Detective KRISTEN SWINKUNAS (Shield # 2190);
Police Officer ANTONELLA JIMENEZ (Shield # 5209);
Police Officer MAXWELL BALTZER (Shield No.
15451); and Lieutenant JOHN LANE,

                       Defendants.

-------------------------------------------------------------------- X

**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE UNDER LOCAL CIVIL RULE 56.1(b)**

20 Civ. 10864 (LGS)

      Defendants City of New York, Lieutenant Angel Leon, Detective Kristen Swinkunas, Officer Antonella Jimenez, Officer Maxwell Baltzer, and Lieutenant John Lane, by their attorney, Hon. Sylvia O. Hinds-Radix, Corporation Counsel for the City of New York, submit this reply to Plaintiff's Response Under Local Civil Rule 56.1(b).

      131.   No member of the NYPD placed any tape, barrier, or other physical marking around the Tahoe, even though it is typical practice to do so.  Lane Tr. 31: 3-8; Baltzer Tr. 51:17-52:2; Swinkunas Tr. 62:5-13; Leon Tr. 40:11-17; Jimenez Tr. 53:14-21.

            **<u>Response:</u>** Not disputed that no tape, barrier, or other physical marking was placed around the Tahoe.  Disputed that "it is typical practice to do so."  None of the defendants so testified.  Officer Jimenez was asked "Is it typically *your* practice when securing or watching something that's under investigation to put up police caution tape or otherwise indicate that to members of the public", to which she responded in the affirmative. <u>Ex. J</u> (Jimenez Dep.) at 53: 14-19.  Regardless, the statement is immaterial.  It is undisputed that all of the defendants were

clearly in police uniform and that Lieutenant Leon and Lieutenant Lane instructed plaintiff multiple times that the Tahoe was a crime scene and to step away from the vehicle.  Ex. L (Leon BWC #1) at 00:30 – 1:06.  It is undisputed that plaintiff heard the instructions to step away from the Tahoe and understood that the police believed it was a crime scene.  Ex. D (50-h) at 27: 14 – 28: 23; Ex. N (Jimenez BWC) at 4:08 – 4:12.

132.    Leon "didn't think it was necessary" to block off or cordon off the area. Leon Tr. 40:8-10.

**Response:** Not disputed.   Regardless, the statement is immaterial.   It is undisputed that all of the defendants were clearly in police uniform and that Lieutenant Leon and Lieutenant Lane instructed plaintiff multiple times that the Tahoe was a crime scene and to step away from the vehicle.  Ex. L (Leon BWC #1) at 00:30 – 1:06.  It is undisputed that plaintiff heard the instructions to step away from the Tahoe and understood that the police believed it was a crime scene.  Ex. D (50-h) at 27: 14 – 28: 23; Ex. N (Jimenez BWC) at 4:08 – 4:12.

133.    There was nothing to indicate to a member of the public that police regarded the vehicle as a crime scene. Baltzer Tr. 56:4-10; Swinkunas Tr. 62:5-13.

**Response:** Disputed.  All of the defendants were clearly in police inform and instructed plaintiff multiple times that the Tahoe was a crime scene and to step away from the vehicle, Ex. L (Leon BWC #1) at 00:30 – 1:06, which was more than sufficient to indicate to a member of the public, such as plaintiff, that the police regarded the vehicle as a crime scene.  Plaintiff understood that the officers regarded the Tahoe as a crime scene.  Ex. N (Jimenez BWC) at 4:08 – 4:12.

134.    West 113th Street remained open to vehicular traffic. Leon Tr. 39:23-40:7. No member of the NYPD placed any tape, barrier, or other physical marking around the Tahoe. Lane Tr. 31:3-8; Baltzer Tr. 51:17-52:2; Swinkunas Tr. 62:5-13; Leon Tr. 40:11-17.

> **Response:** Not disputed.   Regardless, the statement is immaterial.   It is undisputed that all of the defendants were clearly in police uniform and that Lieutenant Leon and Lieutenant Lane instructed plaintiff multiple times that the Tahoe was a crime scene and to step away from the vehicle.  Ex. L (Leon BWC #1) at 00:30 – 1:06.  It is undisputed that plaintiff heard the instructions to step away from the Tahoe and understood that the police believed it was a crime scene.  Ex. D (50-h) at 27: 14 – 28: 23; Ex. N (Jimenez BWC) at 4:08 – 4:12.

135.    When Mr. Harris first approached Defendants, they were just "standing there not doing anything in particular."  Lane Tr. 45:9-12; *see id.* at 46:13-16.

> **Response:** Disputed.   Lieutenant Leon, Lieutenant Lane, Detective Swinkunas, and Officer Jimenez testified that they were safeguarding the vehicle to make sure no one went near it, touched it, or tried to move it.  Ex. G (Leon Dep.) at 35: 9-10; 70: 19 – 71: 9; Ex. H (Lane Dep.) at 30: 18-22.; 32: 13-15; 67: 4-8; Ex. I (Swinkunas Dep.) at 61: 12-22; 63: 12-14; Ex. J (Jimenez Dep.) at 49: 14 – 50: 19.   Furthermore, it is undisputed that Lieutenant Leon and Lieutenant Lane instructed plaintiff multiple times that the Tahoe was a crime scene and to step away from the vehicle.  Ex. L (Leon BWC #1) at 00:30 – 1:06.

136.    "At no point did any of the police officers present physically block Mr. Harris from entering the vehicle."  Lane Tr. 64:10-14.

**Response:** Disputed in part.  The quoted statement above was a question posed by plaintiff's counsel, to which Lieutenant Lane responded "No, it doesn't appear that way."  Ex. H (Lane Dep.) at 64: 14. Regardless, the statement is not material because the defendants were not required to get into a hands-on physical confrontation with plaintiff to prevent him from entering the Tahoe.   See MacLeod v. Town of Brattleboro, 548 Fed. Appx. 6, 8 (2d Cir. 2013); Prive v. Wells, No. 5:13-cv-320, 2015 U.S. Dist. LEXIS 33215 at *38 (D. Vt. Mar. 17, 2015); Towsley v. Frank, No. 5:09-cv-23, 2010 U.S. Dist. LEXIS 137005 at *22-*23 (D. Vt. Dec. 28, 2010); Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004).

137.    Nothing physically prevented Mr. Harris from getting into the Tahoe. Baltzer Tr. 82:7-10; Leon Tr. 79: 15-20.

**Response:** Disputed in part.  After plaintiff refused multiple commands to step away from the Tahoe, Lieutenant Lane attempted to grab ahold of him to put him in handcuffs, which would have prevented him from entering the Tahoe, but was unable to do so because plaintiff lifted his arms up and away from Lieutenant Lane's grasp.  Ex. F (Baltzer Dep.) at 74: 3-13; 77: 10-11; Ex. G (Leon Dep.) at 53: 12-13; 60: 12-17; 84: 14-17; Ex. H (Lane Dep.) at 52: 16-53: 5; 57: 4-7; Ex. I (Swinkunas Dep.) at 82: 5-7; Ex. J (Jimenez Dep.) at 62: 6-7; 67: 2; Ex. L (Leon BWC #1) at 1:06 – 1:07.

138.    Mr. Harris did not enter the Tahoe.

**Response:** Disputed in part.  Though plaintiff did not successfully manage to get fully inside of the Tahoe, it is undisputed that he was facing the open door of the

Tahoe and leaning into the vehicle when he was tased.  Ex. E (Pl. Dep.) at 104: 23
– 105: 3 Ex. F (Baltzer Dep.) at 79: 5-8, 14-17; 80: 10-21; 81: 15 – 82: 13; Ex. G
(Leon Dep.) at 62: 7-20; Ex. L (Leon BWC #1) at 1:09.

139.   "Mr. Harris did not use force against any members of the police
department at any time during this interaction."  Lane Tr. 75:20-24; TRI Report (Pl. Ex. O)
("Subject Used Force? No"); Baltzer Tr. 90:7-12.

**Response:** Disputed in part.  Not disputed that Lieutenant Lane testified plaintiff
did not use force against the police.  Regarding Officer Baltzer's TRI Report, Pl.
Ex. O, in the section "FORCE AGAINST REPORTING MOS" on DEF021,
Officer Baltzer noted "Active resistance." Further, Officer Baltzer testified that
the TRI "form is based on my interaction with Mr. Harris, and from my
interaction, Mr. Harris didn't use force against me," and that he the question
"Subject Used Force: No" "because [plaintiff] didn't use force against me." Ex. F
(Baltzer Dep.) at 88: 13-24.  When Officer Baltzer was asked "You didn't observe
[plaintiff] use force against anyone else, right?", Officer Baltzer answered "I
observed a physical struggle between him and Lieutenant Lane." Ex. N (Baltzer
Dep.) at 88:25 – 89:4.  Officer Baltzer was asked about his understanding of the
meaning of the term "force" in the context of the TRI report, "Based on that
understanding of force, the meaning of the word 'force,' did you observe Mr.
Harris use force against any members of the NYPD, yes or no?"  Ex. N (Baltzer
Dep.) at 90: 7-10.  Officer Baltzer responded "No, I did not.  It depends on your
definition of force.  A physical struggle does not constitute the use of force."  Ex.
N (Baltzer Dep.) at 90: 12-14.

140.    Mr. Harris did not "take any physical steps to assault or injure" any officer.  Jimenez Tr. 80:12-20.

> **<u>Response:</u>** Disputed in part.  Officer Jimenez explained that she believed plaintiff may injure one of the officers because he was being uncooperative, was very big, and seemed upset.  <u>Ex. J</u> (Jimenez Dep.) at 79: 17 – 80: 11.  It is immaterial that plaintiff did not physically assault or injure any officer because the defendants were not required to get into a hands-on physical confrontation with plaintiff.  <u>See MacLeod v. Town of Brattleboro</u>, 548 Fed. Appx. 6, 8 (2d Cir. 2013); <u>Prive v. Wells</u>, No. 5:13-cv-320, 2015 U.S. Dist. LEXIS 33215 at *38 (D. Vt. Mar. 17, 2015); <u>Towsley v. Frank</u>, No. 5:09-cv-23, 2010 U.S. Dist. LEXIS 137005 at *22-*23 (D. Vt. Dec. 28, 2010); <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1278 (11th Cir. 2004).

141.    Mr. Harris did not "physically threaten or otherwise threaten" any police officer at any point.  Swinkunas Tr. 103:9-12; *accord* Jimenez Tr. 79:9-12 (cannot recall any physical or verbal threats made by Mr. Harris).

> **<u>Response:</u>** Disputed.  Detective Swinkunas was asked "Did you *hear* plaintiff physically threaten or otherwise threaten any of the other members of service?", to which she responded "Not to my knowledge."  Officer Jimenez did not testify that she could not recall any physical or verbal threats.  Rather, when she was asked "Sitting here today, can you recall any physical or verbal threats he made to you or the other officers," she responded "I don't remember," meaning she could not recall one way or the other.

142.    Mr. Harris did not strike, kick, push, or punch anyone at any time during the interaction.  Leon Tr. 87:6-13.

**Response:** Not disputed.  However, the statement is not material because the defendants were not required to get into a hands-on physical confrontation with plaintiff.  See MacLeod v. Town of Brattleboro, 548 Fed. Appx. 6, 8 (2d Cir. 2013); Prive v. Wells, No. 5:13-cv-320, 2015 U.S. Dist. LEXIS 33215 at *38 (D. Vt. Mar. 17, 2015); Towsley v. Frank, No. 5:09-cv-23, 2010 U.S. Dist. LEXIS 137005 at *22-*23 (D. Vt. Dec. 28, 2010); Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004).

143.    During the interaction with Mr. Harris, Defendants could see Mr. Harris' hands. Swinkunas Tr. 76:10-17; Leon Tr. 49:21-50:10.

**Response:** Not disputed that Detective Swinkunas so testified.  However, none of the other defendants were specifically asked this question.  Moreover, it is not material.

144.    Police officers are trained to look for weapons or dangerous objects in a subject's hands.  Swinkunas Tr. 76:24-77:9.

**Response:** Not disputed.  However, this statement is not material.

145.    Defendants knew that Mr. Harris did not have any weapons or dangerous objects in his hands.  Swinkunas Tr. 76:14-23; Jimenez Tr. 78:11-19; Leon Tr. 50:11-13.

**Response:** Not disputed that Lieutenant Leon, Detective Swinkunas, and Officer Jimenez testified that plaintiff did not have any weapons.  However, Officer Baltzer and Lieutenant Lane were specifically not asked if they knew whether plaintiff had any weapons or dangerous objects.

146.    At no point before Mr. Harris was tased were Defendants "concerned that he had a weapon or dangerous object on him." Swinkunas Tr. 102:15-19; Jimenez Tr. 78:6-10.

**Response:** Not disputed that Detective Swinkunas so testified.  However, none of the other defendants were specifically asked if they were "concerned" plaintiff may have a weapon.

147.    Defendants did not regard Mr. Harris as an emotionally disturbed person. TRI Report.

**Response:** Not disputed.

148.    Defendants did not suspect Mr. Harris of being under the influence of drugs or alcohol.  TRI Report; Swinkunas Tr. 102:20-103:3; Jimenez Tr. 78:20-79:3.

**Response:** Not disputed.

149.    Lt. Leon made the determination that Mr. Harris should be tased as soon as Mr. Harris said "don't touch me." Leon Tr. 53:7-18.

**Response:** Disputed.  Lieutenant Leon testified in detail at his deposition that he directed Officer Baltzer to draw his taser based on multiple factors, including plaintiff's size, plaintiff was resisting arrest, plaintiff was physically struggling with Lieutenant Lane, plaintiff was trying to prevent himself from being handcuffed, plaintiff was flailing his arms, plaintiff said "don't touch me," and it appeared that plaintiff was trying to get into the Tahoe. Ex. G (Leon Dep.) at 78: 16-25; 79: 10-14; 80: 6-9; 87: 22 – 88: 6; 94: 24 – 96:2.

150.    Lt. Leon's decision to order the tasing was based upon Mr. Harris' "size coupled with the words 'don't touch me.'" Leon Tr. 80:6-9.

**Response:** Disputed. Lieutenant Leon testified in detail at his deposition that he directed Officer Baltzer to draw his taser based on multiple factors, including plaintiff's size, plaintiff was resisting arrest, plaintiff was physically struggling with Lieutenant Lane, plaintiff was trying to prevent himself from being handcuffed, plaintiff was flailing his arms, plaintiff said "don't touch me," and it appeared that plaintiff was trying to get into the Tahoe. Ex. G (Leon Dep.) at 78: 16-25; 79: 10-14; 80: 6-9; 87: 22 – 88: 6; 94: 24 – 96:2.

151.    In no other case has Lt. Leon "ordered someone to be tased based upon their size and the words they used, as in this case." Leon Tr. 87:14-18.

**Response:** Disputed. The quoted statement above is not Lieutenant Leon's testimony, but rather a question posed by plaintiff's counsel. Lieutenant Leon testified in detail at his deposition that he directed Officer Baltzer to draw his taser based on multiple factors, including plaintiff's size, plaintiff was resisting arrest, plaintiff was physically struggling with Lieutenant Lane, plaintiff was trying to prevent himself from being handcuffed, plaintiff was flailing his arms, plaintiff said "don't touch me," and it appeared that plaintiff was trying to get into the Tahoe. Ex. G (Leon Dep.) at 78: 16-25; 79: 10-14; 80: 6-9; 87: 22 – 88: 6; 94: 24 – 96:2.

152.    Mr. Harris' statement, "Don't touch me," was "verbal defiance." Leon Tr. 91:23-92:8.

**Response:** Not disputed. However, the statement is not material. Numerous courts in this Circuit and others have found that repeated defiance of police orders constitutes active resistance justifying the use of a taser. See, e.g., Crowell v.

- 9 -

Kirkpatrick, 400 Fed. Appx. 592, 594-95 (2d Cir. 2010); MacLeod, 548 Fed.

Appx. at 6; Scoma v. City of New York, No. 16 CV 6693 (KAM)(SJB), 2021

U.S. Dist. LEXIS 12727 at *26 (E.D.N.Y. Jan. 22, 2021); Prive, 2015 U.S. Dist.

LEXIS 33215 at *37-*40; Draper, 369 F.3d at 1278; DeVoe v. Rebant, No. 05-

71836, 2006 U.S. Dist. LEXIS 5326 at *21-*22 (E.D. Mich. Feb. 13, 2006); see

also Towsley, 2010 U.S. Dist. LEXIS 137005 at *20-*24; Tracy v. Freshwater,

623 F.3d 90, 97 (2d Cir. 2010)).

153.    According to Lt. Leon's NYPD training, tasers are not supposed to be

used for verbal defiance.  NYPD Annual CEW User Training Update (Pl. Ex. P) at 466; Leon Tr.

94:17-20.

**Response:** Not disputed.  However, this statement is not material because the

NYPD's policies, procedures, and training materials do not establish standard for

a § 1983 claim.  See Cerbelli v. City of New York, No. 99 CV 6846 (ARR)(RML)

2008 U.S. Dist. LEXIS 109341 (E.D.N.Y. Sept. 8, 2008), report and

recommendation adopted at 2008 U.S. Dist. LEXIS 77335 (E.D.N.Y. Oct. 1,

2008) ("local agency-established policies, such as the Patrol Guide, do not

establish constitutional standards") (citing Poe v. Leonard, 282 F.3d 123, 146 (2d

Cir. 2002)); see also  McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d

Cir. 2009) ("Here, the Court concluded that the [Philadelphia Police Department

use of force] directives had the potential to lead the jury to equate local policy

violations with constitutional violations, and that this risk of confusing the issues

substantially outweighed the directives' probative value. We do not find that in

making this determination the Court abused its discretion."); Thompson v. City of

Chicago, 472 F.3d 444, 454 (7th Cir. 2006) ("§ 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices.   In other words, the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established"); Romero v. Board of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995) ("violations of state law and police procedure generally do not give rise to a 1983 claim").

154.   Leon acknowledges that "if a big guy says 'don't touch me,'" that alone is not enough justification to order the person to be tased under the training guidance he received from the NYPD.  Leon Tr. 96:3-5.

**Response:**  Not disputed that Lieutenant Leon so testified.  However, Lieutenant Leon explained "That alone won't suffice, but coupled if someone is having a struggle to handcuff you, physically grabbing your hand to place you under arrest, then a taser is going to be used."  Ex. G (Leon Dep.) at 95: 23 – 96: 2.  Further, Lieutenant Leon testified in detail at his deposition that he directed Officer Baltzer to draw his taser based on multiple factors, including plaintiff's size, plaintiff was resisting arrest, plaintiff was physically struggling with Lieutenant Lane, plaintiff was trying to prevent himself from being handcuffed, plaintiff was flailing his arms, plaintiff said "don't touch me," and it appeared that plaintiff was trying to get into the Tahoe.  Ex. G (Leon Dep.) at 78: 16-25; 79: 10-14; 80: 6-9; 87: 22 – 88: 6; 94: 24 – 96:2.  Moreover, the statement is not material because the NYPD's policies, procedures, and training materials do not establish standard for a § 1983 claim. See Resp to Statement 153 *supra*.

- 11 -

155.    Putting one's hands in the air is a widely understood gesture that commonly communicates the absence of a threat.  Lane Tr. 56:3-6; Baltzer Tr. 72:20-23.

**Response:** Disputed.  When Lieutenant Lane was asked if plaintiff putting his hands up "is pretty much a universal gesture of 'hands up, not a threat,'" he answered "Yes, depending on the context."  Lieutenant Lane then explained that in the context of this situation, he believed plaintiff was raising his hands up in preparation to hit Lieutenant Lane because plaintiff had refused numerous orders to back away from the Tahoe, said "you can't tell me what to do with my property," his behavior and demeanor were aggressive, and he did not seem to care when he was told he would be placed under arrest.  Ex. H (Lane Dep.) at 56: 7-22.  When Officer Baltzer was asked "when someone is putting their hands up, they are showing you they are not a threat, right," he answered "Not necessarily. You don't know if someone was trying to grab our wrist and you picked them up, that would be resisting."  Further, whether something is "widely understood" is vague and ambiguous and a subjective interpretation.

156.    It is "very common" for NYPD officers to say "stop resisting" to a resisting subject.  Lane Tr. 38:18-22; *accord* Leon Tr. 45:16-46:7.

**Response:** Not disputed that Lieutenant Leon and Lieutenant Lane so testified. However, the statement is not material.

157.    Once Mr. Harris put his hands up in the air, no one told Mr. Harris to stop resisting.  *See* Leon BWC #1 at 1:06-1:12.

**Response:** Not disputed.  However, the statement is not material.

158.    Once Mr. Harris put his hands in the air, no police officer ordered him to put his hands behind his back.  Lane Tr. 61:14-18.

**Response:**  Not disputed that Lieutenant Lane so testified.  However, it is undisputed that plaintiff was told he would be placed under arrest and responded by yelling "I don't care" five times.  Ex. L (Leon BWC #1) at 00:49 – 00:55.

159.    Once Mr. Harris put his hands in the air, no police officer gave him further verbal commands.  Leon BWC #1 at 1:06-1:12.

**Response:** Not disputed.  However, the statement is not material because it is undisputed that by the time plaintiff put his hands in the air, he heard the officers tell him numerous times to back away from the Tahoe but he refused to comply.  Ex. D (50-h) at 27: 14 – 29: 9; Ex. L (Leon BWC #1) at 00:30 – 1:07.

160.    If Lane saw another officer struggling to gain compliance of a resisting subject, he would go help them because "that's his job." Lane Tr. 40:7-16.

**Response:** Not disputed.

161.    Baltzer would also help a fellow officer who was struggling to gain compliance of a resisting subject.  Baltzer Tr. 78:15-79:2.

**Response:** Not disputed.

162.    Leon would also assist a fellow officer if he observed them struggling to handcuff a subject.  Leon Tr. 47:4-6.

**Response:** Not disputed.

163.    Lane expects his colleagues to come to his aid when he is struggling to control a resisting subject, unless there are other hostile civilians nearby. Lane Tr. 41:16-22.

**Response:** Disputed in part.  When Lieutenant Lane was asked "Would you expect your fellow officers [to assist you] if you were the one struggling to gain compliance of the subject," he answered "It also depends on the situation though, I believe some situations the more officers involved in trying to gain control of the situation it gets tangled up, and then there are other people around that you want officers protecting you from these people as well, so nobody throws anything; it all depends on the situation."  Ex. H (Lane Dep.) at 40: 17 – 41: 3.

164.    If Mr. Harris had been "moving his arms in the way [Lane] described for several seconds and evading [Lane's] attempt to gain control of him," Lane would have "expect[ed] some kind of assistance from his fellow officers."  Lane Tr. 63:17-24.

**Response:** Disputed in part.  When Lieutenant Lane was asked "If Mr. Harris was moving his arms away in the way you described for several seconds and evading your attempt to gain control of him, would you have expected one of the other officers to come to your aid?", he answered "I suppose, yeah, I expect some kind of assistance."  Lieutenant Lane was then asked "But that is not what happened, right?", and he answered "The situation was a little tricky because the car door was open, and I believe the officers were still on the other side of it.  So Lieutenant Leon who was standing next to me, he and I were both engaging with Mr. Harris at that time, I believe Baltzer was behind Lt. Leon."  Further, Lieutenant Leon and Officer Baltzer did assist Lieutenant Lane.  It is undisputed that Lieutenant Leon instructed Officer Baltzer to tase plaintiff, and Officer Baltzer tased plaintiff, in order to assist Lieutenant Lane in his effort to place plaintiff under arrest and in handcuffs.  Ex. G (Leon Dep.) at 78: 16-25; 79: 10-

14; 80: 6-9; 87: 22 – 88: 6; 94: 24 – 96:2; <u>Ex. F</u> (Baltzer Dep.) at 66: 17 – 67: 25;

69: 17 – 71: 11; 71: 17-22; 72: 2-10; <u>Ex. L</u> (Leon BWC #1) at 1:03 – 1:07.

165.    "If Lane had been struggling with Mr. Harris between the period when Mr.

Harris said 'don't touch me' and the time when the taser was deployed," Leon would have

expected Swinkunas to help Lane effect the arrest.

> **<u>Response:</u>** Disputed in part.  As an initial matter, the statement fails to comply
> with Local Civil Rule 56.1(d) because it is not "followed by citation to evidence
> which would be admissible."  Nevertheless, When Lieutenant Leon was asked
> "Between the moment when Mr. Harris says 'don't touch me' and you decide that
> the taser is necessary, and the moment that the taser is deployed, what did
> Lieutenant Lane do?", he answered "I see Lieutenant Lane struggling with Brian
> Harris."  <u>Ex. G</u> (Leon Dep.) at 60: 8-13

166.    Swinkunas "did not take any steps to physically intervene" to help Lane

effectuate the arrest.  Swinkunas Tr. 98:7-10, 100:10-13.

> **<u>Response:</u>** Not disputed that she so testified.

167.    Swinkunas "didn't think it was necessary to intervene further in order to

help Lieutenant Lane effectuate the arrest."  Swinkuns Tr. 99:13-17.

> **<u>Response:</u>** Not disputed that she so testified.

168.    Jimenez "did not take any steps to intervene or restrain or arrest [Mr.

Harris] at any point before he was tased."  Jimenez Tr. 65:2-6.

> **<u>Response:</u>** Disputed.  Officer Jimenez testified that she took a step towards
> Lieutenant Lane to assist him, but before she intervened plaintiff was tased, and

this sequence of events happened very quickly.  Ex. J (Jimenez Dep.) at 65: 7 –
66: 10.

169.    Lieutenant Leon "did not attempt to physically assist to effect the arrest in
any way" between when Mr. Harris said "don't touch me" and when the taser was deployed.
Leon Tr. 64:4-8.

>   **Response:** Disputed in part.  Though Lieutenant Leon testified that he himself did
>   not *physically* assist Lieutenant Lane, he ordered Officer Baltzer to deploy his
>   taser to assist Lieutenant Lane.  Ex. G (Leon Dep.) at 78: 16-25; 79: 10-14; 80: 6-
>   9; 87: 22 – 88: 6; 94: 24 – 96:2.

170.    Other than deploying a taser, Baltzer did not physically intervene to help
Lane effect the arrest.  Swinkunas Tr. 132:6-10.

>   **Response:** Not disputed that Detective Swinkunas so testified.

171.    No one except Lt. Lane touched Mr. Harris before he was tased.  Lane Tr.
62:11-15.

>   **Response:** Not disputed.

172.    None of the other officers gave verbal commands or physically intervened
to help Lane effect the arrest, as they would be expected to do if Mr. Harris had been actively
resisting handcuffing, because Mr. Harris was not actively resisting handcuffing. *Supra* ¶¶ 156-
171.

>   **Response:** Disputed. As an initial matter, the statement fails to comply with Local
>   Civil Rule 56.1.  It is not a "short and concise statement of material fact," Local
>   Civil Rule 56.1(b), but rather is argument.  Further, it is not "followed by citation
>   to evidence which would be admissible."  Local Civil Rule 56.1(d).  Moreover,

Lieutenant Leon gave the order to deploy the taser, and Officer Baltzer decided to deploy the taser, to help Lieutenant Lane.  Ex. G (Leon Dep.) at 78: 16-25; 79: 10-14; 80: 6-9; 87: 22 – 88: 6; 94: 24 – 96:2; Ex. F (Baltzer Dep.) at 66: 17 – 67: 25; 69: 17 – 71: 11; 71: 17-22; 72: 2-10.   Officer Jimenez took a step toward Lieutenant Lane in anticipation of helping him, but before she could intervene plaintiff was tased because everything happened very quickly.  Ex. J (Jimenez Dep.) at 65: 7 – 66: 10.

173.    Lane, Jimenez, Baltzer, and Leon all had tasers on their belts at the scene during the incident.  Swinkunas Tr. 86:9-24.

**Response:** Not disputed.

174.    Taser-certified members of the NYPD are trained to draw their tasers quickly. Lane Tr. 34:23-35:3.

**Response:** Not disputed.  However, the statement is not relevant or material.  The NYPD's policies, procedures, and training materials do not establish standard for a § 1983 claim.  See Cerbelli, 2008 U.S. Dist. LEXIS 109341; see also McKenna, 582 F.3d at 461; Thompson, 472 F.3d at 454; Romero, 60 F.3d at 705.

175.    The taser is carried with the cartridge already inside.  Baltzer Tr. 29:24-390:9; Lane Tr. 34:23-35:3.

**Response:** Not disputed.

176.    To use the taser, the officer simply need to draw it from the holster, click off the safety, and pull the trigger.  Lane Tr. 35:8-10; Baltzer Tr. 30:15-31:8.

**Response:** Not disputed.

177.     Leon "would expect a police officer under his command to be able to draw their taser in an instant."  Leon Tr. 54:22-55:2.

**Response:** Not disputed.

178.     Baltzer can draw a taser quickly to use it without hesitation when necessary.  Baltzer Tr. 37:2-7.

**Response:** Not disputed.

179.     Baltzer hesitated to draw his taser after being ordered to do so multiple times by Leon.  Leon Tr. 55:12-15,  55:21-25; Leon BWC #1 at 1:07-1:12.

**Response:** Disputed.   Lieutenant Leon testified that, from his perspective, it appeared Officer Baltzer hesitated and that "it's common for an officer to hesitate to pull out their taser."  Ex. G (Leon Dep.) at 7-15.  Officer Baltzer did not testify that he hesitated to draw his taser.

180.     During the incident, the thought of grabbing his taser off his belt and using it "did not cross [Lane's] mind."  Lane Tr. 70:22-71:3.

**Response:** Disputed in part.  Lieutenant Lane testified that he "did not make a conscious decision to not tase" plaintiff, Ex. H (Lane Dep. at 70: 15-16), and he did not think to use his taser because "the way the situation was progressing, I tried to grab his arms hoping he would comply at that point."  Ex. H (Lane Dep.) at 68: 18-20.

181.     Jimenez did not consider using her taser during the incident.  Jimenez Tr. 83:23-84:4. (did not consider using her taser)

**Response:** Disputed in part.  Officer Jimenez testified that the reason she did not consider using her taser was because of her "inexperience" and she was "still in

training and still learning on the job." <u>Ex. J</u> (Jimenez Dep.) at 84: 10-12.  Officer Jimenez graduated from the police academy in June 2020 and had only been working as a patrol officer for about two months on the date of incident.  <u>Ex. J</u> (Jimenez Dep.) at 15: 21 – 16: 2.  She was still in training on the date of incident. <u>Ex. J</u> (Jimenez Dep.) at 21:4-8.

182.    Defendants did not come to each other's aid, give verbal commands, or draw their tasers of their own because they did not actually regard Mr. Harris as dangerous.  *See supra* ¶¶ 156-181.

> **Response:** Disputed. As an initial matter, the statement fails to comply with Local Civil Rule 56.1.  It is not a "short and concise statement of material fact," Local Civil Rule 56.1(b), but rather is argument.  Further, it is not "followed by citation to evidence which would be admissible."  Local Civil Rule 56.1(d).  Lieutenant Leon gave the order to deploy the taser, and Officer Baltzer decided to deploy the taser, to help Lieutenant Lane because plaintiff was resisting him.  <u>Ex. G</u> (Leon Dep.) at 78: 16-25; 79: 10-14; 80: 6-9; 87: 22 – 88: 6; 94: 24 – 96:2; <u>Ex. F</u> (Baltzer Dep.) at 66: 17 – 67: 25; 69: 17 – 71: 11; 71: 17-22; 72: 2-10.  Officer Jimenez took a step toward Lieutenant Lane in anticipation of helping him, but before she could intervene plaintiff was tased because everything happened very quickly.  <u>Ex. J</u> (Jimenez Dep.) at 65: 7 – 66: 10.

183.    After putting his hands and arms in the air, Mr. Harris did not move them side to side or up and down. Harris Dec. ¶ 4.

> **Response:** Disputed.   All of the defendants perceived plaintiff's conduct as physically resisting Lieutenant Lane's efforts to place him under arrest by, among

other things, moving his arms in a way that prevented Lieutenant Lane from placing him in handcuffs.  Ex. F (Baltzer Dep.) at 68: 6-10, 17-19; 71: 10-11; 73: 12-18; 74: 3-25; 89: 3-4; Ex. G (Leon Dep.) at 60: 8-17; 84: 14-17; 86: 25 – 87: 5; 87: 22 – 88: 6; Ex. H (Lane Dep.) at 61: 25 – 63: 4; Ex. I (Swinkunas Dep.) at 82: 20 – 84: 17; 95: 21 – 96: 8; Ex. J (Jimenez Dep.) at 67: 16 – 68: 7.

184.    After putting his hands and arms in the air, Mr. Harris did not do anything else with them to evade the application of the handcuffs. Harris Decl. ¶ 5.

> **Response:** Disputed.   By raising his hands in the air, plaintiff was evading Lieutenant Lane's efforts to put him in handcuffs.  Ex. H (Lane Dep.) at 57: 4-19. Before plaintiff was tased, he never put his hands behind his back to be handcuffed.  Ex. E (Pl. Dep.) at 117: 21-23.

185.    Mr. Harris was not resisting arrest at the time he was tased.  Harris Decl. ¶¶ 4-5; *Supra* ¶¶ 156-172.

> **Response:** Disputed.  The statement fails to comply with Local Civil Rule 56.1. It is not a "short and concise statement of material fact," Local Civil Rule 56.1(b), but rather is argument and a conclusion of law.  Further, by raising his hands in the air, plaintiff was evading Lieutenant Lane's efforts to put him in handcuffs. Ex. H (Lane Dep.) at 57: 4-19.  Before plaintiff was tased, he never put his hands behind his back to be handcuffed.  Ex. E (Pl. Dep.) at 117: 21-23.  Plaintiff actively resisted arrest by failing to comply with all of the commands the officers gave.  Ex. D (50-h) at 27: 14 – 29: 9; Ex. L (Leon BWC #1) at 00:30 – 1:07; See, e.g., Crowell, 400 Fed. Appx. at 594-95; MacLeod, 548 Fed. Appx. at 6; Scoma, 2021 U.S. Dist. LEXIS 12727 at *26; Prive, 2015 U.S. Dist. LEXIS 33215 at *37-

*40; <u>Draper</u>, 369 F.3d at 1278; <u>DeVoe</u>, 2006 U.S. Dist. LEXIS 5326 at *21-*22; <u>see also Towsley</u>, 2010 U.S. Dist. LEXIS 137005 at *20-*24; <u>Tracy v. Freshwater</u>, 623 F.3d 90, 97 (2d Cir. 2010))

186.   Leon directed that Mr. Harris be arrested for obstructing government administration (OGA) and resisting arrest.  Leon Tr. 75:7-11.

> **<u>Response:</u>** Not disputed.  However, the statement is not material.  Plaintiff does not allege claims for false arrest, malicious prosecution, or denial of the right to a fair trial.

187.   Leon did not direct that Mr. Harris be arrested for tampering with evidence because he did not believe Mr. Harris committed that offense.  Leon Tr. 75:25-76:10.

> **<u>Response:</u>** Not disputed.  However, Lieutenant Leon's subjective belief as to whether plaintiff's conduct amounted to "tampering with evidence" is not material.  Further, it is not material because plaintiff does not allege claims for false arrest, malicious prosecution, or denial of the right to a fair trial.

188.   A New York City Department of Sanitation ("DOS") worker ordinarily receives base pay, differentials associated with his position title, differentials associated with specific tasks he performs (e.g., picking up the garbage), and overtime, but does not receive the latter categories of payment while on sick leave.  Wright Tr. (Ds' Ex. K) at 24:3-24; Paystubs (Pl. Ex. R) at PL105-06.

> **<u>Response:</u>** Disputed in part.  There is no evidence in the record that a DOS employee "ordinarily" receives differentials associated with specific tasks and overtime.

189.    Plaintiff did not receive overtime or differentials associated with specific tasks he performed when on sick leave.  Paystubs at PL105-106; Wright Tr. 166:2-167; 46:2-11; 48:10-17; Harris Dep. Tr. 166:2-167:3.

**Response:** Not disputed.

190.    While on leave, Plaintiff received only his base salary and differentials associated with his position, totaling $1606.23 per week.  Paystubs at PL106-07; Annual Pay Summary Sheets (Pl. Ex. S) at PL110, 113.

> **Response:** Disputed in part.  For the par period "11/29/20 – 12/05/20," plaintiff was paid $4,251.14.  Ex. R (Paystubs) at PL107.  Plaintiff's pay for the pay periods in November and December 2020 varied from week to week.  Ex. S (Annual Pay Summary Sheets) at PL110.

191.    Any additional payments reflected on Plaintiff's paystubs while he was on leave over and above $1606.23 per week reflect a one-week "lag time" between the time ordinary work is performed and the time a timekeeper inputs it, and a two-week-plus lag time between the time overtime is performed and the time a timekeeper inputs it. Wright Tr. 29:17-31:18.

> **Response:** Disputed.  The statement is not supported by the cited deposition testimony.

192.    Plaintiff made income from overtime and/or differentials associated with specific tasks 39 of the 46 weeks preceding his leave in 2020.  Annual Pay Summary Sheets at PL110-11.

**Response:** Disputed.   The statement is not supported by the cited document, which does not indicate the category of wages plaintiff was paid in any given pay period.  There is no evidence in the record to support this statement.

193.    Plaintiff's average weekly salary in 2020, for the 46 weeks immediately preceding his leave, was $2,197.23, with a median of $2,229.45.  Annual Pay Summary Sheets PL110-11.

**Response:** Not disputed.

194.    Plaintiff made income from overtime and/or differentials associated with specific tasks during each of the 29 weeks immediately following his leave in 2021.  Annual Pay Summary Sheets at PL110-11.

**Response:** Disputed.   The statement is not supported by the cited document, which does not indicate the category of wages plaintiff was paid in any given pay period.  There is no evidence in the record to support this statement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

195.   Plaintiff's average weekly salary in 2021, for the 29 weeks immediately following his leave, was $2,760.11, with a median of $2392.12.  Annual Pay Summary Sheets at PL112-12.

**Response:** Not disputed.


Dated: New York, NY
       April 7, 2022

                                        **HON. SYLVIA O. HINDS-RADIX**
                                        Corporation Counsel of the City of New York
                                        *Attorney for Defendants City of New York,*
                                        *Leon, Swinkunas, Jimenez, Baltzer, and Lane*
                                        100 Church Street
                                        New York, New York 10007
                                        (212) 356-5044


                                        By:  /s/ Christopher G. Arko
                                             Christopher G. Arko
                                             *Senior Counsel*
                                             Special Federal Litigation Division


cc:    Doug Lieb, Esq. (by ECF)
       Alanna Kaufman, Esq. (by ECF)
       *Attorneys for plaintiff*

20 Civ. 10864 (LGS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN HARRIS,

                                        Plaintiff,

                    -against-

CITY OF NEW YORK; Lieutenant ANGEL LEON; Detective
KRISTEN SWINKUNAS (Shield # 2190); Police Officer
ANTONELLA JIMENEZ (Shield # 5209); Police Officer
MAXWELL BALTZER (Shield No. 15451); and Lieutenant
JOHN LANE,

                                        Defendants.

**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE
UNDER LOCAL CIVIL RULE 56.1(b)**

**HON. SYLVIA O. HINDS-RADIX**
Corporation Counsel of the City of New York
*Attorney for Defendants City of New York, Leon, Swinkunas,
Jimenez, Baltzer, and Lane*
100 Church Street
New York, New York 10007

Of Counsel: Christopher G. Arko
Tel:  (212) 356-5044

*Due and timely service is hereby admitted.*

*New York, N.Y.  ............................................, 2022*

*.........................................................Esq.*

*Attorney for ...........................................................*